No. 21-6992

---

In the

# United States Court of Appeals

## For the Fourth Circuit

———————————

UNITED STATES OF AMERICA,

*Appellee,*

v.

NATHANIEL POWELL, a/k/a Nate,

*Appellant.*

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 2:16-cr-97

———————————

## JOINT APPENDIX – VOLUME I (pages JA1–JA382)

———————————

Jacqueline R. Bechara
OFFICE OF THE UNITED STATES ATTORNEY
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
T: (703) 299-3819

John F. Butler
OFFICE OF THE UNITED STATES ATTORNEY
101 West Main Street, Suite 8000
Norfolk, VA 23510
T: (757) 441-6331

*Counsel for Appellee the United States of
America*

Erin B. Ashwell
Morgan V. Maloney
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-1002

*Counsel for Appellant Nathaniel Powell*

# TABLE OF CONTENTS

**Page**

**Volume I (pages JA1–JA382)**

E.D. Va. Docket Sheet (Case No. 2:16-cr-00097-AWA-LRL-2) .......................1

Dkt. 17:
    Indictment (July 20, 2016) ..........................................................................12

Dkt. 104:
    Plea Agreement (Oct. 20, 2016) .................................................................30

Dkt. 105:
    Statement of Facts (Oct. 20, 2016) ............................................................43

Dkt. 155:
    Position of the Defendant, Nathaniel Powell, with Respect
    to Sentencing Factors (Mar. 24, 2017) ......................................................46

Dkt. 156:
    Government Position with Respect to Sentencing
    (Mar. 24, 2017) ..........................................................................................53

Dkt. 167:
    Transcript of Mar. 31, 2017 Sentencing Hearing Held
    before Judge Arenda L. Wright Allen (pages 1-65) ..............................68

        R. Dyer – Direct Examination ..................................................75

        R. Dyer – Cross Examination ..................................................100

Dkt. 251:
    Transcript of Mar. 31, 2017 Sentencing Hearing Held
    before Judge Arenda L. Wright Allen (pages 66-94) .........................134

i

Dkt. 160:
    Judgment (Apr. 6, 2017) ........................................................164

Dkt. 168:
    Motion to Vacate, Set Aside, or Correct Sentence under 28
    U.S.C. § 2255 filed by Nathaniel Powell (Apr. 2, 2018) ......................170

Dkt. 169:
    Request for Leave to Supplement § 2255 Motion filed by
    Nathaniel Powell (May 11, 2018) ............................................194

Dkt. 170:
    Letter Regarding Supplement to § 2255 Motion filed by
    Nathaniel Powell (May 17, 2018) ............................................201

    Dkt. 170-1: Lease Agreement .................................................202

Dkt. 180:
    Order Granting Motion for Leave to Supplement § 2255
    Motion (Oct. 19, 2018) .......................................................204

Dkt. 185:
    Government Response in Opposition to § 2255 Motion
    (Jan. 7, 2019) ................................................................208

    Dkt. 185-1: Woodward Affidavit ............................................231

Dkt. 186:
    Reply to Government Response in Opposition to § 2255
    Motion filed by Nathaniel Powell (Jan. 22, 2019)...............................234

    Dkt. 186-1: Lease Agreement .................................................246

    Dkt. 186-2: Powell Affidavit..................................................248

Dkt. 190:

    Court § 2255 Evidentiary Hearing Order (Aug. 9, 2019) ...................251

Dkt. 197:

    Government Response as to Court § 2255 Evidentiary
    Hearing Order (Mar. 18, 2020) ...............................................................259

        Dkt. 197-1: Woodward Affidavit...........................................268

Dkt. 198:

    Reply to Government Response as to Court § 2255
    Evidentiary Hearing Order filed by Nathaniel Powell
    (Mar. 24, 2020) ........................................................................................270

Dkt. 201:

    Government Sur-Reply to § 2255 Motion (Apr. 14, 2020)..................283

Dkt. 231:

    Transcript of June 8, 2021 Evidentiary Hearing Held
    before Judge Arenda L. Wright Allen....................................................289

    L. Woodward – Direct Examination .....................................................302

    L. Woodward – Cross Examination ......................................................314

    L. Woodward – Redirect Examination .................................................324

    L. Woodward – Recross Examination ...................................................326

    N. Powell – Direct Examination ............................................................331

    N. Powell – Cross Examination .............................................................343

Dkt. 216:

    Joint Stipulation Regarding Evidentiary Hearing
    (June 10, 2021)..........................................................................................360

Dkt. 217:

    Order Denying § 2255 Motion (June 24, 2021) ....................................362

Dkt. 220:

    Notice of Appeal (June 28, 2021) .........................................................377

Dkt. 225:

    Amended Order Denying Motion for Certificate of
    Appealability (July 1, 2021) ....................................................................379

USCA Doc. 17:

    Order Granting Partial Certificate of Appealability
    (Oct. 5, 2023) ............................................................................................381

**SEALED Volume II (pages JA383–JA413)**

Dkt. 153:

    Presentence Investigation Report (Mar. 22, 2017)..............................383

Dkt. 161:

    Statement of Reasons (Apr. 6, 2017).....................................................409

iv

# U.S. District Court
## Eastern District of Virginia – (Norfolk)
## CRIMINAL DOCKET FOR CASE #: 2:16–cr–00097–AWA–LRL–2

Case title: USA v. Gordon et al

Related Case:  2:18–cv–00175–AWA
Magistrate judge case number:  2:16–mj–00268

Date Filed: 07/20/2016

Date Terminated: 04/06/2017

Assigned to: District Judge
Arenda L. Wright Allen
Referred to: Magistrate Judge
Lawrence R. Leonard

Appeals court case number:
21–6992 4CCA Case Manager E.
Borneisen

### Defendant (2)

**Nathaniel Powell**
*TERMINATED: 04/06/2017*
*also known as*
Nate
*TERMINATED: 04/06/2017*

represented by **Adam Michael Carroll**
Wolcott Rivers Gates P. C.
Convergence Center IV
200 Bendix Rd
Suite 300
Virginia Beach, VA 23452
757–497–6633
Fax: 757–497–7267
Email: acarroll@wolriv.com
*TERMINATED: 07/13/2021*
*Designation: CJA Appointment*

**Keith Loren Kimball**
Office of the Federal Public Defender
500 E. Main Street
Ste 500
Norfolk, VA 23502
757–457–0800
Fax: 757–457–0880
Email: keith_kimball@fd.org
*TERMINATED: 09/19/2016*
*Designation: Public Defender*

**Lawrence Hunter Woodward , Jr.**
Ruloff Swain Haddad Morecock Talbert &
Woodward, PC
317 30th Street
Virginia Beach, VA 23451
757–671–6047
Fax: 757–671–6004
Email: lwoodward@srgslaw.com
*TERMINATED: 08/12/2019*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Pending Counts**                    **Disposition**

# JA1

| | |
|---|---|
| T. 21 USC 846 – Conspiracy to Manufacture, Distribute and Possess with Intent to Distribute Heroin; T. 18 USC 924(d) by T. 28 USC 2461, and T. 21 USC 853 – Forfeiture Allegation (1) | THREE HUNDRED (300) MONTHS; SUPERVISED RELEASE: FOUR (4) YEARS; SPECIAL ASSESSMENT: $100.00 |
| T. 21 USC 841(a)(1) and (b)(1)(C) – Possession with Intent to Distribute Fentanyl (11) | DISMISSED ON MOTION OF THE GOVERNMENT AT SENTENCING |

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                           **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                                     **Disposition**

21 U.S.C.§§ 841(a)(1) & (b)(1)(B)– Conspiracy to Distribution Heroin; 21 U.S.C.§§ 841(a)(1) & (b)(1)(C) – Possession with Intent to Distribute Fentanyl

---

**Plaintiff**

**USA**                              represented by  **John F. Butler**
                                                    U.S. Attorney's Office (Norfolk)
                                                    101 W. Main Street
                                                    Suite 8000
                                                    Norfolk, VA 23510
                                                    (757) 441−6331
                                                    Fax: (757) 441−6689
                                                    Email: john.f.butler@usdoj.gov
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Designation: US Attorney*

                                                    **Joseph E. DePadilla**
                                                    United States Attorney's Office
                                                    101 W Main St
                                                    Suite 8000
                                                    Norfolk, VA 23510
                                                    **NA**
                                                    (757) 441−6331
                                                    Fax: (757) 441−6689
                                                    Email: joe.depadilla@usdoj.gov
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Designation: US Attorney*

                                                    **Andrew C. Bosse**
                                                    Jfb Legal

**JA2**

500 East Main Street
Suite 1400
Norfolk, VA 23510
757–916–5771
Email: abosse@bkbfirm.com
*TERMINATED: 12/01/2022*
*Designation: US Attorney*

**Kevin Patrick Hudson**
DOJ–USAO
11815 Fountain Way
Suite 200
Newport News, VA 23606
757–591–4033
Email: kevin.hudson@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/20/2016 | 1 | MOTION to Seal Case by USA as to Nathaniel Powell. (ldab, ) [2:16–mj–00268] (Entered: 06/21/2016) |
| 06/20/2016 | 2 | ORDER Granting 1 Motion to Seal Case as to Nathaniel Powell (1). It is further ORDERED that the criminal complaint, affidavit in support of the criminal complaint and arrest warrant are unsealed at time of the arrest of the defendant, at which time the criminal complaint and affidavit in support of the complaint may be treated as a public record. Signed by Magistrate Judge Douglas E. Miller and filed on 6/20/16. (ldab, ) [2:16–mj–00268] (Entered: 06/21/2016) |
| 06/20/2016 | 3 | CRIMINAL COMPLAINT as to Nathaniel Powell (1). (ldab, ) [2:16–mj–00268] (Entered: 06/21/2016) |
| 06/20/2016 | 5 | REDACTED AFFIDAVIT by USA as to Nathaniel Powell 3 Criminal Complaint (ldab, ) [2:16–mj–00268] (Entered: 06/21/2016) |
| 06/20/2016 | 6 | Arrest Warrant Issued & delivered to USM 6/20/16 directed by Magistrate Judge Douglas E. Miller in case as to Nathaniel Powell. (ldab, ) [2:16–mj–00268] (Entered: 06/21/2016) |
| 07/01/2016 | | Set Hearings as to Nathaniel Powell: Initial Appearance set for 7/1/2016 at 12:30 PM in Norfolk Mag Courtroom 2 before Magistrate Judge Lawrence R. Leonard. (cdod, ) [2:16–mj–00268] (Entered: 07/01/2016) |
| 07/01/2016 | | Keith Kimball, FPD attorney, appointed as to Nathaniel Powell. (tbro) [2:16–mj–00268] (Entered: 07/01/2016) |
| 07/01/2016 | | Case unsealed as to Nathaniel Powell (ldab, ) [2:16–mj–00268] (Entered: 07/05/2016) |
| 07/01/2016 | 8 | Arrest Warrant Returned Executed on 7/1/16 in case as to Nathaniel Powell. (ldab, ) [2:16–mj–00268] (Entered: 07/05/2016) |
| 07/01/2016 | 9 | Minute Entry for proceedings held before Magistrate Judge Lawrence R. Leonard:Initial Appearance as to Nathaniel Powell held on 7/1/2016, Set/Reset Deadlines/Hearings as to Nathaniel Powell:, advised of rights, charges and right to counsel, counsel desired. Court DIRECTED appointment of counsel. Government motion for detention GRANTED, TEMPORARY DETENTION ORDERED. Detention and Preliminary Hearing set for 7/7/2016 at 02:30 PM in Norfolk Mag Courtroom 2 Magistrate Judge Douglas E. Miller.<br><br>**Appearances**: AUSA Beth Yusi for the Government. Defendant present and remanded to custody of USM. (Court Reporter FTR.)(ldab, ) [2:16–mj–00268] (Entered: 07/05/2016) |
| 07/01/2016 | 10 | CJA 23 Financial Affidavit by Nathaniel Powell (ldab, ) [2:16–mj–00268] (Entered: 07/05/2016) |

**JA3**

| | | |
|---|---|---|
| 07/01/2016 | 11 | Temporary Detention Order as to Nathaniel Powell. Signed by Magistrate Judge Lawrence R. Leonard and filed on 7/1/16. Copies distributed to all parties 7/5/16. (ldab, ) [2:16−mj−00268] (Entered: 07/05/2016) |
| 07/07/2016 | 12 | Minute Entry for proceedings held before Magistrate Judge Douglas E. Miller:Detention and Preliminary Hearing as to Nathaniel Powell held on 7/7/2016; FTR. Argument, sworn testimony and introduction of exhibits. Court finds probable cause. Government motion for detention−−GRANTED. Defendant remanded/held for Grand Jury.<br><br>**Appearances**: AUSA Joseph DePadilla and Mallory Brennan for the Government; AFPD Keith Kimball for defendant, Defendant was present and in custody. (afor) [2:16−mj−00268] (Entered: 07/08/2016) |
| 07/13/2016 | 14 | ORDER OF DETENTION as to Nathaniel Powell. Signed by Magistrate Judge Douglas E. Miller on 7−13−16. (afar) [2:16−mj−00268] (Entered: 07/13/2016) |
| 07/20/2016 | 15 | MOTION to Seal Case by USA as to Detaun Gordon, Ernest Cross, Valerie Wilson, Marque Wilson, Nathaniel Powell. (bgra) (Entered: 07/20/2016) |
| 07/20/2016 | 16 | ORDER granting 15 Motion to Seal Case as to Detaun Gordon (1), Nathaniel Powell (2), Ernest Cross (3), Valerie Wilson (4), Marque Wilson (5).It is hereby ORDERED that the indictment and arrest warrant(s) are sealed.It is further ORDERED that: (1) a certified copy of the indictment shall be provided to those law enforcement officials involved in the prosecution of this case; and (2) a copy of the sealed arrest warrants shall be made available to agents of the Drug Enforcement Administration for execution of the same. It is further ORDERED that the indictment and arrest warrant(s) are unsealed at the time of the arrest of the defendant, at which time the indictment may be treated as a public record. Signed by Magistrate Judge Douglas E. Miller on 7/20/2016. (bgra) (Entered: 07/20/2016) |
| 07/20/2016 | 17 | SEALED CRIMINAL INDICTMENT FILED IN OPEN COURT ON 7/20/2016 as to Detaun Gordon (1) counts 1, 4−6, 9−10, 12, 13, 17, 18, 19−20, Nathaniel Powell (2) counts 1, 11, Ernest Cross (3) counts 1, 7−8, 9−10, 12, 13, Valerie Wilson (4) counts 1, 2, Marque Wilson (5) counts 1, 3, 14−16. On motion of the Government, the Court directed warrants to be issued as to Detaun Gordon, Ernest Cross, Valerie Wilson, Marque Wilson; Nathaniel Powell already in custody. (Attachments: # 1 Criminal Cover Sheet) (bgra) (Entered: 07/21/2016) |
| 08/08/2016 | | Case unsealed as to Detaun Gordon, Ernest Cross, Valerie Wilson, Marque Wilson, Nathaniel Powell (bgra) (Entered: 08/08/2016) |
| 08/16/2016 | | Set Hearings as to Nathaniel Powell: Initial Appearance and Arraignment Hearing set for 8/17/2016 at 02:00 PM in Norfolk Mag Courtroom 2 Magistrate Judge Robert J. Krask. (lwoo) (Entered: 08/16/2016) |
| 08/16/2016 | | Arrest of Nathaniel Powell on Superseding Indictment. (ecav, ) (Entered: 08/16/2016) |
| 08/17/2016 | 51 | Minute Entry for proceedings held before Magistrate Judge Robert J. Krask:Initial Appearance as to Nathaniel Powell held on 8/17/2016, Arraignment as to Nathaniel Powell (2) Count 1,11 held on 8/17/2016; FTR. Defendant waived formal arraignment, entered plea of not guilty, asked for trial by jury and wishes to be present for pretrial motions. Motions cutoff set for 9/19/16. Jury trial set before Judge Allen for 2/7/17 at 10:00 a.m. in Norfolk. Findings made on record re: waiver of speedy trial. Agreed discovery order entered and filed in open court. Defendant remanded.<br><br>**Appearances**: AUSA John Butler for the Government; AFPD Keith Kimball for defendant. Defendant was present and in custody. (afor) (Entered: 08/18/2016) |
| 08/17/2016 | 52 | Agreed Discovery Order as to Nathaniel Powell. Signed by Magistrate Judge Robert J. Krask on 8/17/16. (afor) (Entered: 08/18/2016) |
| 08/17/2016 | | Set/Reset Deadlines/Hearings as to Nathaniel Powell: Jury Trial set for 2/7/2017 at 10:00 AM in Norfolk Courtroom 3 before District Judge Arenda L. Wright Allen. (afor) (Entered: 08/18/2016) |
| 09/18/2016 | 76 | MOTION to Withdraw as Attorney *Motion to Withdraw as Counsel* by Keith Loren Kimball. by Nathaniel Powell. (Kimball, Keith) (Entered: 09/18/2016) |

**JA4**

| | | |
|---|---|---|
| 09/19/2016 | 77 | ORDER granting <u>76</u> Motion to Withdraw as Attorney filed by Keith Loren Kimball and the Office of the Federal Public Defender, counsel for Defendant Nathaniel Powell, for good cause shown. The Clerk is instructed to appoint alternative counsel to represent Mr. Powell. Signed by District Judge Arenda L. Wright Allen on 9/19/2016. (Allen, Arenda) (Entered: 09/19/2016) |
| 09/20/2016 | | CJA 20 as to Nathaniel Powell: Appointment of Attorney Lawrence Hunter Woodward, Jr. for Nathaniel Powell. (bgra) (Entered: 09/20/2016) |
| 10/07/2016 | 92 | ORDER as to Nathaniel Powell: This Court has been advised that the defendant wishes to enter a plea of guilty. A United States Magistrate Judge is hereby authorized, with the consent of the defendant, to conduct the proceedings required by Federal Rule of Criminal Procedure 11 incident to the making of the plea. See 28 U.S.C. §636 (b)(1); United States v. Dees, 125 F.3d 261 (5th Cir. 1997). The defendant may consent to the Magistrate Judge conducting the proceedings on a form provided by the Clerk. Copy of Order sent to counsel for the parties. Signed by District Judge Arenda L. Wright Allen on 10/7/2016. (bgra) (Entered: 10/07/2016) |
| 10/12/2016 | | Set/Reset Deadlines/Hearings as to Nathaniel Powell: Plea Agreement Hearing set for 10/20/2016 at 11:30 AM in Norfolk Mag Courtroom 1 before Magistrate Judge Lawrence R. Leonard. (afor) (Entered: 10/12/2016) |
| 10/20/2016 | 102 | Consent – Waiver of Right to Rule 11 before a US District Judge by Nathaniel Powell. (lhow) (Entered: 10/21/2016) |
| 10/20/2016 | 103 | Plea Agreement Hearing held before Magistrate Judge Lawrence R. Leonard as to Nathaniel Powell on 10/20/2016: John Butler present on behalf of the government; Lawrence Woodward present on behalf of the defendant; Defendant present and in custody; Defendant sworn; Court explained to the defendant that by pleading guilty he waived his right to appeal; Plea entered by Nathaniel Powell (2) Guilty: Count 1. Sentencing set for 2/17/2017 at 09:00 AM in Norfolk Courtroom 3 before District Judge Arenda L. Wright Allen. Defendant remanded to the custody of the USM. COURT HOURS: 11:30 a.m. – 12:01 p.m.(Court Reporter Paul McManus.)(lhow) (Entered: 10/21/2016) |
| 10/20/2016 | 104 | PLEA AGREEMENT as to Nathaniel Powell filed in open court. (lhow) (Entered: 10/21/2016) |
| 10/20/2016 | 105 | Statement of Facts as to Nathaniel Powell filed in open court.. (lhow) (Entered: 10/21/2016) |
| 10/20/2016 | 106 | Order Accepting Plea of Guilty as to Nathaniel Powell. Signed by Magistrate Judge Lawrence R. Leonard and filed on 10/20/16. (lhow) (Entered: 10/21/2016) |
| 10/20/2016 | 107 | Sentencing Procedures Order as to Nathaniel Powell. Signed by Magistrate Judge Lawrence R. Leonard and filed on 10/20/16. (lhow) (Entered: 10/21/2016) |
| 01/13/2017 | 122 | PRESENTENCE INVESTIGATION REPORT (Disclosed Presentence Investigation Report) (SEALED – government and defense counsel) *Addendum due: 2/8/17* as to Nathaniel Powell. Objections to PSI due 2/1/17. (hiemer, jill) (Entered: 01/13/2017) |
| 01/18/2017 | 127 | First MOTION to Continue *Sentencing* by USA as to Nathaniel Powell. (Butler, John) (Entered: 01/18/2017) |
| 01/19/2017 | 128 | ORDER granting <u>127</u> , the Government's unopposed "Motion to Continue Sentencing" as to Defendant Nathaniel Powell (02) as follows: in the interests of justice, the sentencing set for February 17, 2017 is continued. Counsel are directed to confer and contact the Courtroom Deputy to reschedule this sentencing. Signed by District Judge Arenda L. Wright Allen on 1/19/2017. (Allen, Arenda) (Entered: 01/19/2017) |
| 01/19/2017 | | Terminate Sentencing set for 2/17/17 as to Nathaniel Powell. (lhow) (Entered: 01/19/2017) |
| 01/19/2017 | | Reset Sentencing as to Nathaniel Powell for 3/31/2017 at 11:00 AM in Norfolk Courtroom 3 before District Judge Arenda L. Wright Allen. (lhow) (Entered: 01/19/2017) |
| 03/22/2017 | 153 | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED – government and defense counsel) as to Nathaniel Powell. |

**JA5**

| | | |
|---|---|---|
| | | (hiemer, jill) (Entered: 03/22/2017) |
| 03/24/2017 | 155 | Position on Sentencing by Nathaniel Powell (Woodward, Lawrence) (Entered: 03/24/2017) |
| 03/24/2017 | 156 | Position on Sentencing by USA as to Nathaniel Powell (Attachments: # 1 Exhibit Government Exhibit 1, # 2 Exhibit Government Exhibit 2)(Butler, John) (Entered: 03/24/2017) |
| 03/31/2017 | 158 | Sentencing held before District Judge Arenda L. Wright Allen on 3/31/2017 for Nathaniel Powell: John Butler present on behalf of the government; Lawrence Woodward present on behalf of the defendant; Defendant present and in custody; Defendant sworn; Arguments of counsel heard; Objections heard and rulings made; Evidence presented. (witness and exhibits listed on last page of minutes); Nathaniel Powell (2), Count 1, THREE HUNDRED (300) MONTHS; SUPERVISED RELEASE: FOUR (4) YEARS; SPECIAL ASSESSMENT: $100.00; Remaining count dismissed on motion of the government at sentencing. Defendant remanded to the custody of the USM. COURT HOURS: 11:00 a.m. – 1:10 p.m. (Court Reporter Heidi Jeffreys.)(lhow) (Entered: 04/04/2017) |
| 03/31/2017 | 159 | CONSENT ORDER OF FORFEITURE as to Nathaniel Powell. Signed by District Judge Arenda L. Wright Allen and filed on 3/31/17. (lhow) (Entered: 04/04/2017) |
| 04/06/2017 | 160 | JUDGMENT as to Nathaniel Powell (2), Count(s) 1, THREE HUNDRED (300) MONTHS; SUPERVISED RELEASE: FOUR (4) YEARS; SPECIAL ASSESSMENT: $100.00; Count(s) 11, DISMISSED ON MOTION OF THE GOVERNMENT AT SENTENCING. Deft is remanded to the custody the US Marshal. Signed by District Judge Arenda L. Wright Allen on 4/6/2017. (bgra) (Entered: 04/06/2017) |
| 04/06/2017 | 161 | Sealed Statement of Reasons as to Nathaniel Powell. Signed by District Judge Arenda L. Wright Allen on 3/6/2017. (bgra) (Entered: 04/06/2017) |
| 07/18/2017 | 164 | Exhibits Returned to US Attorney as to Nathaniel Powell. (bgra) (Entered: 07/20/2017) |
| 08/11/2017 | 166 | NOTICE of Publication and Finality of Consent Order of Forfeiture by Nathaniel Powell re 159 Consent Order for Forfeiture of Property (Attachments: # 1 Exhibit Declaration of Publication)(Hudson, Kevin) (Entered: 08/11/2017) |
| 02/15/2018 | 167 | TRANSCRIPT of Proceedings (Excerpt from sentencing hearing, pgs. 1−65 only) held on 03/31/2017, before Judge Arenda L. Wright Allen. Court reporter/transcriber Heidi Jeffreys, Telephone number 757−222−7075. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br>** Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 3/19/2018. Redacted Transcript Deadline set for 4/17/2018. Release of Transcript Restriction set for 5/16/2018.(jeffreys, heidi) (Entered: 02/15/2018) |
| 04/02/2018 | 168 | MOTION to Vacate under 28 U.S.C. 2255 by Nathaniel Powell. (Attachments: # 1 Envelope)(jrin, ) Civil case 2:18−cv−00175 opened. (Entered: 04/03/2018) |
| 05/11/2018 | 169 | PETITIONER'S REQUEST for Leave to Supplement 2255 Motion Pursuant to Fed.R.Civ.P Rule 15(a) by Nathaniel Powell. (Attachments: # 1 Envelope) (bpet) (Entered: 05/11/2018) |
| 05/17/2018 | 170 | Letter re 169 Supplement to 2255 Motion by Nathaniel Powell. (Attachments: # 1 Exhibit 1 – Lease agreement, # 2 Letter to USAO, # 3 Envelope) (bpet) (Entered: 05/17/2018) |
| 06/08/2018 | 171 | Letter received from Nathaniel Powell. (bpet) (Entered: 06/08/2018) |

| 06/08/2018 | 172 | Letter sent to Nathaniel Powell. (bpet) (Entered: 06/08/2018) |
|---|---|---|
| 08/01/2018 | 174 | MOTION for Transcript by Nathaniel Powell. (Attachments: # 1 Exhibit, # 2 Envelope)(jrin) (Entered: 08/01/2018) |
| 08/13/2018 | 175 | REQUEST FOR RETURN OF PERSONAL PROPERTY TO FED. RULE OF CRIM. PROCEDURE 41(g) by Nathaniel Powell. (Attachments: # 1 Affidavit, # 2 Envelope) (bpet, ) (Entered: 08/13/2018) |
| 08/23/2018 | 176 | MOTION for Extension of Time to File Response/Reply as to 175 MOTION for Return of Property/PostTrial by USA as to Nathaniel Powell. (Attachments: # 1 Proposed Order)(Hudson, Kevin) (Entered: 08/23/2018) |
| 08/28/2018 | 177 | ORDER granting 176 , the Government's Motion for Extension of Time to File Response/Reply as to the motion for return of property filed by Nathaniel Powell (2), as follows: the Government represents that it is investigating the status of the property at issue, and shall have until September 18, 2018 to file a formal Response to the motion. The Clerk of the Court is requested to please post this Order by US Mail to Defendant Mr. Powell. Signed by District Judge Arenda L. Wright Allen on 8/28/2018. (Allen, Arenda) (Entered: 08/28/2018) |
| 09/06/2018 | 178 | Letter received from Nathaniel Powell. (bpet, ) (Entered: 09/10/2018) |
| 09/17/2018 | 179 | RESPONSE to Motion by USA as to Nathaniel Powell re 175 MOTION for Return of Property/PostTrial (Hudson, Kevin) (Entered: 09/17/2018) |
| 10/19/2018 | 180 | ORDER granting 169 Motion for Leave to Supplement 2255 Motion; denying 174 Motion for Transcript; and denying 175 Motion for Return of Personal Property, all as to Nathaniel Powell (2). The Government is ORDERED to respond to Petitioner's 168 Motion to Vacate by 12/24/18; any reply to the response shall be filed by 1/25/19. Signed by District Judge Arenda L. Wright Allen on 10/19/18. Copy of order and IFP application mailed to Petitioner. (bpet, ) (Entered: 10/19/2018) |
| 11/14/2018 | 181 | MOTION to Compel *Disclosure of Information from Former Defense Counsel* by USA as to Nathaniel Powell. (Butler, John) (Entered: 11/14/2018) |
| 11/15/2018 | 182 | ORDER granting 181 Motion to Compel as to Nathaniel Powell (2). The Govt is ORDERED to respond to the Petition within 30 days of receipt of the response from Petitioner's former defense counsel. The prior deadline of 12/24/18 is STRICKEN. Signed by District Judge Arenda L. Wright Allen on 11/15/18. Copies distributed as directed. (bpet, ) (Entered: 11/15/2018) |
| 12/19/2018 | 183 | ORDER. Petitioner's 1/25/19 deadline to file a reply is STRICKEN. If Petitioner opts to reply to the Government's response to his Motion to Vacate, he may do so within 30 days of receipt of same. Signed by District Judge Arenda L. Wright Allen on 12/19/18. Copies distributed as directed. (bpet, ) (Entered: 12/19/2018) |
| 01/02/2019 | 184 | MOTION to Clarify by Nathaniel Powell. (Attachments: # 1 Exhibit, # 2 Envelope) (bpet, ) (Entered: 01/02/2019) |
| 01/07/2019 | 185 | RESPONSE in Opposition by USA as to Nathaniel Powell re 168 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Exhibit Mr. Woodward Affidavit)(Butler, John) (Entered: 01/07/2019) |
| 01/22/2019 | 186 | REPLY TO RESPONSE by Nathaniel Powell re 185 Response in Opposition to 168 Motion to Vacate [two copies rec'd]. (Attachments: # 1 Lease agreement, # 2 Affidavit, # 3 Envelope) (bpet, ) (Entered: 01/22/2019) |
| 08/09/2019 | 190 | EVIDENTIARY HEARING ORDER as to Nathaniel Powell (2). Defendant's 184 Motion to Clarify is DISMISSED as moot. The Court DENIES four of Defendant's claims of ineffective assistance of counsel and ORDERS an evidentiary hearing to address the remains two claims. The Court ORDERS the Clerk to appoint counsel for Defendant; within 1 week of such appointment, the parties are ORDERED to contact the Courtroom Deputy to schedule a hearing. Signed by District Judge Arenda L. Wright Allen on 8/9/19. Copies distributed as directed. (bpet, ) (Entered: 08/12/2019) |
| 08/12/2019 |  | CJA 20 Appointment of Attorney Adam Michael Carroll for Nathaniel Powell. (bpet, ) (Entered: 08/12/2019) |

| | | |
|---|---|---|
| 08/15/2019 | | Evidentiary Hearing as to Nathaniel Powell set for 12/3/2019 at 09:00 AM in Norfolk Courtroom 3 before District Judge Arenda L. Wright Allen. (lhow) (Entered: 08/15/2019) |
| 11/14/2019 | 195 | Joint MOTION to Continue *Evidentiary Hearing* by Nathaniel Powell. (Attachments: # 1 Proposed Order)(Carroll, Adam) (Entered: 11/14/2019) |
| 11/15/2019 | 196 | ORDER granting 195 , a Joint Motion to Continue Evidentiary Hearing as to Nathaniel Powell (2), as follows: for good cause shown, the hearing date of December 3, 2019 is stricken. Counsel are directed to confer and contact the Courtroom Deputy by November 29, 2019 to set a new hearing date. Signed by District Judge Arenda L. Wright Allen on 11/15/2019. (Allen, Arenda) (Entered: 11/15/2019) |
| 11/15/2019 | | Terminate Hearing as to Nathaniel Powell: 12/3/19 Evidentiary Hearing to be reset. (bpet, ) (Entered: 11/15/2019) |
| 11/20/2019 | | Reset Evidentiary Hearing as to Nathaniel Powell for 4/1/2020 at 09:00 AM in Norfolk Courtroom 3 before District Judge Arenda L. Wright Allen. (lhow) (Entered: 11/20/2019) |
| 03/17/2020 | | Terminate evidentiary hearing set for 4/1/2020 as to Nathaniel Powell; matter to be reset. (lhow) (Entered: 03/17/2020) |
| 03/18/2020 | 197 | RESPONSE by USA as to Nathaniel Powell re 190 Order on Motion for Miscellaneous Relief,, (Attachments: # 1 Affidavit)(Butler, John) (Entered: 03/18/2020) |
| 03/24/2020 | 198 | Reply by Nathaniel Powell re 197 Response (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Carroll, Adam) (Entered: 03/24/2020) |
| 03/27/2020 | 199 | MOTION for Leave to File *Sur–Reply* by USA as to Nathaniel Powell. (Attachments: # 1 Sur–Reply, # 2 Proposed Order)(Butler, John) (Entered: 03/27/2020) |
| 04/02/2020 | 200 | ORDER granting 199 , the Government's unopposed Motion for Leave to File Sur–Reply as follows: Petitioner raised a new legal argument in his Reply in support of the pending Motion to Vacate, and the Government is granted leave to do so. The Government's Sur–Reply must be filed no later than April 30, 2020. Signed by District Judge Arenda L. Wright Allen on 4/2/2020. (Allen, Arenda) (Entered: 04/02/2020) |
| 04/14/2020 | 201 | Sur–Reply by USA as to Nathaniel Powell re 198 Reply (Butler, John) (Entered: 04/14/2020) |
| 10/26/2020 | | Reset Evidentiary Hearing as to Nathaniel Powell for 2/5/2021 at 10:00 AM in Norfolk Courtroom 3 before District Judge Arenda L. Wright Allen. (lhow) (Entered: 10/26/2020) |
| 12/07/2020 | 202 | MOTION for Compassionate Release by Nathaniel Powell. (Attachments: # 1 Envelope) (bpet, ) (Entered: 12/07/2020) |
| 12/07/2020 | 203 | ORDER as to Nathaniel Powell re 202 MOTION for Compassionate Release. FPD is appointed and directed, if warranted, to submit a supplemental motion within 30 days; see Order for details. Signed by District Judge Arenda L. Wright Allen on 12/7/20. Copy mailed to defendant. (bpet, ) (Entered: 12/07/2020) |
| 12/08/2020 | 204 | Compassionate Release Presentence Investigation Report (Initial Compassionate Release Presentence Investigation Report) (SEALED – government and defense counsel) as to Nathaniel Powell. (schoener, lauren) (Entered: 12/08/2020) |
| 12/15/2020 | 205 | MOTION to Withdraw as Attorney *Motion to Withdraw as Counsel* by Keith Loren Kimball. by Nathaniel Powell. (Attachments: # 1 Proposed Order)(Kimball, Keith) (Entered: 12/15/2020) |
| 12/18/2020 | 206 | ORDER granting 205 , a Motion to Withdraw as Attorney for Defendant Nathaniel Powell (2) as follows: the Federal Public Defender is unable to represent Defendant in his Motion for Compassionate Release due to a conflict of interest. Accordingly, the Clerk's Office is requested to appoint an attorney serving on the Criminal Justice Act Panel for the Eastern District of Virginia to represent Defendant in his Motion for Compassionate Release. The briefing schedule established previously remains in place. Keith Loren Kimball is withdrawn from representing Nathaniel Powell. Signed by |

**JA8**

| | | District Judge Arenda L. Wright Allen on 12/18/2020. (Allen, Arenda) (Entered: 12/18/2020) |
|---|---|---|
| 12/21/2020 | | CJA 20 Appointment of Attorney Adam Michael Carroll for Nathaniel Powell as to defendant's 202 Motion for Compassionate Release. (bpet, ) (Entered: 12/21/2020) |
| 01/04/2021 | 207 | Memorandum by Nathaniel Powell re 202 MOTION for Compassionate Release (Attachments: # 1 Exhibit (Slip Sheet – Medical Records Filed Under Seal), # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit)(Carroll, Adam) (Entered: 01/04/2021) |
| 01/04/2021 | 208 | Unredacted Memorandum in Support re 202 MOTION for Compassionate Release filed by Nathaniel Powell. (Attachments: # 1 Exhibit 1 (Sealed) Medical records, # 2 Exhibit 4 (unredacted)) (bpet, ) (Entered: 01/04/2021) |
| 01/06/2021 | 209 | RESPONSE in Opposition by USA as to Nathaniel Powell re 202 MOTION for Compassionate Release (Butler, John) (Entered: 01/06/2021) |
| 01/27/2021 | | Reset Evidentiary Hearing as to Nathaniel Powell for 4/22/2021 at 09:00 AM before District Judge Arenda L. Wright Allen. (lhow) (Entered: 01/27/2021) |
| 02/02/2021 | 210 | Compassionate Release Recommendation as to Nathaniel Powell (frere, laurie) (Entered: 02/02/2021) |
| 03/30/2021 | 212 | ORDER as to Nathaniel Powell (2). Defendant's 202 Motion for Compassionate Release is DENIED, and his 173 Motion to Compel is also DENIED. Signed by District Judge Arenda L. Wright Allen on 3/29/21. Copies distributed as directed. (bpet, ) (Entered: 03/30/2021) |
| 04/12/2021 | 213 | Second MOTION to Continue *Evidentiary Hearing* by Nathaniel Powell. (Attachments: # 1 Proposed Order)(Carroll, Adam) (Entered: 04/12/2021) |
| 04/13/2021 | 214 | ORDER granting 213 Petitioner Nathaniel Powell's (2) Second Unopposed Motion to Continue Evidentiary Hearing as follows: Mr. Powell's witness is unavailable on April 22, 2021. The Government does not oppose a second continuance. For good cause shown, Mr. Powells evidentiary hearing must be reset due to the unavailability of a necessary and material witness. The Parties are DIRECTED to contact the Courtroom Deputy to reschedule the evidentiary hearing within 7 days of this Order. Signed by District Judge Arenda L. Wright Allen on April 13, 2021. (Allen, Arenda) (Entered: 04/13/2021) |
| 04/13/2021 | | Reset Evidentiary Hearing as to Nathaniel Powell for 6/8/2021 at 09:00 AM in Norfolk Courtroom 3 before District Judge Arenda L. Wright Allen. (lhow) (Entered: 04/13/2021) |
| 06/08/2021 | 215 | Evidentiary Hearing as to Nathaniel Powell held on 6/8/2021 before District Judge Arenda L. Wright Allen: John Butler present on behalf of the government. Adam Carroll present on behalf of the defendant. Defendant present and in custody. Oral Motion to Continue by the Defendant. Argument of Counsel heard on oral motion; motion denied. Evidence presented. (witnesses sworn; witness list and exhibit list on page 2) Closing Arguments of Counsel. Court directed the parties to file stipulations within seven days. Court to take the matter under advisement and issue an order. Defendant remanded. Court adjourned. COURT HOURS: 9:00 AM – 10:40 AM (Court Reporter Heidi Jeffreys.)(lhow) (Entered: 06/08/2021) |
| 06/10/2021 | 216 | NOTICE *of filing Stipulation* by Nathaniel Powell re 215 Evidentiary Hearing,, (Carroll, Adam) (Entered: 06/10/2021) |
| 06/24/2021 | 217 | ORDER denying 168 Motion to Vacate (2255) as to Nathaniel Powell (2). Signed by District Judge Arenda L. Wright Allen on 6/24/2021. (copy distributed as directed 6/24/21) (afar)<br>Civil Case 2:18−cv−00175−AWA closed. (Entered: 06/24/2021) |
| 06/24/2021 | 218 | JUDGMENT entered and signed by Clerk on 6/24/2021. (afar) (Entered: 06/24/2021) |
| 06/28/2021 | 219 | MOTION for Certificate of Appealability by Nathaniel Powell. (Carroll, Adam) (Entered: 06/28/2021) |

**JA9**

| | | |
|---|---|---|
| 06/28/2021 | 220 | NOTICE OF APPEAL by Nathaniel Powell as to 217 Order on Motion to Vacate (2255) (Carroll, Adam) (Entered: 06/28/2021) |
| 06/28/2021 | 221 | First MOTION to Withdraw as Attorney *for Nathaniel Powell* by Adam M. Carroll. by Nathaniel Powell. (Carroll, Adam) (Entered: 06/28/2021) |
| 06/28/2021 | 222 | Transmission of Notice of Appeal to 4CCA as to Nathaniel Powell to US Court of Appeals re 220 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov). (Attachments: # 1 Notice of Appeal) (bpet, ) (Entered: 06/28/2021) |
| 06/30/2021 | 223 | USCA Case Number 21-6992. 4CCA Case Manager E. Borneisen for 220 Notice of Appeal filed by Nathaniel Powell. (bpet, ) (Entered: 06/30/2021) |
| 06/30/2021 | 224 | ORDER of USCA remanding case for limited purpose as to Nathaniel Powell re 220 Notice of Appeal. [21-6992] (bpet, ) (Entered: 06/30/2021) |
| 07/01/2021 | 225 | AMENDED ORDER denying 219 Motion for Certificate of Appealability as to Nathaniel Powell (2). Signed by District Judge Arenda L. Wright Allen on 7/1/21. Copies distributed as directed. (bpet, ) (Entered: 07/01/2021) |
| 07/01/2021 | | Assembled INITIAL Electronic Record Transmitted to 4CCA as to Nathaniel Powell. [21-6992] (bpet, ) Modified on 7/1/2021 (bpet, ) (Entered: 07/01/2021) |
| 07/13/2021 | 226 | ORDER granting 221 Motion to Withdraw as Attorney. Adam Michael Carroll withdrawn from case as to Nathaniel Powell (2). Signed by District Judge Arenda L. Wright Allen on 7/12/21. (jhie, ) (Entered: 07/13/2021) |
| 02/24/2022 | 229 | Letter Requesting Transcript from Nathaniel Powell (Attachments: # 1 Envelope)(jhie, ) (Entered: 02/24/2022) |
| 03/01/2022 | 230 | ORDER as to Nathaniel Powell (2). Petitioner's pro se 229 Letter for Transcript is construed as a Motion for Transcript at the Government's Expense and is GRANTED. Signed by District Judge Arenda L. Wright Allen on 3/1/22. Copies distributed as directed. (jhie, ) (Entered: 03/01/2022) |
| 03/18/2022 | 231 | TRANSCRIPT of Proceedings (Evidentiary Hearing) held on 06/08/2021, before Judge Arenda L. Wright Allen. Court reporter/transcriber Heidi Jeffreys, Telephone number 757-222-7075. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 4/18/2022. Redacted Transcript Deadline set for 5/18/2022. Release of Transcript Restriction set for 6/16/2022.(jeffreys, heidi) (Entered: 03/18/2022)** |
| 03/22/2022 | 232 | ORDER. The Court Reporter is DIRECTED to file the transcript referenced in ECF 230 on the docket. The Clerk is REQUESTED to forward a copy of the transcript with this Order to the Petitioner and the Assistant United States Attorney. Signed by District Judge Arenda L. Wright Allen on 3/22/22. Copy of order emailed to Court Reporter. (jhie, ) (Entered: 03/22/2022) |
| 04/06/2022 | | Assembled SUPPLEMENTAL Electronic Record Transmitted to 4CCA as to Nathaniel Powell. [21-6992] (jhie, ) (Entered: 04/06/2022) |
| 11/14/2022 | 233 | Motion for Reduction in Sentence Pursuant to 3582(c)(1)(A) by Nathaniel Powell. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Envelope)(jhie, ) (Entered: 11/14/2022) |
| 12/19/2022 | 234 | Letter from Nathaniel Powell (jhie, ) (Entered: 12/20/2022) |
| 12/20/2022 | 235 | Letter from Clerk to Nathaniel Powell (jhie, ) (Entered: 12/20/2022) |
| 12/27/2022 | 236 | Sealed Submission by Nathaniel Powell. (jhie, ) (Entered: 12/28/2022) |

## JA10

| 10/05/2023 | <u>249</u> | ORDER of USCA appointing Erin B. Ashwell as counsel for Nathaniel Powell re <u>220</u> Notice of Appeal. [21–6992] (jhie, ) (Entered: 10/05/2023) |
| 11/21/2023 | <u>250</u> | Transcript Order Acknowledgment from USCA re <u>220</u> Notice of Appeal: Court Reporter/Transcriber Heidi Jeffreys; 3/31/2017 sentencing; deadline 1/29/2024. [21–6992] (jhie, ) (Entered: 11/27/2023) |
| 11/30/2023 | <u>251</u> | TRANSCRIPT of Excerpt of proceedings (Pages 66–94 of Sentencing) as to Nathaniel Powell for dates of 3–31–2017 before Judge Arenda L. Wright Allen, re <u>220</u> Notice of Appeal Court Reporter/Transcriber Heidi Jeffreys, Telephone number 757–222–7075. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at <u>www.vaed.uscourts.gov.</u>** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 1/2/2024. Redacted Transcript Deadline set for 1/30/2024. Release of Transcript Restriction set for 2/28/2024.(stewart, jody) (Entered: 11/30/2023)** |

SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

FILED
IN OPEN COURT

JUL 20 2016

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | UNDER SEAL |
| | ) | |
| v. | ) | CRIMINAL NO. 2:16cr |
| | ) | |
| DETAUN GORDON, | ) | 21 U.S.C. § 846 |
| a/k/a "Ock" | ) | Conspiracy to Manufacture, Distribute and |
| (Counts 1, 4-6, 9-10, 12-13, 17-20) | ) | Possess with Intent to Distribute Heroin |
| | ) | (Count 1) |
| | ) | |
| NATHANIEL POWELL, | ) | 21 U.S.C §§ 841(a)(1) and (b)(1)(C) |
| a/k/a "Nate" | ) | Distribution of a Controlled Substance |
| (Counts 1, 11) | ) | (Counts 2-10) |
| | ) | |
| | ) | 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) |
| | ) | Possession with Intent to Distribute Fentanyl |
| ERNEST CROSS, | ) | (Counts 11, 13, 15) |
| a/k/a "Pooh" | ) | |
| (Counts 1, 7-10, 12-13) | ) | |
| | ) | 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) |
| | ) | Possession with Intent to Distribute Heroin |
| VALERIE WILSON | ) | (Counts 12, 14) |
| a/k/a "Mary" | ) | |
| (Counts 1, 2) | ) | 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) |
| | ) | Possession with Intent to Distribute |
| | ) | Crack Cocaine |
| MARQUE WILSON | ) | (Count 16) |
| a/k/a "Quis" | ) | |
| (Counts 1, 3, 14-16) | ) | 18 U.S.C. § 924(c)(1)(A) |
| | ) | Possession of Firearms in Furtherance of a |
| | ) | Drug Trafficking Crime |
| Defendants. | ) | (Count 17) |
| | ) | |
| | ) | 18 U.S.C. §§ 922(g)(1) and 924(a)(2) |
| | ) | Felon in Possession of a Firearm |
| | ) | (Count 18) |
| | ) | |
| | ) | 21 U.S.C. § 856(a)(1) and (b) |
| | ) | Maintaining a Drug-Involved Premises |
| | ) | (Counts 19-20) |
| | ) | |
| | ) | 18 U.S.C. § 924(d), 21 U.S.C. § 853, |
| | ) | 28 U.S.C. § 2461 |
| | ) | Asset Forfeiture |

INDICTMENT

July 2016 TERM – at Norfolk

**JA12**

THE GRAND JURY CHARGES THAT:

## COUNT ONE

From in or about March 2012 and continuing until in or about July 2016, within the Eastern District of Virginia and elsewhere, the defendants, DETAUN GORDON, a/k/a "Ock," (hereinafter referred to as "DETAUN GORDON"), NATHANIEL POWELL, a/k/a "Nate," (hereinafter referred to as "NATHANIEL POWELL"), ERNEST CROSS, a/k/a "Pooh," (hereinafter referred to as "ERNEST CROSS), VALERIE WILSON, a/k/a "Mary," and MARQUE WILSON, a/k/a "Quis," did unlawfully and knowingly combine, conspire, confederate, and agree with each other and with other persons, both known and unknown to the grand jury, to commit one or more of the following offenses:

To unlawfully, knowingly and intentionally manufacture, distribute, and possess with intent to distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, all in violation of Title 21, United States Code, Section 841(a)(1). The quantity of controlled substances involved in the conspiracy is:

a) With respect to defendant DETAUN GORDON, the amount involved in the conspiracy attributable to DETAUN GORDON, as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to DETAUN GORDON, is one kilogram or more of a mixture and substance containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A);

b) With respect to defendants NATHANIEL POWELL and ERNEST CROSS, the amount involved in the conspiracy attributable to NATHANIEL POWELL and ERNEST CROSS as a result of their own conduct, and the conduct of other conspirators reasonably foreseeable to NATHANIEL POWELL and ERNEST CROSS, is one hundred (100) grams or more of a mixture and substance containing a detectable amount of heroin in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B); and

c) With respect to defendants VALERIE WILSON and MARQUE WILSON, the amount involved in the conspiracy attributable to MARQUE WILSON and VALERIE WILSON as a result of their own conduct, and the conduct of other conspirators reasonably foreseeable to VALERIE WILSON and MARQUE WILSON, is an amount of a mixture and substance containing a detectable amount of heroin in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C).

## Ways, Manner, and Means of the Conspiracy

1.      It was part of the conspiracy for DETAUN GORDON and NATHANIEL POWELL to purchase wholesale narcotics both within and outside the Hampton Roads area for resale within the Hampton Roads area.

2.      It was part of the conspiracy for DETAUN GORDON and NATHANIEL POWELL to exchange heroin with, purchase heroin from, and sell heroin to one another.

3.      It was part of the conspiracy for MARQUE WILSON to buy heroin from NATHANIEL POWELL for resale.

4.      It was part of the conspiracy for VALERIE WILSON to buy heroin from MARQUE WILSON and NATHANIEL POWELL for resale.

5.      It was part of the conspiracy for ERNEST CROSS to package heroin for DETAUN GORDON for retail distribution and to sell heroin in the Hampton Roads region.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish the objectives thereof, the following overt acts, including the acts described in Counts 2-20, which are incorporated here as additional overt acts, among others, were committed in the Eastern District of Virginia and elsewhere:

1.      From in or about March 2012 to in or about May 2012, in Portsmouth, Virginia, in the Eastern District of Virginia, ERNEST CROSS sold in excess of 100 grams of heroin for an amount of United States currency.

3

**JA14**

2.      From in or about December 2013 to in or about June 2014, in Portsmouth, Virginia, DETAUN GORDON sold in excess of 1,000 grams of heroin for an amount of United States currency.

3.      On or about October 16, 2015, in or near Portsmouth, Virginia, VALERIE WILSON sold approximately six grams of heroin for an amount of United States currency.

4.      On or about October 21, 2015, in Portsmouth, Virginia, MARQUE WILSON sold approximately two grams of heroin for an amount of United States currency.

5.      On or about October 21, 2015, in Portsmouth, Virginia, MARQUE WILSON was arrested and had in his possession ten grams of heroin for the purpose of resale.

6.      On or about December 16, 2015, in Portsmouth, Virginia, DETAUN GORDON sold approximately two grams of heroin for an amount of United States currency.

7.      On or about December 18, 2015, in Portsmouth, Virginia, DETAUN GORDON sold approximately one gram of heroin for an amount of United States currency.

8.      On or about December 22, 2015, in Chesapeake, Virginia, in the Eastern District of Virginia, DETAUN GORDON maintained at his home on Battery Park Road an amount of heroin, one (1) oxycodone pill, two long guns, and an assortment of drug paraphernalia, including, syringes, crack "stems," capsules, straws, a plastic bag with suspected marijuana residue, a cutting agent, a sifter, 17 unused glass pipes, multiple glassine baggies, and multiple scales, including a scale with heroin residue.

9.      On or about January 7, 2016, in Portsmouth, Virginia, DETAUN GORDON sold approximately one half (.5) gram of heroin for an amount of United States currency.

10.     On or about February 17, 2016, in Chesapeake, Virginia, DETAUN GORDON sold approximately one gram of heroin for an amount of United States currency.

11.     From in or about February 2016 to in or about June 2016, DETAUN GORDON purchased heroin from a Baltimore, Maryland-area supplier on multiple occasions.   Initially,

4

**JA15**

DETAUN GORDON purchased heroin in ten gram increments.   Subsequently, he increased the amount he purchased on each occasion, up to 150 grams in a single purchase.   During this time period, DETAUN GORDON purchased approximately 1,000 grams of heroin in total.   The wholesale amounts of heroin DETAUN GORDON purchased in Baltimore were then transported to Hampton Roads and resold for a profit.

12.     From in or about February 2016 to in or about April 2016, DETAUN GORDON made a series of heroin sales collectively in excess of 500 grams.   During this same period DETAUN GORDON possessed an AK-47-style rifle as well as a Taurus handgun.

13.     From in or about February 2016 to in or about June 2016, DETAUN GORDON manufactured heroin for resale in Hampton Roads by using a hydraulic press to combine the heroin he received from his Baltimore supplier with a cutting agent and morphine.

14.     From in or about March 2016 to in or about June 2016, ERNEST CROSS regularly encapsulated heroin, provided by DETAUN GORDON, for resale in the Hampton Roads region.

15.     From on or about March 26, 2016, to in or about June 2016, NATHANIEL POWELL and DETAUN GORDON sold various amounts of heroin and other controlled substances to one another.

16.     From in or about March 2016 to in or about June 2016, DETAUN GORDON purchased heroin from an unidentified associate of NATHANIEL POWELL.   During this time period, DETAUN GORDON obtained approximately 12 ounces of heroin from the associate of NATHANIEL POWELL.

17.     Between on or about March 26, 2016, and May 26, 2016, NATHANIEL POWELL purchased heroin from DETAUN GORDON that DETAUN GORDON had previously purchased in Baltimore and transported back to Hampton Roads.   NATHANIEL POWELL purchased the heroin from DETAUN GORDON for $2,300 per ounce and resold the heroin in Hampton Roads at $2,800 per ounce.

**JA16**

18.     Between in or about March 2016, and in or about June 2016, NATHANIEL
POWELL traveled to Baltimore, Maryland approximately ten times to make wholesale purchases
of heroin.   After each purchase, he brought the heroin back to Hampton Roads, where he resold it.

19.     On or about May 26, 2016, NATHANIEL POWELL, after leading police officers
on a high-speed chase through residential areas of Portsmouth, was found in possession of seven
grams of fentanyl.

20.     On or about May 27, 2016, NATHANIEL POWELL, during the car chase,
disposed of a firearm in his possession.

21.     On or about June 1, 2016, in Portsmouth, Virginia, in the Eastern District of
Virginia, ERNEST CROSS sold approximately seven-tenths (.7) of a gram of heroin and
three-tenths (.3) of a gram of crack cocaine for an amount of United States currency.

22.     On or about June 2, 2016, in Moyock, North Carolina, VALERIE WILSON sold
approximately five grams of heroin for an amount of United States currency.

23.     On or about June 8, 2016, DETAUN GORDON drove ERNEST CROSS to a
residence on Carol Lane, in Portsmouth, Virginia, for the purpose of facilitating a sale of heroin for
an amount of United States currency.

24.     On or about June 8, 2016, in Portsmouth, Virginia, DETAUN GORDON possessed
a firearm, approximately $5,000 in cash, an amount of fentanyl, and in excess of one ounce of
heroin.

25.     On or about June 8, 2016, in Portsmouth, Virginia, DETAUN GORDON possessed
in excess of $42,000 in United States currency, a hydraulic press machine, cutting agents, digital
scales, and an amount of heroin.

26.     On or about June 10, 2016, in the Eastern District of Virginia, MARQUE WILSON
led police on a vehicle pursuit while in possession of approximately two grams of heroin and an
amount of cocaine.

27.     In or about June 2016, NATHANIEL POWELL, through messages posted and exchanged on a social media account, threatened an individual who NATHANIEL POWELL believed was a police informant.

28.     On or about June 15, 2016, in Portsmouth, Virginia, MARQUE WILSON possessed approximately eight grams of crack cocaine and approximately six grams of fentanyl.

(All in violation of Title 21, United States Code, Section 846.)

## COUNT 2

On or about October 16, 2015, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, VALERIE WILSON, did unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C)).

## COUNT 3

On or about October 21, 2015, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, MARQUE WILSON, did unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C)).

## COUNT 4

On or about December 18, 2015, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, DETAUN GORDON, did unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C)).

## COUNT 5

On or about January 7, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, DETAUN GORDON, did unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C)).

**JA19**

## COUNT 6

On or about February 17, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, DETAUN GORDON, did unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C)).

## COUNT 7

On or about June 1, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, ERNEST CROSS, did unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of cocaine base, also known as "crack cocaine," a Schedule II controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C)).

## COUNT 8

On or about June 1, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, ERNEST CROSS, did unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C)).

## COUNT 9

On or about June 8, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, DETAUN GORDON and ERNEST CROSS, did unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and Title 18, United States Code, Section 2.)

**JA21**

## COUNT 10

On or about June 8, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, DETAUN GORDON and ERNEST CROSS, did unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and Title 18, United States Code, Section 2.)

## COUNT 11

On or about May 26, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, NATHANIEL POWELL, did unlawfully, knowingly, and intentionally possess with intent to distribute a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C))

11

**JA22**

## COUNT 12

On or about June 8, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, DETAUN GORDON and ERNEST CROSS, did unlawfully, knowingly, and intentionally possess with intent to distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and Title 18, United States Code, Section 2.)

## COUNT 13

On or about June 8, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, DETAUN GORDON and ERNEST CROSS, did unlawfully, knowingly, and intentionally possess with intent to distribute a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and Title 18, United States Code, Section 2.)

## COUNT 14

On or about June 10, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, MARQUE WILSON, did unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C)).

## COUNT 15

On or about June 15, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, MARQUE WILSON, did unlawfully, knowingly, and intentionally possess with intent to distribute a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C)).

## COUNT 16

On or about June 15, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, MARQUE WILSON, did unlawfully, knowingly, and intentionally possess with intent to distribute a mixture and substance containing a detectable amount of cocaine base, also known as "crack cocaine," a Schedule II controlled substance.

(In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C)).

## COUNT 17

On or about June 8, 2016, in Portsmouth, Virginia, within the Eastern District of Virginia, the defendant, DETAUN GORDON, did knowingly and unlawfully possess one or more firearms in furtherance of, and use and carry one or more firearms during and in relation to, a drug trafficking crime for which he may be prosecuted in a court of the United States, including, but not limited to, the drug trafficking crimes alleged in Counts 1, 4-6, 9-10, 12-13 of this Indictment, which description of each said drug trafficking crime is re-alleged and incorporated by reference as if set forth in full herein.

(In violation of Title 18, United States Code, Section 924(c)(1)(A)).

14

**JA25**

## COUNT 18

On or about June 8, 2016, in the Eastern District of Virginia, the defendant, DETAUN

GORDON, having been previously convicted in a court of a crime punishable by imprisonment for

a term exceeding one year, did knowingly and unlawfully possess in and affecting commerce a

firearm, to wit, a Taurus Revolver, which had been shipped and transported in interstate and

foreign commerce.

(In violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2)).

## COUNT 19

From in or about November 2015 to in or about December 2015, in the Eastern District of

Virginia, the defendant, DETAUN GORDON, did unlawfully, knowingly and intentionally open,

rent, use, and maintain any place, to wit, a residence on Battery Park Road in Chesapeake,

Virginia, for the purpose of manufacturing heroin, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Sections 856(a)(1) and (b)).

**JA26**

## COUNT 20

From in or about March 26, 2016 to June 8, 2016, in the Eastern District of Virginia, the

defendant, DETAUN GORDON, did unlawfully, knowingly and intentionally open, rent, use, and

maintain any place, to wit, a residence on Green Street in Portsmouth, Virginia, for the purpose of

manufacturing heroin, a Schedule I controlled substance.

(In violation of Title 21, United States Code, Sections 856(a)(1) and (b)).

## FORFEITURE ALLEGATION

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT, AND ALLEGES THAT:

1. The defendants, if convicted of any of the violations alleged in Counts One through Sixteen and Nineteen through Twenty of this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2:

    a. Any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of the violation; and

    b. Any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the violation.

2. The defendants, if convicted of any of the violations alleged in this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any firearm or ammunition involved in or used in the violation.

3. If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

4. The property subject to forfeiture includes, but is not limited to, the following property:

    a. A Taurus Revolver with serial # IU52297.

    (In accordance with 18 U.S.C. §§ 924(d) by 28 U.S.C. § 2461, and 21 U.S.C. § 853.)

17

**JA28**

UNITED STATES v. DETAUN GORDON et al.
CRIMINAL NO. 2:16CR 97

Sealed Pursuant to the
E-Government Act of 2002

A TRUE BILL

REDACTED COPY

_____

FOREPERSON

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____
John F. Butler
Special Assistant United States Attorney
Joseph E. DePadilla
Andrew C. Bosse
Assistant United States Attorneys
Attorneys for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number:       757-441-6331
Facsimile Number:    757-441-6689
E-Mail Addresses:    john.f.butler@usdoj.gov
                     joe.depadilla@usdoj.gov
                     andrew.bosse@usdoj.gov

**JA29**



IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:16cr97 |
| | ) | |
| NATHANIEL POWELL, | ) | |
| a/k/a "Nate" | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

PLEA AGREEMENT

Dana J. Boente, United States Attorney for the Eastern District of Virginia; John F.

Butler, Special Assistant United States Attorney; Joseph E. DePadilla and Andrew C. Bosse,

Assistant United Attorneys; the defendant, NATHANIEL POWELL; and the defendant's

counsel have entered into an agreement pursuant to Rule 11 of the Federal Rules of Criminal

Procedure. The terms of the agreement are as follows:

1.     **Offense and Maximum Penalties**

The defendant agrees to plead guilty to Count One of the pending indictment. Count One

charges the defendant with Conspiracy to Manufacture, Distribute, and Possess with Intent to

Distribute more than 100 grams of Heroin, in violation of Title 21, United States Code, Sections

846, 841(a)(1) and 841(b)(1)(B). The maximum penalties for Count One are: a mandatory

minimum term of five years of imprisonment, a maximum term of 40 years, a fine not to exceed

$5,000,000, forfeiture of assets as outlined in paragraph 16 below, a special assessment, and at

least four years of supervised release. The defendant understands that the supervised release

term is in addition to any prison term the defendant may receive, and that a violation of a term of

**JA30**

supervised release could result in the defendant being returned to prison for the full term of supervised release.

### 2.      Detention Pending Sentencing

The defendant understands that this case is governed by 18 U.S.C. §§ 3143(a)(2) and 3145(c). These provisions provide that a judicial officer shall order that a person who has been found guilty of an offense of this kind be detained unless there are statutory justifications why such person's detention would not be appropriate.

### 3.      Factual Basis for the Plea

The defendant will plead guilty because the defendant is in fact guilty of the charged offense. The defendant admits the facts set forth in the statement of facts filed with this plea agreement and agrees that those facts establish guilt of the offense charged beyond a reasonable doubt. The statement of facts, which is hereby incorporated into this plea agreement, constitutes a stipulation of facts for purposes of Section 1B1.2(a) of the Sentencing Guidelines.

### 4.      Assistance and Advice of Counsel

The defendant is satisfied that the defendant's attorney has rendered effective assistance. The defendant understands that by entering into this agreement, defendant surrenders certain rights as provided in this agreement. The defendant understands that the rights of criminal defendants include the following:

a.      the right to plead not guilty and to persist in that plea;

b.      the right to a jury trial;

c.      the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings; and

2

**JA31**

d.      the right at trial to confront and cross-examine adverse witnesses, to be protected

from compelled self-incrimination, to testify and present evidence, and to compel

the attendance of witnesses.

**5.      Role of the Court and the Probation Officer**

The defendant understands that the Court has jurisdiction and authority to impose any

sentence within the statutory maximum described above but that the Court will determine the

defendant's actual sentence in accordance with 18 U.S.C. § 3553(a).  The defendant understands

that the Court has not yet determined a sentence and that any estimate of the advisory sentencing

range under the U.S. Sentencing Commission's Sentencing Guidelines Manual the defendant

may have received from the defendant's counsel, the United States, or the Probation Office, is a

prediction, not a promise, and is not binding on the United States, the Probation Office, or the

Court.  Additionally, pursuant to the Supreme Court's decision in *United States v. Booker*, 543

U.S. 220 (2005), the Court, after considering the factors set forth in 18 U.S.C. § 3553(a), may

impose a sentence above or below the advisory sentencing range, subject only to review by

higher courts for reasonableness.  The United States makes no promise or representation

concerning what sentence the defendant will receive, and the defendant cannot withdraw a guilty

plea based upon the actual sentence.

**6.      Waiver of Appeal, FOIA and Privacy Act Rights**

The defendant also understands that 18 U.S.C. § 3742 affords a defendant the right to

appeal the sentence imposed.  Nonetheless, the defendant knowingly waives the right to appeal

the conviction and any sentence within the statutory maximum described above (or the manner in

which that sentence was determined) on the grounds set forth in 18 U.S.C. § 3742 or on any

ground whatsoever other than an ineffective assistance of counsel claim that is cognizable on

3

**JA32**

direct appeal, in exchange for the concessions made by the United States in this plea agreement. This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b). The defendant also hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

### 7.    Special Assessment

Before sentencing in this case, the defendant agrees to pay a mandatory special assessment of one hundred dollars ($100.00) per count of conviction.

### 8.    Payment of Monetary Penalties

The defendant understands and agrees that, pursuant to 18 U.S.C. § 3613, whatever monetary penalties are imposed by the Court will be due immediately and subject to immediate enforcement by the United States as provided for in Section 3613. Furthermore, within 14 days of a request, the defendant agrees to provide all of the defendant's financial information to the United States and the Probation Office and, if requested, to participate in a pre-sentencing debtor's examination and/or complete a financial statement under penalty of perjury. If the Court imposes a schedule of payments, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. If the defendant is incarcerated, the defendant agrees to voluntarily participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

4

**JA33**

9.      **Immunity from Further Prosecution in this District**

The United States will not further criminally prosecute the defendant in the Eastern

District of Virginia for the specific conduct described in the indictment or statement of facts,

except that the United States may prosecute the defendant for any crime of violence or

conspiracy to commit, or aiding and abetting, a crime of violence not charged in the indictment

as an offense. In such a prosecution the United States may allege and prove conduct described in

the indictment or statement of facts. "Crime of violence" has the meaning set forth in 18 U.S.C.

§ 16.

10.     **Agreement Concerning Prior Felony Drug Conviction.**

The United States agrees that it will not file an information with the Court, pursuant to 21

U.S.C. § 851, stating the defendant's prior conviction for a felony drug offense

11.     **Dismissal of Other Counts**

As a condition of the execution of this agreement and the Court's acceptance of the

defendant's plea of guilty, the United States will move to dismiss the remaining counts of the

indictment against this defendant.

12.     **Defendant's Cooperation**

The defendant agrees to cooperate fully and truthfully with the United States, and provide

all information known to the defendant regarding any criminal activity as requested by the

government. In that regard:

      a.      The defendant agrees to testify truthfully and completely at any grand

juries, trials or other proceedings.

      b.      The defendant agrees to be reasonably available for debriefing and pre-

trial conferences as the United States may require.

**JA34**

c.     The defendant agrees to provide all documents, records, writings, or materials of any kind in the defendant's possession or under the defendant's care, custody, or control relating directly or indirectly to all areas of inquiry and investigation.

d.     The defendant agrees that, at the request of the United States, the defendant will voluntarily submit to polygraph examinations, and that the United States will choose the polygraph examiner and specify the procedures for the examinations.

e.     The defendant agrees that the Statement of Facts is limited to information to support the plea. The defendant will provide more detailed facts relating to this case during ensuing debriefings.

f.     The defendant is hereby on notice that the defendant may not violate any federal, state, or local criminal law while cooperating with the government, and that the government will, in its discretion, consider any such violation in evaluating whether to file a motion for a downward departure or reduction of sentence.

g.     Nothing in this agreement places any obligation on the government to seek the defendant's cooperation or assistance.

**13.    Use of Information Provided by the Defendant Under This Agreement**

The United States will not use any truthful information provided pursuant to this agreement in any criminal prosecution against the defendant in the Eastern District of Virginia, except in any prosecution for a crime of violence or conspiracy to commit, or aiding and abetting, a crime of violence (as defined in 18 U.S.C. § 16). Pursuant to U.S.S.G. § 1B1.8, no

6

**JA35**

truthful information that the defendant provides under this agreement will be used in determining

the applicable guideline range, except as provided in Section 1B1.8(b). Nothing in this plea

agreement, however, restricts the Court's or Probation Officer's access to information and

records in the possession of the United States. Furthermore, nothing in this agreement prevents

the government in any way from prosecuting the defendant should the defendant knowingly

provide false, untruthful, or perjurious information or testimony, or from using information

provided by the defendant in furtherance of any forfeiture action, whether criminal or civil,

administrative or judicial. The United States will bring this plea agreement and the full extent of

the defendant's cooperation to the attention of other prosecuting offices if requested.

### 14. Defendant Must Provide Full, Complete and Truthful Cooperation

This plea agreement is not conditioned upon charges being brought against any other

individual. This plea agreement is not conditioned upon any outcome in any pending

investigation. This plea agreement is not conditioned upon any result in any future prosecution

which may occur because of the defendant's cooperation. This plea agreement is not

conditioned upon any result in any future grand jury presentation or trial involving charges

resulting from this investigation. This plea agreement is conditioned upon the defendant

providing full, complete and truthful cooperation.

### 15. Motion for a Downward Departure

The parties agree that the United States reserves the right to seek any departure from the

applicable sentencing guidelines, pursuant to Section 5K1.1 of the Sentencing Guidelines and

Policy Statements, or any reduction of sentence pursuant to Rule 35(b) of the Federal Rules of

Criminal Procedure, if, in its sole discretion, the United States determines that such a departure

or reduction of sentence is appropriate.

7

**JA36**

16.    **Forfeiture Agreement**

The defendant understands that the forfeiture of assets is part of the sentence that must be

imposed in this case. The defendant agrees to forfeit all interests in any drug related asset that

the defendant owns or over which the defendant exercises control, directly or indirectly, as well

as any property that is traceable to, derived from, fungible with, or a substitute for property that

constitutes the proceeds of his offense or facilitating property for his offense. The defendant

further agrees to forfeit any interest in any firearm used in or involved in the offense. The

defendant understands that if proceeds of the offenses are not available to the United States to be

forfeited, the Court must enter a forfeiture money judgment in the amount of the proceeds.

*United States v. Blackman*, 746 F.3d 137 (4th Cir. 2014). The defendant further agrees to waive

all interest in the assets in any administrative or judicial forfeiture proceeding, whether criminal

or civil, state or federal. This includes, but is not limited to, any civil forfeiture proceedings

pending in the Portsmouth Circuit Court. The defendant agrees to consent to the entry of orders

of forfeiture for such property and waives the requirements of Federal Rules of Criminal

Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument,

announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

Defendant admits and agrees that the conduct described in the charging instrument and

Statement of Facts provides a sufficient factual and statutory basis for the forfeiture of the

property sought by the government.

17.    **Waiver of Further Review of Forfeiture**

The defendant further agrees to waive all constitutional and statutory challenges to

forfeiture in any manner (including direct appeal, habeas corpus, or any other means) to any

forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the

8

**JA37**

forfeiture constitutes an excessive fine or punishment. The defendant also waives any failure by the Court to advise the defendant of any applicable forfeiture at the time the guilty plea is accepted as required by Rule 11(b)(1)(J). The defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, and to testify truthfully in any judicial forfeiture proceeding. The defendant understands and agrees that all property covered by this agreement is subject to forfeiture as proceeds of illegal conduct and property facilitating illegal conduct.

### 18.    The Defendant's Obligations Regarding Assets Subject to Forfeiture

Upon request by the government, the defendant agrees to identify all assets in which the defendant had any interest or over which the defendant exercises or exercised control, directly or indirectly, within the past five years. The defendant agrees to take all steps as requested by the United States to obtain from any other parties by any lawful means any records of assets owned at any time by the defendant. The defendant agrees to undergo any polygraph examination the United States may choose to administer concerning such assets and to provide and/or consent to the release of the defendant's tax returns for the previous five years.

### 19.    Breach of the Plea Agreement and Remedies

This agreement is effective when signed by the defendant, the defendant's attorney, and an attorney for the United States. The defendant agrees to entry of this plea agreement at the date and time scheduled with the Court by the United States (in consultation with the defendant's attorney). If the defendant withdraws from this agreement, or commits or attempts to commit any additional federal, state or local crimes, or intentionally gives materially false, incomplete, or misleading testimony or information, or otherwise violates any provision of this agreement, then:

9

**JA38**

a. The United States will be released from its obligations under this agreement, including any obligation to seek a downward departure or a reduction in sentence. The defendant, however, may not withdraw the guilty plea entered pursuant to this agreement;

b. The defendant will be subject to prosecution for any federal criminal violation, including, but not limited to, perjury and obstruction of justice, that is not time-barred by the applicable statute of limitations on the date this agreement is signed. Notwithstanding the subsequent expiration of the statute of limitations, in any such prosecution, the defendant agrees to waive any statute-of-limitations defense; and

c. Any prosecution, including the prosecution that is the subject of this agreement, may be premised upon any information provided, or statements made, by the defendant, and all such information, statements, and leads derived therefrom may be used against the defendant. The defendant waives any right to claim that statements made before or after the date of this agreement, including the statement of facts accompanying this agreement or adopted by the defendant and any other statements made pursuant to this or any other agreement with the United States, should be excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), the Sentencing Guidelines or any other provision of the Constitution or federal law.

Any alleged breach of this agreement by either party shall be determined by the Court in an appropriate proceeding at which the defendant's disclosures and documentary evidence shall

10

**JA39**

be admissible and at which the moving party shall be required to establish a breach of the plea

agreement by a preponderance of the evidence. The proceeding established by this paragraph

does not apply, however, to the decision of the United States whether to file a motion based on

"substantial assistance" as that phrase is used in Rule 35(b) of the Federal Rules of Criminal

Procedure and Section 5K1.1 of the Sentencing Guidelines and Policy Statements. The

defendant agrees that the decision whether to file such a motion rests in the sole discretion of the

United States.

**20.    Nature of the Agreement and Modifications**

This written agreement constitutes the complete plea agreement between the United

States, the defendant, and the defendant's counsel. The defendant and the defendant's attorney

acknowledge that no threats, promises, or representations have been made, nor agreements

reached, other than those set forth in writing in this plea agreement, to cause the defendant to

plead guilty. Any modification of this plea agreement shall be valid only as set forth in writing

in a supplemental or revised plea agreement signed by all parties.


Dana J. Boente
United States Attorney

By: _____

John F. Butler
Special Assistant United States Attorney
Joseph E. DePadilla
Andrew C. Bosse
Assistant United States Attorneys

11

**JA40**

Defendant's Signature: I hereby agree that I have consulted with my attorney and fully understand all rights with respect to the criminal indictment. Further, I fully understand all rights with respect to Title 18, United States Code, Section 3553 and the provisions of the Sentencing Guidelines Manual that may apply in my case. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this agreement and voluntarily agree to it.

Date: 10/18/16     _____
                   NATHANIEL POWELL, Defendant

Defense Counsel Signature: I am counsel for the defendant in this case. I have fully explained to the defendant the defendant's rights with respect to the criminal indictment. Further, I have reviewed Title 18, United States Code, Section 3553 and the Sentencing Guidelines Manual, and I have fully explained to the defendant the provisions that may apply in this case. I have carefully reviewed every part of this plea agreement with the defendant. To my knowledge, the defendant's decision to enter into this agreement is an informed and voluntary one.

Date: 10/18/16     _____
                   Lawrence H. Woodward, Jr.
                   Counsel for the Defendant

U. S. DEPARTMENT OF JUSTICE
Statement of Special Assessment Account

This statement reflects your special assessment only. There may be other penalties imposed at sentencing.

| ACCOUNT INFORMATION | |
|---|---|
| CRIM. ACTION NO.: | 2:16cr97 |
| DEFENDANT'S NAME: | NATHANIEL POWELL |
| PAY THIS AMOUNT: | $100 |

INSTRUCTIONS:

1. **MAKE CHECK OR MONEY ORDER PAYABLE TO:**
   *CLERK, U.S. DISTRICT COURT*

2. **PAYMENT MUST REACH THE CLERK'S OFFICE BEFORE YOUR SENTENCING DATE**

3. **PAYMENT SHOULD BE SENT TO:**

|  | In person (9 AM to 4 PM) | By mail: |
|---|---|---|
| **Alexandria cases:** | | Clerk, U.S. District Court<br>401 Courthouse Square<br>Alexandria, VA 22314 |
| **Richmond cases:** | | Clerk, U.S. District Court<br>701 East Broad Street, Suite 3000<br>Richmond, VA 23219 |
| **Newport News cases:** | | Clerk, U.S. District Court<br>2400 West Ave, Ste 100<br>Newport News, VA 23607 |
| **Norfolk cases:** | | Clerk, U.S. District Court<br>600 Granby Street<br>Norfolk, VA 23510 |

4. **INCLUDE DEFENDANT'S NAME ON CHECK OR MONEY ORDER**

5. **ENCLOSE THIS COUPON TO ENSURE PROPER and PROMPT APPLICATION OF PAYMENT**

13

**JA42**

FILED
IN OPEN COURT

OCT 2 0 2016

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

UNITED STATES OF AMERICA          )
                                  )
            v.                    )        CRIMINAL NO. 2:16cr97
                                  )
NATHANIEL POWELL,                 )
     a/k/a "Nate,"                )
                                  )
                                  )
            Defendant.            )

## STATEMENT OF FACTS

By signing below, the parties and their respective counsel agree that if this case had gone to trial, the government's evidence would have established the following facts beyond a reasonable doubt:

1.      From in or about March 2012 to in or about July 2016, the defendant, NATHANIEL POWELL, was a leading member of a drug trafficking conspiracy that primarily operated in Portsmouth and Chesapeake, Virginia. The defendant entered into a conspiracy with other individuals to purchase, manufacture, distribute, and possess with intent to distribute in excess of 100 grams of heroin in the Eastern District of Virginia and elsewhere.

2.      The defendant's role in the conspiracy included, but was not limited to, procuring heroin and fentanyl from sources of supply in Baltimore, Maryland. The defendant would have the narcotics trafficked into the Hampton Roads area where it was repackaged and resold for wholesale and retail distribution. The defendant supplied co-conspirator, VALERIE WILSON, who then transported and sold heroin to individuals in North Carolina.

3.      Between on or about March 26, 2016 and in or about May 2016, the defendant

1

LHW, 12
NP

**JA43**

traveled to Baltimore, Maryland approximately 10 times to make wholesale purchases of heroin. After each purchase, he transported the heroin to the Hampton Roads area for resale.

4.      On or about May 26, 2016, the defendant, led police officers on a high-speed vehicle pursuit through a residential area of Portsmouth. Upon arrest the defendant had seven grams of fentanyl in his possession.

5.      Between in or about May and June 2016, the defendant, through messages posted and exchanged on social media, threatened an individual who the defendant believed was a police informant.

6.      The acts taken by the defendant in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law.   The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offenses charged in this case, nor does it identify all of the persons with whom the defendant may have engaged in illegal activities. The defendant further acknowledges that he is obligated under his plea agreement to provide additional information about this case beyond that which is described in this statement of facts.

                    Respectfully submitted,

                    Dana J. Boente
                    United States Attorney

                    By:
                    _____
                    John F. Butler
                    Special Assistant United States Attorney
                    Joseph E. DePadilla
                    Andrew C. Bosse
                    Assistant United States Attorneys

                            2

**JA44**

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Nathaniel Powell, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Nathaniel Powell, Defendant

I am the attorney for defendant, Nathaniel Powell.   I have carefully reviewed the above Statement of Facts with him.   His decision to enter into this factual stipulation is knowing, intelligent, and voluntary.

Lawrence H. Woodward, Jr., Esq.
Defense Counsel

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

UNITED STATES OF AMERICA

v.                                                              CRIMINAL NO.: 2:16cr97

NATHANIEL POWELL

      Defendant.

## POSITION OF THE DEFENDANT, NATHANIEL POWELL, <br> WITH RESPECT TO SENTENCING FACTORS

      COMES NOW the defendant, Nathaniel Powell, by counsel, and states as follows for his position on sentencing:

      The Defendant and counsel have met numerous times to discuss and analyze the pre-sentence report (PSR). On behalf of the Defendant, counsel raises the following objections to certain enhancements and factors that affect the advisory sentencing guidelines.

A.    Objections

      1.    The defense objects to the two (2) point enhancement under paragraph 20 for a firearm. There was no mention of a firearm being possessed by the Defendant in the Statement of Facts and only after receiving the PSR counsel was provided a debrief summary on March 15, 2017, in which one individual, Valerie Wilson, indicated that Mr. Powell sat on a gun in his wheelchair during drug transactions. This individual offered no detail on this weapon and did not indicate

Pg: 51 of 388    Filed: 01/10/2024    Doc: 32    USCA4 Appeal: 21-6992

**JA46**

any time frame. The individual said she purchased heroin every day for five (5) plus years and had dealt with Mr. Powell on approximately twelve (12) occasions with no indication of what time frame. The defense contends that even under the preponderance of the evidence standard this statement, does not rise to the level to support the enhancement.

2.     The defense objects to the 1 kilogram drug weight attributed to the Defendant in paragraph 10. This is again based on the statement of the same individual which was provided to the defense on March 15, 2017, and was not stipulated to. This person apparently told authorities that on some occasion at an unspecified time, she saw an unknown person give the Defendant a package that she suspected was a kilogram of cocaine. The defense contends that this does not support any drug weight being attributed to the Defendant and is on its face is mere speculation. It is important to point out that the witness says in her debrief that she "suspected this was a kilo of heroin" and the PSR at paragraph 10 states in more definite form that a kilo was delivered. The addition of this drug weight increases Defendant's base offense level from 26 to 30.

3.     The defense contends that the enhancements in paragraphs 21 and 26 constitute double counting and that the Defendant should receive only two (2) points for sending the communication, which he stipulated he sent, not four (4) points as contemplated by the PSR. The Defendant sent one electronic message which was threatening and defense counsel cannot find any authority on point

**JA47**

that justifies parsing out a single threatening communication to support and justify multiple enhancements.

4.     The final objection is the two (2) point enhancement for maintaining drug premises, which again is based on the recently received summary of a statement made by Valerie Wilson.

The Court, in determining the applicability of the drug weight, gun enhancement, and drug premise issue, has to base its determination on a summary of one witness that contains almost no detail, was provided under the advice of counsel who presumably advised her about how to maximize her value to the government and who is a heavy drug user.  While she no doubt made those statements to the agents, the issue for the Court is, does this single source provide an adequate basis to increase the Defendant's advisory guideline range by 8 points.  The defense contends that it does not.  It is also worth pointing out that the Defendant, who has a lengthy criminal record of arrests and convictions, has never been arrested for or convicted of having a firearm, yet Ms. Wilson tells authorities he had one or two guns every day.

B.     The 18 U.S.C. § 3553 Factors

The defense is fully aware that once the Court rules on the various objections and arrives at an advisory guideline range that the suggested guidelines are just one factor that the Court must consider. The United States will no doubt ask the Court to give great weight to the factors that concern deterrence, the nature

Filed: 01/10/2024   Pg: 53 of 388

USCA4 Appeal: 21-6992   Doc: 32

of the offense, and the Defendant's criminal history.  There is no dispute that Congress has passed laws that treat drug offenses as serious crimes.

There does not seem to be any valid information or empirical evidence that lengthy prison sentences act as a general deterrent to drug activity.  There is no question that Mr. Powell has a lengthy criminal record and has lived most of his life in the street.  The defense contends that the Court should consider some of the societal and economic reasons for Mr. Powell's plight as well as his personal responsibility.

The personal, medical, and educational portion of the PSR (paragraphs 69-85) is a distressing account of violence, substance abuse, lack of positive role models, and economical problems that is all too familiar and not amenable to being made better by the application of a severe criminal justice system.

An individual with no meaningful education, no positive male role model, a severe and crippling injury, the stigma of being a felon at a very young age, and a history of depression faces an almost impossible task in trying to rise above those circumstances.  The sad fact is that in many of the neighborhoods in our area and our country, the drug trade is the only viable economy that exists.  The Defendant is certainly responsible for his own conduct but not for the environment he grew up in.  The Defendant's family support system, guidance as a youth, and environment are certainly matters that the Court should consider when weighing and balancing the sentencing factors and determining punishment.

USCA4 Appeal: 21-6992     Doc: 32     Filed: 01/10/2024     Pg: 54 of 388

Filed: 01/10/2024   Pg: 55 of 388

Doc: 32

USCA4 Appeal: 21-6992

If the Defendant's objections are granted, it will result in a level 27 with an advisory guideline range of 130 to 162 months. The defense contends that a sentence even in the reduced range, would be a punishment that is greater than necessary in this case.

The defense contends that a sentence of 120 months is sufficient but not greater than necessary. Such a sentence will mean that Mr. Powell is in federal custody until he is in his mid-forties. The Court should also order that he avail himself of any and all educational and vocational opportunities that he can while incarcerated. Such a sentence is not an indication that the Court is soft on crime or does not take drug offenses seriously, but instead is a recognition that lengthy prison sentences do not solve the drug problem and a sentence that is too long does as much damage to our legal system and the Defendant as a sentence that is too short.

Counsel will present additional information and arguments in support of this position at sentencing.

Respectfully submitted,

**NATHANIEL POWELL**

/ s /
_____
Lawrence H. Woodward, Jr., Esquire
Virginia State Bar #21756
Attorney for the Defendant
   Nathaniel Powell
Shuttleworth, Ruloff, Swain,
   Haddad & Morecock, P.C.
317 30th Street

Page 5 of 7

Pg: 56 of 388     Filed: 01/10/2024     Doc: 32     USCA4 Appeal: 21-6992

Virginia Beach, Virginia   23451
Telephone Number:  (757) 671-6000
Facsimile Number:   (757) 671-6004
Email address: lwoodward@srgslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of March, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Andrew C. Bosse, Esquire
John F. Butler, Esquire
Joseph E. DePadilla, Esquire
Assistant United States Attorney
Attorney for the United States
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
Phone: 757/441-6331
Fax: 757/441-6689
Email address:      andrew.bosse@usdoj.gov
                    John.f.butler@usdoj.gov
                    Joe.depadilla@usdoj.gov


Anita G. Powell, Probation Officer
United States Probation
827 Diligence Drive, Suite 210
Newport News, VA 23606


                         _____/ s / _____
                         Lawrence H. Woodward, Jr. Esquire
                         Virginia State Bar #21756
                         Attorney for the Defendant,
                            Nathaniel Powell
                         Shuttleworth, Ruloff, Swain,
                            Haddad & Morecock, P.C.


Page 6 of 7

# JA51

317 30th Street
Virginia Beach, Virginia   23451
Telephone Number:  (757) 671-6000
Facsimile Number:   (757) 671-6004
Email address: lwoodward@srgslaw.com

USCA4 Appeal: 21-6992      Doc: 32      Filed: 01/10/2024      Pg: 57 of 388

**JA52**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:16cr97-002 |
| | ) | |
| NATHANIEL POWELL, | ) | |
| a/k/a "Nate" | ) | |
| | ) | |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, through its attorneys, Dana J. Boente, United States

Attorney, John F. Butler, Special Assistant United States Attorney, and Andrew C. Bosse and

Joseph E. DePadilla, Assistant United States Attorneys, hereby submits its position with respect

to the defendant's sentencing factors.  In the Presentence Investigation Report (PSR) prepared in

this matter, the United States Probation Office determined the applicable advisory guidelines

range to be a term of 360 to 480 months' imprisonment (Offense Level 37 and Criminal History

Category VI).  PSR ¶ 104.  In accordance with Section 6A1.2 of the Sentencing Guidelines

Manual and this Court's policy regarding sentencing, the United States represents that it has

reviewed the PSR and consulted with the Probation Office and with defense counsel.  The United

States does not dispute any of the sentencing factors set forth in the PSR or the guidelines range

calculation.  The defendant objects to the enhancements related to drug weight, maintaining a

premise, firearms, threats, and obstruction, all of which are discussed in Section III below.

After considering each of the 18 U.S.C. § 3553(a) factors, the PSR, this defendant's

criminal record, and the defendant's aggravated, deplorable, and continued criminal conduct, the

JA53

United States respectfully submits that a sentence of at least 360 months is appropriate and warranted.

**I.   Motion**

The United States moves this Court, pursuant to U.S.S.G. § 3E1.1(b) and based upon the terms of the binding plea agreement in this case, to grant an additional one-level reduction in the defendant's offense level for acceptance of responsibility.  The defendant timely notified the United States of his intention to enter a plea of guilty, thereby allowing the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently.

**II.   Background**

On July 20, 2016, the defendant and his four co-defendants were charged in a 20-count indictment arising out of a conspiracy to manufacture, distribute, and possess with intent to distribute heroin (Count 1).  The defendant was also charged in Count Eleven for possession with the intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  The defendant pleaded guilty on October 20, 2016, and is scheduled to appear before this Court for sentencing on March 30, 2017.

**III.   Objections**

a.   Drug Weight

The PSR calculated the aggregate drug weight attributable to the defendant at over one kilogram of heroin.  PSR ¶¶ 10, 19.  The drug weight attributed to the defendant came in large part from information provided by one of the co-defendants, who provided information about her role in the conspiracy before she was federally indicted.  PSR ¶ 10.  In addition to a dozen transactions she had with the defendant, she also described one occasion where the defendant

**JA54**

received a kilogram of heroin.  She described hearing how he began using a blender or coffee grinder to breakdown the product from its original packaging.  Additionally, the defendant agreed in his statement of facts that the drug weight was in excess of 100 grams of heroin.  Finally, as noted in paragraph 11 of the PSR, the defendant was interviewed by the Probation Office and admitted to making wholesale purchases of heroin from sources of supply in Baltimore.  He described purchasing 100 grams of heroin and selling it in ½ ounce or 1 ounce quantities.  He also described a joint purchase with co-conspirator Gordon, in which they pooled together $17,200 to purchase of 200 grams of heroin.

The defendant does not deny supplying heroin to his co-conspirator, purchasing wholesale amounts with another co-conspirator, or distributing heroin to others.  Instead, the defendant's sole claim is that the kilogram of heroin described in paragraph 10 of the PSR is either exaggerated or not credible.  "[A] mere objection to the finding in the presentence report is not sufficient."  *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990).  "The defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate."  *Id.*  Without providing more specific information about why the heroin described is not credible, especially in light of the fact that this defendant was a wholesale trafficker of heroin for multiple years, the defendant has not met that burden here.  The defense has neither given the Court sufficient reason to determine that a lower guidelines range should apply nor given the government sufficient information to re-evaluate any of the attributed drug weights.  Without more, the objection should be denied.

The defendant, of course, is free to testify to fulfill his affirmative duty to show the PSR's drug weight calculation is unreliable.  If he does testify, he will be subjected to cross-

examination, including about the statements he made in his own debrief. If necessary, the government is prepared to call DEA Task Force Officer Rob Dyer, who had the opportunity to debrief the defendant's other co-conspirators and who can testify about drug weights attributed to the defendant. But before that happens, the defendant should be required to make at least some showing that the drug weight attributed to him is inaccurate or unreliable. His mere say-so, through his attorney, is not enough.

     b.  <u>Firearm Enhancement</u>

Like the drug weight, the defendant is also objecting to the firearm enhancement without providing a basis for that objection. As cited above, an objection is not sufficient without affirmatively showing that the finding is unreliable.

This enhancement was applied because one of the defendant's co-conspirators, Valerie Wilson, told investigators how she observed the defendant with a firearm on almost every occasion on which she purchased heroin from him and that the defendant always sat on one or two firearms in his wheel chair. She reported that the defendant (who is also the uncle of Wilson's niece) may have possessed a 9mm, but was unclear on the exact model. Wilson told investigators that she stopped dealing with the defendant because he was acting "crazy" and "violent." The fact that Wilson did not provide the exact date on which she observed the firearm does not make her claim any less credible. This woman dealt with the defendant over a five-year period. It would be unusual to remember the twelve occasions on which she observed the firearm over such a long period. The defendant's objection is not sufficient to undermine the credibility of Wilson's statement and should therefore be overruled. Again, the defendant is free to take the stand to tell the Court he did not use a gun during the conspiracy. If he does so, the government is prepared to present evidence that there were others in addition to Wilson who

**JA56**

observed the defendant with a firearm. But it should not have to do so without something more than the general objection lodged by the defendant.

    c.  <u>Maintaining a Premises</u>

Section 2D1.1(b)(1) of the USSG states, "If the defendant maintained a premises for the purposes of manufacturing or distributing a controlled substance, increase [the offense level] by 2 levels." Section 856(a)(1) of Title 21 of the United States Code provides in part that:

> It shall be unlawful to knowingly open, lease, rent, *use*, or *maintain* any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance.

Emphasis added.

Where the premises in question is a residence, a defendant must have a substantial connection to the residence and must be more than a casual visitor to qualify for the enhancement. It is not necessary that the defendant lease or own the premises. Acts that evidence "maintenance" are such matters as control of the site, the amount of time spent in the site, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, or supplying food to the site, and continuity of use. *See United States v. Williams*, 923 F.2d 1397, 1403 (10th Cir. 1990); *United States v. Russell*, 595 F.3d 633, 644 (6th Cir. 2010) (citing *United States v. Clavis*, 956 F.2d 1079, 1091 (11th Cir. 1992)). Surely the fact that the defendant used his Portsmouth residence over a five-year period is sufficient to establish continuity of use. The question, then, is whether the defendant used the residence for the purpose of manufacturing, distributing, or using heroin.

That question is answered in paragraph 10 of the PSR. Wilson, who is related to the defendant, visited the defendant's home on Gateway Drive in the Churchland section of Portsmouth on a dozen occasions since the summer of 2011 to purchase heroin. On one occasion she observed the defendant take possession of a kilogram of heroin at his home, which he then

**JA57**

proceeded to process for retail distribution.  Wilson overheard Powell cut the wholesale heroin with a blender or coffee grinder.

Wilson does not describe a onetime association with Powell.  Powell was her source of supply and they had a series of heroin transactions since the summer of 2011 that took place at or around the same residence.  Using a residence to manufacture and distribute heroin as the defendant did is exactly the kind of aggravation § 2D1.1(b)(12) was designed to address.

d.  Communicating a Threat and Obstruction of Justice

The defendant objects to enhancements for communicating a threat and for obstruction of justice.  He seems to suggest that, because the underlying evidence is from the same source – a Facebook message – both enhancements are unfairly applied.  That is not correct.  The content of the message contains a threat and it seeks to impede the administration of justice.

To the extent the defendant attempts to rely at sentencing on *United States v. Jones*, 716 F.3d 851 (4th Cir. 2013), that case—which dealt with marriage fraud—is not applicable here. *Jones* challenged the district court's calculation of the advisory sentencing range as it pertained to the grouping of multiple obstruction of justice convictions.  In the instant case, we are dealing with an obstruction of justice enhancement, not an underlying conviction for obstruction.

The Sentencing Guidelines were designed in part to prevent "double counting" that would occur if a district court applied both a base offense level and an enhancement for the same conduct.  *See* U.S.S.G. § 3D1.2 cmt. n.5.  That did not happen here.  The two enhancements that were applied based on the Facebook message are distinguishable –one is for communicating a threat –actually, numerous threats (*e.g.*, "to fix ur ass"; "Don't find yourself on a t-shirt" (it is tradition among some to print the deceased's image on a t-shirt, *i.e.*, an "RIP shirt," to mourn their loss); "I know wea u rest ur head"; "if you want [*i.e.*, "weren't"] 12 I would have been sent

**JA58**

the lurkers" ("12" commonly refers to the police or to a someone assisting the police – in this context it appears the defendant was stating that if the target of this threat was not with the police, he would have sent someone to hurt and or kill him); "stop playing my nicca before I lose my morals and involve ppl u love nicca."). *See* Government Exhibit 2.

The message *also* contains content specifically designed to intimidate the target of the message from participating in the investigation or assisting law enforcement (*e.g.*, telling "fbf" (Facebook friends) that a particular individual is a police informant and stating, "no way in hell I'm gone let you set me up"; "stop playing"). *Id.* Other than communicating threats to harm his intended target and the people he loves, the defendant was also seeking to "out" this particular person whom he believes is working with police to those on his social media network. This kind of intimidation is exactly the kind of conduct U.S.S.G. § 3C1.1 is designed to address. If the target of the defendant's message were in fact a confidential informant, this type of communication could easily derail the administration of justice. Pressuring people not to cooperate with the government is obviously obstructive conduct that threatens the ability of the police and prosecutors to do their jobs. As a general matter, law enforcement relies on individuals in the community who know about crime to cooperate in solving it. This case itself shows the importance of confidential witness cooperation. Without the help of the CI who conducted the controlled purchase charged in Count 11, the government would not have been able to charge that heroin sale.

Finally, even if the court were inclined to agree with the defense and not apply the obstruction of justice enhancement for that particular set of Facebook posts, the government notes that the defendant was involved in other obstructive behavior that would merit the enhancement.

**JA59**

After the indictment, the defendant sent three letters to co-conspirator, Detaun Gordon, while both of them were in custody in Western Tidewater Regional Jail.  *See* Government Exhibit 1.   The defendant sought to impede the administration of justice by encouraging Mr. Gordon to tell him what he had told law enforcement so that the defendant knew what he was "walking into" with respect to drug weight (e.g. "I'm trying to figure out what you told the people about me…I know you been debriefed;" "Play fair and don't put no weight on them;" "I just want to know how much weight he put on me.  I'm facing 40 *ucking years myself.  If he don't want to tell me I got to do what I got to do.").  In what looks to be a signature move, the defendant here as well mixed a threat into the attempt at obstruction: "My shots not gone miss either so make your next words count my boy."

## IV.    Position on Sentencing and Argument

"[I]n imposing a sentence after *Booker*, the district court must engage in a multi-step process.  First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range."  *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006).  "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'"  *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)).  In making this determination,

> a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need "to reflect the seriousness of the offense," provide "just punishment," "afford adequate deterrence," "protect the public," and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

*United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (quoting 18 U.S.C. § 3553(a)).

8

**JA60**

A)    <u>Nature and Circumstances of the Offense</u>

The nature and circumstances of the offense are especially serious for several reasons. First, the defendant was engaged in a long-term conspiracy to distribute heroin, which lasted more than four years. Second, in addition to the length of the conspiracy, this defendant, because of his role as a supplier to other members of the group, was one of the two most culpable conspirators. While he was not assessed an enhancement for his role, which involved supplying a drug trafficking organization of five or more members, he was one of two individuals who procured heroin and fentanyl from sources of supply in Baltimore. He repackaged those wholesale amounts for retail sales in the Hampton Roads region and supplied at least one other member of the group who further disseminated this poison to nearly two dozen individuals in North Carolina.

Third, unlike his co-conspirator Detuan Gordon, this defendant was also known for his violence. He threatened multiple people and continued his threats even after pleading guilty. The United States highlighted the Facebook threats the defendant made at his detention hearing. Even after knowing that the government was monitoring his behavior, he persisted with his campaign to intimidate witnesses and obstruct justice by threatening his co-conspirator in a series of jail letters. While it is unlikely that the defendant himself could have shot his co-defendant while both were in custody—as he threatened—the Court is well aware that local jails are not immune from violence, and that inmates sometimes order violent actions against fellow inmates. Even putting aside the very real threat of danger, the threats are indicative of the mindset of this defendant. This is a man determined to hurt and threaten people even in the face of the consequences associated with this impending sentencing hearing.

9

**JA61**

On May 26, 2016, law enforcement coordinated a controlled purchase of heroin through the use of a confidential informant. When the defendant realized something was amiss, he led officers on a high-speed chase, with estimated speeds upwards of 70 miles per hour, through residential neighborhoods in the middle of the day. *See* Government Exhibit 3.[1] He did not stop by choice—the chase ended only because he crashed into another vehicle. The victim from the other vehicle sustained injuries and was taken to the hospital. The defendant's actions bespeak a complete disregard for the lives of others.

This defendant is in a wheelchair because of a car accident in 2007 that left him paralyzed from the waist down. This accident was also the result of an attempt to elude police while in possession of narcotics; the defendant crashed his car during that incident, as well. PSR ¶ 48. This is someone who knows the dangers associated with (1) selling drugs; (2) eluding police; and (3) driving recklessly, yet who under similar circumstances again chose to lead law enforcement on a high-speed chase. This one was even more reckless, in fact, because the defendant was using a cane to depress both the accelerator and brake.

B)    <u>History and Characteristics of the Defendant</u>

i. <u>Criminal History</u>

The defendant's deplorable criminal history paints the picture of a man who is resolute in his defiance of the law. It also demonstrates a history of violence, reckless endangerment of others, and cruelty towards women. If a Criminal History Category VII existed, he would be in it with his 16 criminal history points. The severity of his criminal history is even more significant when one considers that eleven (11) of his convictions did not even result in criminal

---

[1] Government Exhibit 3 is a three minute video of the pursuit that the government intends to play at the sentencing hearing.

history points.  The defendant has demonstrated time and time again that he will not stop

committing crimes.

The defendant racked up more than two dozen convictions, including six for narcotics,

five for suspended licenses, two for obstruction of justice, two for eluding police, two for failing

to appear, two for contempt of court, and for conduct involving violence against two different

women.  The facts underlying his assault convictions are disturbing.  The defendant assaulted

one woman in 2006 and 2007, and then in 2012 he was convicted of unlawful wounding.  The

fact that the defendant is bound to a wheelchair should not disguise his capacity for violence.  In

June 2012, he ripped his girlfriend out of a parked car and began attacking her with a kitchen

knife.  His vicious attack left her with lacerations on her face, left arm, and right hand, which

required medical treatment and stitches.

On two occasions, he had narcotic charges reduced from possession with intent to

distribute to simple possession.  PSR ¶¶ 33, 41.  These second chances did nothing to deter the

defendant, as confirmed by the fact that he stacked up four more possession charges.  The

defendant had his opportunity to turn his life around.  He had second chance after second chance.

Now he must face the consequences of his determination to disrespect the law, poison the

community, and harm others.

The defendant was under a criminal justice sentence throughout the course of this

conspiracy, but that meant nothing to him.  He has not only failed to stop committing new crimes

while under supervision—he also did poorly complying with the basics.  One adjustment period

characterized unsatisfactory involved positive tests for cocaine, failure to report, failure to

complete treatment, and absconding.  PSR ¶¶ 41, 55.

From the possession of firearms, to the violent end of a police chase in this case, to the assaults and new threats to kill after his arrest here, the government is left with the unmistakable conclusion that this defendant is dangerous, violent, and a threat to the public. The only place he will stop committing crimes against the public is in prison.

        ii. <u>Personal Data</u>

The defendant was raised in a two-parent home until his parents separated when he was about 15 years old, at which time his maternal grandparents cared for him. He dropped out of high school in the tenth grade, but completed his GED at the age of 30. His mother had a history of drug use. His family life was marred by violence. One of the defendant's brothers was killed in 2000, and his other brother is in the Department of Corrections serving a sentence for murder.

The defendant has never been married, but has three biological children. He had his first child when he was 18. The defendant did not file tax returns in 2012 or 2015, but when he did, he listed income from a car detailing business. He receives monthly disability checks ($659.70) from the Social Security Administration from the crash that resulted from his eluding police in 2007.

        C)     <u>Other Factors to be Considered Under Section 3553(a)</u>

While each factor under 18 U.S.C. § 3553(a) must be considered in fashioning an appropriate sentence, the United States highlights the need to promote respect for the law, to safeguard the community from this defendant's dangerous narcotics and his violent tendencies, and to specifically deter the defendant from continuing his life of crime.

The United States is also mindful to guard against disparity of sentences in a conspiracy case. With that said, the United States contends that this defendant is the most dangerous of the five charged conspirators. Given his criminal history, flagrant disregard for the administration of

**JA64**

justice, and criminal offense level, the government submits that a significant sentence well beyond what his co-conspirators received is warranted.

The following sentences and advisory guidelines apply:

| Defendant | Guidelines | Sentence |
|---|---|---|
| Detaun Gordon | 235-293, plus 60 months consecutive (34/V) | 295 months |
| **Nathaniel Powell** | **360-480 (37/VI)** | |
| Ernest Cross | 70-87 (25/III) | 60 months |
| Marque Wilson | 30-37 (15/IV) | 72 months |
| Valerie Wilson | 151-188 (31/IV) | 70 months |

## V.    Conclusion

The Section 3553(a) factors, including the circumstances of the defendant's leadership role in the offense, the presence of a firearm, his deplorable criminal history, and his brazen threats and obstruction all weigh in favor of a sentence within the advisory guidelines range and in excess of 360 months.  The need to promote respect for the law, protect the community from the defendant, to specifically deter him from continuing to commit new crimes, and to address the aggravating and long-term nature of the defendant's role in the conspiracy make a guideline sentence appropriate and not greater than necessary to accomplish the goals of 18 U.S.C. § 3553(a).

JA65

Respectfully submitted,

Dana J. Boente
United States Attorney


By:    _____/s/_____
       John F. Butler
       Special Assistant United States Attorney
       Andrew C. Bosse
       Joseph E. DePadilla
       Assistant United States Attorneys
       Attorneys for the United States
       United States Attorney's Office
       101 West Main Street, Suite 8000
       Norfolk, VA 23510
       Office Number: 757-441-6331
       Facsimile Number: 757-441-6689
       john.f.butler@usdoj.gov
       andrew.bosse@usdoj.gov
       joe.depadilla@usdoj.gov

14

**JA66**

<u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that on this 24th day of March, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

      I HEREBY CERTIFY that on this 24th day of March, 2017, I sent by electronic mail a true and correct copy of the foregoing to the following:

            Anita Powell
            United States Probation Officer
            827 Diligence Drive
            Newport News, Virginia 23606

                        /s/
            John F. Butler
            Special Assistant United States Attorney
            Attorney for the United States
            United States Attorney's Office
            101 West Main Street, Suite 8000
            Norfolk, VA 23510
            Office Number: 757-441-6331
            Facsimile Number: 757-441-6689
            john.f.butler@usdoj.gov

JA67

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                            Norfolk Division

 3

 4    - - - - - - - - - - - - - - - - - - -
         UNITED STATES OF AMERICA,        )
 5                                        )
                   Plaintiff,             )
 6                                        )   CRIMINAL CASE NO.
         v.                               )     2:16cr00097
 7                                        )
         NATHANIEL POWELL,                )
 8                                        )
                   Defendant.             )
 9    - - - - - - - - - - - - - - - - - - -

10

11                        Excerpt OF PROCEEDINGS
                   (Pages 1-65 of the Sentencing Hearing)
12
                             Norfolk, Virginia
13
                             March 31, 2017
14

15

16    BEFORE:   THE HONORABLE ARENDA L. WRIGHT ALLEN,
                United States District Judge
17

18

19    APPEARANCES:

20              UNITED STATES ATTORNEY'S OFFICE
                By:  John F. Butler
21                   Assistant United States Attorney
                     Counsel for the United States
22
                RULOFF, SWAIN, HADDAD, MORECOCK, TALBERT &
23              WOODWARD, P.C.
                By:  Lawrence H. Woodward, Jr.
24                   Assistant Federal Public Defender
                     Counsel for the Defendant
25
```

```
 1                        I N D E X

 2

 3   ON BEHALF OF THE GOVERNMENT:      Direct   Cross   Red.    Rec.

 4   R. Dyer                             9       33     --      --

 5

 6

 7

 8

 9

10                       E X H I B I T S

11   No.                                                      Page

12   Government Exhibit 3                                       27

13   Government Exhibit 4                                       28

14   Government Exhibit 2                                       30

15   Government Exhibit 1                                       33

16

17

18

19

20

21

22

23

24

25
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 75 of 388

```
 1              (The hearing commenced at 11:00 a.m.)
 2              THE CLERK:  United States of America v. Nathaniel
 3     Powell, Criminal Case No. 2:16cr97.
 4              Mr. Butler, is the government ready?
 5              MR. BUTLER:  The United States is ready.  Good
 6     morning, Your Honor.
 7              THE COURT:  Good morning, Mr. Butler.  It's good to
 8     see you and your agent.
 9              THE CLERK:  Mr. Woodward, is the defendant ready to
10     proceed?
11              MR. WOODWARD:  We're ready to proceed.  And, as
12     you're aware, he's in a wheelchair, and I presume he can just
13     remain --
14              THE COURT:  He can.  And, Mr. Woodward, you can stay
15     there seated with him there, too.
16              MR. WOODWARD:  Yes, ma'am.
17              THE COURT:  All right.  Can we place Mr. Powell
18     under oath, please, so he can be sworn.
19              (The clerk administered the oath.)
20              THE COURT:  All right, Mr. Powell, it's good to see
21     you this morning as well.
22              On October 20th, 2016, you appeared before Judge
23     Leonard of our court and pled guilty to Count One of the
24     criminal indictment, pursuant to a written plea agreement,
25     and it charged you with conspiracy to manufacture,
```

Heidi L. Jeffreys, Official Court Reporter

## JA70

1    distribute, and possess with intent to distribute more than a

2    hundred grams of heroin, in violation of Title 21, United

3    States Code, Section 846, 841(a)(1), and 841(b)(1)(B).

4            Judge Leonard accepted your plea of guilty, and the

5    matter was continued for sentencing, and I hereby accept your

6    plea of guilty as well.  Do you understand?

7            THE DEFENDANT:  Yes, ma'am.

8            THE COURT:  The Court has reviewed the presentence

9    report prepared by Ms. Powell, your probation officer -- and

10   she's seated in the jury box -- and her documents are dated

11   January 13, 2017, and her addendum, March 22nd, 2017.  And

12   the addendum indicates that the government has no objections

13   to your presentence report.

14           You have four objections to your presentence report.

15   First, you're objecting to the kilogram quantity of the

16   heroin that is being attributed to you, and that's listed in

17   paragraph 10 of your presentence report.

18           Secondly, you're also objecting to the firearm

19   enhancement, which is in paragraph 20 of your presentence

20   report.

21           Thirdly, you're objecting to the two enhancements

22   for your Facebook communications, and that's pursuant to the

23   a 2D1.1(b)(2) and 3C1.1, and that's in paragraphs 21 and 26

24   of your presentence report.

25           And then, lastly, you're objecting to the two-level

```
 1    enhancement for the premises, and that's in paragraph 22 of
 2    your presentence report.
 3              Mr. Powell, do you understand everything that I just
 4    said?
 5              THE DEFENDANT:  Yes, ma'am.
 6              THE COURT:  Okay, good.  All right.  And then,
 7    Mr. Powell, I have also reviewed, in preparing for your
 8    sentencing this morning, a letter from you.  And so I have
 9    reviewed that.
10              Did you get a copy of his letter, Mr. Butler?
11              MR. BUTLER:  Yes, Your Honor, I did.
12              THE COURT:  All right.  And so I've got that,
13    Mr. Powell, and then a letter from a Marquida Smith, and then
14    a letter from the Marquiva Bell, and we received those on
15    March 29th and March 30th from your attorney.
16              So I have reviewed those as well.  Do you
17    understand?
18              THE DEFENDANT:  Yes, ma'am.
19              THE COURT:  And, Mr. Butler, you got copies of those
20    as well.  Is that correct?
21              MR. BUTLER:  Yes, Your Honor.
22              THE COURT:  And then, right before I took the bench,
23    I have some photographs here, it looks like, from the
24    high-speed chase, and then the post, and then the letter that
25    was sent to Mr. Gordon.
```

```
 1              So I have considered all that as well.  So do you
 2    understand, Mr. Powell?
 3              THE DEFENDANT:  Yes, ma'am.
 4              THE COURT:  All right, good.
 5              All right, Mr. Woodward.  Did you review the PSR,
 6    the addendum, and all the documents that I just referred to
 7    with your client?
 8              MR. WOODWARD:  I did, Your Honor, and there's one
 9    additional document.  It's a certificate.  Mr. Powell
10    completed a study course in the Western Tidewater Regional
11    Jail.  I provided a copy to Mr. Butler, and I neglected to
12    turn that in.  If I could just pass that up, I'd appreciate
13    that as well, Your Honor.
14              THE COURT:  You can.  All right.  Thank you,
15    Mr. Woodward, very much.
16              No objection, right, Mr. Butler?
17              MR. BUTLER:  No, Your Honor.
18              THE COURT:  All right.  Thank you, sir.
19              MR. WOODWARD:  And, yes, Your Honor, I've reviewed
20    the presentence report and the addenda and the objections and
21    discussed it with Mr. Powell on numerous occasions.
22              THE COURT:  All right.  Thank you, Mr. Woodward.
23              And then, Mr. Powell, I'm going to consider this
24    certificate as well.  Do you understand?
25              THE DEFENDANT:  Yes, ma'am.
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 79 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 7 of 66 PageID# 879

7

```
 1              THE COURT:  All right.  Hold on for one second,
 2    please.
 3              (There was a pause in the proceedings.)
 4              MR. WOODWARD:  Your Honor, may I -- while you're
 5    doing that, can I look out in the hall?  Some of Mr. Powell's
 6    family was in the courtroom, they left, and I told them to be
 7    back at 11:00.  Can I just stick my head out there?
 8              THE COURT:  You sure can.
 9              (There was a pause in the proceedings.)
10              THE COURT:  All right, Mr. Woodward.  And I'm going
11    to give this original -- do you want the original back for
12    your client?
13              MR. WOODWARD:  No, Your Honor.  He has the original.
14    That's actually a copy.
15              THE COURT:  Oh, is it?  It's a nice copy.  We're
16    going to give it to Ms. Powell so she can affix it to your
17    PSR.
18              All right, Mr. Powell.  Mr. Woodward has told me
19    that he's reviewed your PSR, your addendum, and all the
20    documents in this case, and other than the errors that I've
21    mentioned already, there's no errors in the presentence
22    report.  Is all that true?
23              THE DEFENDANT:  Yes, ma'am.
24              THE COURT:  All right.  So you have reviewed the PSR
25    and the addendum with your attorney?
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 80 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 8 of 66 PageID# 880

8

─────────────── R. Dyer - Direct ───────────────

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  And you've had adequate time to do so?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  And other than the objections that I've

5    already noted for the record, the PSR is an accurate

6    reflection of your history and characteristics.  Is that

7    correct?

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  All right.  That being the case, we'll

10   start with the evidence, Mr. Butler.

11         MR. BUTLER:  Your Honor, understanding that the

12   defendant has an affirmative duty to show that the

13   information is unreliable, nonetheless, we are prepared to

14   call Task Force Officer Robert Dyer to the stand.

15         Before we do that, I do want to ask the Court's

16   permission, just for judicial economy, to not only cover the

17   objections, but we also have some aggravation evidence for

18   sentencing, and we wanted to kind of combine that.

19         THE COURT:  Absolutely.  Let's do it all together.

20   That's perfect.

21         MR. BUTLER:  So at this time the United States calls

22   Task Force Agent Robert Dyer.

23         THE COURT:  All right, Mr. Dyer.

24         (The clerk administered the oath.)

25         ROBERT DYER, called as a witness, having been first

──────────── R. Dyer - Direct ────────────

1    duly sworn, testified as follows:

2                    DIRECT EXAMINATION

3    BY MR. BUTLER:

4    Q.   Good morning.  Please state your name for the record.

5    A.   Good morning.  Robert Dyer.

6    Q.   By whom are you employed?

7    A.   The Portsmouth Police Department.

8    Q.   How long have you been with the Portsmouth Police

9    Department?

10   A.   Ten-and-a-half years.

11   Q.   Okay.  And you're a detective there?

12   A.   Yes.

13   Q.   And do you have another role, other than your role as a

14   detective?

15   A.   Yes.  I'm the department's task force officer with the

16   DEA.

17   Q.   And how long have you been a task force officer with DEA?

18   A.   Approximately, three years.

19   Q.   How are you familiar with the case against the defendant?

20   A.   I'm the case agent.

21   Q.   Were there other agencies or police departments involved

22   in this case?

23   A.   Yes, sir.

24   Q.   What were they?

25   A.   The are Portsmouth Police Department, the Chesapeake

USCA4 Appeal: 21-6892    Doc: 32    Filed: 01/10/2024    Pg: 82 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 10 of 66 PageID# 882

10

————R. Dyer - Direct————

1    Police Department, the Currituck County Sheriff's Office,

2    from North Carolina, and DEA-Maryland, Baltimore.

3    Q.  Now, based on your investigation into the defendant and

4    his group of coconspirators, what can you tell the Court with

5    respect to his role in the organization?

6    A.  Mr. Powell was one of the primary suppliers or sources of

7    supply.

8    Q.  Who, specifically, in the group was he supplying?

9    A.  Valerie Wilson, Marque Wilson, and Detaun Gordon.

10          MR. WOODWARD:  Your Honor, I'm going to have to

11   object at this point.  This enhancement is based on some

12   specific information that's in the presentence report,

13   particularly a debrief from Mary Wilson, if you look at the

14   pertinent paragraphs.  I was provided that relatively late in

15   the process, after the PSR came out.

16          It seems to me that, factually, what we're here to

17   talk about, the only factual objections, are the drug house,

18   the gun, and the drug weight.  The other one is a legal

19   objection.  But the only thing that I've been given to date

20   to support that enhancement relevant to the PSR is an

21   interview with Ms. Wilson that was conducted on July 8th of

22   2016.

23          So, again, I understand in terms of background, but

24   this is specific information that I've been provided about

25   these enhancements.

USCA4 Appeal: 21-6883    Doc: 32      Filed: 01/10/2024    Pg: 83 of 388
Case 2:16-cr-00097-AWA-LRL    Document 167    Filed 02/15/18    Page 11 of 66 PageID# 883

11

─────── R. Dyer - Direct ───────

1          THE COURT:  So it's Friday, and I'm definitely
2     tired, so I'll put that on the record.
3          What's the specific nature of your objection,
4     Mr. Woodward?
5          MR. WOODWARD:  Well, the specific nature of my
6     objection, Your Honor, is it appears that this testimony is
7     going beyond what was in the PSR to support the enhancements.
8          THE COURT:  Okay.  Mr. Butler?
9          MR. BUTLER:  Your Honor, what I did before I called
10    him up was to specifically ask the Court's permission to also
11    get into evidence on aggravation for sentencing.
12         THE COURT:  Okay.  So this is for 3553(a) as well?
13         MR. BUTLER:  Yes, Your Honor, that's specifically
14    what that question was designed for.
15         THE COURT:  All right.  And everything that he's
16    talking about, the gist of it, has the bottom line been
17    provided to Mr. Woodward?
18         MR. BUTLER:  The fact that -- yes.  I mean, these
19    are --
20         THE COURT:  Discovery and all that?
21         MR. BUTLER:  Mr. Powell himself was interviewed
22    three times and provided much of this information.
23         MR. WOODWARD:  Well, and again, Your Honor,
24    Mr. Powell -- and that's where I want to make sure not to
25    tell Mr. Butler how to do his job, but one of Mr. Powell's

──────────R. Dyer - Direct──────────

1    interviews was subject to the plea agreement, and that

2    information, obviously, as the Court knows, can never be used

3    to enhance his sentence or to bring any other charges.

4              THE COURT:  Right.

5              MR. WOODWARD:  So, again, he's certainly entitled to

6    put on aggravation, if he wants.  We have a stipulation of

7    facts and a presentence report, but it seems to me we're

8    treading on thin ice here with regard to keeping straight

9    what was said.  And some of Mr. Powell's interviews were

10   before he was under the plea agreement, which obviously are

11   fair game, but I just want to make sure we're all aware of

12   the rules here.

13             THE COURT:  All right.  It may be thin ice,

14   Mr. Woodward, but, if I know Mr. Woodward, that means you can

15   pull out your chisel and chisel away at it.  So I'm going to

16   overrule it.

17             You go ahead, Mr. Butler.

18   BY MR. BUTLER:

19   Q.  You had just finished talking about some of the other

20   members that he was supplying.  How did he get his heroin?

21   A.  The source of supply was through Baltimore.

22   Q.  Okay.  And, based on what you learned throughout your

23   investigation of this case, what is your estimate with

24   respect to the drug weight as it pertains specifically to

25   Mr. Powell?

─────────────── R. Dyer - Direct ───────────────

1    A.  Approximately, 2,000 grams.

2    Q.  Okay.  Now, is your answer different as it pertains to

3    the entire conspiracy?

4    A.  Yes.

5    Q.  And what is your estimate with respect to the entire

6    conspiracy?

7    A.  I would approximate close to 20 kilograms.

8    Q.  Okay.  Now, we're not asking the Court to assess that

9    here.  What I do want to specifically talk about is your

10   estimate with respect to just Mr. Powell.

11        What --

12        THE COURT:  And 2,000 converts to what?  What is

13   that?  Is that one kilogram, 2,000 grams, as it pertains to

14   the defendant?

15        THE WITNESS:  It would be two kilograms.

16        THE COURT:  Two kilograms.  All right.

17        THE WITNESS:  I'm sorry, two kilograms.

18        MR. WOODWARD:  Again, Your Honor, I'd like to

19   object.

20        The presentence report, which is what we're driven

21   by here, on page 7 -- the United States did not object to it,

22   and the total weight is 1,050 grams, 1 kilogram of which is

23   based on Mary Wilson.

24        So, again, I think the Court can, I guess, separate

25   that out to aggravation, but we've not been put on notice

USCA4 Appeal: 21-6983    Doc: 32    Filed: 01/10/2024    Pg: 86 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 14 of 66 PageID# 886

14

————R. Dyer - Direct————

1    that anybody is trying to say he had two kilograms.

2           If that's what the PSR -- they could have objected

3    and come in and said, One is not enough, it's two, and we

4    could have teed that up.  They elected not to do that.

5           THE COURT:  Mr. Butler?

6           MR. BUTLER:  The defense is trying to use both a

7    shield and a sword.  They have objected to the drug weight,

8    and now we are putting on evidence of what we believe the

9    drug weight to be.  We didn't object to --

10          THE COURT:  Is the evidence going to be somebody

11   other than Valerie?

12          MR. BUTLER:  Yes, it's actually going to be the

13   defendant himself, and the task force officer is prepared to

14   break down that --

15          THE COURT:  All right.  Go ahead.

16   BY MR. BUTLER:

17   Q.  Okay.  So you said 2,000 grams or 2 kilograms of heroin,

18   correct?

19   A.  (The witness nodded his head.)

20   Q.  Okay.  And, just for audio, was that a "yes"?

21   A.  Yes.

22   Q.  All right.  Now, can you break that down for the Court as

23   to how you determined that?  Let's specifically start with

24   Mr. Powell himself.  What did he himself admit to?

25   A.  Approximately, 848 grams.

Heidi L. Jeffreys, Official Court Reporter

**JA81**

USCA4 Appeal: 21-6982   Doc: 32   Filed: 01/10/2024   Pg: 87 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 15 of 66 PageID# 887

15

──────────── R. Dyer - Direct ────────────

1  Q.  Okay.  Now, how about Ms. Wilson?

2  A.  Approximately, 1,015 grams.

3  Q.  Okay.  Let's talk specifically about Ms. Wilson and her

4  description of this kilogram of heroin that she believed that

5  she saw.  Could you tell the Court a little bit about your

6  interview with her and how that was described?

7  A.  During the course of the interview, I asked specifics of

8  the package that she observed being delivered to an address

9  on Gateway Drive to Mr. Powell.  She explained that it was

10  approximately 2 to 3 inches thick, and it was approximately 9

11  inches by 6 inches in size.

12        THE COURT:  Okay.  Slow down, sir, because I'm

13  writing this down because it's important, because his

14  guidelines are 360 to life.  So we have to get it right.

15        THE WITNESS:  Yes, ma'am.

16        THE COURT:  2 to 3 inches thick?

17        THE WITNESS:  Yes, ma'am.

18        THE COURT:  Go ahead.  What else did you --

19        THE WITNESS:  9 x 6 inches.

20        THE COURT:  Okay.

21        THE WITNESS:  It was wrapped in aluminum foil and in

22  a plastic bag.

23  BY MR. BUTLER:

24  Q.  And based on your ten-plus years of experience in law

25  enforcement, is that consistent with a kilogram of heroin --

USCA4 Appeal: 21-6892    Doc: 32      Filed: 01/10/2024    Pg: 88 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 16 of 66 PageID# 888

16

R. Dyer - Direct

1    could it be?

2    A.  Yes, it is.

3    Q.  All right.  Now, what did she say happened after she saw

4    what she believed to be a kilogram?

5    A.  Powell took it into another room, out of her sight, and

6    she heard what she believed to be a coffee grinder or some

7    sort of a blender running.

8    Q.  And how is that significant?

9    A.  Typically, with heroin, cutting and adding additives to

10   the heroin, the best way to mix the two is with a blender.

11   Q.  Okay.  And Ms. Wilson, just for the record -- and the

12   Court is aware of this, but just for the record here, is she

13   somebody that is involved in the distribution of narcotics?

14   A.  Yes.

15   Q.  And how long was she distributing narcotics?

16   A.  At least four years.

17   Q.  Okay.  They've made the objection now.  There was another

18   source of historic weight that you used to come up with

19   2,000 grams of heroin, right?

20   A.  Yes.

21   Q.  And the reason that Probation doesn't have that is why?

22   Why is that?

23   A.  It was Detaun Gordon.

24   Q.  Okay.  And when did that debrief take place?

25   A.  Very recently.

USCA4 Appeal: 21-6882    Doc: 32    Filed: 01/10/2024    Pg: 89 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 17 of 66 PageID# 889

17

─────────── R. Dyer - Direct ───────────

1  Q.  Okay.  What was the weight that Mr. Gordon put on the
2  defendant?
3       MR. WOODWARD:  Again, Your Honor, I enter an
4  objection.  I don't have that, either.  I do not have
5  Mr. Detaun Gordon's debrief that took place very recently, so
6  again, I don't know how I'm supposed to --
7       THE COURT:  That's not provided in discovery,
8  Mr. Butler?
9       MR. BUTLER:  No.  I mean, again, this is, you know,
10 the sword-and-the-shield thing here.  They're making this
11 objection -- even if we stopped at Mr. Powell and Ms. Wilson,
12 the weight that Mr. Gordon put on the defendant is very low.
13 Even with Ms. Wilson and Mr. Powell himself, we're at about
14 1800 grams of heroin, which, for purposes of calculating the
15 guidelines, is still within that same 1- to 3-kilogram level
16 of narcotics.
17      So we don't even need it, but we bring that to your
18 attention because, you know, from a public policy standpoint
19 we don't like to turn over debriefs.  But when we get to a
20 point where somebody is making an objection and calling the
21 drug weight, you know, not credible, then the United States
22 believes that we have an obligation to --
23      THE COURT:  But you turn the information over to the
24 defense attorney, though, right?  We're in agreement with
25 that?

─────────────── R. Dyer - Direct ───────────────

1          MR. BUTLER:  Right.

2          THE COURT:  So he's not privy to this information,

3   which sounds like it's cumulative, anyway, and not necessary.

4   Is that right?

5          MR. BUTLER:  That's right.  So I'll move on, because

6   it's not necessary.

7          THE COURT:  Okay.  But we just need to be clear

8   that, at least in this courtroom, when we are putting

9   objections and enhancements on folks, I don't mind hearing

10  the evidence, and if it's there I'll rule and hit somebody

11  with it -- and if it's not, then so be it -- but they need to

12  know about it to properly prepare.

13         MR. BUTLER:  Okay.

14         THE COURT:  Is that understood?  We're good,

15  Mr. Butler?

16         MR. BUTLER:  Oh, yes, ma'am, we're good.  Yes, Your

17  Honor.

18         THE COURT:  Let's stay away from Mr. Gordon.

19         MR. BUTLER:  Okay.

20         THE COURT:  Okay?  And then, Mr. Woodward, I'm

21  sorry.

22         MR. WOODWARD:  I just -- again, Mr. Butler turned

23  over Ms. Wilson's debrief but not Mr. Gordon's.

24         THE COURT:  Okay.  No, that's fine.  All right.

25  BY MR. BUTLER:

```
                         ┌──────── R. Dyer - Direct ────────┐
```

 1    Q.  All right.  Just so the record is clear here, you said

 2    848 grams were from Mr. Powell's admissions, correct?

 3    A.  Yes.

 4    Q.  And 1,015 grams from Ms. Wilson.

 5    A.  Yes.

 6    Q.  Okay.  And, by the way, when you interviewed Ms. Wilson

 7    who was present?

 8    A.  Her counsel.

 9    Q.  Okay.  All right.  There's also an objection about a

10    firearm enhancement.  What information do you have with

11    respect to this objection?  And let's focus this in on

12    Ms. Wilson.

13    A.  During the interview, she indicated that she had observed

14    Mr. Powell with a firearm, which she believed was on every

15    occasion, and she believed that it was a nine-millimeter.

16    Q.  Okay.  And "every occasion" -- how many times did she

17    have occasion to purchase narcotics, at least from your

18    debrief that you --

19    A.  Approximately, 12.

20            THE COURT:  12 times?

21            THE WITNESS:  Yes, ma'am.

22    BY MR. BUTLER:

23    Q.  And she said that she always saw it?

24    A.  Yes.

25    Q.  And where did she see it, again?

Heidi L. Jeffreys, Official Court Reporter

# JA86

USCA4 Appeal: 21-6893    Doc: 32    Filed: 01/10/2024    Pg: 92 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 20 of 66 PageID# 892

20

────R. Dyer - Direct────

1   A.   Typically, under his leg, under the wheelchair seat.

2   Q.   Okay.  Now, you also reviewed the defendant's jail calls

3   in this case, right?

4   A.   Yes.

5   Q.   What did those reveal to you?

6   A.   On multiple conversations -- Mr. Powell stated in one, "I

7   got rid of the gun," and in another, quote, "I got rid of

8   that thing, I got rid of that rack."

9            THE COURT:  All right.  Please, Agent.  I know

10  nobody likes testifying, but slow down, because I really have

11  to get this right.  I'm tired.

12           "I got rid of the gun."  What was the other quote?

13           THE WITNESS:  "I got rid of that thing."

14           THE COURT:  "I got rid of that thing."

15           THE WITNESS:  "I got rid of that rack."

16           THE COURT:  "Rack"?

17           THE WITNESS:  Rack, R-A-C-K.

18  BY MR. BUTLER:

19  Q.   Can you explain, based on your experience in DEA in

20  Portsmouth, Detective, what does a "rack" refer to?

21  A.   On the street it's referred to as a gun.

22           THE COURT:  All right.

23  BY MR. BUTLER:

24  Q.   And did he also ever use a line, "The gun has to go"?

25  A.   Yes.

USCA4 Appeal: 21-6982    Doc: 32    Filed: 01/10/2024    Pg: 93 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 21 of 66 PageID# 893

21

────────── R. Dyer - Direct ──────────

1    Q.  Can you explain the context of that?

2    A.  In the conversation he states, "trying to get rid of

3    everything, but shit fell somewhere.  I couldn't -- I was,

4    like, the gun got to go."

5    Q.  And did you interview the defendant and ask him

6    specifically about a firearm?

7    A.  Yes.

8    Q.  What did he tell you?

9    A.  He stated that he didn't need a gun, he had two "killas"

10   in the club.

11              THE COURT:  Wait.  Say this again.

12              THE WITNESS:  He stated that he did not need a gun;

13   he had two "killas" in the club.

14              THE COURT:  So, in your opinion, was he being

15   untruthful to you in that statement?

16              THE WITNESS:  Not necessarily.  He indicated that he

17   had two other people that would be willing to do whatever he

18   needed, two "killas" in the club.

19              THE COURT:  Oh, okay.  But the telephone call said

20   that he had a gun.

21              THE WITNESS:  Correct.

22              THE COURT:  So that would be inconsistent, so --

23              THE WITNESS:  These are two separate events.  The

24   interview was at the time of his arrest, and then the jail

25   calls were at the other time of his arrest.

USCA4 Appeal: 21-6993    Doc: 32    Filed: 01/10/2024    Pg: 94 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 22 of 66 PageID# 894

22

─────────────── R. Dyer - Direct ───────────────

```
 1              THE COURT:  Which one was first?
 2              THE WITNESS:  The jail calls.
 3              THE COURT:  Okay.
 4    BY MR. BUTLER:
 5    Q.  Let's break that down, because there were actually two
 6    arrests, right, a state and a federal?
 7    A.  Yes.
 8    Q.  Okay.  When did the state arrest occur?  On May 26, after
 9    the crash?
10    A.  Yes.
11    Q.  Okay.  So on May 26, 2016, there's one arrest.
12    A.  Right.
13    Q.  Okay.  And then the jail calls that you're referring to
14    where he had to get rid of the rack, were those jail calls
15    that happened immediately after that arrest?
16    A.  They were on May 27th.
17              THE COURT:  May 27th?
18              THE WITNESS:  Yes, ma'am.
19              THE COURT:  Of what year?
20              THE WITNESS:  2016.
21              THE COURT:  Okay.  Go ahead.
22    BY MR. BUTLER:
23    Q.  Then you referred to a second arrest.  Are you referring
24    to the federal arrest?
25    A.  Yes.
```

USCA4 Appeal: 21-6983    Doc: 32    Filed: 01/10/2024    Pg: 95 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 23 of 66 PageID# 895

23

─────────────R. Dyer - Direct─────────────

1   Q.  Is that the one that took place on July 1st?

2   A.  Yes.

3   Q.  Okay.  And is that the interview where he referred to two

4   "killas" in the club?

5   A.  Yes.

6   Q.  Okay.  There's also an objection about maintaining a

7   premises.  What do you know about the defendant's use of a

8   residence to manufacture and sell heroin?

9   A.  Debriefing Valerie Wilson, she indicated that her

10  purchases came from an address on Gateway Drive in

11  Portsmouth, in an apartment complex.  During the time after

12  Mr. Powell was wanted and I sought a criminal complaint, I

13  actually conducted surveillance on an apartment complex on

14  Gateway Drive in the 3600 block.

15  Q.  Other than Ms. Wilson being a coconspirator with this

16  defendant, do they also have another relationship?

17  A.  They do.

18  Q.  And what is that?

19  A.  There's an actual blood relationship.

20  Q.  Okay.  Now, shifting gears a bit here outside the

21  objection and specifically addressing aggravation in this

22  case, I want to ask you about the events of May 26, 2016.

23       Can you please explain to the Court how that day

24  unfolded for you?

25  A.  Yes.

USCA4 Appeal: 21-6982    Doc: 32    Filed: 01/10/2024    Pg: 96 of 388

─────────────────── R. Dyer - Direct ───────────────────

1          THE COURT:  What's the date again?  I'm sorry.

2          MR. BUTLER:  May 26 of 2016.

3          THE COURT:  Okay.

4          THE WITNESS:  One of the detectives with Portsmouth

5    notified me that they had an individual that could purchase a

6    quarter-ounce of heroin from Mr. Powell.  A review of

7    Mr. Powell's criminal history indicated that he was a risk

8    and that the SWAT team would be needed to effect an arrest at

9    the time of the purchase.

10          I actually planned the operation, and the

11    cooperating individual placed a phone call and made the

12    arrangement.  Mr. Powell changed the location on

13    approximately three different times.  This was -- this is

14    consistent with somebody that's conducting

15    countersurveillance to detect law enforcement in the area,

16    and that's exactly what happened.

17          Mr. Powell set the location, and he was actually

18    sitting across the street in a vehicle.  I observed him in

19    the vehicle.  As police pulled into the parking lot of the

20    gas station, Mr. Powell left at a high rate of speed.  As

21    unmarked police units attempted to stop him, he continued to

22    flee into a vehicle pursuit.

23          The vehicle pursuit occurred around close to 6:20 in

24    the evening.  Traffic was moderate.  It went through both

25    commercial and residential neighborhoods, actually passing a

─────────────────R. Dyer - Direct─────────────────

1    school, one near-accident in a larger intersection, and then

2    ultimately ending in an accident with an innocent civilian.

3    BY MR. BUTLER:

4    Q.  And how was it that the defendant was able to operate

5    that vehicle?

6    A.  Mr. Powell operated the vehicle with a cane.

7    Q.  Okay.  Now, you said that there was -- there's a victim

8    of this crash?

9    A.  Yes.

10   Q.  What happened to this victim?

11   A.  The force of the impact -- the impact was a T-bone

12   collision.  It actually dislodged her from the driver's seat

13   and moved her all the way to the passenger's seat.

14   Q.  Okay.  And was she injured?

15   A.  Yes.  She was transported to the hospital.

16   Q.  What was recovered from the defendant's vehicle?

17   A.  Approximately seven grams of fentanyl, $3600 in cash, and

18   some marijuana.

19   Q.  All right.  I'd like to hand you Government Exhibit 3 --

20          MR. BUTLER:  And the defense has been provided this

21   in discovery.

22   BY MR. BUTLER:

23   Q.  What is Government Exhibit 3?

24   A.  This is a CD that contains the video, my initials, and

25   yesterday's date, when I viewed it.

USCA4 Appeal: 21-6983    Doc: 32    Filed: 01/10/2024    Pg: 98 of 388

R. Dyer - Direct

1  Q.  And that's how you know it contains the video?

2  A.  Yes.

3  Q.  And about how long is the video?

4  A.  Approximately two minutes, two-and-a-half minutes.

5  Q.  What are some things that you want to point out before we

6  see this video?

7  A.  Mr. Powell was traveling in a white Chevy Malibu, that

8  car you can see in the distance.  There is a dark gray or

9  silver Nissan Altima that is actually an unmarked police

10  vehicle.  You can't hear the sirens from it, because the

11  sirens are projected from the front of the vehicle.

12       The view of the camera is in the vehicle that I'm

13  travelling in.  I'm actually the passenger.  The driver is

14  wearing a body camera.  We're in a Chevy Suburban that cannot

15  keep up the pace of the pursuit, so you'll see the distance,

16  you'll see the acceleration when we're making some of the

17  turns.  And, ultimately, we take an alternate route to

18  parallel the course through the residential neighborhoods to

19  stay on main streets to keep the pursuit a little safer.  And

20  ultimately, towards the end of the pursuit, we meet the

21  accident, and I take Mr. Powell into custody.

22  Q.  And were there any issues with taking him into custody?

23  A.  No.

24  Q.  All right.

25       MR. BUTLER:  Your Honor, at this time I offer

USCA4 Appeal: 21-6883    Doc: 32    Filed: 01/10/2024    Pg: 99 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 27 of 66 PageID# 899

27

──────────────── R. Dyer - Direct ────────────────

 1    Government Exhibit 3 and ask permission to publish it.

 2            MR. WOODWARD:  Your Honor, this is part of the

 3    stipulation.  We've seen this.  We had this in discovery.

 4            THE COURT:  All right.  So it will be admitted.

 5            (The exhibit was admitted into evidence.)

 6            MR. BUTLER:  And, also, I asked defense counsel

 7    beforehand, it's on the disk, but I also have it on the

 8    computer, and for technological purposes it will play a

 9    little smoother.  They didn't have any objection to that, and

10    I just want to ask the Court if that's okay.

11            THE COURT:  It is.

12            MR. BUTLER:  Okay.  So at this time we're going to

13    play Government Exhibit 3.

14            (The video was shown.)

15            MR. BUTLER:  At this time I'd like to show the

16    witness Government Exhibit 4 for identification, which has

17    previously been given to the defense.

18    BY MR. BUTLER:

19    Q.   What is Government Exhibit 4?

20    A.   On Government Exhibit 4, the black car is the --

21    Q.   Just generally speaking, how many pages is this exhibit?

22    A.   Three.

23            MR. WOODWARD:  Your Honor, those are pictures of the

24    wreck.  We received them.  We'll stipulate that they're of

25    part of the scene after the crash.

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 100 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 28 of 66 PageID# 900

28

─────────────R. Dyer - Direct─────────────

1          THE COURT:  All right.

2          (The exhibit was admitted into evidence.)

3          MR. BUTLER:  So we do offer those, Your Honor, but

4     just so it's clear to those...

5     BY MR. BUTLER:

6     Q.  Page 1, whose vehicle is that?

7     A.  That's the civilian vehicle.

8     Q.  Okay.  And then page 2?

9     A.  Mr. Powell's rental vehicle.

10    Q.  Okay.  And then page 3 is just a depiction of the scene?

11    A.  Yes.

12    Q.  All right.  And you were there, right?

13    A.  Yes.

14    Q.  So he's originally arrested on state charges.  Is that

15    right?

16    A.  Yes.

17    Q.  Okay.  What was the result of his state bond hearing?

18    A.  He was released on bond.

19    Q.  And what happened after he was granted bond?

20    A.  He made some jail calls, and --

21    Q.  No, after he got bond.

22    A.  Oh, I'm sorry.  He ultimately posted some messages on

23    Facebook.

24    Q.  How did you become aware that he was using Facebook?

25    A.  I was monitoring his Facebook.

─────────────────R. Dyer - Direct─────────────────

1    Q.   Okay.  And what account were you monitoring?

2    A.   It was identified as Nate Trap-a-Lot Powell.

3    Q.   What causes you to believe that that account is

4    associated with the defendant?

5    A.   Mr. Powell commonly goes by "Nate" as nickname, and

6    pictures on the page indicate Mr. Powell.

7    Q.   How about were there pictures of any known family members

8    or anything of that --

9    A.   Yes.

10            MR. WOODWARD:  Your Honor, again, this is part of --

11            THE COURT:  Okay.  Let him put on his evidence,

12    though, Mr. Woodward.  At sentencing, rules of evidence don't

13    apply if --

14            MR. WOODWARD:  But I'm not going to object on

15    foundation.

16            THE COURT:  It's Mr. Butler's case.

17            All right.  Go ahead, Mr. Butler.

18    BY MR. BUTLER:

19    Q.   Earlier you mentioned the account name Nate Trap-a-Lot.

20    What is the significance of Trap-a-Lot?

21    A.   "Trap" is a street word or slang.  Trap can be a location

22    to sell drugs out of, or Trap-a-Lot I take to mean a drug

23    dealer, in that realm.

24    Q.   And is that based on your experience working narcotics

25    cases?

USCA4 Appeal: 21-6983    Doc: 32    Filed: 01/10/2024    Pg: 102 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 30 of 66 PageID# 902

30

─────────────────R. Dyer - Direct─────────────────

1    A.   Yes.

2    Q.   Okay.

3         MR. BUTLER:  It appears the defense does not have

4    any objection to Government Exhibit 2, so I do offer

5    Government Exhibit 2 at this time, but I would like to hand

6    Government Exhibit 2 to the witness.

7         THE COURT:  It will be admitted.

8         (The exhibit was admitted into evidence.)

9         MR. BUTLER:  And that's previously been handed to

10   defense.

11   BY MR. BUTLER:

12   Q.   What about these messages caused alarm for you?

13   A.   A couple things, one of which is that the messages

14   indicate that Mr. Powell wants to notify his friends,

15   Facebook friends, which he had approximately 1200 of, the

16   identity of the individual he believed to be working with

17   police, which is obviously a safety concern.

18        The other is that he indicates that he's going to

19   fix him and he doesn't want the individual to end up on a

20   T-shirt.  In my training and experience, that indicates --

21   typically, after a death or the loss of a loved one,

22   individuals will post pictures of their T-shirts and "RIP" in

23   memoriam of that lost individual.

24   Q.   So what did you do as a result -- after you viewed what

25   you believed to be -- did you believe that to be obstruction?

USCA4 Appeal: 21-6902    Doc: 32    Filed: 01/10/2024    Pg: 103 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 31 of 66 PageID# 903

31

─────────────── R. Dyer - Direct ───────────────

1    What specifically jumped out to you with respect to
2    obstruction?  You said something about his 1200 friends on
3    Facebook.  What did he say?
4    A.  Specifically, he says that, "I came to FB," referring to
5    Facebook, "because I don't want a nigga from my city selling
6    yo police ass a $5 bag of weed."
7    Q.  And then what action did you take after you saw the
8    threats in these messages?
9    A.  I drafted and had signed a criminal complaint for
10   Mr. Powell's arrest.
11   Q.  Okay.  Now, we've mentioned a debrief that took place
12   with Mr. Gordon, right?
13   A.  Yes.
14   Q.  Okay.  Did he discuss with you any communications he
15   believed the defendant had with him?
16   A.  Yes.
17   Q.  While they were in custody?
18   A.  Yes.
19   Q.  Okay.  Tell the Court about that.
20   A.  I received several jail kites, referred to as jail kites,
21   correspondence between jail inmates that are typically passed
22   between trustees or members of the jail that have access to
23   pass them from one to the other.  It's an informal means of
24   communication, and they were provided to us from Mr. Gordon.
25   Q.  And were the defendant and Mr. Gordon housed in the same

USCA4 Appeal: 21-6983    Doc: 32    Filed: 01/10/2024    Pg: 104 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 32 of 66 PageID# 904

32

─────────── R. Dyer - Direct ───────────

1   facility?

2   A.   Yes.

3   Q.   Okay.  But they were just in different blocks?

4   A.   Correct.

5   Q.   Okay.  I'd like to hand you Government Exhibit 1, which

6   has been filed with the position paper.

7          MR. BUTLER:  And the defense has a copy of this.

8   BY MR. BUTLER:

9   Q.   Are these the jail kites that you earlier referred to?

10  A.   Yes.

11  Q.   Okay.  And how many are there?

12  A.   Three.

13  Q.   All right.  Can you tell the Court what specifically

14  leads you to believe that those are from Mr. Powell?

15  A.   The last page indicates, quote, "I'm facing 40 fucking

16  years myself."  Of the coconspirators that were charged,

17  Mr. Powell was the only one that was facing 40 years.

18  Q.   How about on the second letter?

19  A.   In the second letter it indicates the individual was

20  going to be debriefed.  This date was, I believe, November,

21  2016, and it was around the November/December time frame that

22  I was in contact with Mr. Woodward, trying to arrange a

23  debrief.

24  Q.   And were there any other members of the conspiracy that

25  you debriefed in the November/December time frame?

USCA4 Appeal: 21-6983    Doc: 32    Filed: 01/10/2024    Pg: 105 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 33 of 66 PageID# 905

33

─────────────── R. Dyer - Cross ───────────────

1    A.  No.

2    Q.  Now, in your experience -- I mean, you don't know that

3    Mr. Powell is the one that actually put his pen to that

4    paper, right?

5    A.  No.

6    Q.  Okay.  But, in your experience, do you know whether or

7    not inmates get other inmates to write letters for them?

8    A.  Yes.

9    Q.  And you said the dates on those letters indicate, what,

10   October or November of --

11   A.  2016.

12   Q.  2016.  Okay.

13           MR. BUTLER:  Your Honor, I do offer Government

14   Exhibit 1 at this time.

15           THE COURT:  It's admitted.

16           (The exhibit was admitted into evidence.)

17           MR. BUTLER:  Those are all the questions that I

18   have.

19           THE COURT:  All right, Mr. Woodward.

20           MR. WOODWARD:  Thank you.

21           THE COURT:  You're welcome.

22                      CROSS-EXAMINATION

23   BY MR. WOODWARD:

24   Q.  Officer Dyer, what were the dates of the interviews with

25   Mr. Powell, including the debrief?  I don't want any of the

USCA4 Appeal: 21-6892   Doc: 32     Filed: 01/10/2024   Pg: 106 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 34 of 66 PageID# 906

34

───────R. Dyer - Cross───────

1    details of the debrief.  He was arrested in the state case, I
2    think you said, on May 26th.
3    A.   That was one interview.
4    Q.   He made an interview that day, and then he got out on
5    bond, and then what date was he arrested on the federal case?
6    A.   July 1.
7    Q.   Okay.  And then what day was the debrief?
8    A.   There was that interview, and then December 16th.
9    Q.   Okay.  So December 16th was the debrief -- I'm sorry.
10   Can you hear me?
11   A.   Yes, sir.  I'm sorry.
12   Q.   Okay.  And the kites that you have are dated November the
13   11th, what the Court has admitted as -- I missed the
14   number -- 1.  Those are November the 11th, correct?
15   A.   Yes.
16   Q.   Okay.  And his debrief was on December 16th, not -- so
17   when you said about someone being debriefed during the
18   November time frame, who was debriefed?
19   A.   The only person was Nate Powell.
20   Q.   In your view of the world, December 16th is the November
21   time frame?
22   A.   October/November, in that realm.  Nobody else in the
23   conspiracy was debriefed.
24   Q.   All right.  Now let me just make sure with regard to the
25   objections I've made relating to the -- you prepared -- you

USCA4 Appeal: 21-6983   Doc: 32   Filed: 01/10/2024   Pg: 107 of 388

—————R. Dyer - Cross—————

1    or someone who was with you prepared a summary of this
2    interview with Ms. Wilson that you talked to Judge Allen
3    about.  Is that correct?
4    A.  Yes, sir.
5    Q.  Okay.  And she indicated that she didn't know that this
6    package was heroin.  She said that she suspected it was.  Is
7    that correct?
8    A.  Yes, sir.
9    Q.  Okay.  And do you know when that happened?
10   A.  Not right off, sir.
11   Q.  She didn't know.  Well, you couldn't know because she
12   didn't know.  She didn't give you any time, not even a year,
13   of when that occurred, did she?
14   A.  Her contact, I believe, was in 2014 with him.
15   Q.  Does your report indicate that it happened in 2014?  I've
16   got a copy.  I'm not trying to -- I'll be glad to pass it up
17   to you, if you would like to look at it.
18   A.  Yeah, I'd like to look at the report.
19          (There was a pause in the proceedings.)
20   BY MR. WOODWARD:
21   Q.  It doesn't, does it?
22   A.  No, sir.
23   Q.  Okay.  As a matter of fact, what that says is that she
24   was buying bundles of heroin, which are ten bags, is that
25   correct, for --

R. Dyer - Cross

1    A.   Ten bags.

2    Q.   -- from 2011 until 2016.

3    A.   Uh-huh.

4    Q.   Five years.  And she said she bought ten bags every day,

5    did she not?  Or at least that's what you-all wrote down that

6    she said.

7    A.   She estimated purchasing ten racks a day.

8    Q.   Since 2011?

9    A.   On approximately 12 occasions.

10   Q.   No, that's -- I don't think that's -- can I have it back?

11   Let me read what it says and make sure we're not -- let me

12   just read it, and then I'll ask you.

13        "Wilson indicated that she had been purchasing heroin

14   from Powell since the summer of 2011.  She indicated that she

15   had been to the apartment approximately on 12 occasions."

16        Is that correct?

17   A.   Yes, sir.

18   Q.   Okay.  And my question is do you know when it was that

19   she says she saw this kilo, or what you call a kilo?

20   A.   No.

21   Q.   Okay.  When you arrested Mr. Powell after the high-speed

22   chase, he didn't have a gun on him.

23   A.   Correct.

24   Q.   Okay.  And he didn't have any heroin on him, he had

25   fentanyl; is that correct?

USCA4 Appeal: 21-6883    Doc: 32      Filed: 01/10/2024    Pg: 109 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 37 of 66 PageID# 909

37

———————R. Dyer - Cross———————

1  A.  Yes.

2  Q.  Okay.  Ms. Powell is a drug user -- I mean, Ms. Wilson is

3  a drug user.

4  A.  Yes.

5  Q.  You know her to be a junky or a heroin addict.

6  A.  She's a user, yes, sir.

7  Q.  Okay.  Well, would you consider -- you told the Court of

8  your expertise in handling drug cases.  Would you consider

9  her an addict?

10  A.  Yes.

11  Q.  Okay.  And how long do you think she's been a drug

12  addict, from your knowledge of this case?

13  A.  Several years.

14  Q.  Okay.  And you certainly never saw Mr. Powell with a kilo

15  of heroin.

16  A.  No, sir.

17  Q.  And you certainly never saw him with a gun.

18  A.  No, sir.

19  Q.  And you did verify that he lived or had an apartment on

20  Gateway Drive in the Churchland section of Portsmouth, but

21  you've certainly not ever been in there and seen any

22  drug-processing equipment.

23  A.  No, sir.

24  Q.  Okay.  So all of that is based on this one statement of

25  Ms. Wilson --

USCA4 Appeal: 21-6982   Doc: 32   Filed: 01/10/2024   Pg: 110 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 38 of 66 PageID# 910

38

─────R. Dyer - Cross─────

 1   A.  Yes, sir.

 2   Q.  -- that was given in 2016, with her lawyer.

 3        Did you have a chance to study -- is that correct,

 4   with her lawyer?

 5   A.  Yes, sir.

 6   Q.  Did you have a chance to study my client's criminal

 7   history as part of your preparation in this case?

 8   A.  I've looked at it.  I didn't look at it this morning.

 9   Q.  You'd agree with me that he's had a lot of contacts and

10   interaction with law enforcement.

11   A.  I would.

12   Q.  To your knowledge, has he ever been arrested or found in

13   possession of a gun, in all of those times?

14   A.  I don't know right off.  I haven't -- it's been a while

15   since I reviewed it.

16        THE COURT:  I know.  He doesn't.

17        MR. WOODWARD:  Yes, Your Honor.

18        THE COURT:  He doesn't.

19   BY MR. WOODWARD:

20   Q.  And you also say that Ms. Wilson said she did not even

21   know what type of gun it was but thought it might have been a

22   nine-millimeter.  Again, that's what you wrote down in your

23   report.

24   A.  Yes, sir.

25   Q.  In terms of her describing the gun, did you ask her what

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 111 of 388
Case 2:16-cr-00097-AWA-LRL    Document 167    Filed 02/15/18    Page 39 of 66 PageID# 911

39

R. Dyer - Cross

1    color it was?

2    A.   The -- what's written in the report is the information

3    she provided.

4    Q.   Okay.  Well, again, you're used to interviewing people

5    and asking them about guns.  Did you ask her what color it

6    was?

7    A.   I don't remember, if I did.  That would be common

8    practice for me to do, yes, sir.

9    Q.   Okay.  Would that have been something you would have

10   found important to record, if she had said that?

11   A.   Yes.

12   Q.   Okay.  Did you ask her what her knowledge and what her

13   experience with firearms were so that you could determine

14   whether or not she knew the difference between a

15   nine-millimeter and any other kind of gun?

16   A.   No.

17   Q.   Okay.  So you just basically wrote down what she said

18   about that.

19   A.   Uh-huh.

20   Q.   Same as with this package she told you about.

21   A.   Yes, sir.

22   Q.   Okay.  And did you try to pin her down when you were

23   interviewing her and she said she saw this package that she

24   stated she suspected was heroin?  Did you try to ask her when

25   that was in the last -- did you see it a month ago, a year

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 112 of 388
Case 2:16-cr-00097-AWA-LRL    Document 167    Filed 02/15/18    Page 40 of 66 PageID# 912

40

R. Dyer - Cross

1   ago, or any kind of time frame?

2   A.  Not that I recall, specifically.  It's something I

3   typically would have done, much like the gun, but as you ask

4   me today I can't recall.

5   Q.  And, certainly, if she had told you that, you would have

6   recorded it in your debrief --

7   A.  I would think so.

8   Q.  -- the date and the time.  Did you drill down with her at

9   all about anything -- you say, "She recalled one time in the

10  apartment a black male came to the door."

11       Did you ask her any questions to get her to describe

12  that black male, ask her if she knew who he was, did he have

13  dreadlocks, tall, short, light skin, dark complected,

14  anything to determine who that might be?

15  A.  I don't recall.

16  Q.  Did you ask her if she overheard any conversation with

17  Mr. Powell and this individual about this transaction that

18  she was relating to you?

19  A.  I may have.  I may have asked her several questions that

20  aren't depicted verbatim in the report or even mentioned in

21  the report, just as a matter of record.

22  Q.  Okay.  All right.

23       MR. WOODWARD:  Thank you, Your Honor.  That's all I

24  have.

25       THE COURT:  All right.  Thank you, Mr. Woodward.

Heidi L. Jeffreys, Official Court Reporter

JA107

USCA4 Appeal: 21-6893    Doc: 32      Filed: 01/10/2024    Pg: 113 of 388
Case 2:16-cr-00097-AWA-LRL    Document 167    Filed 02/15/18    Page 41 of 66 PageID# 913

41

```
1              Any additional redirect, sir?

2              MR. BUTLER:  No, Your Honor.

3              THE COURT:  Sir, thank you for your testimony.  You

4    can step down.

5              THE WITNESS:  Thank you.

6              THE COURT:  All right.  Any additional evidence,

7    Mr. Butler?

8              MR. BUTLER:  No, but, if the Court would like, I'm

9    prepared to make both some arguments on just the objections,

10   and then I do have a general argument.

11             THE COURT:  Yes, that's the way I do it, so the

12   record is clear.  Any additional evidence that you want to

13   talk about as it pertains to the objections that are before

14   the Court and the defendant's burden to prove the inaccuracy

15   or unreliability of the --

16             MR. WOODWARD:  No, Your Honor.  And, just so the

17   Court knows, I've explained to Mr. Powell his right to

18   testify, and he's indicated to me that he would not like to

19   testify regarding the objections.

20             THE COURT:  All right, and I want to put that on the

21   record as well.

22             Mr. Powell, do you understand you have the right to

23   testify regarding the objections that are before the Court?

24   And that would be the drug weight, the firearm, the Facebook

25   communications, and the premises enhancements.
```

```
 1            THE DEFENDANT:  Yes, ma'am.

 2            THE COURT:  And it is your desire not to testify in

 3   these matters?

 4            THE DEFENDANT:  Yes, ma'am.

 5            THE COURT:  All right.  And is anybody forcing you

 6   not to testify?

 7            THE DEFENDANT:  No, ma'am.

 8            THE COURT:  All right, Mr. Butler.  Let's first take

 9   up the drug weight objection.

10            MR. BUTLER:  All right.  So the defense -- they're

11   undermining Ms. Wilson's credibility, citing that, you know,

12   she's a drug addict and not specific on the dates.  The fact

13   of the matter is this is a course of conduct over five years.

14   It would be unreasonable for her to pull out, you know,

15   July 2nd of 2012.  But what she is certain about is this is

16   somebody that she's related to, and this is somebody who is a

17   source of supply for her, not just one time or two times, but

18   at least a dozen times.

19            She specifically -- and I'll note, too, with respect

20   to the credibility, I mean, this Court has also had the

21   opportunity to -- you know, she's made an appearance in

22   court, and you've had an exchange with her at sentencing, and

23   the defense has not had that same opportunity to have seen

24   that, although it was open to the public.  And the Court has

25   also seen her PSR.  But even aside from that, she's providing
```

1    details that are credible.  She describes this 9-by-6-inch

2    package that the task force officer, with over a dozen years

3    of narcotics experience, says is consistent with a kilogram.

4    She then describes how it's taken into another room and it's

5    blended, which is consistent with somebody who is trying to

6    manufacture and cut adulterants into it.

7         And, at the end of the day, she may be an addict,

8    but she's also a drug dealer.  So this is somebody who was

9    dealing to about a dozen different people on the Outer Banks.

10   She knows heroin.  Personally, she actually uses it, but

11   she's also selling it and sold it for an extended period of

12   time.

13        We heard some testimony, too, about the specific

14   drug weights, not just as they were given by Ms. Wilson, but

15   from the defendant himself.  850 grams he admits to.  And I

16   do want to be clear.  Even though there was testimony, really

17   for aggravation, of 20 kilograms of heroin, you know, in

18   theory, you know, we could have, you know, done a *Pinkerton*

19   theory of liability.  We're not doing that here.  We don't

20   want the Court to do that here.  What we are asking the Court

21   to do is to find that the heroin in this case exceeds one

22   kilogram and is at that base offense level of 30, Your Honor.

23        THE COURT:  All right.  Thank you, Mr. Butler.

24        Mr. Woodward, I'd like to hear from you.

25        MR. WOODWARD:  Are we just doing it one at a time?

USCA4 Appeal: 21-6983    Doc: 32    Filed: 01/10/2024    Pg: 116 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 44 of 66 PageID# 916

44

```
 1              THE COURT:  We do it back and forth, yes, we do.
 2              MR. WOODWARD:  Well, yes, Your Honor.  Obviously,
 3    the Court can see -- I'll talk about the drug weight.
 4              Three of my objections all relate to Ms. Wilson's
 5    credibility, and one is a legal issue.  And, certainly, you
 6    know, what the Court has really got to decide is the vague
 7    and unspecific statement of one individual, who we know to be
 8    a drug addict and we know to be providing information in the
 9    hopes of helping herself, because she was with her lawyer and
10    in custody enough to support all these enhancements.  I
11    haven't had the privilege or the right or anything to see
12    Mrs. Wilson, but -- you know, certainly I understand the
13    standard here is preponderance, not proof beyond a reasonable
14    doubt, but, I mean, we have a -- and I don't doubt for a
15    minute that -- you know, I've known Officer Dyer a long
16    time -- that he accurately wrote down what it was she said.
17    I mean, that wasn't the point of my questions.  The point of
18    my questions was that there's not much there-there.
19              There's this allegation sometime in a six-year
20    period she saw somebody bring a bundle, and they even wrote
21    down that she suspected it was heroin.  It wasn't a question
22    of he opened it up in front of her and said, Hey, look, I
23    just got this good stuff, or, you know, Here, try this, or,
24    Here, come watch me -- I mean, that kind of detail.  I mean,
25    to her credit, that would have perhaps been the specificity
```

USCA4 Appeal: 21-6993    Doc: 32    Filed: 01/10/2024    Pg: 117 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 45 of 66 PageID# 917

45

```
 1    that would get even to a preponderance.  This is a mere
 2    allegation, in my view, and I think that if we get to the
 3    point where, you know, there's enhancements that greatly
 4    increase a guideline range, based on this type of
 5    information, there's no way for the defense to attack that.
 6           I mean, we -- you know, as the Court is well aware
 7    from your experience on both sides of the ball, all kinds of
 8    things go into debriefs.  I mean, you know, people say all
 9    kinds of things when they're being debriefed, and it's
10    just -- Mr. Powell asked me to make those objections.  I
11    believe that she said that, but I just don't believe it's
12    reliable enough to base sentencing enhancements on, because,
13    again, he's never caught with a big amount of drugs.  You
14    know, there's no -- if you look at his record, he's been a
15    small-time drug dealer.  He's dealt bundles and grams on the
16    state level.  I don't want to slop over to the gun, but the
17    same thing.  This is not an individual who has been moving
18    weight based on all of his contacts.  When he ran from the
19    police, he had seven grams of fentanyl in the car.  That deal
20    they were going to set up was for a couple of grams.
21           And that's what we have.  And, like I said, I don't
22    doubt she said it, it's just how much weight the Court wants
23    to give it.
24           THE COURT:  Thank you.  The burden of proof is on
25    the government, and I agree with the government in total, and
```

USCA4 Appeal: 21-6983    Doc: 32    Filed: 01/10/2024    Pg: 118 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 46 of 66 PageID# 918

46

1   I'm going to overrule the objection.  So the drug weight is
2   going to be one kilogram, based on a total of 30.
3           All right.  How about the firearm, Mr. Butler?
4           MR. BUTLER:  So we have two sources here, right?
5   We've got Ms. Wilson.  She says she sees this every time that
6   she's dealing with him and that it's specifically in the
7   wheelchair.  She doesn't know the exact model but believes it
8   to be a nine-millimeter.
9           And then we have the defendant himself, on recorded
10  jail calls, talking about getting rid of a rack.  He's, you
11  know, bragging about that the police didn't find it.  And
12  this was something that he was on notice of at the detention
13  hearing.  It was the fact that we used in our contention to
14  hold him, pending trial.  And, you know, the bottom line is
15  we think, with both Ms. Wilson and the defendant himself,
16  that we've exceeded the preponderance standard, Your Honor.
17          THE COURT:  All right.  Mr. Woodward, anything
18  additional?
19          MR. WOODWARD:  Well, again, Your Honor, my same
20  thing would be that you have a long history, multiple
21  contacts with the police, never in possession of a gun.  You
22  know, she says he has a gun with him every day.  Every time
23  he's been arrested he never had a gun, including both times
24  that relate to this case after that chase.  There was no gun
25  in that car; there was no gun on his person.  And, again, we

USCA4 Appeal: 21-6983    Doc: 32    Filed: 01/10/2024    Pg: 119 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 47 of 66 PageID# 919

47

1    don't even know what time frame she's talking about, sometime

2    between 2011 and 2016.

3           So I would, again -- based on my experience, if

4    somebody carries a gun all the time, they carry a gun all the

5    time.  And he's had, by my count, 20-plus encounters with

6    police officers over the last 15 years, and has never had a

7    weapon in his possession.

8           THE COURT:  How about the record, the jail calls,

9    his own words?

10          MR. WOODWARD:  Well, Your Honor, I understand that,

11   and that's one factor, but what this enhancement is based

12   on -- and, again, I think we have to stay true to what we're

13   talking about.  We have no clue -- this is based on Mrs. --

14   the enhancement is not based on him having a gun the day he

15   was arrested in that car, and if that jail call -- if, in

16   fact, there was a gun in the car and they somehow didn't find

17   it and then he got rid of it and that's what that means,

18   that's not what we're on notice of.

19          If you look at the presentence report, the

20   presentence report says he should get a gun enhancement

21   because he carried a weapon during transactions with Mary

22   Wilson sometime over a six-year period.  That's what -- the

23   way I read it, it's all based on her, it's not based on

24   anything else.

25          I mean, maybe -- if I'm misreading it, it wouldn't

```
 1   be the first time, but that's what the presentence report is
 2   based on, his interactions with Ms. Wilson for that
 3   enhancement, just like the other ones.
 4            THE COURT:  All right, Mr. Butler.
 5            MR. BUTLER:  Your Honor, those jail calls were
 6   turned over in discovery, and we made those part of notice at
 7   the detention hearing.  This defendant knows of this
 8   information, so it should come as no surprise.  Even though
 9   it's not in the presentence report, that's something they
10   were made aware of.
11            MR. WOODWARD:  Well, but, Your Honor, it's not, "it
12   should come as no surprise."  I get the right to rely on --
13   they could have said that he possessed a firearm during a
14   drug transaction on May 26th.  They certainly could have put
15   that in the statement of facts and said that that was based
16   on a jail -- if you look at paragraph 10, that whole
17   paragraph is based on Mary Wilson's debrief.  It's not --
18            THE COURT:  It says, "The defendant was observed in
19   possession of a firearm during drug transactions," so is the
20   basis of the gun enhancement for his possessing guns during
21   the conspiracy, Mr. Butler?
22            MR. BUTLER:  Yes, Your Honor.  As it pertains to
23   Ms. Wilson, that's what -- we were just reading paragraph 10.
24   Yes, she's saying in the 12 times that she's purchasing
25   heroin from the defendant she's observing him with a firearm.
```

```
 1              THE COURT:  And she was a member of the conspiracy
 2    during the four- or five-year time period with him, correct?
 3              MR. BUTLER:  Yes, Your Honor.
 4              THE COURT:  And she was the drug dealer for him,
 5    correct?
 6              MR. BUTLER:  Yes, Your Honor.
 7              THE COURT:  All right.  And there are jail call
 8    records where he's saying he has to get rid of a gun,
 9    correct, Mr. Woodward?
10              MR. WOODWARD:  Yes, Your Honor.  My only point is
11    that the jail call, as I understand it, talks about at the
12    point in time after he made bond on the state case.  This is
13    based on Ms. Wilson's testimony, not that he had a gun in
14    that car during that chase that you just saw.
15              THE COURT:  All right.  I'm going to overrule the
16    objection.  I think it's been properly applied.
17              All right.  Next is the Facebook post, Mr. Butler.
18              MR. BUTLER:  So there's two enhancements from these
19    Facebook posts, right, the threats and the obstruction.  So
20    3C1.1 deals with the obstruction, an attempt to obstruct or
21    impede the administration of justice.  And here, assuming for
22    argument that this man that he's communicating with, that he
23    was intimidating, was actually a confidential informant --
24    and we're not going to deny or confirm that, but this most
25    certainly would have had an adverse impact on our ability to
```

USCA4 Appeal: 21-6993    Doc: 32    Filed: 01/10/2024    Pg: 122 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 50 of 66 PageID# 922

50

1    prove our case.  He's putting out to his 1200-person network,

2    and he says, quote, "I came to FB" -- Facebook -- "because I

3    don't want" -- an N word -- "from my city selling yo police

4    ass a $5 bag of weed."

5             I mean, he's putting his network on notice that he

6    believes this guy is with the police.  He's basically calling

7    him a snitch, and that can have a significant effect,

8    potentially, on that May 26 Count Eleven charge and then on

9    the conspiracy itself.

10            We see the threat totally different from that.  He

11   tells this individual that he knows where he rests his head.

12   He says he's going to, quote, "fix your ass," and he's

13   referring to, "better watch out or you're gonna end up on a

14   T-shirt."

15            And the guidelines have measures in place to address

16   the concern that the defense has, right?  They don't want,

17   you know, these both to occur.  And there's Section 3D1.2,

18   and it addresses groups of closely related counts -- counts,

19   not enhancements.  And so here we have conduct that, yes,

20   stems from the same exchange on Facebook, but they constitute

21   separate enhancements.

22            And so we do believe that both of those were

23   properly applied, Your Honor.

24            THE COURT:  Mr. Woodward?

25            MR. WOODWARD:  Again, Your Honor, just if you read

USCA4 Appeal: 21-6982    Doc: 32    Filed: 01/10/2024    Pg: 123 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 51 of 66 PageID# 923

51

```
 1   what it is, I mean, he used -- you know, 21 says he used, you
 2   know, Facebook or social media to make a credible threat to
 3   use violence, and 26 says he threatened, intimidated, or
 4   otherwise influenced the witness over social media.  So,
 5   again, it seems to me it's all one electronic message in
 6   which he did all of that, but I can't find any basis for that
 7   to be two separate enhancements to split that out.  I think
 8   there's clearly one, and we're not objecting to there being
 9   two points, we're objecting to there being four, because it's
10   one communication.
11           THE COURT:  All right.  Thank you, Mr. Woodward.
12           And I'm going to overrule this as well and all the
13   arguments.  I'm looking at the guidelines.  I'm not going to
14   put it in the record, but what's not in the record is 1B1.1.
15   Application note 4(B) states that, "Multiple enhancements may
16   be triggered by the same conduct."
17           And so I think here we have a threat, on the one
18   hand, the communications intimidating the witness, and then
19   we have the other one, just the threat of violence.  I think
20   Ms. Powell applied them properly, so I'm going to overrule
21   the objection.
22           And then premise as well, Mr. Butler?
23           MR. BUTLER:  We have -- this all comes down to
24   Ms. Wilson and her information, and she says she's going to
25   the same place 12 different, you know, times over the course
```

USCA4 Appeal: 21-6882    Doc: 32    Filed: 01/10/2024    Pg: 124 of 388
Case 2:16-cr-00097-AWA-LRL    Document 167    Filed 02/15/18    Page 52 of 66 PageID# 924

52

1    of the conspiracy, so this goes back years.  She specifies

2    the street name, the neighborhood, and a residence that never

3    changed.  The task force officer, you know, testified about

4    conducting surveillance of that property, and given what I've

5    already proffered to the Court with respect to our belief

6    that what she said was credible, we believe that we've met

7    the preponderance standard there as well, Your Honor.

8              THE COURT:  And Mr. Woodward?

9              MR. WOODWARD:  Well, again, Your Honor, I'm not

10   going to beat a dead horse.  It's Ms. Wilson, and it's all

11   based on her statement.

12             THE COURT:  All right.  And so I'm going to overrule

13   that as well.

14             That being the case, Mr. Powell, I'm going to adopt

15   the factual statements contained in the presentence report,

16   as written by Ms. Powell, as my findings of fact, and so that

17   means that your offense level is a 37.  That takes into

18   account that three-level reduction for acceptance of

19   responsibility.  Two of those points you controlled; one

20   point Mr. Butler controlled.  So I'm granting his motion.

21             Your Criminal History Category is a VI, and so your

22   guideline range is 360 to life, but it's restricted to the

23   480 months, because you're looking at a 5-to-40.  Hearing no

24   objection from the probation officer or the lawyers,

25   Mr. Powell, do you understand what I've just said?

```
 1              THE DEFENDANT:  Yes, ma'am.

 2              THE COURT:  Okay.  And then, of course, the statute

 3    has a minimum mandatory of five years, and, as I just alluded

 4    to, the max is 40 years.  And then supervised release, five

 5    years max.

 6              So hearing no objections from the lawyers or the

 7    probation officer, sir, do you understand what I just said?

 8              THE DEFENDANT:  Yes, ma'am.

 9              THE COURT:  Okay.  Mr. Butler, no additional

10    evidence; you gave me your aggravation evidence.

11              Mr. Woodward, any mitigation evidence?

12              MR. WOODWARD:  Well, no, Your Honor, other than the

13    letters and the certificate.

14              THE COURT:  Okay.  And how about -- who is here this

15    afternoon with Mr. Powell?

16              MR. WOODWARD:  Your Honor, I'm not sure of everybody

17    who's here, other than that's his family and, I think, the

18    people that wrote you the letters.  I mean, they're all

19    supporters and family of his.  I can't call off all of their

20    names.

21              Would you like me to have them introduce themselves?

22              THE COURT:  I'll have him do it when I address him.

23              All right, Mr. Butler.  I'd like to hear from you

24    and whether or not he's continuing in the investigation and

25    prosecution of others.  That's a hard call, if somebody
```

USCA4 Appeal: 21-6983   Doc: 32   Filed: 01/10/2024   Pg: 126 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 54 of 66 PageID# 926

54

1    writes a threatening letter to another codefendant, I know,

2    but I don't know what you're doing with it, if anything.  Or

3    if you even want to answer the Court, because you can decline

4    to answer the Court, if you would like, or if you haven't

5    thought about it, of course.

6              MR. BUTLER:  I have an answer, I just -- I don't

7    know that it would be -- I don't want it to impact your

8    sentence, Your Honor.

9              THE COURT:  Okay.  We're good.  All right, I'll be

10   glad to hear from you regarding a sentence.

11             MR. BUTLER:  Thank you, Your Honor.

12             Out of the five coconspirators that form this group,

13   the United States believes that Mr. Powell is the most

14   dangerous, and our view is not based on the fact that he's

15   the only one with a Criminal History Category of VI.  It's

16   not based just on that.

17             Yes, he was involved in a conspiracy that lasted for

18   four years.  Yes, he was trafficking, manufacturing, selling

19   poison.  Yes, he was involved in a trafficking organization

20   that spanned three states, from suppliers in Baltimore to

21   addicts in North Carolina.  And, yes, he was one of the

22   primary suppliers of this group.  He himself had a direct

23   source to Baltimore.  All of those things make the nature and

24   circumstances of the offense very serious, but, on top of

25   that, and unlike the others, this is a violent defendant, and

1    he has a brazen disregard for other human beings.  We've seen

2    this in the pattern of destruction he left in the wake of his

3    car chases, we see this in his treatment of women, and we see

4    this by virtue of the preference to possess firearms in

5    furtherance of his drug dealing.

6           The Court has now seen a video depicting what he's

7    capable of.  Even with the limitations of a paralysis, he is

8    completely unrestrained.  He's using a cane to power through

9    residential neighborhoods in the middle of the day, past a

10   school, going in excess of 65 miles per hour.  And,

11   naturally, something dangerous was going to happen, and it

12   did, and it ended up in somebody getting hospitalized after a

13   T-bone collision.  She's hit so hard she's dislodged from the

14   driver's seat into the passenger's seat, and the Court has

15   Government Exhibit 4 to see the extent of the damage to the

16   front of that vehicle.

17          And what's astounding is that his decision to elude

18   police occurs in the context that he had done the same thing

19   before -- drugs in the car, running from police -- and it was

20   a decision in 2007 that left him paralyzed.  So,

21   unfortunately for him, we have the past to predict the

22   future, and his past is marred by violence, drug dealing, and

23   a defiance of the law.

24          And so now I would like to address his history and

25   characteristics.  We agree with the defense that his

USCA4 Appeal: 21-6993    Doc: 32    Filed: 01/10/2024    Pg: 128 of 388
Case 2:16-cr-00097-AWA-LRL    Document 167    Filed 02/15/18    Page 56 of 66 PageID# 928

56

1    childhood was far from perfect, but, unlike many others that

2    we see in this court, he was raised by two parents until he

3    was 15, at which point his grandparents took care of him.  He

4    chose to drop out of high school, but we know he doesn't lack

5    intelligence.  He got his GED when he was 30.  And it's

6    unfortunate that, even in the light of growing up with a

7    mother who had a struggle with addiction, he chose to sell

8    heroin, and it's a cycle that we hope will be broken by a

9    significant sentence here today.

10         I spoke in the position paper about some fatal

11   violence that has been both inflicted on his one brother and

12   that was inflicted by one of his other brothers onto others.

13         He's unmarried, but he has three children with two

14   different women, and the decisions that he's made throughout

15   his life have put those children at a disadvantage, and

16   that's a fact that should not be used as a shield here today.

17         He's never been treated for substance abuse, but he

18   tells Probation he does not need it.  And we'll note he does

19   not have an addiction to heroin, like some of the other

20   members of this group that appeared before you.  In fact, he

21   reports no use of heroin at all, so -- and then if you look

22   at his letter to the Court, he himself even knows the

23   devastation that this addiction caused, because he knows

24   people close to him that are suffering from it.  But that

25   didn't stop him.  It doesn't stop him from dealing it, and we

1    find that to be very aggravating, because he knows this stuff
2    up close and personal, yet he's okay with doing it.  And so
3    the only conclusion that we can make from that is that he's
4    motivated by greed.
5              As for the criminal history, it is deplorable.  Not
6    bad, it is terrible.  He's got 16 criminal history points,
7    two of which were assessed because he was under a period of
8    supervision.  11 of the convictions did not result in
9    criminal history points, and those 11, coupled with 12 other
10   convictions that were scored, shows us that we have somebody
11   who has had second chance after second chance after second
12   chance.  Two of those narcotics convictions were actually
13   possession with intent to distribute, and then they were
14   reduced to simple possession, yet another example of getting
15   these second chances.
16             And then, even after serving more than a year in
17   jail for a narcotics offense, he goes back out and goes right
18   back into the game.  Again, these are past decisions that
19   help us predict future ones.  There are some incidences,
20   including the assaults on women, one of which occurred in
21   2012 -- he rips a woman out of a car, pulls out a kitchen
22   knife, tells her not to move or scream, and this assault
23   results in multiple lacerations and her hospitalization at
24   Sentara.  So promoting respect for the law and deterrence is
25   particularly important in a case involving such a defiant

1    past.

2            We are asking for 30 years, at least 30 years, of

3    confinement, and we do not make that suggestion lightly.  We

4    simply do not believe that a variance should be made in a

5    case involving a violent defendant.  At 30 years this

6    defendant is still getting the benefit of the low end of the

7    guidelines, and I'm sure that he recognizes that the Court

8    certainly has the power to sentence him to 40 years.  That's

9    the maximum punishment in this case, but given his decision

10   to plead guilty, we are not asking for that.  We don't think

11   that that is warranted, but we do believe that his

12   culpability in this conspiracy to put this poison out in this

13   community, his total disregard for human beings, and the

14   mindset of intimidation that we've seen here in this case,

15   warrant at least a 30-year sentence.

16           And we might not have been so insistent on that had

17   the destruction ended on May 26 of 2016, but in light of that

18   significant event he doesn't back down.  He rises up, and he

19   takes to Facebook, and he shows us the kind of bully that he

20   can be.  He shows us his capacity for intimidation.  He gets

21   out on state bond, and he goes to his 1200-person network to

22   out who he believes is working with police, to embarrass the

23   person, to intimidate, to obstruct justice.  And he threatens

24   him, and he threatens the people that he loves.

25           These are victims of the crimes, too, not just all

1    these addicts, but these people.  We've got the women, we've
2    got the victim of the head-on collision, we've got all the
3    folks that bought this fentanyl and this heroin, where he's
4    making money on their misery.  But we've got these victims of
5    intimidation and people that may not have been sleeping all
6    that great after getting messages like that, knowing that he
7    was out on bond.

8           And, thanks to the DEA and specifically Task Force
9    Officer Dyer arresting him in the criminal complaint, we were
10   able to, you know, eliminate, you know, that threat, so that
11   goes towards the victims that I know the Court is mindful of
12   and to protect society from this defendant.  And that would
13   have been a good place to end this argument, right?  But the
14   facts of his destruction don't even end there.  It doesn't
15   even end when he's in federal custody.

16          And so the other reason that we're so insistent that
17   he receive significant punishment is that this man pleads
18   guilty on October 20th.  He knew he would be sentenced.  He
19   knew he would be facing you and 40 years, but, in spite of
20   that, he didn't back down.  He rises up again -- more
21   obstruction.  He wants to undermine the probation process by
22   learning how much drug weight other people are putting on
23   him, what his coconspirator, Mr. Gordon, said about him.
24   More intimidation, more bullying, more threats of violence --
25   "My shots don't miss."

Heidi L. Jeffreys, Official Court Reporter

**JA126**

1          And whether or not he's the one that put his pen to
2    paper or had somebody else do it, we heard testimony, you
3    know, that he's the only one in this group that had 40 years
4    over his head, as was depicted in that third letter.  He's
5    the only one in the group that we tried to schedule a debrief
6    in November.  The letter is dated November 11th.  He says,
7    quote, "I'm getting ready to be debriefed," which was true.
8    Now, it didn't occur until a couple weeks later, based on
9    scheduling between parties, but even putting aside for a
10   moment that Mr. Gordon tells us these messages are from him,
11   the context is there to establish that these were from
12   Mr. Powell or they were sent under his direction.  They show
13   us a mindset of somebody who is determined, no matter what,
14   to threaten and intimidate others, even in the face of an
15   extreme sentence of 40 years.
16         Now, we have his words to the Court.  He's provided
17   a letter.  He talks about getting closer to God, taking
18   responsibility, understanding the harm that he's caused.  And
19   we can't peer into his soul.  We don't know his heart.  We
20   can't pretend to know what's there.  But what we can do is we
21   can look at his actions.  We can look at the facts.  We can
22   look at the destruction, the threats, the intimidation, and
23   the past behavior to predict the likelihood of recidivism in
24   this case is very, very high.
25         We look at his criminal history, and we see that

Heidi L. Jeffreys, Official Court Reporter

JA127

USCA4 Appeal: 21-6882    Doc: 32    Filed: 01/10/2024    Pg: 133 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 61 of 66 PageID# 933

61

1    he's spent a life dealing drugs, a life profiting off the

2    backs of other people's misery.  And today, no more.  No more

3    greed, no more poison, no more car chases, no more crashes,

4    no more harm, no more threats, no more intimidation, no more.

5    We respectfully ask that a sentence of at least 30 years is

6    appropriate, Your Honor.

7              THE COURT:  All right.  Thank you very much,

8    Mr. Butler.

9              Mr. Woodward?

10             MR. WOODWARD:  Thank you, Your Honor.

11             When I took over this case from the Federal Public

12   Defender and started trying to get in to understand

13   Mr. Powell and understand what I would say to the Court when

14   this time came, I started thinking about how people learn

15   lessons and what lessons they learn.

16             And I'm going to share with you one of the things

17   that we do at my law firm, is when we get young lawyers in,

18   when we start them off, we try to give them cases that we

19   know they can win.  You know, we try to build their

20   confidence.  We try to give them cases that we know they can

21   win for a couple years.  And then, after that, we have sort

22   of a project where we give them some cases where we know

23   they're not going to win.  And the way we test those people,

24   if that's the right term, or the way we do that is we,

25   obviously, watch how they deal with the success, and we watch

USCA4 Appeal: 21-6883    Doc: 32       Filed: 01/10/2024    Pg: 134 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 62 of 66 PageID# 934

62

 1    how they deal with the failure.  And then, when we get ready

 2    to consider whether they're going to be full-time and

 3    permanent members of the firm, we kind of sit down and say,

 4    Well, what were the lessons you learned over the last four

 5    years?  And the people that stick around are the people that

 6    learn the lesson or can articulate the lesson, I learned

 7    having a good case doesn't mean you're a good lawyer, and

 8    having a bad case doesn't mean you're a bad lawyer.

 9            And I think that that's -- you know, I've taught and

10    lectured, and I think that's sort of apropos to some of the

11    things that the Court ought to consider about Mr. Powell,

12    because certainly a lot of what Mr. Butler says about his

13    background is true.

14            I will tell the Court when I got his letter I was

15    stunned.  I really -- and I'm not easily stunned, as you

16    know.  Life has kind of kicked all the being stunned out of

17    me at this point.  Because with every client I say, Would you

18    write a letter, tell the Court -- and I always tell my

19    clients -- I say, Look, you don't need to tell the Court

20    anything that's in the PSR.  Tell the Court something about

21    you that they're not going to know if they just look at

22    the -- they're going to know where you went to school,

23    they're going to know your criminal history.  You tell them

24    something that only you could tell them.

25            And I, frankly, expected to get a two-paragraph kind

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 135 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 63 of 66 PageID# 935

63

```
 1   of not really articulate sort of -- I really did.

 2           THE COURT:  I did, too, and we were wrong.  We were

 3   wrong.

 4           You're smart, and it's inexcusable that you are

 5   here, inexcusable.

 6           MR. WOODWARD:  And when I got that letter I was

 7   actually amazed at how articulate and well-written and

 8   insightful that it was.

 9           THE COURT:  Inexcusable.

10           MR. WOODWARD:  So what that tells me, Your Honor, is

11   just like getting back to my analogy about who's trainable

12   and who's not.  And, you know, at our law firm, again, you

13   know, plenty of people do it their own way, but the people

14   that come in and say, Well, what I've learned is the last

15   couple of years the judges have been screwing me, or, the

16   prosecutors haven't been treating me fair, or they -- but,

17   you know, when, you know, they don't learn the lesson that,

18   hey, you know, giving you a good case doesn't make you a good

19   lawyer, and giving you a bad case doesn't make you a bad

20   lawyer -- you've got to learn about yourself.

21           And I think what you have here is, obviously,

22   Mr. Powell is in a wheelchair.  The sentence that the

23   government has asked for -- there's no reason to sugar coat

24   it -- it's essentially a life sentence.  I mean, it's

25   30 years.  He's, you know --
```

USCA4 Appeal: 21-6982    Doc: 32    Filed: 01/10/2024    Pg: 136 of 388
Case 2:16-cr-00097-AWA-LRL   Document 167   Filed 02/15/18   Page 64 of 66 PageID# 936

64

```
 1              THE COURT:  He's 33.

 2              MR. WOODWARD:  He's 33.

 3              THE COURT:  34?

 4              THE DEFENDANT:  Yes, ma'am.

 5              THE COURT:  Okay.

 6              MR. WOODWARD:  34 years old.  30 years means, you

 7    know, that the decision that's made here is that everything

 8    that Mr. Butler talked about in his argument is true and

 9    correct and nothing that Mr. Powell says in his letter is

10    true and correct, and I don't think either one of those

11    things are actually true and correct.

12              I think, certainly, that somewhere inside of

13    Mr. Powell there's the ability to understand and articulate.

14    And, you know, I tell people all the time, Before you can be

15    honest with anybody else, you've got to be honest with

16    yourself.

17              THE COURT:  That's right.

18              MR. WOODWARD:  And he's got family.  He's got

19    support.  He's made a series of bad decisions.

20              I understand Mr. Butler's characterizing him as

21    violent, but you and I both know and probably Mr. Butler,

22    too -- he's advocating for his side of it, as he should --

23    he's not violent like some people we see up here that are in

24    drug conspiracies that are violent --

25              THE COURT:  He's a different type, though.  He's
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 137 of 388
Case 2:16-cr-00097-AWA-LRL    Document 167    Filed 02/15/18    Page 65 of 66 PageID# 937

65

1    very interesting.

2            You are.  I don't think I've ever seen a drug dealer

3    in court in a wheelchair.

4            MR. WOODWARD:  I had one other one.

5            THE COURT:  Did you?

6            MR. WOODWARD:  Yes.

7            THE COURT:  Okay, so one.  And you've got 25 years

8    over here; I've got 20 years over here.

9            So he's different.  Just the mere -- what was it, a

10   cane on the pedal?  That is insane.  And all of us -- I

11   looked at everybody's face in here, because we were there in

12   the car.

13           So he is violent.  I have to -- and I'm not saying

14   your letter is not true, because Mr. Butler is right on this,

15   too.  There's a jury instruction that says there's no way any

16   of us can figure out the inner workings of the human mind,

17   because I can't read what's in your mind, and you can't read

18   what's in my mind.  So your letter may be very true.  I would

19   never even try to judge that.  I cannot do it.  But he is

20   dangerous.

21           The good news -- and there's always good news in a

22   federal case, as far as the Court is concerned.  The good

23   news is the highway, customers on the pavement, that

24   residential neighborhood, the woman didn't die in the car.  I

25   mean, I hope you're looking at it the way you should be *****

Heidi L. Jeffreys, Official Court Reporter

# JA132

```
 1                        CERTIFICATION
 2
 3          I certify that the foregoing is a correct transcript
 4   of an excerpt from the record of proceedings in the
 5   above-entitled matter.
 6
 7                              /s
 8                        Heidi L. Jeffreys
 9
10                        February 15, 2018
11                           Date
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Heidi L. Jeffreys, Official Court Reporter

**JA133**

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          Norfolk Division

 3

 4    - - - - - - - - - - - - - - - - - -
       UNITED STATES OF AMERICA,          )
 5                                        )
                Plaintiff,                )
 6                                        )        CRIMINAL CASE NO.
       v.                                 )           2:16cr00097
 7                                        )
       NATHANIEL POWELL,                  )
 8                                        )
                Defendant.                )
 9    - - - - - - - - - - - - - - - - - -

10

11                       Excerpt OF PROCEEDINGS
                  (Pages 66-94 of the Sentencing Hearing)
12
                            Norfolk, Virginia
13
                           March 31, 2017
14

15

16    BEFORE:   THE HONORABLE ARENDA L. WRIGHT ALLEN,
                 United States District Judge
17

18

19    APPEARANCES:

20             UNITED STATES ATTORNEY'S OFFICE
               By:  John F. Butler
21                  Assistant United States Attorney
                    Counsel for the United States
22
               RULOFF, SWAIN, HADDAD, MORECOCK, TALBERT &
23             WOODWARD, P.C.
               By:  Lawrence H. Woodward, Jr.
24                  Assistant Federal Public Defender
                    Counsel for the Defendant
25
```

Heidi L. Jeffreys, Official Court Reporter (Ret.)

JA134

```
 1          ***** looking at that videotape, because you could
 2     have -- I mean, let's not begin to count the number of cars
 3     that he passed, and then let's not begin to count the number
 4     of people.  This madness has to stop.  It has to stop.  And
 5     you've got people all around you.  You've got him, and I know
 6     what he told you when he first met you.  And you even are
 7     still doing it.
 8          So the mindset -- I have my notes, too, but I don't
 9     know how many times Mr. Butler said "mindset."  But he's
10     right, it's your mindset, and it is a violent mindset.  That
11     doesn't mean that you cannot change, of course.  We all can
12     change, and the goal of anybody should be to continue to grow
13     and get old and be better before you leave this earth.  But
14     the record shows that you're violent.  The record also shows
15     that you can love your children.
16          So this is a very pivotal time for you in your life,
17     Mr. Powell.  And I don't know where you are mentally, but our
18     hope will always be -- at least in this courtroom -- that you
19     don't want to live the next 60 years with this violent
20     mindset.  Because it's going to kill you or somebody else,
21     and we saw it on a two-minute videotape -- two minutes.  You
22     could have killed a whole bunch of people.  Thankfully, you
23     did not, so I hope you feel good about that.  The Court does.
24          So you need to focus on getting out of the cage.
25     You're already in a cage because of the wheelchair, right?
```

1    And so you need to focus on getting out of the cage and being
2    an honorable man.  Because there's no doubt in my mind you
3    can be honorable man.  You should be outside feeling the
4    rain, if you want to, but because of your decisions you are
5    not.  So get it.  I know he beat it into you, because that's
6    the way he rolls.  Other people have, too.
7            It's so frustrating when the Court sees intelligent
8    folks that could do better and the women are here, day after
9    day, rocking, and the tears.  And it's not the first time
10   they've rocked and had the tears.  See, that's the problem.
11   The Criminal History Category is a VI.
12           So I really hope you -- and I'm not beating you up.
13   You're a human being just like I am, all right?  But I'm
14   really hoping that you -- you're even willing to throw your
15   blood relative under the bus.  Too busy running your mouth on
16   the phone, which corroborates what she says about you.  If
17   you just learned to keep your mouth shut when you got him...
18           So let's turn your life around.  You still can be a
19   light while you're in the BOP, which we'll talk about in a
20   minute.
21           And I'm sorry to interrupt you, Mr. Woodward.  But
22   Mr. Woodward has it.  Your criminal history is your criminal
23   history.  If this is true -- and I don't know if it's true or
24   not -- it caught me off guard.  I wasn't expecting it.  It
25   just shows me you write beautifully.  I suspect you can speak

```
 1    well, as well.  There's no reason -- I don't care how broken
 2    you -- there's always goodness in everybody's family, I don't
 3    care how bad it is, for the most part.
 4              Go ahead, Mr. Woodward.
 5              MR. WOODWARD:  Well, obviously, what I'm saying is
 6    that I think that, unlike the picture that Mr. Butler would
 7    paint of hopelessness, there's hope.  And I think that letter
 8    shows that.  That doesn't mean that there doesn't have to be
 9    all of the factors and all of the stuff that the guidelines
10    talk about, but I really -- actually, until I got that letter
11    on Tuesday, I didn't know what I was going to say today, to
12    be candid with you.  I got the letter, and it kind of made me
13    think, well, here's somebody that, while they haven't shown
14    they get it yet, it's certainly clear that he can get it.
15              THE COURT:  That's right.
16              MR. WOODWARD:  And that's what I would ask the Court
17    to consider.
18              THE COURT:  All right, Mr. Woodward.  Thank you, as
19    always.
20              All right, Mr. Powell.  I know your attorney has
21    told you that you have the right to make a statement, in
22    addition to your written statement, if you would like to do
23    so.  If you don't want to make an oral statement, the Court
24    will not hold it against you.  And if you're not sure what to
25    do, please speak to Mr. Woodward.
```

```
 1              THE DEFENDANT:  Yes, ma'am.
 2              THE COURT:  Yes?  I can't hear you.
 3              THE DEFENDANT:  Hello?
 4              THE COURT:  Yes, I can hear you now.
 5              THE DEFENDANT:  For starters, I want to say that
 6    I've never been in this type of situation; to understand and
 7    learn my mistakes.  As we sit here today, facing the type of
 8    time I'm facing, I've thought over and over again, why?  Why
 9    do I keep doing the same things over and over again?  But
10    it's not -- see, I didn't choose to sell drugs for profit or
11    gain.  It was mainly to take care of my kids, family members
12    that didn't have, because I'm the only male left for the
13    support system.  I was going to school, trying to find jobs.
14    I did everything that I could do to be an honest man.  I'm
15    not the evil, destructive person that the picture may paint.
16    I'm kindhearted and really love to do for others, not hurt
17    people.  That's not what I like to do.  I was just moving off
18    of an instinct and thought process at that time.  I'm
19    learning to regret it, and I'd like to apologize for anybody
20    I hurt, everything that fell apart.  I want to be around to
21    see my kids grow up.
22              That's all.
23              THE COURT:  Mr. Powell, who is here with you this
24    morning?  And first let's start with the young lady that's in
25    the red jacket.  Who is that, Mr. Powell?
```

```
 1            MR. WOODWARD:  That's Sonia Carraway, his
 2    stepmother, Your Honor.
 3            THE DEFENDANT:  My two kids' mother, Marquia Bell.
 4            MR. WOODWARD:  Marquia's in the green sweater?
 5            THE DEFENDANT:  Yes, sir.
 6            THE COURT:  That's two children.
 7            MR. WOODWARD:  The mothers of his children.
 8    Ms. Bell is in the green sweater, and to the right, I think,
 9    is --
10            THE DEFENDANT:  Yes, my son's mother, Marquida
11    Smith.  My mother, in the back --
12            THE COURT:  Your mother is here?  Where is she?
13            Okay.  Got you.
14            THE DEFENDANT:  My grandmother --
15            THE COURT:  That's your grandmother in the
16    burgundy --
17            THE DEFENDANT:  Holly Rogers.
18            My nephew.
19            THE COURT:  Your nephew?  How old is he?
20            THE DEFENDANT:  9 -- 10?
21            SPEAKER FROM THE FLOOR:  11.
22            THE DEFENDANT:  He's 11.  And my sister.
23            THE COURT:  Okay.  Thank you, Mr. Woodward.  I'm
24    glad that they're here for you.  Sometimes, Mr. Powell,
25    there's nobody here.  For some of the young men that we see
```

1    here in federal court, there's nobody here.

2              As Mr. Woodward has explained to you -- and I'm

3    going to make sure I explain it, too, because it's a lesson.

4    He nailed it; it's a lesson.  And it's for your family, as

5    well.

6              There's something called the 3553(a) statutory

7    factors, and, basically, Congress gives us guidance as to --

8    for the Judge -- what I should look to in determining a

9    sentence that is sufficient but not greater than necessary.

10   So that's the buzzwords.  So, the law.

11             And so the factors that we've got to consider --

12   Mr. Woodward has gone over all this with Mr. Powell, so he

13   understands it.  Because it is a learning experience, and you

14   can use, Mr. Powell, your knowledge of the federal system,

15   your education of the federal system, your presentence

16   report -- you can use that, in the Court's opinion, because

17   he basically says in this letter -- I'm not going to have you

18   read it, but he basically says -- it's very long.  It's five

19   pages, single spaced, and he basically says that he has a

20   purpose in life, to help others, because he's listening to

21   his God.  That's the bottom line.  Now, I don't know if

22   that's true.  It doesn't matter.  That's what he says, and so

23   we have to take everybody at their word.

24             And so these factors, use them as an educational

25   tool when you go in the BOP, because maybe part of the

1    purpose -- you got your certificate while you were there at

2    the Western Tidewater Regional Jail.  Part of the purpose is

3    to help educate others that are in the BOP that are under the

4    age of 34, so the young ones between 18 and 34, and beg them

5    not to break the law again when they get out.  Maybe that's

6    your purpose.

7            And so the factors are -- Congress has said we have

8    to look at the crime.  You all saw a little bit of the crime

9    on the videotape -- the crime.

10           And then his criminal history; is this the first

11   time getting arrested by the police.

12           The seriousness of the offense; is heroin serious.

13   You wouldn't want any of these beautiful ladies and your

14   nephew using any of this.

15           Respect for the law is a factor.  We have to respect

16   the law.

17           Punishment.  He has to be punished, of course,

18   because he's poisoned other human beings in our society.

19   Whether we know them or not, the agent knows it, Mr. Butler

20   knows it, Mr. Woodward knows it, and Mr. Powell knows it.

21   People are messed up.  This heroin is killing people.  It's

22   an epidemic.  Fentanyl is bad, as well.  It's killing people.

23   It's poison, and you weren't raised to poison people.  I'm

24   confident that your grandmother and your mom instilled good

25   values in you.

1          Deterrence is a factor.  I don't believe any of the
2     young ladies know any other drug dealers out there in the
3     community, but if you do, go out and tell them about what you
4     saw today in federal court.  Beg the young men to stop
5     poisoning other human beings.  Tell them to get two or three
6     jobs, if they need to, to provide their family with good,
7     clean food.
8          You can be part of the solution, too, and deter
9     other people from breaking the law.  Because if they get
10    caught by the Feds, I'm telling you, it's no joke over here,
11    as you well know now.  It's no joke.
12         So that's general deterrence, but then specific
13    deterrence -- hopefully, this experience has been so raw for
14    you -- and I think it is today; the letters and the
15    communications and all that -- you weren't scared.  You were
16    still doing your thing, but, hopefully, you're scared and you
17    don't want to get caught ever again, which means you won't
18    break the law again.  So specific deterrence is another
19    factor as it pertains to Mr. Powell.
20         The public and what its needs are.
21         And the penalty is severe; 360, which is 30 years.
22    Actually, the guidelines are 360 to life, but because of the
23    statute that he was charged with, there's a cap, so it's 30
24    to 40 years.  But you could have been charged in such a way
25    that you were looking at a life sentence.  Do you want to die

1   in the federal penitentiary?

2          THE DEFENDANT:  No, ma'am.

3          THE COURT:  I don't think you do, either.  I really

4   don't.

5          And then I've got to look at your actual conduct,

6   the role that you played, whether or not you've obstructed

7   justice, and whether or not you've truly accepted

8   responsibility for your behavior.

9          And then the sentences of your colleagues:

10  Mr. Gordon got 24 years.  That was one of his friends.  His

11  Criminal History Category was not as bad as Mr. Powell's

12  Criminal History Category; he was a V.

13         And then Mr. Cross got 70 months.  He had a lower

14  Criminal History Category.

15         And then Ms. Wilson, 60 months.

16         Mr. Wilson, 72 months.  His Criminal History

17  Category was a IV.

18         So I'm back to you now, Mr. Powell.  When I looked

19  at my notes before I entered this morning, in 2007 you had a

20  tragedy in an auto accident, and one would think that that

21  would have been like a bat upside your head.

22         But then for four years -- so he's here for four

23  years of activity of poisoning people.  It's not a month,

24  it's not one year, it's four years of poisoning human beings.

25  And he's doing it in Portsmouth and in Chesapeake, and he's

1    traveling to Baltimore, Maryland, on ten occasions to get the
2    poison from a source of supply and then bringing it back here
3    to Virginia.  So it's interstate; it's a big deal.  And then
4    using his blood relative to distribute further heroin,
5    Valerie, down in North Carolina.  So you've got multiple
6    states and then multiple communities.  These are communities
7    in Virginia that you're poisoning.

8          I'm glad that we saw the high-speed chase.  I wrote
9    in my notes before I saw the video, "I'm just thankful that
10   you weren't killed and that no one else was killed."  But the
11   high-speed chase in the video, that puts it in another
12   context, because we get to see it and actually be in the car
13   with you.

14         And then you were in the car, and, as I alluded to
15   earlier, you need to be very, very happy that you weren't
16   killed and the passenger wasn't killed -- it looks like she
17   could have been, if you look at that photo -- and then
18   someone along the way -- a child.  It was a beautiful day.

19         You should be glad that nothing happened to the
20   police informant.  You were talking about it.  You had the
21   mindset to talk about it.  The posts, in my opinion, are
22   violent.  The drive, in my opinion, was violent.

23         And so he's a federal felon now, and so sometimes
24   that means something because a person doesn't have a prior
25   record.  But, unfortunately, because of his prior record,

Heidi L. Jeffreys, Official Court Reporter (Ret.)

**JA144**

1   which has lots of felonies in it, that doesn't mean anything
2   for you.  Once you're a felon, you're always a felon, so
3   whether it's one felony or a hundred, a felony status doesn't
4   really mean anything.  So that's the crime.
5           I think -- I'm glad that you pled.  You met with
6   Ms. Powell, and you said, "That's what I did."  And I can
7   only say that I hope you haven't erased the possibility of
8   you cooperating because of your mindset once you were brought
9   over to this federal courthouse and got your cooperation
10  agreement.  I can only hope.  If the government has said,
11  "We're not interested" -- I'm not telling you what to do, but
12  ask again.
13          The three-level reduction for acceptance of
14  responsibility deals with your crime.  Helping your community
15  get cleaned up by the cops, that's honorable behavior.  It's
16  not being a snitch.  I don't know what you were thinking when
17  you made the post, but it's not.  There are honorable and
18  law-abiding people in all communities, and all communities
19  have the right to come out and watch their kids play and sit
20  on the steps or on the porch.  Being a snitch helps honorable
21  people stay protected and safe.
22          So I don't know what's going on with you and the
23  government, but if you shut the door, try to open it back up.
24  If you're really serious about everything that you wrote in
25  here, that's what you'll do.  If you're not, you're just

going to go out of here and be angry at the world.  Which we
know you that have a thread, a character trait, of being
angry.  So I don't know if you've closed that window or not,
but I hope if you have you'll reopen it.  It makes sense,
because you're helping clean up your community, number one,
and then, secondly, it makes sense because you're empowering
the government to release you sooner so you can go back to
your family and your children and then your grandchildren.
So these are the things that you should be thinking about,
Mr. Powell.

        So you did plead, and you got your acceptance, and I
think that's good.  I'm discussing your record with you
because, in my opinion, even though it's negative, I believe
that you can use it as a shield and a sword to help other
people that you meet along the way, whether you're in or out,
to not break the law.  And, so -- and you have to change your
mindset.  You really do.  You have to.

        So at the age of 16 he had a possession of cocaine.
So this is the first time he's placed on notice that cocaine
is bad.

        Age 16, a resisting arrest.  So let's stop resisting
the police.  They're just doing their jobs.  Let's be
respectful to everybody all the time, even when no one's
watching.

        Age 17, a suspended license and no operator's

```
 1    license, and failure to yield.  But yet we have that
 2    high-speed chase.  So you were put on notice way back when
 3    about the traffic.  I'm not beating you up, but you've got to
 4    stop making the same mistakes; otherwise, you're going to end
 5    up dying or killing someone.
 6              And then age 17, a suspended license.
 7              All right.  So how about the adult record?  And one
 8    of the factors, of course, is whether or not he's previously
 9    been arrested or whether or not this is somebody that's been
10    in and out of the system, with various different types of
11    charges, all of which were opportunities for him to turn
12    himself around.
13              Age 17, possession of cocaine.  So it's the mindset,
14    right?  You were already placed on notice way back, cocaine
15    is "No."  So when you're on federal paper, no cocaine.
16              You've learned a lesson.  He said it, "lesson."
17              He was given a break on probation, but then he had
18    new arrests, failing to report as instructed and failing to
19    follow instructions.  So when he has a state probation
20    officer way back when and he's told to do stuff, he's not
21    following the rules.  You've got to follow the rules.  We all
22    have to follow the rules.
23              You're smart.  There's no question that you're
24    smart.  Make sure you follow the rules, whether it's with
25    this marshal, the officials at the BOP.  Let's try something
```

1    different, because the way you've been doing it hasn't worked

2    for you.  So let's try being a model person every waking

3    moment.  See what that feels like, Mr. Powell.

4           Age 18, obstruction of justice.  All right?  And

5    then here we are at 33, right?  Obstruction of justice.

6           You've got to change your mindset.  You didn't learn

7    your lesson.  And you were getting bigger.  You're getting

8    bigger, so let's change.  No more obstructing justice.  How

9    about helping with justice?

10          Age 18, possession of cocaine.  How many times do

11    you need -- God bless you.

12          All right?  They've cried one time too many.

13          Police observe narcotics in a 1988 Acura Legend that

14    the defendant had previously occupied.  Because the defendant

15    tossed the keys for the vehicle to adjacent bystanders, the

16    police had to break the window to gain entry.  They retrieved

17    some cocaine and some money.

18          He goes to the state pen, and he has three

19    disciplinary infractions; aggravated assault upon an

20    inmate -- that's violent -- indecent exposure -- that was

21    violent to whoever saw the exposure -- vulgar, insolent

22    language.

23          Released, put on state paper.  Okay, you're on state

24    paper again.  Let's behave.

25          He uses cocaine, he fails to report to the Probation

1  Office, he fails to complete substance abuse treatment, and
2  he absconds.
3        So it's a mindset.  Nobody is trying to beat anybody
4  up, but the facts are the facts.  You've got to let this be
5  your lesson.
6        Age 19, suspended license.
7        Age 19, failure to appear for the cocaine
8  possession.  This deals with respect for the law; showing up
9  in court.
10        Age 20, assault and battery and eluding police.
11  Your state of mind; you're hitting somebody.  Got to stop it.
12        Age 23, possession of cocaine.
13        Ms. Mack, the defendant's paramour, physical
14  altercations, caused injuries to her.  He also reportedly
15  threw an object through her front window.  Arrested with
16  cocaine on his person.
17        Age 23, contempt of court.
18        And then in 2007 we have the incident with your
19  legs.  And so one would think that that would catch your
20  attention and keep you away from breaking the law.  That's
21  what one would think, but age 26, eluding police, obstruction
22  of justice.  So it's the same thing, and you're just getting
23  bigger and bigger and bigger.  You're growing.
24        The law enforcement attempted to stop the
25  defendant's vehicle for dark tint and reckless driving.

1    Reckless driving again.  He evaded.  He was later found to

2    have crashed on an exit ramp; marijuana, odor of alcohol.

3          Age 26, contempt of court.

4          Age 28, possession of marijuana.

5          Age 29, unlawful wounding.  So sometimes, you know,

6    the families see the prosecution use a word like "violent" --

7    Mr. Butler is not just making this stuff up.  Lots of times

8    the families don't even know half the charges.  I can see the

9    lights go off on their faces, Mr. Powell, or shaking their

10    heads because they don't even know about some of this stuff.

11    And that's not the way a loving family is.  You've been

12    hiding in the dark.  It's time to come out and be in the

13    light.  You say you want to.  Only you truly know.

14          Unlawful wounding.  Another woman, a different woman

15    than the first, Ms. Goddard, reported to the police station

16    to press charges.  She stated she drove to North Street to

17    meet the defendant to give him the balance of his belongings

18    that were at her house.  He was confined to a wheelchair,

19    maneuvered over to her car, pulled out a kitchen knife, and

20    told her not to move or scream.  He then snatched her out of

21    the car and commenced attacking her.  It sounds like an

22    animal.  You're not an animal.

23          A laceration to the left side of her face.  Her left

24    arm and right hand required stitches.  She said they had just

25    broken up, and he wanted to talk and work things out, and he

```
 1    became angry.

 2              32, driving while revoked.

 3              32, failure to appear.

 4              So the record shows the Court someone who has a

 5    tendency to be mean.  The letter to Mr. Gordon shows the

 6    Court he has a tendency to be mean; notwithstanding the fact

 7    he's been hauled into federal court and then told he's

 8    looking at 40 years.  The posts show that he likes to type in

 9    words that are mean.

10              So the Court really, really hopes that you were

11    sincere with this.  I don't know if you wrote it or not.  I

12    hope you wrote it.  I'm believing you.  You're shaking your

13    head "Yes."  I don't know if you meant the words.  I hope you

14    did.  That's all we can do.  We always have to have hope.

15              But this is your record, so use it as an aid to say,

16    "Hey, guys, this is what I used to do, but I'm not that way

17    anymore."  You are going to miss your family and friends, no

18    question about it, but you can still do work, honorable and

19    positive work, if you decide to do so.  That's the Court's

20    belief.

21              That's your Criminal History Category.  It's a VI.

22    It's the worst category over here in federal court.

23              Mr. Powell, I don't know if you know this or not,

24    but I'm going to tell you.  You have 11 zeros.  So you

25    understand that some of your convictions got 3 points, some
```

1    of your convictions got 2 points, some of your convictions

2    got 1 point.  Okay.  Ms. Powell, your probation officer,

3    could have put in the presentence report, "Hey, Judge Allen,

4    there's 11 zeros here, and we're going to make the math even

5    higher, so let's make it 40 years."  All right.  But she

6    didn't do that.  The government could be asking for -- you

7    asked for 30 years, right?  The government could say, "Hey, I

8    was going to ask for 30 years, but he's got 11 zeros, so I'm

9    going to ask for 40 years."

10          So there's a lot going on here.  We're not going to

11   do that, but that's the way the math works.  But I think you

12   get that you're so close to 40 years it's scary.  And you

13   could have easily gotten life, based on your guidelines, but

14   that statutory cap sealed it.  So let this be a lesson for

15   you.

16          And so that's just his convictions.  Then there were

17   eight other times he was arrested; use of a firearm,

18   aggravated malicious wounding, assault and battery, petty

19   larceny, failure to appear, failure to appear, abduction and

20   kidnapping, assault and battery, suspended license.  And they

21   disappeared.  You're not guilty, got no points.  I'm not

22   sentencing you on them.  They disappeared; nol prossed, not

23   guilty, or dismissed.  But you've got to be -- and you're 34.

24   You've got to be tired.  You've got to be tired.

25          You wrote something, and it actually made me smile.

```
 1    I'll get to it.  But you said, "sick and tired of being sick
 2    and tired."  That's what you said.  You've got to be.  So the
 3    Court really hopes you are; that you never see another state
 4    cop, federal cop, state judge, federal judge, Assistant U.S.
 5    Attorney, federal defender.  Be true to your word and be
 6    done.  If I look at your record, however, the risk to offend
 7    is very, very high.  The Court hopes the Court is wrong.
 8            So then we're looking at the presentence report, and
 9    we see, okay, what kind of family does he have?  And I get
10    the broken family and the man is not home and, "I don't have
11    a dad," and all that, but after a while enough becomes
12    enough.  And the Court believes that there is always -- I
13    think I've maybe seen two cases since 1990 where the
14    presentence report was so black, nothing in it; that the
15    report was in hell.  There is always evidence of morals and
16    values, and it's present in your case, as well.  That's why
17    it's so frustrating, and that's why I said -- I don't know --
18    an hour ago now, "There's no reason you should be here."
19            Born in Portsmouth.  Your father passed.  Let's
20    please his memory.  This is just food for thought, to do with
21    what you will, if anything.  Let's honor his memory.  Let's
22    make him proud now.
23            Stephany, 55 -- I know -- rocking.  I could tell
24    which charges you knew about and which charges you didn't.
25    How about this:  Let's give her some peace and quiet for a
```

1    while.  You write beautifully.  Write her a letter and let
2    her know that you meant everything in your letter.  Write her
3    and let her know about the young men that you're helping.  If
4    you're going to be the leader, the God-fearing man that you
5    said in your letter, let your mom know that.  "Yeah, I'm away
6    from you, and I'm missing you, but I'm doing it.  I'm helping
7    people, and they're listening, because I command attention.
8    I don't have any legs, but I know my knowledge of my Maker.
9    And I love you so much, young man, that I don't want you to
10   end up like me or like I used to be."  Write your mom and
11   tell her that.  Give her some peace and quiet.  Stop her from
12   rocking and crying.
13           Your maternal grandparents, Ollie -- you're Ollie?
14   I knew it.  I wrote in my notes I didn't know whether you
15   were going to be here or not.  I was hoping you would be, and
16   you're just like I thought you would look.
17           She put good morals and values in you.  There's no
18   question about it, Mr. Powell.  You know it, and I know it.
19   And some of these violent tendencies that we've seen -- we're
20   not beating you up on it, but it's there -- you know she
21   would not approve of.  She didn't raise you to be an animal.
22   These are the reasons why you need to value your freedom and
23   be honorable now and henceforth, if you decide to do so.
24   Give her some peace of mind and let her know -- it may have
25   been a little late, but let her know that you're going to be

1    an honorable grandson.  You can do it.

2           Nakia is 33, a homemaker; your sister.

3           You have a brother that's deceased, fatally shot

4    multiple times.

5           Another brother that's in the BVOC for murder.

6    Reach out to him.  See how he's doing.  See if he still has

7    the same mindset.  If he does, you would know.  Help him

8    change his mind.  This is honorable work, Mr. Powell.

9           And then you have a sister who is a nurse and a

10   substitute teacher, Sharifa.

11          The girls are evidence that good values were

12   instilled, as well.

13          We've talked about your children.  You're going to

14   be gone for a minute, but they're still going to need you as

15   adults; when they get married, when they have children.

16          Is it "MAN"?  Do you say it, "MAN"?

17          THE DEFENDANT:  "MAY-AHN."

18          THE COURT:  "MAY-AHN" and "NAY-AHN-NEE"?

19          THE DEFENDANT:  Right.

20          THE COURT:  "NAY-AHN-NEE" and Nathaniel.

21          And then Jakeita.  Where is Jakeita?  26,

22   private-duty nurse.

23          THE DEFENDANT:  She was here.  I guess she stepped

24   out.

25          THE COURT:  She was here?  Okay.

Heidi L. Jeffreys, Official Court Reporter (Ret.)

# JA155

1        We talked about your car accident.  You've got some
2    depression issues.  I see that.  We're going to recommend
3    mental health treatment and emotional treatment while you're
4    in the BOP.  Take advantage of it.
5        Substance abuse.  We're going to recommend RDAP as
6    well.  If you get in, get an A+.  It will give you the tools
7    you need so when you get out you won't use drugs or alcohol.
8        I was surprised to see this:  In 2013 you got your
9    GED.  Tidewater Community College, August 2013 through
10   December 2016, clearly evidence that, notwithstanding the
11   fact dad was in and out, he knows the value of an education,
12   and he knows how to study, feed his brain good stuff, and
13   work hard.  There's no reason you should be here.
14       Lillian Vernon -- who doesn't like Lillian Vernon --
15   Pack's Plastering Service, and then getting disability.
16   There's lots of disabled people in the world that don't have
17   the brain that you have, and they work and contribute to our
18   economy.  You can do the same thing, the Court believes.
19   But, as I've said several times now, it doesn't matter what I
20   think.
21       And then the letters.  He wants to be a youth
22   counselor.  You helped -- how do you say her name,
23   "MAR-KEE-DA"?  You helped Marquida get her CNA certificate.
24   You were helping her to get her GED so she could become a
25   registered nurse, more evidence that you know the value of an

1    education.  Present with the kids, school programs,
2    parent/teacher conferences, helping with their homework.
3    They miss you.
4            There's people here in this courthouse that work 60
5    to 70 hours a week and can't go to all these things that
6    you've been able to go to.  So hopefully you'll value your
7    freedom the next time you have it.
8            She says before your arrest you were changing your
9    life around.  And that's kind of true, but then something got
10   in your head and caused you to send that letter to
11   Mr. Gordon.
12           And then your letter, I've considered that:
13           "I'm sick and tired of being sick and tired.
14           "My purpose in life has never been clearer, and I
15   have found peace with myself and God."
16           And then we got some more letters after that about
17   you and your children.
18           Ms. Bell:  She says she is writing to do anything to
19   ensure that this doesn't happen again.  She can't control
20   you.  You've got to make sure this doesn't happen again.
21           And then the certificate that Mr. Woodward gave me,
22   March 6, 2017, a certificate from Southern Ministries:  It's
23   Your Choice, One God One Way, Doing Time With Jesus, How to
24   Succeed on the Streets, Walking the Walk, Managing Anger
25   God's Way.  I hope you weren't just given it to put up in

1  here.  At the end of the day, I don't know.  I hope you're
2  true to your word, Mr. Powell.
3         At the end of the day, looking at the 3553(a)
4  statutory sentencing factors, the reason that we're here is
5  because for several years you were poisoning fellow human
6  beings to make money.
7         His Criminal History Category is a VI, and it's a
8  mix; violence and assaults and batteries and unlawful
9  woundings, some cocaine, eluding police, lots of traffics.
10  You've been locked up to no avail, approximately 6.5 years.
11         I know, right?
12         11 zeros that have not been counted in your Criminal
13  History Category.  2012-2016, poisoning people, threatening,
14  dangerous, state of mind, is before the Court, impeding
15  justice, and the guidelines are 360 to life, but they're
16  restricted by that 40-year statutory cap.
17         But you're still young; you're 34.  You have
18  children, a family, a desire for college.  Maybe you really
19  do want to turn your life around.  The Court certainly hopes
20  so.  We hope what you wrote is true.  Those are all the
21  factors the Court is looking at in assessing a sentence.
22         (There was a pause in the proceedings.)
23         THE COURT:  And I've also considered the sentences
24  of your codefendants.  I neglected to say that.
25         All right.  Pursuant to the Sentencing Reform Act of

```
 1    1984, it is the judgment of the Court that the defendant,
 2    Nathaniel Powell, is hereby committed to the custody of the
 3    United States Bureau of Prisons to be imprisoned for a term
 4    of 300 months.
 5              That is below what the government asked for, and I'm
 6    relying upon the certificate that Mr. Woodward provided, as
 7    well as your letter.
 8              You'll be remanded to the custody of the United
 9    States Marshal.  Upon release from imprisonment, you shall be
10    placed on supervised release for a term of 4 years.
11              Within 72 hours of release from custody of the
12    Bureau of Prisons, you shall report in person to the
13    Probation Office in the district to which you are released.
14              You shall refrain from any unlawful use of a
15    controlled substance and submit to one drug test within 15
16    days of release while on supervised release and at least two
17    periodic drug tests thereafter, all as directed by your
18    probation officer.
19              While on supervision, you shall not commit another
20    federal, state, or local crime, you shall not unlawfully
21    possess a controlled substance, and you shall not possess a
22    firearm or other destructive device.
23              You shall comply with the standard conditions that
24    have been adopted by this Court, as well as the following
25    additional conditions:
```

1          You shall pay for the support of your children in an

2     amount ordered by any social service agency or court of

3     competent jurisdiction.  In the absence of an order, payments

4     are to be made on a schedule to be determined by the Court at

5     the inception of your supervision, based on your financial

6     circumstances.

7          You shall provide your probation officer with access

8     to any requested financial information.

9          If you test positive for any illicit substance, you

10    shall participate in a program approved by the United States

11    Probation Office for substance abuse, which program may

12    include residential treatment and testing to determine

13    whether or not you've reverted to the use of drugs or

14    alcohol, with special costs to be paid by you, all as

15    directed by your probation officer.

16         You shall waive all rights of confidentiality

17    regarding substance abuse treatment in order to allow the

18    release of information to the United States Probation Office

19    and authorize communication between your probation officer

20    and your treatment provider.

21         The Court has considered your negative net worth,

22    liquid assets, lifestyle, earning potential, the dependents

23    relying upon you for support, and I find you cannot pay a

24    fine, but you shall pay the following total penalties:

25              As to Count One, $100 special assessment.  No

1    restitution or fine.  Your special assessment shall be due in

2    full immediately.  Any balance remaining unpaid on your

3    special assessment at the inception of your supervision shall

4    be paid by you in installments of not less than $25 per

5    month, until paid in full.  Said payments shall commence

6    60 days after your supervision begins.

7            And you shall notify the U.S. Attorney for our

8    district within 30 days of any change of your name,

9    residential mailing address until that special assessment

10   imposed by the judgment is paid in full.

11           All right, Mr. Powell.  You've waived your right to

12   appeal your conviction and your sentence, and if you change

13   your mind on those issues, please speak to Mr. Woodward,

14   because he's familiar with all those rules.

15           And then I have a consent order of forfeiture.  Did

16   you review this with Mr. Woodward, Mr. Powell?

17           THE DEFENDANT:  Yes, ma'am.

18           THE COURT:  I'm sorry?

19           THE DEFENDANT:  Yes, ma'am.

20           THE COURT:  All right.  And so the attorneys have

21   signed this, and we're going to place that in your record.

22           And then I have the documents, the three letters

23   that I reviewed, and so I'm going to give them to the clerk

24   so she can place those in your file.

25           We're going to recommend a BOP as close as possible

Heidi L. Jeffreys, Official Court Reporter (Ret.)

# JA161

1    so your family and friends can visit you, a BOP with mental

2    health treatment for depression, and the RDAP program, and

3    hopefully you will get in.

4              And, hopefully, Mr. Powell, you'll be a light for

5    all the rest of your days.

6              Anything additional, Mr. Woodward?

7              MR. WOODWARD:  There are some charges -- not from

8    me, but I think there are some charges --

9              THE COURT:  Okay.  So nothing from you.

10             How about you, Mr. Butler?

11             MR. BUTLER:  The United States, pursuant to the plea

12   agreement, moves to dismiss Count Eleven.

13             THE COURT:  All right.  That motion is granted.

14             (The hearing adjourned at 1:09 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATION

2

3         I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6                         /s

7                    Heidi L. Jeffreys

8

9                    November 30, 2023

10                        Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Heidi L. Jeffreys, Official Court Reporter (Ret.)

**JA163**

AO 245B (Rev. 12/03)(VAED rev. 2) Sheet 1 - Judgment in a Criminal Case



## UNITED STATES DISTRICT COURT
### Eastern District of Virginia
Norfolk Division

FILED

APR _ 6 2017

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

UNITED STATES OF AMERICA

      v.

NATHANIEL POWELL
a/k/a "Nate"
Defendant.

Case Number:   2:16CR00097-002

USM Number:  90186-083
Defendant's Attorney:   Lawrence Woodward

## JUDGMENT IN A CRIMINAL CASE

The defendant pled guilty to Count 1 of the Indictment.

Accordingly, the defendant is adjudged guilty of the following count involving the indicated offense.

| Title       and Section | Nature of Offense | Offense Class | Offense Ended | Count |
|---|---|---|---|---|
| T. 21 U.S.C. §846, 841(a)(1) and (b)(1)(B) | Conspiracy to Manufacture, Distribute and Possess with Intent to Distribute More Than 100 Grams of Heroin | Felony | July 2016 | 1 |

On motion of the United States, the Court has dismissed the remaining count in the Indictment as to defendant NATHANIEL POWELL.

As pronounced on March 31, 2017, the defendant is sentenced as provided in pages 2 through 6 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until the special assessment imposed by this judgment is fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

Signed this _____ day of____April____ 2017.

_____
Arenda L. Wright Allen
United States District Judge

# JA164

USCA4 Appeal: 21-6982    Doc: 32    Filed: 01/10/2024    Pg: 170 of 388
Case 2:16-cr-00097-AWA-LRL   Document 160   Filed 04/06/17   Page 2 of 6 PageID# 842
AO 245B (Rev. 12/03)(VAED rev. 2) Judgment in a Criminal Case
Sheet 2 - Imprisonment

Page 2 of 6

| | |
|---|---|
| **Case Number:** | 2:16CR00097-002 |
| **Defendant's Name:** | POWELL, NATHANIEL |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **THREE HUNDRED (300) MONTHS.**

The Court makes the following recommendations to the Bureau of Prisons:

1) The defendant shall be incarcerated in a facility as close to the Tidewater Virginia area as possible.

2) The defendant shall be incarcerated in a facility with a Residential Drug Abuse Program (RDAP) when and if the defendant qualifies.

3) The defendant shall be incarcerated in a facility with mental health treatment for depression.

The defendant is remanded to the custody of the United States Marshal.

# RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to_____

at_____, with a certified copy of this Judgment.

_____

UNITED STATES MARSHAL

By        _____

DEPUTY UNITED STATES MARSHAL

**JA165**

| Case Number: | 2:16CR00097-002 |
|---|---|
| Defendant's Name: | POWELL, NATHANIEL |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **FOUR (4) YEARS**.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of supervised release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and periodic drug tests thereafter, as determined by the court.

The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or restitution obligation, it is a condition of supervised release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

## STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court set forth below:

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;
2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4)  the defendant shall support his or her dependents and meet other family responsibilities;
5)  the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance or any paraphernalia related to such substances, except as prescribed by a physician;
8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer for a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

**JA166**

USCA4 Appeal: 21-6982    Doc: 32    Filed: 01/10/2024    Pg: 172 of 388
Case 2:16-cr-00097-AWA-LRL    Document 160    Filed 04/06/17    Page 4 of 6 PageID# 844
AO 245B (Rev. 12/03)(VAED rev. 2) Judgment in a Criminal Case
Sheet 3A – Supervised Release

Page 4 of 6

| Case Number: | 2:16CR00097-002 |
|---|---|
| Defendant's Name: | POWELL, NATHANIEL |

# SPECIAL CONDITIONS OF SUPERVISION

While on supervised release pursuant to this Judgment, the defendant shall also comply with the following additional special conditions:

The defendant shall pay for the support of his children in the amount ordered by any social service agency or court of competent jurisdiction. In the absence of any such order, payments are to be made on a schedule to be determined by the court at the inception of supervision, based on defendant's financial circumstances.

The defendant shall provide the probation officer access to any requested financial information.

If the defendant tests positive for illicit substances, he shall participate in a program approved by the United States Probation Office for substance abuse, which program may include residential treatment and testing to determine whether the defendant has reverted to the use of drugs or alcohol, with partial costs to be paid by the defendant, all as directed by the probation officer.

The defendant shall waive all rights of confidentiality regarding substance abuse treatment in order to allow the release of information to the United States Probation Office and authorize communication between the probation officer and the treatment provider.

USCA4 Appeal: 21-6982    Doc: 32    Filed: 01/10/2024    Pg: 173 of 388
Case 2:16-cr-00097-AWA-LRL   Document 160   Filed 04/06/17   Page 5 of 6 PageID# 845

AO 245B (Rev. 12/03)(VAED rev. 2) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

Page 5 of 6

| Case Number: | 2:16CR00097-002 |
| Defendant's Name: | POWELL, NATHANIEL |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

| | Count | Assessment | Fine | Restitution |
|---|---|---|---|---|
| | 1 | $100.00 | $0.00 | $0.00 |
| | | $0.00 | $0.00 | $0.00 |
| TOTALS: | | **$100.00** | **$0.00** | **$0.00** |

\

## FINES

No fines have been imposed in this case.

## RESTITUTION

No restitution has been imposed in this case.

## FORFEITURE

SEE CONSENT ORDER OF FORFEITURE ENTERED AND FILED IN OPEN COURT ON MARCH 31, 2017

**JA168**

AO 245B (Rev. 12/03)(VAED rev. 2) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

| Case Number: | 2:16CR00097-002 |
|---|---|
| Defendant's Name: | POWELL, NATHANIEL |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

The special assessment is due and payable immediately. Any balance remaining unpaid on the special assessment at the inception of supervision, shall be paid by the defendant in installments of not less than $25.00 per month, until paid in full. Said payments shall commence 60 days after defendant's supervision begins.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Payments shall be applied in the following order: (1) assessment (2) restitution principal (3) restitution interest (4) fine principal (5) fine interest (6) community restitution (7) penalties and (8) costs, including cost of prosecution and court costs.

Nothing in the court's order shall prohibit the collection of any judgment by the United States.

**JA169**

AO 243 (Rev. 01/15)

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

**FILED**

APR - 2 2018

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| United States District Court | District EASTERN DISTRICT OF VIRGINIA | |
|---|---|---|
| Name (under which you were convicted):<br>NATHANIEL POWELL | | Docket or Case No.:<br>2:16-CR-00097 |
| Place of Confinement:<br>FCI 1 P.O. Box 1000 Butner, NC 27509 | Prisoner No.:<br>90186-083 | |
| UNITED STATES OF AMERICA | Movant (include name under which convicted) | |
| V.<br>NATHANIEL POWELL | | |

MOTION

1.  (a) Name and location of court which entered the judgment of conviction you are challenging:
    U.S. District Court
    Eastern District of VA
    600 GRanby Street, Rm 193
    Norfolk, VA 23510-1915

    (b) Criminal docket or case number (if you know): <u>2:16-CR-00097</u>

2.  (a) Date of the judgment of conviction (if you know): <u>October 20th, 2016</u>
    (b) Date of sentencing: <u>March 31st, 2017</u>

3.  Length of sentence: <u>25 years</u>

4.  Nature of crime (all counts): One Count of Conspiracy to Distribute more
    than a hundred grams of heroin, §846, §841(A)(1), (b)(1)(B).

5.  (a) What was your plea? (Check one)
    (1) Not guilty ☐          (2) Guilty ☒          (3) Nolo contendere (no contest) ☐

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or
    what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have? (Check one)          Jury ☐          Judge only ☐

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?          Yes ☐          No ☐

8.  Did you appeal from the judgment of conviction?          Yes ☐          No ☐

**JA170**

6. Nature of the offenses with which you were charged: (all counts)

One Count of Conspiracy to distribute more than 100 grams of heroin. 846(A) (1), (b)(1)(B)

7. On which counts were you convicted?

Count One

8. What was your plea?

Guilty

9. If you pled guilty pursuant to a plea bargain, describe the terms and conditions of the plea:

SEE ATTACHMENT

10. Kind of trial:

__ Jury ✓ Judge only (CHECK ONE)

11. Did you testify at trial?

__ Yes ✓ No (CHECK ONE)

## B. DIRECT APPEAL

1. Did you file a direct appeal?

__ Yes ✓ No (CHECK ONE)

2. Date and result of 10th Circuit decision (attach a copy of the decision if available):

N/A

3. Date and result of any appeal to the United States Supreme Court (attach a copy of the decision if available):

N/A

4. List the claims raised on direct appeal:

N/A

(Rev. 4/15/02)

2

**JA171**

5. If you did not file a direct appeal, explain why: _All Claims are being pre-sented, because Counsel failed to raise any of the Claims including Ineffective Assistance of Counsel._

## C. POSTCONVICTION PROCEEDINGS

1. Other than a direct appeal, have you initiated any postconviction proceedings with respect to the judgment under attack?

   ___ Yes ✓ No (CHECK ONE)

2. If you answered "Yes" to question 1., give the following information for each postconviction proceeding. If you have initiated more than one postconviction proceeding, use extra paper to list each proceeding using the format below.

   A. Name and location of court: _N/A_

   B. Type of proceeding: _N/A_

   C. Date filed: _N/A_

   D. List the claims raised: _N/A_

   E. Date and result (attach a copy of the decision if available): _N/A_

   F. Did you appeal? ___ Yes ✓ No (CHECK ONE)

   G. Date and result on appeal (attach a copy of the decision if available): _N/A_

(Rev. 4/15/02)                     3

**JA172**

3. If the instant application is a second or successive application, have you obtained authorization from the United States Court of Appeals for the Tenth Circuit for this court to consider the application? ___ Yes ✓ No (CHECK ONE)

## D. CLAIMS

State concisely every claim that you wish to assert in this action. For each claim, specify the right that allegedly has been violated and state all supporting facts that you consider important. You do not need to cite specific cases to support your claim(s). If you need additional space to describe any claim or to assert additional claims, use extra paper to continue the claim or to assert the additional claims. Identify clearly any additional pages that you attach to this form.

1. Did you raise on direct appeal or in a prior action any of the claims you are asserting in this motion? ___ Yes ✓ No (CHECK ONE)

2. If you answered "Yes" to question 1., state which claims previously were raised and explain why those claims are being raised again:

_____

_____

_____

3. If you answered "No" to question 1., state which claims were not raised previously and explain why those claims were not raised on direct appeal or in a prior action:

Counsel is rendered ineffective for failing to file any of the claims on direct appeal, and petitioner is raising them herein S 2255

4. Claim One: Ineffective Assistance of Counsel/ Counsel performed deficiently under Strickland -

A. Supporting facts: SEE ATTACHMENT

(Rev. 4/15/02)                    4

**JA173**

5.    Claim Two: Ineffective Assistance of Counsel

A.    Supporting Facts: Counsel performed deficiently for failing to properly chall-enge the erroneous drug quantity.

See Attachment

(Rev. 4/15/02)

5

**JA174**

6. Claim Three: Ineffective Assistance of Counsel
Counsel Performed Deficiently At Sentencing when the Government
A. Supporting facts: Used Perjured Testimony

See Attachment

7. Claim Four: Ineffective Assistance of Counsel
The Government Breached Petitioner's Plea Agreement
A. Supporting facts:

See Attachment

(Rev. 4/15/02)

6

**JA175**

AO 243 (Rev. 01/15)

15. Give the name and address, if known, of each attorney who represented you in the following stages of the you are challenging:

(a) At the preliminary hearing:

KEITH LOREN KIMBALL

(b) At the arraignment and plea:

KEITH LOREN KIMBALL

(c) At the trial: (PLEA)

LAWRENCE H. WOODWARD, JR

(d) At sentencing:

LAWRENCE H. WOODWARD, JR

(e) On appeal:

N/A

(f) In any post-conviction proceeding:

N/A

(g) On appeal from any ruling against you in a post-conviction proceeding:

N/A

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?        Yes ☐      No ☑

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?        Yes ☐      No ☑

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?        Yes ☐      No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

This Motion is Timely Filed which complies with the one (1) year time limitation

JA176

I request the following relief:

I am requesting that the court vacate petitioner's conviction and sentence and remand the case back to the district court for resentencing and a evidentiary hearing.

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I am the movant in this action, that I have read this motion, and that the information in this motion is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed on <u>March 27, 2018</u>
(Date)

<u>Nathaniel Lee Powell</u>
(Movant's Original Signature)

Movant's prisoner identification number and complete mailing address:
<u>Nathaniel Lee Powell #90186-083</u>
<u>P.O. Box 1000</u>
<u>Butner, NC 27509</u>

(Rev. 4/15/02)                     8

**JA177**

CASE NO: 2:16-CR-00097

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

NATHANIEL POWELL

PETITIONER,

V.

UNITED STATES OF AMERICA,

RESPONDENT.

PETITIONER'S REQUEST FOR LEAVE OF MOTION TO VACATE,
SET-ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. §2255

COMES NOW, the Petitioner, NATHANIEL POWELL, (herein after referred to as the defendant), Pro-Se, in the above styled and captioned cause and respectfully submits his REQUEST FOR LEAVE OF MOTION TO VACATE, SET-ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. §2255.  The Petitioner invokes the Court to follow the Supreme Court's decision in Haines v. Kerner, supra, (whereas a Pro-Se litigant should be held to a lesser standard than professional attorney's).  The following continues to wit in support therof:

JURISDICTION

This Honorable Court is vested with the jurisdiction and the

**JA178**

discretionary authority to grant an Evidentiary Hearing in the instant case.  See 28 U.S.C. §2255 Rules.

<u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

<u>STANDARD OF REVIEW:</u>

    In order to state a claim for relief under 28 U.S.C. §2255 based on a Sixth Amendment claim for Ineffective Assistance of Counsel, Petitioner must prove both elements of the test set forth by the United States Supreme court in <u>Strickland v. Washington,</u> 466 U.S. 668, 671, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  First, Petitioner must show that counsel's performance was so deficient as to fall below an 'objective standard of reasonableness'.  <u>Id</u>. at 688.  In assessing whether courts adopt a "strong presumption that counsel's actions fall within the wide range of reasonable professional assistance".  <u>Id</u>. at 689.

    Second, Petitioner must show that counsel's performance was so prejudicial as to "deprive the defendant of a fair trial".  <u>Id</u>. at 687.  In order to establish this level of prejudice, Petitioner must demonstrate a "reasonable probability that, but for counsel's [alleged] unprofessional errors, the results of the proceeding would have been different".  <u>Id</u>. at 689.

<u>CLAIM ONE:</u>

        INEFFECTIVE ASSISTANCE OF COUNSEL/COUNSEL PERFORMED
    DEFICIENTLY UNDER STRICKLAND WHEN COUNSEL FAILED TO
    FILE AN APPEAL AFTER BEING INFORMED BY PETITIONER TO
    DO SO CONSTITUTES A CLEAR AND BLATANT ACTOF
        INEFFECTIVE ASSISTANCE OF COUNSEL:

The Petitioner contends that he was deprived of his Sixth Amendment Right to Effective Assistance of counsel where his counsel performed deficiently under Strickland, when counsel failed to file an appeal after being informed by Petitioner at sentencing to do so, constitutes a clear act of a deprivation of Petitioner's Sixth Amendment Right. It's clearly without dispute that an Evidentiary Hearing is needed to resolve this claim. See Roe v. Flores-Ortega, 528 U.S. 470 (2000).

The law has been well established and undisputable wheras: "(t)he Strickland test applies to claims of 'ineffective assistance based on counsels failure to file an appeal." See Roe v. Flores-Ortega, 528 U.S. 470, 476-77, 120 S.Ct. 1029, 1034, 145 L.Ed.2d. 985 (2000). Counsel acts in a constitutionally unreasonable manner when he "disregards specific instruction from (a) defendant to file a notice of appeal." Id. at 477, 120 S.Ct. at 1035. When this happens, we presume the defendant was prejudiced even if he signed an appeal waiver as part of his plea agreement. Gomez-Diaz v. United States, F.3d 788, 790 (11th Cir. 2005).

Even when a defendant does not give specific instructions to appeal, his attorney has a constitutional duty to consult with him about an appeal if (1) "A rational defendant would want an appeal", or (2) the "particular defendant reasonably demonstrated to counsel that he was interested in appealing." Flores-Ortega, 528 U.S. at 480, 120 S.Ct. at 1036. In determining whether a lawyer had a duty to consult his client about an appeal, we

"must take into account all the information counsel knew or should have known." Id.

In the case at bar, the Petitioner informed his attorney at sentencing to file his appeal, and counsel failed to do so. With respect to the first prong of Strickland, an attorney who disregards specific instructions from his client to file a 'Notice of Appeal', acts in a professionally unreasonable manner. Id. Flores-Ortega, 528 U.S. at 477.

For the following reasons stated in the following issue, the case should be remanded back to the District Court for an Evidentiary Hearing.

CLAIM TWO:

> INEFFECTIVE ASSISTANCE OF COUNSEL/COUNSEL PERFORMED
> DEFICIENTLY FOR FAILING TO PROPERLY CHALLENGE
> THE ERRONEOUS DRUG QUANTITY FINDINGS THAT THE
> GOVERNMENT USED THAT DID NOT MEET THE
> PREPONDERANCE OF THE EVIDENCE STANDARD.

The Petitioner contends that his Sixth Amendment Right to 'Effective Assistance' was violated: "when counsel performed deficiently by failing to properly challenge the erroneous drug quantity findings that the Government used that did not meet the 'Preponderance of the Evidence Standard'."

To prevail on a claim of 'Ineffective Assistance of Counsel', Movant [first] must show that counsels representation fell below an objective standard of reasonableness, as "measured against prevailing professional norms": Strickland v. Washington, 466

U.S. 668, 688, 104 S.Ct. 2052, 80 L. Ed.2d 674 (1984). In addition, Petitioner must demonstrate that counsels "deficient performance prejudiced the defense", Id. at 687, meaning that, "there is a reasonable probability that, but for counsels unprofessional errors, the result of the proceeding would have been different". Id. at 694.

In the case at bar, the Petitioner entered a plea of guilty to One Count of Conspiracy to Manufacture, Distribute and Possess with Intent to Distribute More Than A Hundred Grams of Heroin, in violation of Title 21 U.S.C. §846, §841(A)(1), and 841(B). After, the Court accepted the Petitioners guilty plea the Government used "relevant conduct" to enhance Petitioners sentence to one (1) kilogram of heroin based upon suspected controlled substance from Ms. Wilson, who never appeared at the sentence hearing. The Petitioner was deprived of his Sixth Amendment Right to confront his accusers "as counsel never had an opportunity to cross-examine Ms. Wilson prior to sentencing". (sic).

Thus, counsels performance and assistance was constitutionally deficient, because counsel failed to call a chemist to test and weigh the controlled substance prior to Petitioner's sentencing in which could have possibly affected Petitioner's ultimate sentence. Drug weight to Petitioner's base offense level to 30, for 1000 to 3000 grams, and had counsel properly objected to the drug weight which could have resulted in a level 24, which is a 100 to 400 grams of heroin. Thus, counsels deficiency

**JA182**

prejudiced the defendant and there is a reasonable probability that the outcome of the proceeding would have been different.

The Government must prove the drug quantity attributable to the defendant by a preponderance of the evidence. United States v. Carter, 300 F.3d 415, 425 (4th Cir. 2002) (no forensic chemist tested or weighed the amount of drugs the Government erroneously attributed to the defendant).

The law has long since been established in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and Alleyne v. United States, 570 U.S. 99, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013), The Supreme Court held that, "factual determinations that increase maximum or minimum sentences, other than a prior conviction, must be found by a jury beyond a reasonable doubt (or admitted by the defendant)".

Here, the Government never proved one (1) kilogram of heroin by the 'Preponderance of the Evidence Standard' and the Petitioner never admitted to one (1) kilogram of heroin.  Therefore, the erroneously one (1) kilogram of heroin that was illegally attributed to the defendant violated his Sixth Amendment Right because he never admitted to it, and the Government lacked it's proof under the 'Preponderance of the Evidence Standard'.

For the following reasons stated in the present argument the Petitioner should be accorded an Evidentiary Hearing.

**JA183**

CLAIM THREE:

INEFFECTIVE ASSISTANCE OF COUNSEL/COUNSEL'S PERFORMED
DEFICIENTLY AT SENTENCING WHEN THE GOVERNMENT USED
PERJURED TESTIMONY FROM DETECTIVE ROBERT DYER TO
ERRONEOUSLY MEET IT'S BURDEN OF PROOF UNDER THE
PREPONDERANCE OF THE EVIDENCE TO SUPPORT THE 2-LEVEL
FIREARM ENHANCEMENT:

The Petitioner contends that his Sixth Amendment Right to Effective Assistance was violated:  "When counsel performed deficiently at sentencing when the Government knowingly and intentionally used perjured testimony from Detective Robert Dyer to erroneously meet it's burden of proof under the preponderance of the evidence standard to support the 2-level firearm enhancement.  For the following reasons stated in the present argument the 2-level firearm enhancement must be vacated because Petitioner's 5th Amendment Right to due process was violated.

To prevail on a claim of "Ineffective Assistance of Counsel, Movant must show that counsels representation fell below an 'objective standard of reasonableness as measured against prevailing professional norms.'"  See Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  In addition, Petitioner must demonstrate that counsels "deficient performance prejudiced the defense...," meaning that "there is a reasonable probability that, but for counsels unprofessional errors, the result of the proceeding would have been different." Id. at 694.

The Fifth Amendment to the U.S. Constitution prohibits a person from being deprived of life, liberty, or property without

7

**JA184**

due process of law.  U.S. Const. Amend. V..  Due process, in
the sentencing context required that the defendant be "given
adequate notice and an opportunity to contest the facts relied
upon to support his criminal penalty."  See United States v.
Satterfield, 743 F.2d 827, 840 (11th Cir. 1984).  "The defendant
need not, however, be accorded the same degree of due process
protections during the sentencing phase as was required at the
criminal trial."  Id.  The sole interest being protected is the
right not to be sentenced on the basis of invalid premises or
inaccurate information.  Id.  Thus, (t)he degree of protection
required is only that which is necessary to ensure that the
District Court is sufficiently informed to enable it to exercise
it's sentencing discretion in an enlightened manner.  Id.

   The law has been long since established that the "due process
clause is implicated if the prosecution presented testimony it
knew to be false".  See, Giglio v. United States, 405 U.S. 150,
153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).  The knowing use of
false evidence or perjured testimony constitutes a due process
violation when there is "any reasonable likelihood that the
false testimony could have affected the judgment of the jury".
See, United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49
L.Ed.2d 342 (1976).  Defendant bares the burden of showing the
testimony was actually perjured and the prosecution used it with
contemporaneous knowledge it was false.  See, United States v.
Roane, 378 F.3d 382, 401 (4th Cir. 2004).

8

**JA185**

In the case at bar, the Government knowingly and intentionally allowed Detective Robert Dyer to testify falsely at Petitioner's Sentencing Proceeding to support a 2-level gun enhancement against Petitioner.  The Government knew Detective Dyer's testimony was false, "when he testified at sentencing that 'RACK' was a gun.  See Sentencing Transcripts, page 36, line 4-7:

4). Q: Five years.  And she said she bought ten bags every day, did she not/  Or at least thats what you-all wrote down that she said.

7). A:  She estimated purchasing ten 'RACKS' a day.*****

It's clearly without dispute that Detective Robert Dyer testified falsely against Petitioner at his Sentencing Proceeding to erroneously support the 2-level gun enhancement.  The Government knew as the record clearly makes a prima facie showing that Detective Dyer testified falsely under oath, and the Government allowed this false testimony to pass uncorrected and this violated the 'Due Process Clause'.  See Giglio v. United States, 405 U.S. 150 (1972).  The record on appeal also contradicts the false testimony of Mr. Dyer as to his experience in the DEA in Portsmouth, when he was asked, "what does 'RACK' refer to?"  And he answered..."on the street it's referred to as a gun."  Id..  See Sentencing Transcripts at page 20.

As explained above, Detective Robert Dyer intentionally lied under oath, and the Government nor Petitioner's attorney ever corrected the false testimony, but allowed the false testimony

9

**JA186**

the enhancements, including "drug weight and quantity, firearm enhancement, Maintaining A Premise and Obstruction of Justice.

The same standard in which requires that a conviction to be vacated, under this same standard Petitioner's sentence must also be vacated because it does not comport with the Due Process Clause. "Due Process is violated not only where the prosecution uses perjured testimony to support it's case, but also where it uses evidence which it knows creates a false impression of a material fact." See Hamric v. Bailey, 386 F.2d 390, 394 (4th Cir. 1967). Hence, "Evidence may be false either because it is perjured or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true". Id..

Based upon counsels overall performance in which was Constitutionally deficient, as counsel was not functioning as the counsel in which the Sixth Amendment guaranteed. It is clearly without dispute that the deficient performance prejudiced the Petitioner's defense. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). But, for counsels deficient performance, "there is a reasonable probability that the result of the proceeding would have been different", (Petitioner's sentence would have been different). See Strickland, 466 U.S. at 694.

For the following reasons stated in the present argument the Petitioner's sentence should be vacated and he be resentenced without any enhancements.

11

**JA187**

## CLAIM FOUR:

### INEFFECTIVE ASSISTANCE OF COUNSEL/THE GOVERNMENT BREACHED PETITIONER'S PLEA AGREEMENT BY ALLOWING THE PETITIONER TO PLEAD GUILTY TO A SPECIFIC AMOUNT OF DRUGS AND THEN AT SENTENCING RELIED ON A GREATER DRUG QUANTITY.

The Petitioner contends that his Sixth Amendment Right to 'Effective Assistance of Counsel' was violated when: "counsel failed to object to the Governments breach of Petitioner's plea agreement, because the Petitioner made statements after his plea agreement in which the Government was prohibited from using; those same statements were used against Petitioner at his sentencing hearing".

To prevail on a claim of 'Ineffective Assistance of Counsel," the Movant must demonstrate that counsels representation fell below an "objective standard of reasonableness", "as measured against prevailing professional norms". Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct 2052, 80 L.Ed.2d 674 (1984).

## BREACH OF PLEA:

In wake of Santobello v. New York, 404 U.S. 257 (1971). Our "interpretation of plea agreements is rooted in contract law." United States v. McLaughlin, 813 F.3d 202, 204 (4th Cir. 2016) (internal quotation marks omitted)." A defendant alleging the Governments breach of a plea agreement bears the burden of establishing that breach by a preponderance of the evidence."

United States v. Snow, 234 F.3d 187, 189 (4th Cir. 2000).
"(W)hen a plea rests in any significant degree on a promise or
agreement of the prosecutor, so that it can be said to be part
of the inducement or consideration, such promise must be
fulfilled." Santobello v. New York, 404 U.S. 257, 262, 92
S.Ct. 495, 30 L.Ed.2d 427 (1971). The Government breaches a plea
agreement when an express or implied promise or assurance it
made to induce the plea remains unfulfilled. See Id. United
States v. Martin, 25 F.3d 211, 217 (4th Cir. 1994).

In the case at bar, the Petitioner entered a plea of guilty
to One Count of Conspiracy to Manufacture, Distribute, and
Possess with Intent to Distribute More Than 100 Grams of Heroin,
in violation of U.S.C. §846, 841(A)(1), and 841(b)(1)(B).

The Petitioner's attorney erroneously led him to believe that
by him pleading guilty, the statements that he made after he
pleaded guilty would not be used against him.

The Government agreed with the terms of Petitioner's plea
agreement and then at sentencing went into statements it had
agreed not to use to lay the foundation for 2 kilograms of
heroin. Thus, at sentencing the Government broke the terms of
the plea, because it was seeking the maximum sentence the Court
could have imposed using Petitioner's statements. See
United States v. Lawlor, 168, F.3d 633, 637 (2nd Cir. 1999). See
also, Santobello v. New York, 404 U.S. 257 (1971). It's clearly
without dispute that the Government breached the Petitioner's
plea agreement.

13

**JA189**

Lastly, the Petitioner's attorney's performance and assistance was Constitutionally deficient for not objecting to the Governments breach of plea agreement, resulting in prejudice against the Petitioner. But, for counsels unprofessional errors the outcome in the proceeding would have been different (here, the Petitioner's sentence would have been different had the Government not used Petitioner's statements to establish the erroneous drug amount).

For the following reasons stated in the present argument the case should be remanded back to the District Court for an 'Evidentiary Hearing'.


CLAIM FIVE:

INEFFECTIVE ASSISTANCE OF COUNSEL/COUNSEL PERFORMED
DEFICIENTLY AT SENTENCING BY FAILING TO OBJECT TO THE
GOVERNMENTS USE OF FALSE STATEMENTS IN REFERENCE TO
BRADY MATERIALS THAT WAS NOT TURNED OVER TO THE
DEFENSE.

The Petitioner contends that his Sixth Amendment Right to Effective Assistance was violated: "when counsel performed deficiently at sentencing by failing to object to the Governments use of false statements in reference to Brady materials that was not turned over to the defense. It's clearly without dispute that counsel was not functioning as the counsel guaranteed to a defendant by the Sixth Amendment. See Strickland, Supra. Therefore, in light of the instant claim, an Evidentiary Hearing should be granted in this §2255 proceeding.

14.

The law has been long since settled under <u>Brady v. Maryland</u>,
Supra, that the Government is required to turn over favorable
evidence to the defense.  It is the Governments duty to turn
over evidence, irrespectable of good or bad faith on the
prosecution.  See <u>Brady v. Maryland</u>  Whenever prosecution fails
to turn over favorable evidence to the defense, the conviction
must be vacated.

The same can be said whenever the prosecution uses perjured
testimony.  See <u>Giglio v. United States</u>, 405 U.S. 150, 153, 92
S.Ct. 763, 31 L.Ed.2d 104 (1972).  See also, <u>United States v.</u>
<u>Agurs</u>, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

To prevail on a claim of Ineffective Assistance of Counsel,
the Movant must show that counsels representation fell below an
'Objective Standard of Reasonableness', "as measured against
prevailing professional norms." <u>Strickland v. Washington</u>, 466
U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  In
addition, Petitioner must demonstrate that counsels "deficient
performance prejudiced the defense", <u>Id</u>. at 687, meaning that
"there is a reasonable probability that, but for counsels
unprofessional errors, the result of the proceeding would have
been different". <u>Id</u>. at 694.

In the case at bar, the Petitioner's attorneys performance and
assistance was constitutionally deficient for failing to object
to the Governments use of false statements in reference to Brady
materials that was not turned over to the defense.  See
Sentencing Transcripts page 17, lines 23-25.  'When the Court

15

asked, "did he turn over the information to the defense attorney?" See Sentencing Transcripts page 18, lines 7-12, and the Government answered. On page 17 of the Sentencing Transcripts, the Court asked "was that information provided in the discovery?" See line 9, and the Government answered, "no".

It is clearly without dispute that counsels conduct fell below an 'Objective Standard of Reasonableness' as counsel was not prepared to represent Petitioner at sentencing, and this was the sole reason why he failed to object. This deficient performance prejudiced the defense. As to the second prong, but for his or her attorney's deficient performance, "there is a reasonable probability that the result would have been different". <u>Id</u>. <u>Strickland</u>, 466 U.S. at 694.

## CONCLUSION

In conclusion, the Petitioner request that an 'Evidentiary Hearing' be granted in his favor because the issues which he presents to this Honorable Court are not frivolous and are cognizable under §2255. In addition, the Petitioner request the just and appropriate relief in Wake of the Interest of Justice.

Wherefore, in Light of the Interest of Justice, the Petitioner's §2255 Motion should be granted and he accorded an 'Evidentiary Hearing' on his claims of 'Ineffective Assistance of Counsel'.

16

**JA192**

## CERTIFICATE OF SERVICE

I, Nathaniel Powell, do hereby certify that a 'true and correct' copy of the aforementioned "Section §2255 Motion" has been sent to the following parties, prepaid for delivery on this _27th_ day of ___MARCH___, in the year of 2018:

Walter E. Hoffman U.S. Courthouse

600 Granby Street, Room 193

Norfolk, Va 23510-1915


United States Attorney's Office

Attn: John F. Butler

600 Granby Street

Norfolk, Va 23510-1915


Respectfully Submitted,

*Nathaniel Powell*
Nathaniel Powell, Pro-Se
Reg. No: 90186-083
FCI Butner 1
P.O. Box 1000
Butner, NC 27509
Petitioner/Defendant

Footnote 1/: Under the mailbox rule pursuant to Houston v. Lavk, Supra, Petitioner pleading is deemed filed when he places it in the hands of prison authorities.

CASE NO: 2:16-CR-97-002

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

NATHANIEL POWELL,

PETITIONER,

V.

UNITED STATES OF AMERICA,

RESPONDENT.

PETITIONER'S REQUEST FOR LEAVE TO SUPPLEMENT
§2255 MOTION PURSUANT TO FED.R.CIV.P.RULE 15(A)

COMES NOW, the Petitioner, NATHANIEL POWELL, (herein after referred to as the Defendant), Pro-Se, in the Above styled and captioned Cause and respectfully Request of Leave to Supplement §2255 Motion pursuant to Fed.R.Civ.P. Rule 15(A). The Petitioner brings to this Honorable Court that the instant Motion is being presented in good faith and effort on the Petitioner's behalf and not for the purposes of him bringing any unwarranted burdens upon this Court's time nor it's resources. The following continues to wit in support thereof:

1

**JA194**

Ineffective Assistance of Counsel/Counsel Failed
To Investigate The False Testimony That Ms. Wilson
Gave To Detective Dyer About Petitioner Using His
Portsmouth Residence Over A Five-Year Period In
Which The Evidence Was Wholly Insufficient To Support
The 2-Level Enhancement For Maintaining A Residence.

The Petitioner contends that he was deprived of his Sixth

Amendment Right to Effective Assistance of Counsel, because

counsel failed to investigate the false testimony that Ms. Wilson

gave to Detective Dyer about Petitioner using his Portsmouth

residence over a five-year period in which the evidence was

wholly insufficient to support the 2-level enhancement for

Maintaining A Residence.  Also, counsel's performance and

assistance was defective for not allowing the Petitioner to

review the position of the United States with respect to

sentencing.  See, Docket Entry #156, filed 3/24/17.  Had

Petitioner would have review the following prior to sentencing

he could have challenged the 2-level enhancement for, Maintaining

A Residence.  Based upon counsel's deficient performance and

assistance which has resulted in prejudice under Strickland v.

Washington, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

White v. Anders, 371 F.3d 900, 902 (7th Cir. 2004). This goes

to the heart of the investigate process that counsel is required

to make before he [counsel] can develop the issues: see Sneed v.

Smith, 670 F.2d 1348, 1353 (4th Cir. 1982) counsel has a duty to

conduct an appropriate investigation and determine whether any

investigation is necessary Id. @1353; also Strickland v.

Washington, Supra.  Counsel must at least, conduct a basic

2

**JA195**

factual legal investigate to determine if defense is available

or can be developed Id. @1353 "at the heart of effective

representation is the independent duty to investigate and prepare

Goodwin v. Balkcom, 648 F.2d 794, 805 (5th Cir. 1982).

To prevail on a claim of "Ineffective Assistance of Counsel,

Movant must show that counsel's representation fell below an

"objective standard of reasonableness as measured against

prevailing professional norms". See, Strickland v. Washington,

466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In addition,'

Petitioner must demonstrate that counsel's "deficient performance

prejudiced the defense..., "meaning that "there is a reasonable

probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." ID. at 694.

Pursuant to Section 2D1.1(b)(i) of the U.S.S.G. states, "if

the defendant Maintained A Premises for the purposes of

manufacturing or distributing a controlled substance, increase

[the offense level] by 2-levels". Section 856(A)(1) of Title 21

of the United States Code provides in part that:

"It shall be unlawful to knowingly open, lease, rent, use, or

maintain any place, whether permanently or temporarily, for the

purpose of manufacturing, distributing, or using any controlled

substance". ID.

In the Case at Bar, the Government never proved evidence of

"maintenance", the amount of time spent in the site, acquisition

of the site, the renting or furnishing the site, because

Detective Dyer never once went to the residence, he relied solely on the perjured testimony from Ms. Wilson.  The Government never proved that Defendant used his Portsmouth residence over a five year period, because Petitioner leased the residence in 2016, however, Ms. Wilson's false declaration about her buying heroin since 2011, from this Portsmouth residence is false and unreliable as the times and dates do not match in which she allegedly purchased heroin from the Defendant.  Ms. Wilson also testified falsely in reference to her erroneously stating that she observed the Defendant take possession of a kilogram of heroin at his home, which he then proceeded to process for retail distribution.  The Government never called Ms. Wilson to the Sentencing of Petitioner, because the Government would have had to reveal that Ms. Wilson was a liar and had two (2) other suppliers in which she purchased heroin from on different occasions.  See Ms. Wilson's Debrief in which it described two (2) other suppliers other than the Petitioner.  See, Exhibit (A) Lease For Apartment.

   Before Rule 613(b) applies the proponent of the evidence must show an inconsistency, United States v. Young, 248 F.3d 260, 267 (4th Cir. 2001) if it taken as a whole either by what it says or by what it omits... affords some indication that the fact was different from the testimony of the witness whom is sought to contradict United States v. Barile, 286 F.3d 749, 755 (4th Cir. 2002).  See also Winsteins Federal Evidence §613.04 (2d. ed. 2001) ("Any statement is inconsistent if under any

relevant conclusion resulting from anything the witness said.

It is clearly without dispute that the 2-level enhancement
in which the Government gave Petitioner for Maintaining A
Premise, because the evidence does not support the fact that
Ms. Wilson purchased drugs from Petitioner during the alleged
five-year period to support the enhancement.
    The Petitioner contends that he was prejudiced, because
counsel failed to conduct any type of investigation into
Ms. Wilson's false testimony, or provide the Petitioner an
opportunity to review the Government's position with respect to
Sentencing, in which counsel failed to challenge the 2-level
enhancement for Maintaining A Premise.  But, for counsel's
unprofessional errors the outcome in the proceeding would have
been different, (here, the Petitioner's Sentencing would have
been different, because he would have never received the 2-level
enhancement for Maintaining A Premise).  The Petitioner has
established both prongs of the test in <u>Strickland</u> and is entitled
to Relief.

    For the following reasons stated in the present argument the
Petitioner's Sentence should be Vacated and he be Resentenced
accordingly.

5

**JA198**

## CONCLUSION

In conclusion the Petitioner humbly prays that this Honorable Court grants the instant Supplemental Motion under Rule 15(A) Fed.R.Civ.P.. In addition, the Petitioner request the just and proper Relief In Light of the Interest of Justice.

WHEREFORE, In Light of the Interest of Justice, the Petitioner's Supplemental Motion should be granted.

Respectfully Submitted,

Nathaniel Powell, Pro-Se

## CERTIFICATE OF SERVICE

I, do hereby certify that a True and Correct copy of the Aforementioned "Supplemental Motion" has been sent to the following parties listed below by way of United States Postal Service prepaid for delivery on this 8 day of May , in the year of 2018:

United States Attorney's Office
101 West Main Street, STE 8000
Norfolk, VA 23510

Respectfully Submitted,

Nathaniel Powell, Pro-Se,
Reg. No: 90186-083
Federal Corrections Inst.
P.O.Box 1000
Butner, N.C. 27509

Nathaniel Powell #90186-083
Federal Correctional Insitiution 1
P. O. Box 1000
Butner, NC 27509

May 13, 2018

Norfolk Districts Clerk's Office
600 Granby Street
Norfolk, VA 23517

Dear, Clerk

To whom this may concern this is Nathaniel Powell I am writing in regards to a very important issue. I filed a $2255 motion with the courts. I also filed a supplement to my original $2255 motion. The issue at hand is I forgot to include Exhibit 1 that goes to the supplement motion. In this letter I am including two copy's of Exhibit 1 asking if you could please add these Exhibits to the supplement motion that I've recently filed with the courts. I would like to apologize for any inconvience I may have caused upon the courts.

Thanking You in Advance
Nathaniel Powell

CC:

**JA201**

LEASE AGREEMENT

WESTWINDS

APARTMENT COMMUNITY          Date: January 15, 2016

THIS AGREEMENT, by and between **Westwinds Associates L .L .C.,** a Virginia Limited Liability Company, doing business as **Westwinds Apartments,** hereinafter called Landlord and <u>**Dwanesa Brown**</u> called Tenant(s).

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, Landlord and Tenant(s) agree as follows:

I.      <u>**SUMMARY OF LEASE TERMS**</u>:

      a.      **Address of Dwelling Unit:**

            **3659 Gateway Drive**

            **Apt. 1D**

            **Portsmouth, VA 23703**

      b.      Term of Lease Begins on:      **01/15/2016**

      c.      Length of Term is:      **Twelve Months**

      d.      Lease Term Ends on:      **01/14/2017**

      e.      Rent Due for Full Term: **Eleven Thousand Four Hundred Dollars 00/100 ($11,400.00)**

      f.      Monthly Rent to be paid in advance on the first day of each month in which due in monthly installments **Nine Hundred Fifty Dollars 00/100 ($950.00),** without deduction or demand at our office located at 3601 Gateway Drive, Portsmouth VA 23703..

Exhibit 1

**Lease Agreement**                                                      1

**Westwinds Apartments**

**RENTAL PAYMENT POLICIES**

Rent is due on the first day of each month. For your convenience, rent may be paid in person; through the postal service, online at www.ripheat.com or Westwinds-apartments.com by using your checking account and routing number or by utilizing the drop slot management has provided. Beginning at midnight on the 2nd day of each month, rent is considered late.

Late rent payments are accepted by cashier's check or money order only and must include a late fee of $50. Personal checks will not be accepted for the payment of late rent. Checks returned from the bank for any reason are subject to a $50 returned check charge. Should said check be returned after the aforementioned grace period of the month, resident will also be charged the late fee of $50. Payment for returned checks will only be accepted by cashier's check or money order. Personal checks will not be accepted.

Utilities: Utilities (water) are due on the 1st of each month. A late fee of $5 will be charged on the 15th in the event your water charges are not paid in full. Should resident have two returned checks on file during a given lease term, management will accept rent payment by cashier's check or money order only for the remainder of said lease term.

All accounts not paid in full by the 12th day of each month will result in a $135 Legal fee and further collection measures by our attorneys will pursue.

**Cash is never accepted in the office for any reason.**

I have read the above addendum to my lease agreement, understand all policies outlined and agree to the contents within.

Apartment #: 3659-1D

_Juanasca E. Brown_ 01/16/16
Resident Signature                                    Date

_____
Resident Signature                                    Date

_JC_                                    1/11/16
Management Signature                                  Date

**JA203**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NATHANIEL POWELL,

               Petitioner,

v.

UNITED STATES OF AMERICA,

               Respondent.

Crim. No. 2:16cr97-02

## ORDER

The matters before the Court include a Motion for Transcript and a Request for Return of Personal Property by Petitioner Nathaniel Powell. For the following reasons the Motion for Transcript (ECF No. 174) is **DENIED** and the Request for Return of Personal Property (ECF No. 175) is **DENIED**.[1]

### I.   BACKGROUND

On March 31, 2017, Mr. Powell was sentenced to three hundred months' imprisonment following a guilty plea for Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute more than 100 grams of Heroin in violation of 21 U.S.C. sections 846, 841(a)(1), and 841(b)(1)(B). ECF No. 158. Mr. Powell was represented by counsel and his plea agreement included waiver of direct appeal. On April 2, 2018, Mr. Powell filed a Motion to Vacate (ECF No. 168) under 28 U.S.C. section 2255. The instant Motions seeking transcripts and return of personal property followed.

---

[1] The Court also **GRANTS** the Petitioner's Request for Leave to Supplement (ECF No. 169) and **ORDERS** the Government to respond to Petitioner's Motion to Vacate (ECF No. 168).

**JA204**

## II.   ANALYSIS

### a.   Transcript

"Fees for transcripts furnished in proceedings brought under section 2255 of this title to persons permitted to sue or appeal in forma pauperis shall be paid by the United States out of money appropriated for that purpose if the trial judge or a circuit judge certifies that the suit or appeal is not frivolous and that the transcript is needed to decide the issue presented by the suit or appeal." 28 U.S.C. § 753(f). Mr. Powell alludes to his indigency. Indigency may support a Section 753(f) fee exemption, but Mr. Powell must provide more information to assist the Court. *See United States v. Jones*, No. 2:14cr132, 2016 WL 8933628, at *2 (E.D. Va. Mar. 7, 2016) (advising a prisoner requesting transcripts that Court required additional information regarding his financial status); *Reid v. United States*, No. CR-92-00149-A-01 (JCC), 2006 WL 4748725, at *4 (E.D. Va. Sept. 22, 2006) ("An indigent is not entitled to transcripts at the government's expense 'without a showing of need.'") (citation omitted). Without fee payment or a showing of both need and of the salience of the transcripts to Mr. Powell's Motion to Vacate, the Motion for Transcripts must be denied without prejudice.

### b.   Return of Personal Property

Under Federal Rule of Criminal Procedure 41(g), "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." When the property is seized by state authorities, a district court can order its return if the federal government actually possesses the property or if it has "constructive federal possession of the property: (1) where the government uses the property as evidence in the federal prosecution, or (2) where the federal government directed state officials to seize the property." *Hill v. United*

2

**JA205**

*States*, 296 F.R.D. 411, 414 (E.D. Va. 2013) (*citing Clymore v. United States*, 164 F.3d 569 (10th Cir. 1999), *superseded on other grounds*).

Here, Portsmouth Police seized Mr. Powell's money incident to arrest. According to the Government's Response (ECF No. 179), the federal government does not and has not possessed the property that Mr. Powell seeks. Therefore, Mr. Powell must establish constructive possession by the federal government to compel the Court to order the federal government to return the property.

Mr. Powell cannot satisfy the first prong because the property was not used in a federal prosecution. ECF No. 179 at 2. Regarding the second prong, the federal government arguably "directed state officials" because Mr. Powell was arrested by state police on a federal criminal complaint. ECF No. 8. However, a subsequent case clarified *Clymore*: constructive possession cannot exist unless the seized property is "held for potential use as evidence in a federal prosecution." *United States v. Copeman*, 458 F.3d 1070, 1072 (10th Cir. 2006). The movant must prove "extensive federal possession or control." *Clymore*, 164 F.3d at 571. Because the federal government neither possesses nor intends to introduce as evidence the property that Mr. Powell seeks, Rule 41(g) avails him no relief.[2]

### III.    CONCLUSION

For the reasons stated herein, Mr. Powell's Motion for Transcript (ECF No. 174) is **DENIED** without prejudice and his Request for Return of Personal Property (ECF No. 175) is **DENIED**.

---

[2] The Government indicates that Portsmouth Police "are willing to return" Mr. Powell's property. ECF No. 179 at 3. Mr. Powell may wish to consult with counsel or contact Portsmouth Police directly.

3

**JA206**

Mr. Powell's Request for Leave to Supplement (ECF Nos. 169) is **GRANTED**.[3]  The Government is also **ORDERED** to respond to Petitioner's Motion to Vacate (ECF No. 168).[4]

The Clerk is **REQUESTED** to send a copy of this Order to Mr. Powell and to the United States Attorney's Office.  The Clerk is also **REQUESTED** to include a copy of the standard application to file *in forma pauperis* with the Order sent to Mr. Powell.

**IT IS SO ORDERED.**

_____
Arenda L. Wright Allen
United States District Judge

Oct 19th, 2018
_____
Norfolk, Virginia

---

[3] On May 11, 2018, Mr. Powell filed a Request for Leave to Supplement (ECF No. 169) his Motion to Vacate pursuant to Federal Rule of Civil Procedure 15(a).  Mr. Powell subsequently informed the Court that he omitted exhibits to his Request for Leave to Supplement, and he provided these exhibits. *See* ECF No. 170, Ex. 1-2.  These are allowed and have been docketed as part of the record of the case.
[4] Mr. Powell filed a Motion to Vacate under Section 2255 on April 2, 2018.  The Government is directed to file a Response to this Motion and supporting exhibits.  This Response shall be filed on or before December 24, 2018.  The Response shall also address whether a hearing is warranted in this matter.  Defendant shall file a Reply by January 25, 2019.

**JA207**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### *Norfolk Division*

| | | |
|---|---|---|
| **NATHANIEL POWELL,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 2:16cr97** |
| | ) | **Civil No.  2:18cv175** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### RESPONSE OF THE UNITED STATES TO PETITIONER'S
### MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

The United States of America, by and through its attorneys, G. Zachary Terwilliger, United States Attorney for the Eastern District of Virginia, John F. Butler and Andrew C. Bosse, Assistant United States Attorneys, hereby responds to Petitioner Nathaniel Powell's motion pursuant to Title 28, United States Code, Section 2255, to vacate, set aside, or correct sentence. The Government respectfully submits that Petitioner's Motion should be denied because his claims are without substantive merit.  In support thereof, the Government states as follows:

## I.      FACTUAL AND PROCEDURAL BACKGROUND

For over four years, from approximately March 2012 to July 2016, Petitioner was a leading member of a drug trafficking conspiracy that primarily operated in Portsmouth and Chesapeake, Virginia.  Petitioner entered into a conspiracy with other individuals to purchase, manufacture, distribute, and possess with intent to distribute in excess of 100 grams of heroin in the Eastern District of Virginia and elsewhere.  Petitioner's role in the conspiracy included, but was not limited to, procuring heroin and fentanyl from sources of supply in Baltimore, Maryland. Petitioner would have the heroin trafficked into the Hampton Roads area where it was repackaged and resold for wholesale and retail distribution.

On May 26, 2016, Petitioner led police officers on a high-speed vehicle pursuit through a residential area of Portsmouth, which ended in a T-bone collision with another vehicle that dislodged a victim from the driver's seat of the struck car. The victim had to be rushed to the hospital. When he was arrested, Petitioner possessed several thousand dollars in cash, seven grams of fentanyl, and seven grams of marijuana.

Between May and June 2016, Petitioner, through messages posted and exchanged on social media, threatened an individual whom Petitioner believed was a police informant. Petitioner threatened to harm this individual and his family.

On June 20, 2016, Petitioner was charged by criminal complaint with conspiracy to distribute heroin and possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 846 and 841. ECF Nos. 3, 5. Petitioner made his initial appearance on July 1, 2016, and requested the appointment of counsel. The Court appointed Keith Kimball, Assistant Federal Public Defender, to represent Petitioner. On July 20, 2016, Petitioner was charged by Indictment with conspiracy to distribute heroin and possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 846 and 841. ECF No. 17. On September 18, 2016, Mr. Kimball filed a Motion to Withdraw as Counsel, which this Court granted. ECF Nos. 76, 77. On September 20, 2016, the Court appointed Lawrence Woodward, Jr. to represent Petitioner.

On October 20, 2016, Petitioner pled guilty to Count One of the Indictment. ECF Nos. 103, 104. The offense to which Petitioner pled guilty carried a mandatory minimum sentence of five years' imprisonment, a maximum sentence of forty years' imprisonment, at least four years of supervised release, a fine up to $5,000,000, and a $100 special assessment. ECF No. 104 at 1. Petitioner appeared before Magistrate Judge Lawrence R. Leonard for a plea hearing pursuant to Rule 11 of the Federal Rules of Criminal Procedure. ECF Nos. 102-106.

**JA209**

Judge Leonard placed Petitioner under oath, and Petitioner acknowledged that he was subject to a prosecution for perjury if his statements later proved to be false and material to the proceedings. ECF Nos. 103, 106. Judge Leonard explained the elements of the charged offense and the maximum penalties. *Id.* Petitioner acknowledged he understood the elements of the offense to which he was pleading guilty and the maximum penalties. *Id.* Petitioner denied that anyone had threatened him or tried to force him to plead guilty. *Id.* Petitioner acknowledged that he had discussed all the facts of the case with his attorney. *Id.* Petitioner testified that he was satisfied his attorney had fully considered the facts of his case and had discussed with Petitioner any possible defenses he may have had. *Id.*

Petitioner acknowledged that he was pleading guilty freely and voluntarily because he was, in fact, guilty of the charged offense. ECF Nos. 103, 104, 106. Petitioner acknowledged that he read his statement of facts, signed it and initialed each page of the document. ECF Nos. 103, 105. Petitioner testified that he agreed with the statement of facts and acknowledged that the government could prove those facts beyond a reasonable doubt. ECF No. 105. Judge Leonard accepted the change of plea and found that Petitioner's plea of guilty was knowing, voluntary, and supported by an independent basis in fact. ECF No. 106.

Petitioner's initial presentence investigation report (PSR) was disclosed to the parties on January 13, 2017. ECF No. 122. In the PSR, the probation officer attributed Petitioner with total drug weights of 7.2 grams of fentanyl, 1.302 kilograms of heroin, and 7.2 grams of marijuana. PSR ¶ 13. The probation officer attributed Petitioner with these drug weights based upon the seizure of 7.2 grams of fentanyl and 7.2 grams of marijuana from Petitioner's vehicle at the time of his arrest; information provided by codefendant Valerie Wilson (1.002 kilograms of heroin); the Petitioner's Statement of Facts; and Petitioner's May 26, 2016, post-arrest interview (300 grams of heroin). *See* PSR ¶¶ 8-13.

3

**JA210**

The probation officer assigned Petitioner a base offense level of 30 (U.S.S.G. § 2D1.1(c)(5) (at least 1,000 kilograms but less than 3,000 kilograms of marijuana)) and set his adjusted offense level at 40. PSR ¶¶ 19-27. After crediting Petitioner a full three levels for acceptance of responsibility and fixing his criminal history category at VI, the probation office determined Petitioner's guidelines range to be 360 to 480 months, which was restricted due to the statutory maximum of 40 years for the charge to which Petitioner pleaded guilty. PSR ¶ 90.

Following the disclosure of the PSR, Petitioner's counsel objected to the kilogram quantity of heroin ascribed to Petitioner based on the statement of his codefendant, Valerie Wilson, who had told agents she observed him possess it, and to the firearm enhancement, which was also based on information provided by Wilson. Counsel stated in his position on sentencing that "There was no mention of a firearm being possessed by the [Petitioner] in the Statement of Facts and only after receiving the PSR counsel was provided a debrief summary on March 15, 2017, in which one individual, Valerie Wilson, indicated that [Petitioner] sat on a gun in his wheelchair during drug transactions." ECF No. 155 at 1. Additionally, counsel stated that the one kilogram of heroin was not stipulated to, and "this person apparently told authorities that on some occasion at an unspecified time, she saw an unknown person give the [Petitioner] a package that she suspected was a kilogram of cocaine" and argued that the statement did not support any drug weight being attributed to Petitioner. *Id*. at 2. Counsel also objected to the two separate enhancements for the Petitioner's Facebook communications outlined in PSR ¶ 12, and to his guidelines being enhanced by U.S.S.G. § 2D1.1(b)(12), for maintaining a premises for the purpose of distributing narcotics. *Id*. at 2-3. Counsel argued that Petitioner's objections should be granted and that doing so would result in a reduction of his offense level to 27 (from 37) for an advisory guidelines range of 130-162 months. *Id* at 2, 5. The government opposed counsel's

JA211

objections and asked the Court to uphold the probation officer's calculation of Petitioner's drug weights and the resulting sentencing guidelines. ECF No. 156.

Petitioner's counsel also submitted to the Court a thorough analysis of the 18 U.S.C. § 3553(a) sentencing factors in requesting a below-guidelines sentence. ECF No. 155 at 3-5. Counsel argued that a number of factors, among them Petitioner's personal, medical and educational history—which included a distressing account of violence, substance abuse, a severe crippling injury and a history of depression justified a departure below the applicable sentencing guidelines to 120 months. *Id.*

On March 31, 2017, this Court conducted Petitioner's sentencing hearing. The Court accepted Petitioner's plea of guilty and adjudged him guilty of the charged offense. ECF No. 158. The United States called Portsmouth Police Department Detective Robert Dyer to testify and address Petitioner's objections. At one point during the direct-examination, Detective Dyer was asked about the statement of co-defendant, Detaun Gordon, as it related to drug quantities attributable to the Petitioner. Defense counsel objected and government counsel agreed to move on to another subject. ECF No. 167 at 17-18. Gordon's statement regarding drug quantities was never used against the Petitioner. After hearing argument on Petitioner's objections to the PSR, the Court adopted the PSR without changes. ECF Nos. 158, 161. The United States recommended a sentence of 360 months' imprisonment. ECF No. 156 at 2. The Court sentenced Petitioner to 300 months' imprisonment, which was a sentence five years below the low end of the advisory guidelines range and sixty months below the government's recommended sentence. ECF Nos. 160, 161. The Court advised the Petitioner of his right to appeal. ECF No. 158. Petitioner did not appeal his sentence.

On April 2, 2018, Petitioner filed a motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. ECF No. 168. On October 19, 2018, the Court ordered the United States to

JA212

respond to Petitioner's motion by December 24, 2018.  ECF No. 180.  On November 14, 2018, the United States filed a Motion to Compel Disclosure of Information from Former Defense Counsel.  ECF No. 181.  The Court granted the motion and ordered the United States to respond within 30 days of receipt of the response from Petitioner's former defense counsel.  ECF No. 182.  The United States received the response on December 12, 2018.  *See* Exh. 1.  The United States hereby responds to Petitioner's motion within the ordered deadline of January 11, 2019, and respectfully submits that the Court should deny Petitioner's motion in its entirety.  As discussed below, Petitioner has no grounds for relief and his claims are substantively without merit.

**II.    STANDARD OF REVIEW**

    A.    Cognizable Claims.

    Pursuant to 28 U.S.C. § 2255, there are four cognizable grounds upon which a federal prisoner may move to vacate, set aside, or correct his sentence: (1) constitutional issues; (2) challenges to the District Court's jurisdiction to impose the sentence; (3) challenges to the length of a sentence in excess of the statutory maximum; and (4) claims that the sentence is otherwise subject to collateral attack.  *See* 28 U.S.C. § 2255.  "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *Jones v. United States*, No. 4:09CV76, 2010 WL 451320, at *4 (E.D. Va. Feb. 8, 2010) (quoting *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992)).  The movant bears the burden of proving his grounds for collateral attack by a preponderance of the evidence.  *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958) (per curium).

6

**JA213**

B.     Section 2255 Claims Following Guilty Pleas.

Because the need for finality has "special force with respect to convictions based on guilty pleas," a guilty plea may be attacked on collateral review only in "strictly limited" circumstances. *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quoting *United States v. Timmreck*, 441 U.S. 780, 784 (1979)). In particular, "a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508 (1984). Thus, when a defendant files a Section 2255 motion to challenge the validity of a conviction pursuant to a guilty plea, "the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569 (1989). In this case, Petitioner's plea was both counseled and voluntary. *See* Exh. 1; ECF Nos. 103, 106.

A defendant who pleaded guilty can file a Section 2255 motion to raise a claim that his plea was not voluntary and intelligent. *See Bousley*, 523 U.S. at 618-19 (where defendant was misinformed as to elements of offense against him, guilty plea was unintelligent and therefore "constitutionally invalid"). Likewise, a claim that the defendant received ineffective assistance of counsel prior to entering the plea is cognizable in a Section 2255 motion.

A guilty plea is an admission of all the elements and material facts of the criminal charge contained in an indictment. *See Broce*, 488 U.S. at 569 ("a plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt"). Thus, a defendant cannot ordinarily challenge his plea on the ground that there was insufficient evidence to prove an element of the offense. It is important, however, to distinguish a claim that the evidence was insufficient to prove an element of the offense (which cannot be raised on collateral review) from a claim that the defendant was misinformed about the elements of the offense at the plea hearing (which can be raised under *Bousley*).

**JA214**

III.    **ANALYSIS**

Petitioner alleges that his constitutional right to the effective assistance of counsel was denied. First, Petitioner alleges that counsel was ineffective for failing to file claims on direct appeal after Petitioner asked him to do so at sentencing. ECF No. 168 at 10-12. Second, Petitioner claims counsel was ineffective for failing to properly challenge the drug quantity, which served, in part, as the basis for Petitioner's total offense level. *Id.* at 12-14. Third, Petitioner argues counsel was ineffective for failing to correct the allegedly false testimony of the detective who testified for the government at sentencing to support the firearm enhancement. *Id.* at 15-18. Ground Four of Petitioner's Motion claims his counsel was ineffective for not objecting to the government's purported breach of the plea agreement. *Id.* at 19-21. Finally, Petitioner's fifth claim is that counsel was ineffective for failing to object to the government's use of purportedly false statements. *Id.* at 21-23. The United States submits that Petitioner's claims for relief are wholly without merit, and that his motion should be denied.

    A.    <u>Defense Counsel Provided Effective Assistance of Counsel.</u>

        1.    Legal Standard For Claims Of Ineffective Assistance Of Counsel.

Under well-settled principles first articulated by the Supreme Court in *Strickland v. Washington*, an individual alleging ineffective assistance of counsel must demonstrate: (1) that his attorney's performance was constitutionally deficient; and (2) that he was so prejudiced by his attorney's deficient performance that there is a reasonable probability that, but for these deficiencies, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984); *see also Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

The "deficient performance" component of this two-pronged formulation requires a litigant to demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

**JA215**

That is, a litigant must show that his attorney's performance fell below an objective standard of reasonableness. *Id*. at 688. Judicial scrutiny of an attorney's performance "must be highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. Furthermore, in considering whether an attorney performed below the level expected of a reasonably competent attorney, it is necessary to "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. As stated by the Fourth Circuit, the standard for deficient performance is "not merely below-average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance." *Griffin v. Warden, Md. Corr. Adjustment Ctr.*, 970 F.2d 1355, 1357 (4th Cir. 1992).

The "prejudice" component of *Strickland* requires a litigant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This prong of the *Strickland* test focuses on whether an attorney's deficient performance rendered the result of the proceeding unreliable or fundamentally unfair. *Id*. at 687. The defendant "bears the burden of proving *Strickland* prejudice," and "[i]f the defendant cannot demonstrate the requisite prejudice, a reviewing court need not consider the performance prong." *Fields v. Attorney Gen. of State of Md.*, 956 F.2d 1290, 1297 (4th Cir. 1992).

A litigant who alleges ineffective assistance of counsel following the entry of a guilty plea, as Petitioner does here, has an even higher burden to meet. *See, e.g., Hill v. Lockhart*, 474 U.S. 52, 53-59 (1985)*; United States v. Dyess*, 478 F.3d 224, 237 (4th Cir. 2007), *cert. denied*, 552 U.S. 1063 (2007). In such cases, the "prejudice" prong of *Strickland* is "slightly modified. Such a defendant 'must show that there is a reasonable probability that, but for counsel's errors,

he would not have pleaded guilty and would have insisted on going to trial.'" *Hooper v. Garraghty*, 845 F.2d 471, 475 (4th Cir. 1988) (quoting *Lockhart*, 474 U.S. at 59).

In evaluating a post-guilty plea claim of ineffective assistance, statements previously made under oath affirming satisfaction with counsel—typically, in a Rule 11 proceeding—are binding on the defendant absent "clear and convincing evidence to the contrary." *Fields*, 956 F.2d at 1299, *citing Blackledge v. Allison,* 431 U.S. 63, 74-75 (1977). *Accord United States v. Lemaster*, 403 F.3d 216, 220-23 (4th Cir. 2005) (affirming summary dismissal of § 2255 motion, including ineffective assistance claim, noting inconsistent statements made during Rule 11 hearing). The fact that a plea bargain is "favorable" to a defendant and that accepting it was "a reasonable and prudent decision" is itself evidence of "[t]he voluntary and intelligent" nature of the plea. *Fields*, 956 F.2d at 1299.

The failure of a litigant to meet *either* component of the *Strickland* test defeats an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 700. The court need not address both components of the test if the litigant makes an insufficient showing on one prong of the test. *Id.* at 697. Here, Petitioner cannot satisfy either of *Strickland*'s requirements. Additionally, a petitioner is not entitled to a hearing on an ineffective assistance of counsel claim based on "unsupported, conclusory allegations." *See Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992), *abrog'n on other grounds recog'd*, *Yeatts v. Angelone*, 166 F.3d 255 (4th Cir. 1999).

    2.    Defense Counsel's Performance Was Not Constitutionally Deficient.

    a.    <u>Claim One: Ineffective Assistance for Failing to File an Appeal.</u>

Petitioner first alleges that counsel was ineffective for failing to file an appeal after Petitioner asked him to do so. An attorney's failure to file an appeal, when requested by his client to do so, is *per se* ineffective assistance of counsel—irrespective of the merits of the appeal. *See, e.g.*, *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985); *Jones v. Barnes*, 463 U.S. 745,

**JA217**

751 (1983) (noting that "fundamental decision" of whether to appeal rests not with counsel, but with the defendant); *Anders v. California,* 386 U.S. 738, 744 (1967) (defendant has right to pursue direct appeal, even if frivolous, which counsel must assist as "an active advocate in behalf of his client"); *Frazer v. South Carolina*, 430 F.3d 696, 703-05 (4th Cir. 2005) (expressed dissatisfaction with sentence deemed request to appeal, granting petition for habeas relief due to counsel's failure to do so); and *United States v. Peak*, 992 F.2d 39, 42 (4th Cir. 1993) (where counsel is asked to appeal but fails to do so, prescribed remedy is to vacate original judgment and enter a new judgment from which appeal can be taken).

Petitioner claims that his counsel was ineffective for failing to file an appeal. In this case, Petitioner knowingly waived his right to appeal his conviction and sentence by signing and agreeing to the plea agreement. ECF No. 104 at 3-4. Petitioner's counsel specifically and fully discussed the waiver of appeal with Petitioner and Petitioner, indicated a clear understanding of that waiver. *See* Exh. 1 at 1.

Petitioner claims that he informed his attorney at sentencing to file an appeal. ECF No. 168 at 12. Petitioner's claim is directly contradicted by his counsel's sworn affidavit:

> At no time after the plea, during the preparation/review of the pre-sentence report or during the sentencing process did he ever indicate[] any desire to appeal.
> I have no record or memory of Mr. Powell ever requesting that I file a notice of appeal. My practice is that if a client requests to file a notice of appeal, I always immediately do so and then move to withdraw when the client has waived his right to appeal as part of the plea agreement.

*Id*. at 2.

Absent some proof of a specific and unequivocal request to file a timely appeal, counsel's performance could not have been constitutionally deficient, particularly given Petitioner's knowing and voluntary waiver of his right to appeal. This claim has no merit.

**JA218**

   b. <u>Claim Two: Ineffective Assistance for Failing to Challenge the Drug Quantity.</u>

  Petitioner also claims his counsel was ineffective for failing to properly challenge the drug quantity findings. ECF No. 168 at 12-14. Specifically, Petitioner's Motion argues that he was deprived of his Sixth Amendment right to cross-examine Valerie Wilson, whose information helped establish the drug quantity assessed against the Petitioner. *Id*. at 13. Ms. Wilson was neither called by the government nor the defense at the sentencing hearing. By pleading guilty, the Petitioner waived the right to cross-examine Ms. Wilson at trial. Paragraph four of Petitioner's plea agreement stipulates:

> The defendant is satisfied that the defendant's attorney has rendered effective assistance. The defendant understands that by entering into this agreement, defendant surrenders certain rights … the right to a jury trial; … *the right at trial to confront and cross-examine adverse witnesses*, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses.

ECF No. 104 at 2 (emphasis added).

  Additionally, Petitioner claims his counsel was deficient because he "failed to call a chemist to test and weigh the controlled substance prior to Petitioner's sentencing." ECF No. 168 at 13. Again, Petitioner's knowing and voluntary decision to plead guilty waived any right to confront the witnesses against him. Petitioner's counsel was under no obligation whatsoever to call a chemist at sentencing. As part of the 1.302 kilograms of heroin assessed against the Petitioner by the Probation Officer, just over one kilogram came from information received from Ms. Wilson.

> Since Summer 2011, Valerie Wilson purchases 10 bundles of heroin from Powell on 12 occasions. In addition, while purchasing 2 to 3 bundles on one occasion, she observed an individual come to Powell's residence and deliver a kilogram of heroin. Powell took the heroin to a back bedroom and could be heard processing the heroin.

ECF No. 153 at 5, paragraph 10.

The government's sole witness at Petitioner's sentencing hearing, Portsmouth Police Department Detective Robert Dyer, was asked to describe the interview with Ms. Wilson and how she described the kilogram of heroin.

> She explained that it was approximately 2 to 3 inches thick, and it was approximately 9 inches by 6 inches in size …. It was wrapped in aluminum foil and in a plastic bag …. Powell took it into another room, out of her sight, and she heard what she believed to be a coffee grinder or some sort of blender running …. Typically, with heroin, cutting and adding additives to the heroin, the best way to mix the two is with a blender.

ECF No. 167 at 16:9-17:10.

Petitioner's counsel could not have been ineffective for failing to challenge the drug quantities because he in fact challenged the drug weight both in his sentencing position paper and at the sentencing hearing. *See* ECF No. 155 at 2. Counsel objected to Petitioner's drug weight calculation and argued against the use of Ms. Wilson's information. He stated, "The defense contends that [Wilson's information] does not support any drug weight being attributed to [Petitioner] and on its face is mere speculation." *Id*. Counsel argued this point at sentencing and also objected to the use of any of Petitioner's post-plea agreement interviews in calculating his drug weights. Mr. Woodward stated, "[O]ne of Mr. Powell's interviews was subject to the plea agreement, and that information, obviously, as the Court knows, can never be used to enhance his sentence or to bring any other charges." ECF No. 167 at 11:25-12:3. The Court agreed with Mr. Woodward, and the government continued to present evidence without discussing Petitioner's post-plea agreement interview. Mr. Woodward later persisted with his objection to Ms. Wilson's information, stating that the information was a "vague and unspecific statement of one individual, who we know to be a drug addict and we know to be providing information in the hopes of helping herself." *Id*. at 44:6-9. After hearing arguments, the Court stated, "The burden of proof is on the government, and I agree with the government in total, and

13

**JA220**

I'm going to overrule the objection.  So the drug weight is going to be one kilogram, based on a total of 30."  *Id*. at 45:24-46:2.

Petitioner's second ground is without merit and should be dismissed.  Counsel objected before and at sentencing, and the Court overruled the objection.  The fact that the Court did not agree with defense counsel's argument does not establish an argument for ineffective assistance of counsel.

       c.     <u>Claim Three: Ineffective Assistance for Failing to Challenge What Petitioner Claims Was False Testimony from the Detective Regarding the Firearm Enhancement.</u>

In Ground Three, Petitioner argues counsel was ineffective for failing to correct the allegedly false testimony of the detective who testified for the government at sentencing to support the firearm enhancement.  Petitioner claims that the detective's testimony was false when he testified that "rack" was another word for a firearm.  ECF No. 168 at 17.

Counsel objected to the firearm enhancement in his position on sentencing.  ECF No. 155 at 1-2.  Counsel stated, "there was no mention of a firearm being possessed by [Petitioner] in the Statement of Facts and only after receiving the PSR counsel was provided a debrief . . . in which one individual, Valerie Wilson, indicated that [Petitioner] sat on a gun in his wheelchair during drug transactions.  This individual offered no detail on this weapon and did not indicate any time frame."  ECF No. 155 at 1-2.  Again at the sentencing hearing, counsel continued this objection and argued against basing the enhancement on Petitioner's jail calls.  Counsel stated, "the presentence report says he should get a gun enhancement because he carried a weapon during transactions with Mary Wilson sometime over a six-year period . . . it's not based on anything else."  ECF No. 167 at 47:20-24.

At sentencing the government presented evidence, including Ms. Wilson's information and the Petitioner's own jail calls about his possession of a firearm.  Detective Dyer described

**JA221**

his interview with Ms. Wilson and relayed to the Court that Wilson observed the Petitioner with a firearm every time they conducted drug transactions—approximately a dozen times. The detective also described the Petitioner's own words, which were captured in recorded jail calls. As he stated in those calls, "I got rid of the gun," and "I got rid of that thing, I got rid of that rack." *Id*. at 20:6-8. The detective, who had also served as a Task Force Officer for the DEA for over three years, was then asked to explain what "rack" meant in that context and based on his decade-long experience in law enforcement. He replied, "On the street, it's referred to as a gun." *Id*. at 20:21. The detective elaborated on the Petitioner's recorded jail calls and informed the Court that he also had said, "the gun got to go." *Id*. at 20:24-21:4.

After hearing argument from both sides, the Court overruled defense counsel's objections and stated that the firearm enhancement had been properly applied. In light of the Petitioner's own recorded statements about a "gun," whether or not counsel had specifically argued about the meaning of the work "rack" would not have made a difference. The Court found that there was sufficient evidence to support the firearm enhancement; therefore Petitioner's third claim is without merit and should be dismissed.

        d.    <u>Claim Four: Ineffective Assistance for Not Objecting to Government's Purported Breach of the Plea Agreement.</u>

The Petitioner's fourth claim also closely follows his second claim—namely an objection about how the drug quantity was calculated. He incorrectly asserts that information from his own post-plea cooperation debrief was used to establish the drug quantity in his case.

The Probation Officer calculated 300 grams of heroin from the defendant's post arrest interview. ECF No. 153 at 5, paragraph 11. Additionally, Probation assessed 1.002 kilograms of heroin against the defendant based on information provided by Ms. Wilson. *Id*. at paragraph 10. The total weight of heroin assessed against the Petitioner was 1.302 kilograms, which

**JA222**

established a base offense level of 30. As discussed *supra*, Petitioner's counsel objected to this both in his position paper and at the sentencing hearing. The government offered the testimony of Detective Dyer and asked him to recount Ms. Wilson's interview. In its argument the government then specifically requested that the Court not exceed the base offense level established by probation even through an argument could be made on the *Pinkerton* theory of liability for a higher drug quantity involved in the conspiracy. ECF No. 167 at 43. Government counsel specifically said, "What we are asking the Court to do is to find that the heroin in this case exceeds one kilogram and is at that base offense level of 30." *Id* at 43:20-22. The Court then heard argument from Petitioner's counsel and his objection to the drug weight. *Id*. at 44-45. The Court, in ruling on the drug quantity, stated, "I agree with the government in total, and I'm going to overrule the objection. So the drug weight is going to be one kilogram, based on a total of 30." *Id*. at 45:25-46:2.

The Court did not make a finding that any greater amount of heroin should be assessed against the defendant nor that a higher offense level applied. Petitioner's counsel aggressively argued and objected, but was ultimately overruled by the Court. Petitioner's fourth claim is also without merit and should be dismissed.

       e.    <u>Claim Five: Ineffective Assistance for Failing to Object to Government's Use of Purportedly False Statements in Reference to *Brady* Materials.</u>

Finally, Petitioner argues counsel was ineffective for failing to object to the government's use of purportedly false statements in reference to *Brady* materials that he claims were not turned over to the defense. ECF No. 168 at 21-23.

Detective Dyer was called to testify by the United States at sentencing to address objections made by Petitioner's counsel. He was asked about the Petitioner's post-arrest confession and Ms. Wilson's interview. Government counsel then asked about how much

weight was ascribed to the Petitioner by his co-defendant, Detaun Gordon.  ECF 167 at 17:1-2.
Despite Petitioner's claim, his counsel immediately objected.  *Id.* at 17:3-6.

Counsel for the government agreed to move on and stay away from drug quantities
discussed with Mr. Gordon.  *Id.* at 18:5-19.  That agreement obviated any requirement that the
government provide the defense with Gordon's post-plea statement about drug quantities
attributable to the Petitioner.

Petitioner wrongly claims that counsel was ineffective for failing to object, but the fact is
Petitioner's counsel did object and did so successfully.  The government did not use Gordon's
information to enhance the drug weights.

Additionally, Petitioner wrongly characterizes Gordon's post-plea cooperation debrief as
*Brady* material.  Pursuant to *Brady*, "the suppression by the prosecution of evidence favorable to
an accused upon request violates due process where the evidence is material either to guilt or to
punishment, irrespective of the good faith or the bad faith of the prosecution."  *Brady*, 373 U.S.
at 87.  "In order to prove that the Government's failure to tender certain evidence constitutes a
*Brady* violation, the burden [rests on the defendant] to show that the undisclosed evidence was
(1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to
the defense, *i.e.*, 'prejudice must have ensued'; and (3) that the prosecution had materials and
failed to disclose them."  *United States v. Wilson*, 624 F.3d 640, 661 (4th Cir. 2010)(citing
*United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001)); *see also Watkins v. Rubenstein*, 802
F.3d 637, 642 (4th Cir. 2015) (discussing elements necessary to establish a *Brady* violation).
Gordon's debrief was far from favorable to the Petitioner.  It did not contain exculpatory material
as to the Petitioner, and therefore was not *Brady* material.  Petitioner did not have a discovery
right to that information, especially when Gordon's information came after the guilty pleas of
both the Petitioner and Mr. Gordon, and when the information was not used against him.

**JA224**

Petitioner's counsel successfully objected. Gordon's information was not disclosed to the Court, and the Court did not use Gordon's information about drug quantities to rule that the drug weight established a base offense level of 30. This fifth ground is without merit and should be dismissed.

3.    Petitioner Was Not Prejudiced By Counsel's Performance.

Petitioner is unable to satisfy either prong of the *Strickland* test. He cannot demonstrate that counsel made any errors, let alone those that fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Additionally, Petitioner has put forth no evidence to demonstrate a "reasonable probability" that "the result of the proceeding would have been different." *Id.* at 694. In fact, the opposite could be found—but for Mr. Woodward's zealous advocacy, Petitioner may have received a 40 year sentence or a 30 year sentence as recommended by the United States and the advisory guidelines. Instead, Petitioner received a sentence five years below the low end of the advisory guidelines.

## IV.    CONCLUSION

For the foregoing reasons, the Government submits that Petitioner has no grounds for relief under 28 U.S.C. § 2255, and that his motion to vacate, set aside, or correct sentence should be denied.

Respectfully submitted,

G. ZACHARY TERWILLGER
UNITED STATES ATTORNEY

18

**JA225**

By:             /s/
John F. Butler
Andrew C. Bosse
Assistant United States Attorneys
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail: john.f.butler@usdoj.gov; andrew.bosse@usdoj.gov

19

**JA226**

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 7th day of January, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and mailed a true and correct copy of the foregoing to the following non-filing user:

Nathaniel Powell
Inmate No. 90186-083
FCI Butner Medium I
Federal Correctional Institution
P.O. Box 1000
Butner, NC 27509

/s/

John F. Butler
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail: john.f.butler@usdoj.gov

JA227

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Norfolk Division**

NATHANIEL POWELL

      Petitioner,

v.                                    CRIMINAL NO.: 2:16cr97

UNITED STATES OF AMERICA

      Respondent.

## <u>AFFIDAVIT</u>

NOW COMES Lawrence H. Woodward, Jr., and states as follows:

1.    I was appointed to represent Nathaniel Powell in criminal case 2:16cr97 on September 19, 2016.

2.    During my representation, I fully and completely explained all the evidence received, discussed in detail all the discovery, fully explained the process, law, and his rights regarding a trial and court procedures. He decided after my advice to enter into a guilty plea at which time we fully discussed and I fully explained, the rights he was giving up by pleading guilty and signing a plea agreement.

3.    The waiver of appeal was specifically and fully discussed. He indicated a clear understanding of the waiver of appeal. I prepared him for the fact that

**JA228**

USCA4 Appeal: 21-6992      Doc: 32      Filed: 01/10/2024      Pg: 234 of 388

the court would make specific inquiry of his waiver of appeal during the plea hearing.

4.     At no time after the plea, during the preparation/review of the pre-sentence report or during the sentencing process did he ever indicated any desire to appeal.

5.     I have no record or memory of Mr. Powell ever requesting that I file a notice of appeal.  My practice is that if a client requests to file a notice of appeal, I always immediately do so and then move to withdraw when the client has waived his right to appeal as part of the plea agreement.

6.     I have reviewed all the claims made by Mr. Powell that are set forth in his 2255 petition (ECF #168) and summarized in the United States' motion to compel (ECF #181).  I fully analyzed all discovery, met and discussed the case on multiple occasions with the attorney for the United States and the Agents, and had many lengthy meetings with Mr. Powell to fully discuss and explain the discovery and the law applicable to his case.  I fully analyzed the pre-sentence report for any legal or factual objections.  Mr. Powell also made statements to law enforcement about his involvement in drug activity prior to my representation and was debriefed by agents in my presence pursuant to his plea agreement.  I strongly advised Mr. Powell on multiple occasions to be completely honest and cooperative with agents during his debrief and fully

**JA229**

advised him of the consequences for failing to be honest.  I do not believe that

any of Mr. Powell's claims have either a legal or factual basis.


STATE OF VIRGINIA
CITY/COUNTY OF VIRGINIA BEACH, to wit:

I, Lawrence H. Woodward, Jr. swear that this information is true and correct to the best of
my knowledge and belief.

_____
Lawrence H. Woodward, Jr.


**SUBSCRIBED** and sworn to before me this 12th day of December, 2018.

_____
Notary Public

TINA T. HEATH
Notary Public
Commonwealth of Virginia
My Commission Expires November 30, 2021
Commission ID# 193519

My Commission Expires: November 30, 2021          Registration #: 193519

Page 3 of 3

**JA230**

Pg: 235 of 388    Filed: 01/10/2024    Doc: 32    USCA4 Appeal: 21-6992

Pg: 236 of 388          Filed: 01/10/2024          Doc: 32          USCA4 Appeal: 21-6992

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Norfolk Division**

NATHANIEL POWELL

      Petitioner,

v.                                                    CRIMINAL NO.: 2:16cr97

UNITED STATES OF AMERICA

      Respondent.

**<u>AFFIDAVIT</u>**

NOW COMES Lawrence H. Woodward, Jr., and states as follows:

1.  I was appointed to represent Nathaniel Powell in criminal case 2:16cr97 on September 19, 2016.

2.  During my representation, I fully and completely explained all the evidence received, discussed in detail all the discovery, fully explained the process, law, and his rights regarding a trial and court procedures.  He decided after my advice to enter into a guilty plea at which time we fully discussed and I fully explained, the rights he was giving up by pleading guilty and signing a plea agreement.

3.  The waiver of appeal was specifically and fully discussed.  He indicated a clear understanding of the waiver of appeal.  I prepared him for the fact that

**JA231**

USCA4 Appeal: 21-6992      Doc: 32      Filed: 01/10/2024      Pg: 237 of 388

the court would make specific inquiry of his waiver of appeal during the plea hearing.

4.     At no time after the plea, during the preparation/review of the pre-sentence report or during the sentencing process did he ever indicated any desire to appeal.

5.     I have no record or memory of Mr. Powell ever requesting that I file a notice of appeal.  My practice is that if a client requests to file a notice of appeal, I always immediately do so and then move to withdraw when the client has waived his right to appeal as part of the plea agreement.

6.     I have reviewed all the claims made by Mr. Powell that are set forth in his 2255 petition (ECF #168) and summarized in the United States' motion to compel (ECF #181). I fully analyzed all discovery, met and discussed the case on multiple occasions with the attorney for the United States and the Agents, and had many lengthy meetings with Mr. Powell to fully discuss and explain the discovery and the law applicable to his case.  I fully analyzed the pre-sentence report for any legal or factual objections.  Mr. Powell also made statements to law enforcement about his involvement in drug activity prior to my representation and was debriefed by agents in my presence pursuant to his plea agreement.  I strongly advised Mr. Powell on multiple occasions to be completely honest and cooperative with agents during his debrief and fully

advised him of the consequences for failing to be honest.  I do not believe that

any of Mr. Powell's claims have either a legal or factual basis.


STATE OF VIRGINIA
CITY/COUNTY OF VIRGINIA BEACH, to wit:

I, Lawrence H. Woodward, Jr. swear that this information is true and correct to the best of
my knowledge and belief.

_____
                    Lawrence H. Woodward, Jr.


**SUBSCRIBED** and sworn to before me this 12th day of December, 2018.

_____
                    Notary Public

TINA T. HEATH
Notary Public
Commonwealth of Virginia
My Commission Expires November 30, 2021
Commission ID# 193519

My Commission Expires: November 30, 2021          Registration #: 193519

**JA233**

USCA4 Appeal: 21-6992      Doc: 32      Filed: 01/10/2024      Pg: 238 of 388

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

NATHANIEL POWELL,               )
    Petitioner,                 )
                                )
-versus-                        )        Criminal No. 2:16-CR-97-002
                                )
UNITED STATES OF AMERICA,       )
    Respondent.                 )

PETITIONER'S REPLY TO GOVERNMENT'S Response
REGARDING 28 U.S.C. §2255

Comes Now, the Petitioner Nathaniel Powel, proceeding pro se submits his timely response to the Government's answer as follows:

1. Reply to Government's response - Claim One: <u>Ineffective Assistance for failing to file an Appeal.</u>

Petitioner requested his attorney to file an appeal, counsel failed to do so. Petitioner was denied his Sixth Amendment Right to effective Assistance of Counsel and direct appeal as a right. The Court advised the Petitioner he had a right to file an appeal. Petitioner was prejudiced even if he signed an appeal waiver as part of his plea agreement. <u>Gomez-Diaz v. United States,</u> 433 F.3d 788, 790 (11th Cir. 2005). Accordingly, a Evidentiary Hearing is needed to resolve this claim see: <u>Roe v. FLores-Ortega,</u> 528 U.S. 470 (2000).

2. Reply to Government's response - Claim Two: <u>Ineffective Assistance for failing to challenge the Drug quantity.</u>

Counsel failed to properly investigate the facts of Petitioner's case related to "Numerous Untruthful" allegations given to the Government by Valerie Wilson. Petitioner advised his Counsel that the information in the PSR supplied by Valerie Wilson to Detective Dyer was untruthful and requested him to obtain the "rental agreement"

1.

**JA234**

from the apartment located on 3600 Block of Gateway Drive which
would show that the Petitioner only lived at that location for
approximately 6-months. This would have proven that Ms. Wilson was
untruthful when she debriefed with Detective Dyer and told him that
she bought ten bags of heroin every day from the year 2011 until 2016
see: (page 36 of the Sentencing Transcript lines 1-16). She makes
a specific claim that her purchases came from the apartment complex
at the 3600 Block of Gateway Drive see: (page 23 of the Sentencing
Transcript lines 7-14), and that, "she was purchasing heroin from
Powell since the summer of 2011, and she indicated that she was at
that apartment on 12 occasions" see: (page 36 of the Sentencing
Transcript lines 13-6). The rental agreement proves that Valerie
Wilson lied to Detective Dyer who then testified and gave false facts
at Petitioner's Sentencing Hearing because the Petitioner did not
live at the apartment on Gateway Drive in 2011. The rental agreement
shows' He did not live there until 2016. This revelation would have
shown the testimonial evidence Detective Dyer was testifying to at
sentencing was materially false and unreliable. The Government used
Ms. Wilson's information to attribute Drug weight and for maintaining
a Drug premise, and she was the Basis of the Relevant Conduct used
against the Petitioner at the Sentencing Hearing. The Court must use
the Preponderance of Evidence Standard at sentencing, However that
information must have a "sufficient indicia of reliability to support
its accuracy" United States v. Mondragon, 860 F.3d 227, 233 (4th Cir.
2017). "The Supreme Court recognizes a due process right to be
sentenced only on information which is accurate". A criminal defendant

2.

**JA235**

must establish that the challenged evidence is materially false or
unreliable, and that such false or unreliable information actually
served as a basis for the sentence in order to prove a due process
violation." <u>United States v. Adams</u>, 873 F.3d 512, 517 (6th Cir. 2017).
This Standard would have been met, had Counsel obtained the rental
agreement and used it to prove the information provided by Valerie
Wilson was untruthful. Based on the above Petitioner's Counsel was
Constitutional ineffective at sentencing. The lease agreement sub-
mitted to the Court clearly shows the occupancy date of January 15,
2016 at 3569 Gateway Drive see: (attached rental agreement).
The Fourth Circuit has held that the Strickland test applies to both
capital and non-capital Sentencing Proceedings. <u>United States v.</u>
<u>Conner</u>, 456 F. App'x 300, 304 (4th Cir. 2011)(citing <u>Glover v. United</u>
<u>States,</u> 531 U.S. 198, 202-04, 121 S.Ct. 696, 148 L.Ed. 2d 604 (2001).
Courts have considered the ABA's Criminal Justice Standards in deter-
mining whether Counsel's representation was objectively reasonable.
<u>Id.</u> (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 524, 123 S.Ct. 2527, 156
L.Ed. 2d 471 (2003). The ABA's Criminal Justice Standards indicate
that Defense Counsel in a Non-Capital Sentencing Proceeding should
(1) promptly investigate the circumstances and facts relevant to sen-
tencing, (2) present the Court with any basis that will help achieve
an outcome favorable to the defendant, and (3) supplement or challenge
information provided in any presentence report. <u>id.</u> (citing ABA Crim-
inal Justice Standards 4-4.1(a), 4-8,1(b)). To establish prejudice, a
Petitioner must demonstrate "a reasonable probability that, but for
Counsel's unprofessional errors, the result of the proceeding would

3.

**JA236**

have been different." <u>United STates v. Curtis</u>, 360 F. App'x 413, 414 (4th Cir. 2010)(quoting <u>Strickland</u>, 466 U.S. at 691-92). It is clear based on the above that the Petitioner has met this burden when he Supplemented his Section 2255 with the rental lease agreement on May 11, 2018 and May 17, 2018 at Docket entry 169 and Docket entry 170.

3. Reply to Government's response - Claim Three: <u>Ineffective Assistance for failing to challenge the false Testimony from Detective Dyer regarding the Firearm Enhancement</u>.

The Government wrongly asserts in their response that Detective Dyer was truthful. The fact is (on page 36- of the Sentencing Transcript lines 1-7)  He testified that Ms. Wilson stated that she bought ten bags of heroin every day and she purchased ten racks a day (obviously the word <u>rack</u> is bundles of heroin). Detective Dyer testified falsely not only in this instance, He also gave false facts to the Court at the Sentencing Hearing supplied to him by his informant Valerie Wilson that Ms. Wilson bought ten bag of heroin from Petitioner from 2011 until 2016 and that all the purchases came from the apartment on the 3600 Block of Gateway Drive. This was also proven false by the lease agreement submitted to the Court. It is obviously apparent that the Petitioner's Sentencing Hearing was tainted with false and unreliable information and this was a violation of Petitioner's Due Process to be sentenced only on information which is accurate, see: <u>United States v. Nichols</u>, 438 F.3d 437, 440 (4th Cir. 2006). The Government also wrongly asserts that Valerie Wilson offered no detail on the weapon on page-14 of their response, this is also untruthful. Detective Dyer

4.

**JA237**

testified that Ms. Wilson said it was a Nine-millimeter see:(Sentencing Transcript page 38 line 22).

4. Reply to Government's response - Claim Four: <u>Ineffective Assistance of Counsel/The Government Breached Petitioner's Plea Agreement by allowing the Petitioner to Plead Guilty to a Specific amount of Drugs and then at Sentencing Relied on a Great Drug quantity</u>.

Petitioner's Attorney and the Government promised that the Statements he made during his debriefing would <u>not</u> be used against him, this promise is layed out in Petitioner's plea agreement (on page 12 lines 1-4) during the Petitioner's Sentencing Hearing information that was protected under the debrief/plea agreement was used to put on aggravating factors during Petitioner's Sentencing see: (Sentencing Transcript page 14 lines 1-25). The Government specifically reveals his debrief when U.S. Attorney Butler questioned Detective Dyer on the stand who stated "The Movant admitted to 848 grams" (on line 24-25). The Government broke the terms of the plea and used the debrief to aggravate Petitioner's sentence only to seek the maximum sentence the Court could impose. See: <u>United States v. Lawlor</u>, 168 F.3d 633, 637 (2nd Cir. 1999); see also: <u>Santobello v. New York</u>, 404 U.S. 257 (1971). Petitioner's Attorney was Constitutionally ineffective for not objectting to the Government's breach of the plea agreement. Nothing should have been mentioned about information provided in Petitioner's debrief at the Sentencing Hearing to influence the Court to consider a higher sentence.

5.

**JA238**

5. Reply to Government's response - Claim Five: <u>Ineffective Assistance for Failing to Object to Government's use of False Statements in reference to Brady Materials that was not Turned over to the Defense</u>. The Government is wrong in this response on this premise, Petitioner is <u>not</u> addressing the Drug quantities informant Detaun Gordon discussed in his post-plea statement made to the Government that were attributable to the Petitioner in his §2255 Petitioner was talking about the statements Mr. Gordon made to the Government regarding letters that were allegedly sent by the Petitioner to the jail, that were inturn used to support the 2-point enhancement for obstruction. The Defense did <u>not</u> received none of the Statement's Mr. Gordon made and the Court instructed the Government that no information will be used in the Sentencing Hearing that was not turned over to the Defense see: (Sentencing Transcript page 18 lines 1-20). The Petitioner did not write any letter to informant Detaun Gordon nor were the Debrief Statements turned over. This is a clear violation of <u>Brady v. Maryland</u>. Counsel failed to object to the Government's use of the false Statements that were <u>not</u> turned over to the Defense.

<u>Counsels Performance Was Constitutional Deficient</u>

Petitioner's Sentencing Hearing was tainted with false and unreliable information that did <u>not</u> meet the "Preponderance of evidence under the sufficient indicia of reliability standard".

<u>Instances of False and Unreliable Testimony</u>:

Counsels performance and assistance was Constitutionally deficient for not objecting to Ms. Wilson's false statements when she was debriefed stating that "she purchase ten 'RACKS' a day". See:

6.

**JA239**

(Sentencing Transcripts page 36 line 7-9). Id. "On approximately
12 occassions", and "she had been to the apartment approximately on
12 occassions". Id. Sentencing Transcripts at 36 line 7-17 (Sic).
The Petitioner was in prison from 8/12 until 6/13, and he was released
in 2013. Counsel should have objected to the false testimony that
Detective Dyer provided to the Court at Petitioner's Sentencing
Hearing. Also, during Ms. Wilson's debrief session she described that
a black male asked her if she knew who he was; did he have dread-
locks, tall, short, light skin, dark complexion, anything to determine
who that might be?
A: I don't recall. See: (Sentencing Transcript page 40 line 11-15);
see also Ms. Wilson's Debrief Transcript.
The 1,050 grams, attributed to the Defendant that was based on the
information Ms. Wilson supplied was not credible. Infact, Detective
Dyer testified that Ms. Wison indicated "she did not know the package
was heroin but suspected it was" see: (Sentencing Transcript page 35
lines 5-7).
The two level enhancement for maintaining a Drug premise was also
based on the information supplied by Ms. Wilson. This information
was not credible either because Ms. Wilson lied about obtaining Drugs
from the Portsmouth address from 2011 to 2016. That fact is proven by
the lease agreement from the Westwinds Apartments submitted to the
Court that is signed by Petitioner's girlfriend. The Government must
prove  the facts underlying a sentencing enhancement by a "preponde-
rance of the evidence". That must have a "sufficient indica of rel-
iability".
U.S. Sentencing Guidelines Manual §2D1.1(b)(12) provides that if the
defendant maintained a premises for the purpose of manufacturing or
distributing a controlled substance, increase by two levels. In

7.

**JA240**

determining whether a defendant maintained a premises, the advisory notes suggest that courts should consider factors such as whether the defendant held a possessory interest in (e.g., owned or rented) the premises and the extent to which the defendant controlled access to, or activities at, the premises. §2D1.1, cmt., application m. 17. Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses. §2D1.1, cmt., application n. 17.

The Government failed to prove none of the above. The only information used to prove the enhancement was from Ms. Wilson that was false and unreliable.

Counsels performance was Constitutionally deficient as to prejudice the Petitioner, because he should have objected and pointed out all the inconsistencies in Detective Dyer's testimony in which was product of Ms. Wilson's debrief session. Detective Dyer's testimony was erroneously used to support all the enhancements, including "Drug weight and quantity, firearm enhancement, Maintaining a Premise and Obstruction of Justice.

The same standard in which requires that a conviction to be vacated, under this same standard Petitioner's sentence must also be vacated because it does not comport with the Due Process Clause. "Due Process is violated not only where the prosecution uses perjured testimony to support it's case, but also where it uses evidence which it knows creates a false impression of a material fact." See <u>Hamric v. Bailey</u>,

8.

**JA241**

386 F.2d 390, 394 (4th Cir. 1967). Hence, "Evidence may be false either because it is perjured or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true". Id. This violate the Petitioner's right to be sentenced on accurate information see: <u>Glover v. United States</u>, 531 U.S. 198, 202-04, 121 S.Ct. 696, 148 L.Ed. 2d 604 (2001).

Based upon counsels overall performance in which was Constitutionally deficient, as counsel was not functioning as the counsel in which the Sixth Amendment guaranteed. It is clearly without dispute that the deficient performance prejudiced the Petitioner's defense. See <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). But, for counsels deficient performance, "there is a reasonable probability that the result of the proceeding would have been different", (Petitioner's sentence would have been different). See Strickland, 466 U.S. at 694.

<u>Government Failure to Respond to Petitioner's 2255 Supplement</u>

The fundamental principle of litigation is that the Plaintiff brings a claim and the defendant has the burden to show why the Plaintiff should not prevail on his claims and the evidence presented. The defendant bears the burden of producing sufficient credible evidence to justify that Plaintiff is warranted no relief. "Once [plaintiff] puts forth credible evidence... , the onus... shift[s] to [defendant] to rebut that evidence with more persuasive evidence." <u>Hamidy v. Rumsfield</u>, 542 U.S. 509, 534 (2004).

The government has chosen not to respond to the Petitioner's supplemented §2255 claim, through they have been served process and

9.

docketed before the Court. Dated May 11, 2018 Docket entry 169 Exhibit
to Supplement Docketed May 17, 2018 Docket entry 170. " The [Government]
has had an opportunity to rebut [Petitioner's claim] for deciding the
[merits of the] claim, [Government] advanced no countervailing [res-
ponse].

"It is objectively unreasonable for [any Court] to fail to make an
obvious factual finding to misapprehend or misstate the record with
material facts, or to ignore evidence in support of Petitioner's
claim." <u>Marjanian v. Tilton</u>, 2012 U.S. Dist. LEXIS 187725 (9th Cir.
2012).

"[T]his Court consider all admitted evidence - whether admitted erro-
neously or not..." <u>U.S. v. Alexander</u>, 331 F.3d 116, 128 (citing
<u>Lodchard v. Nelson</u>, 448 U.S. 33, 39 (1988)). ("The Court must consider
all the evidence in it's full context in deciding [issues]"). What the
Petitioner has submitted to the Court exceeds what this Circuit has
required to maintain a prima facie case.

The government failure to respond to Petitioner's §2255 supplement
dated May 11, 2018 Docket entry 169, May 17, 2018 Docket entry 170
could be construed as a waiver by the government and if the Court
should rule on something sua sponte, it can rule that there is no
genuine issue of material fact in dispute granting the Petitioner's
relief.

Conclusion

In conclusion Petitioner Powell request that an 'Evidentiary Hearing'
be granted and or vacate and remand for resentencing.

10.

**JA243**

Unsworn Declaration Under Penalty of Perjury
(28 U.S.C. §1746)

I declare under penalty of perjury that the foregoing is true
and correct.

Executed on: January 16, 2019

Nathaniel Powell
Pro se,
#90186-083
Butner Medium I
PO Box 1000
Butner, NC 27509

11.

**JA244**

Certificate of Service

I, Nathaniel Powell, do hereby certify that a 'true and correct'
copy of the aforementioned "Petitioner's Reply to Government's
Response Regarding 28 U.S.C. §2255" has been sent to the following
parties, prepaid for delivery on this 15 day of January ,
2019.

Walter E. Hoffman U.S. Courthouse
600 Granby Street, Room 193
Norfolk, VA 23510-1915

United States Attorney's Office
Attn: Mr. John F. Butler
600 Granby Street
Norfolk, VA 23510-1915

BY: _Nathaniel Powell_____
    Nathaniel Powell
    Pro se,
    #90186-083
    Butner Medium I
    PO Box 1000
    Butner, NC 27509

Footnote 1/: Under the mailbox rule pursuant to Houston v. Lack,
Supra, Petitioner pleading is deemed filed when he places it in
the hands of prison authorities.

12.

**JA245**

# LEASE AGREEMENT
## WESTWINDS
### APARTMENT COMMUNITY        Date: January 15, 2016

THIS AGREEMENT, by and between **Westwinds Associates L .L .C.**, a Virginia Limited Liability Company, doing business as **Westwinds Apartments**, hereinafter called Landlord and **Dwanesa Brown** called Tenant(s).

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, Landlord and Tenant(s) agree as follows:

1.     **SUMMARY OF LEASE TERMS**:

     a.     **Address of Dwelling Unit:**

        **3659 Gateway Drive**

        **Apt. 1D**

        **Portsmouth, VA 23703**

     b.     Term of Lease Begins on:    **01/15/2016**

     c.     Length of Term is:    **Twelve Months**

     d.     Lease Term Ends on:    **01/14/2017**

     e.     Rent Due for Full Term: **Eleven Thousand Four Hundred Dollars 00/100 ($11,400.00)**

     f.     Monthly Rent to be paid in advance on the first day of each month in which due in monthly installments **Nine Hundred Fifty Dollars 00/100 ($950.00)**, without deduction or demand at our office located at 3601 Gateway Drive, Portsmouth VA 23703..

Lease Agreement                                     1

## Westwinds Apartments

## RENTAL PAYMENT POLICIES

Rent is due on the first day of each month. For your convenience, rent may be paid in person; through the postal service, online at www.ripheat.com or Westwinds-apartments.com by using your checking account and routing number or by utilizing the drop slot management has provided. Beginning at midnight on the 2nd day of each month, rent is considered late.

Late rent payments are accepted by cashier's check or money order only and must include a late fee of $50. Personal checks will not be accepted for the payment of late rent. Checks returned from the bank for any reason are subject to a $50 returned check charge. Should said check be returned after the aforementioned grace period of the month, resident will also be charged the late fee of $50. Payment for returned checks will only be accepted by cashier's check or money order. Personal checks will not be accepted.

Utilities: Utilities (water) are due on the 1st of each month. A late fee of $5 will be charged on the 15th in the event your water charges are not paid in full. Should resident have two returned checks on file during a given lease term, management will accept rent payment by cashier's check or money order only for the remainder of said lease term.

All accounts not paid in full by the 12th day of each month will result in a $135 Legal fee and further collection measures by our attorneys will pursue.

### Cash is never accepted in the office for any reason.

I have read the above addendum to my lease agreement, understand all policies outlined and agree to the contents within.

Apartment #: 3059-1D

_____                _____
Resident Signature                                      Date

_____                _____
Resident Signature                                      Date

_____                _____
Management Signature                                    Date

Nathaniel Powell
#90186-083
Butner Medium I
PO Box 1000
Butner, NC 27509

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

NATHANIEL POWELL,                    )
    Petitioner,                     )
                               )
-versus-                             )
                               )
UNITED STATES OF AMERICA,             )
    Respondent.                      )

### Affidavit

NOW COMES, Nathaniel Powell herein after "Affiant," solemnly swear and declare and states as follows:

I) Affiant is competent to state to matter set forth herein.

II) Affiant has personal knowledge of the facts stated herein.

III) All facts stated herein are true, correct and complete admissible as evidence and if called upon as witness, Affiant will testify.

1) Mr. Lawrence H. Woodward, Jr was appointed to represent me by the Courts on September 19, 2016.

2) Mr. Woodward never fully discussed all the evidence that the government had on me, Mr. Woodward never even let me listen to the recordings of statements I made to law enforcement officers after being asked several times on several times on several different occasions.

3) I express to Mr. Woodward in detail why I was not comfortable with taking a open plea for 5 years to 40 years and getting 20 years to 30 years.



Page 1 of 3

**JA248**

4) I ask Mr. Woodward to get the lease agreement for the Gateway
drive address to prove that the owner started renting in 2016.

5) Mr. Woodward advise me to take the plea and I would not get that
much time.

6) I ask Mr. Woodward to do a pre PSI before I took the plea and he
advise me it was not such thing.

7) The reason I pleaded guilty because Mr. Woodward explain if I
took the plea I would get 50 percent tooking off of any time I was
giving if I cooperated with the government, on a Rule 35.

8) I was told by the Judge on March 31, 2017 that I still had the
right to appeal and if I wanted to I need to get with my attorney.

9) Mr. Woodward came to see me a few days after I was sentenced and
ask me if I wanted to appeal at that time. I expressed that I was
unhappy with the sentence and wish to appeal.

10) Mr. Woodward advised me by appealing my sentence I risk losing
my Rule 35.

11) Mr. Woodward said that he will file the notice of appeal and ask
to be withdrawn from the case.


I, Nathaniel Lee Powell Swear that this information is true and
correct to the best of my knowledge and belief.


Executed this day 16 of January , 2019.

Nathaniel Lee Powell



**JA249**

State of North Carolina   )
                          )  ss:
County of Granville       )

This document was acknowledged before me on:

        this day 16 of _____January_____, 2019.

        ┌─────────────────────────────┐
        │ AUGUSTINE GOVER             │        _____
        │ NOTARY PUBLIC               │            Notary Public
        │ GRANVILLE COUNTY, NC        │
        │ My Commission Expires  5/31/21 │
        └─────────────────────────────┘

My Commission Expires: ___5/31/21___


Page 3 of 3 of Affidavit



**JA250**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NATHANIEL POWELL,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

Criminal No. 2:16cr97-02

## EVIDENTIARY HEARING ORDER

Before the Court is a Motion to Vacate, Set Aside, or Correct Sentence filed by Nathaniel Powell ("Petitioner") under 28 U.S.C. § 2255. Petitioner brings six claims of ineffective assistance of counsel. ECF Nos. 168, 169. Herein, the Court resolves four of the claims. The Court **ORDERS** an evidentiary hearing to address the two remaining claims according to the following instructions.[1]

## I.  BACKGROUND

Petitioner pleaded guilty by written plea agreement to Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute more than 100 grams of Heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B). ECF No. 104. Petitioner waived his right to appeal his conviction or any sentence under the statutory maximum. *Id.* at 3. This Court sentenced Petitioner to 300 months' imprisonment and four years' supervised release. ECF No. 158.

---

[1] Mr. Powell also filed a Motion to Clarify "the time frames given to the Petitioner and the Government for responses." ECF No. 184. Mr. Powell's request for clarification stems from a reference to the Motion to Compel Disclosure of Information from Former Defense Counsel mistakenly attributing the filing to Petitioner, rather than to the Government. With this acknowledgement, the Motion to Clarify (ECF No. 184) is **DISMISSED** as moot.

1

**JA251**

At sentencing, defense counsel raised four objections to the Presentence Investigation Report ("PSR"): (1) the drug quantity attributed to Petitioner; (2) the two-point firearm enhancement; (3) two enhancements for threatening communications on social media; and (4) the two-point enhancement for maintaining premises for the purpose of distributing narcotics. *See* ECF No. 167 at 4–5.

Petitioner filed the instant Motion, as well as a Request for Leave to Supplement. The Motion to Supplement was granted. ECF No. 169. Petitioner also filed two exhibits, a copy of a Lease Agreement (ECF No. 170-1) and a copy of a letter to the United States Attorney's Office (ECF No. 170-2). The Court ordered the Government to respond to Petitioner's Motion. The Government's Response included an affidavit from counsel. *See* ECF No. 185-1.

## II.   STANDARD OF LAW

A person in federal custody "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the [C]ourt which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). A district court must "grant a prompt hearing thereon" unless the record "conclusively show[s] that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

The Sixth Amendment to the Constitution of the United States guarantees an accused the right "to have the Assistance of Counsel for his defense." U.S. Const., Amend. VI. The Supreme Court has held that "the right to counsel is the right to the effective assistance of Counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970)) (internal quotation marks omitted). To succeed in a claim of ineffective assistance of counsel, a petitioner must show: (1) "that counsel's representation fell below an objective standard of reasonableness;" and (2) "a reasonable probability that, but for counsel's

**JA252**

unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

The decision in *Strickland* directs that counsel's performance is reviewed "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* "Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* at 698.

## III. ANALYSIS

Petitioner alleges that counsel failed to (1) file a Notice of Appeal as instructed by Petitioner; (2) properly challenge relevant conduct at sentencing, leading to a larger drug quantity attributed to Petitioner in the PSR; (3) challenge allegedly perjured testimony from Detective Robert Dyer; (4) challenge the Government's alleged misuse of Petitioner's statements to increase the attributed drug quantity; (5) object to the Government's use of materials kept from Defendant in contravention of the decision in *Brady v. Maryland*, 373 U.S. 83 (1963); and (6) investigate potentially exculpatory evidence pertaining to a two-point Guidelines enhancement. These arguments are addressed in turn.

### i. Notice of Appeal

Petitioner claims that he instructed his attorney to file an appeal at his sentencing. ECF No. 168 at 12. Counsel's affidavit[2] disputes the claim. ECF No. 185-1 at ¶¶ 4–5. An evidentiary hearing is necessary to resolve this challenge.

---

[2] It is clear that Mr. Powell has waived his attorney-client privilege with respect to his ineffective assistance of counsel claims. *United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009) ("Given the ample, unanimous federal authority on point, we hold that when a habeas petitioner claims ineffective assistance of counsel, he impliedly waives attorney-client privilege with respect to communications with his attorney necessary to prove or disprove his claim.");

**JA253**

At the evidentiary hearing, the parties shall address whether Mr. Powell indicated to his counsel an interest in appealing, and, separately, whether counsel consulted with Mr. Powell about filing a Notice of Appeal. *See United States v. Gonzalez*, 570 F. App'x 330, 337 (4th Cir. 2014) (Even if appeal is waived by plea, counsel must give "consultation regarding an appeal whether or not instructed to file an appeal when there are nonfrivolous grounds for appeal or when the defendant demonstrates a mere interest in appealing"); *see also United States v. Poindexter*, 492 F.3d 263, 272 (4th Cir. 2007) ("[W]hen a defendant brings a § 2255 claim based on his attorney's failure to file a requested notice of appeal, the district court should hold a hearing if it is unclear in the record whether the attorney was so instructed.").

If counsel improperly failed to consult with Mr. Powell, the parties shall address whether Mr. Powell "would have instructed his counsel to file an appeal" if he had "received reasonable advice from counsel about" his options. *Frazer v. South Carolina*, 430 F.3d 696, 708 (4th Cir. 2005) (internal quotation marks omitted).

### ii. Drug quantity

Petitioner was attributed with the equivalent of 1,050.01 kilograms of marijuana, which supported a Base Offense Level of 30. ECF No. 153 at ¶ 19. Of the narcotics attributed to Petitioner, 1,002 kilograms came from the statements of co-defendant Valerie Wilson and were considered "Relevant Conduct." *Id.* at ¶ 10. Petitioner claims that his Base Offense Level would

---

*Freedman v. United States*, No. 7:10-CR-15, 2013 WL4014974, at *6 (E.D.N.C. Aug. 6, 2013) ("[W]here such communications are necessary to prove or disprove petitioner's claims, he has waived attorney-client privilege with respect to those claims for the purposes of these habeas proceedings."). *See also* Va. Code § 8.01-654(B)(6) (2014) ("If [a habeas corpus] petitioner alleges as a ground for illegality of his detention the inadequacy of counsel, he shall be deemed to waive his privilege with respect to communications between such counsel and himself to the extent necessary to permit a full and fair hearing for the alleged ground."). As to the attorney's duty of confidentiality (which may be broader than the attorney-client privilege, *see* Va. R. Prof. Conduct 1.6 Comment 13)), the applicable Rule of Professional Conduct explicitly provides that "[t]o the extent a lawyer reasonably believes necessary, the lawyer may reveal . . . such information . . . to respond to allegations in any proceeding concerning the lawyer's representation of the client." Va. R. Prof. Conduct 1.6(b)(2).

have been 24 had counsel adequately challenged the drug quantity by calling a chemist to testify. ECF No. 168 at 13.

The United States Court of Appeals for the Fourth Circuit has held that a challenge to counsel's effectiveness for failing to discredit a witness amounted to a "grading of the quality of counsel's cross-examination." *Hunt v. Nuth*, 57 F. 3d 1327, 1333 (4th Cir. 1995). The Fourth Circuit held that because counsel attempted to impeach the key witness with his pending charges and the favorable deal he struck with the prosecution, counsel's assistance was not ineffective. *See id.*

Here, counsel attacked the credibility of Ms. Wilson's statements during his argument supporting an objection to the drug quantity and during cross-examination of the Government's witness, Detective Dyer. *See* ECF No. 167 at 35–40, 44–45. In response to counsel's questioning, Ms. Wilson revealed that she never saw the narcotics directly, never provided a specific date or time when she allegedly saw the narcotics, and that she was a heroin addict. *Id.* at 35–37. He reiterated these points during argument before the Court. *Id.* at 44. Petitioner's subsequent challenge amounts to an attempt at grading counsel's cross-examination instead of identifying constitutionally deficient performance.

Petitioner also fails to establish prejudice. The Base Offense Level of 30 derives from a drug weight equivalency of 1,000 to 3,000 kilograms of marijuana. ECF No. 153 at ¶ 19. Over 1,000 kilograms of drug weight equivalency came from Ms. Wilson's statements. *Id.* at ¶ 10. Calling a chemist to dispute the remaining weight would have still resulted in attribution of more than 1,000 kilograms to Petitioner. Accordingly, the Base Offense Level would have been unchanged, and Mr. Powell suffered no prejudice by counsel's treatment of the drug weight. This claim is **DENIED**.

**JA255**

iii.  Government's reliance on allegedly perjured testimony

Petitioner claims that counsel was ineffective for failing to properly challenge a two-point

Guidelines enhancement based on allegedly perjured testimony.  ECF No. 168 at 16–17.  Detective

Dyer testified on direct examination at sentencing that based on his experience, the word "rack"

used by Petitioner in a jail call referred to a gun.  ECF No. 167 at 20.  He also testified that

Petitioner said, "The gun has to go."  *Id.*  Later, on cross-examination, the following exchange

regarding drug quantity occurred:

> Q [Counsel]: Okay. As a matter of fact, what it says is that she was buying bundles
> of heroin, which are ten bags, is that correct, for –
> A [Detective Dyer]: Ten bags.
> Q: – from 2011 until 2016.
> A: Uh-huh.
> Q: Five years.  And she said she bought ten bags every day, did she not?  Or at least
> that's what you-all wrote down that she said.
> A: She estimated purchasing ten *racks* a day.

*Id.* at 35–36 (emphasis added).  Petitioner argues that Detective Dyer falsely testified that "rack"

refers to a gun when it instead refers to a bag of heroin, and that the two-point firearm enhancement

was not effectively challenged by counsel.  ECF No. 168 at 17.

Counsel challenged the firearm enhancement, arguing that it was based solely on the

statements of Ms. Wilson and that she was not a credible source.  ECF No. 167 at 47.  The Court

later clarified that the basis for the firearm enhancement was Ms. Wilson's statements that

Petitioner possessed a gun during the conspiracy.  *Id.* at 48.  Again, Petitioner is evaluating

counsel's performance on cross-examination rather than identifying deficient performance.  *See*

*Hunt*, 57 F.3d at 1333.  Accordingly, this claim fails each prong of *Strickland* and is **DENIED**.

iv.  Violation of the plea agreement

Petitioner claims that counsel was ineffective at sentencing for failing to object when the

Government allegedly breached the plea agreement and used Petitioner's post-plea statements to

6

**JA256**

calculate the drug quantity. ECF No. 168 at 20–21. The Government introduced these statements to suggest that Petitioner should have been attributed with the equivalent of 2,000 kilograms of marijuana. *See* ECF No. 168 at 20.

Counsel's performance was not deficient in this instance. He objected to the introduction of the aggravating evidence, stating, "So, again, I think the Court can, I guess, separate that out to aggravation, but we've not been put on notice that anybody is trying to say that he had two kilograms." ECF No. 167 at 13–14. Petitioner was also not prejudiced because Petitioner's Offense Level did not change based on this information. Accordingly, Petitioner fails to demonstrate ineffective assistance under *Strickland*, and the claim is **DENIED**.

> v. Use of *Brady* materials

Petitioner argues that the Government's introduction of alleged statements by co-defendant Detaun Gordon during the direct examination of Detective Dyer violated the principles established in *Brady* and that counsel was ineffective for failing to object. ECF No. 168 at 22. Counsel objected, stating, "Again, Your Honor, I enter an objection. I don't have that, either. I do not have Mr. Detaun Gordon's debrief that took place very recently." ECF No. 167 at 17. The Court then admonished the Government for attempting to introduce evidence it had not shared with opposing counsel, stating, "[W]e just need to be clear that, at least in this courtroom, when we are putting on objections and enhancements . . . they need to know about it to properly prepare." *Id.* at 18. Accordingly, counsel did not err, and this claim is **DENIED**.

> vi. Two-point "maintaining premises" enhancement

Petitioner challenges the enhancement under United States Sentencing Guideline section 2D1.1(b)(12) in the Supplement to his § 2255 Motion. *See* ECF No. 170. After reviewing

**JA257**

Petitioner's briefing and case file, the Court **DIRECTS** the parties to address this claim at the evidentiary hearing.

The parties shall address the nature of Mr. Woodward's investigation relating to the enhancement and the lease agreement (ECF No. 170-1) submitted by Petitioner. The parties shall also address whether any strategic decisions related to this claim were unreasonable and prejudicial to Petitioner. *See Smith v. Moore*, 137 F.3d 808, 817 (4th Cir. 1998). The Government is **DIRECTED** to brief its position at least fourteen days before the date of the evidentiary hearing. Petitioner may file a Reply seven days before the hearing.

## IV. CONCLUSION

The Court **ORDERS** the Clerk to appoint counsel for Mr. Powell pursuant to 18 U.S.C. § 3006A. Within one week of appointment, the parties are **ORDERED** to contact the Courtroom Deputy to schedule an evidentiary hearing for "as soon as [is] practicable after giving the attorneys adequate time to investigate and prepare." R. Governing § 2255 Proceedings 8(c). The Government is **DIRECTED** to produce Mr. Lawrence Woodward, Jr., Petitioner's former counsel, at the hearing for examination.

The Clerk is **REQUESTED** to send a copy of this Order to Mr. Powell, appointed counsel, and to the United States Attorney's Office.

**IT IS SO ORDERED.**

/s/

Arenda L. Wright Allen
United States District Judge

_____, 2019
Norfolk, Virginia

8

**JA258**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

### *Norfolk Division*

NATHANIEL POWELL,　　　　　 )
　　　　　　　　　　　　　　　)
　　　　　　Petitioner,　　　　 )
　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　 )　　　　**Criminal No. 2:16cr97-02**
　　　　　　　　　　　　　　　)　　　　**Civil No.  2:18cv175**
UNITED STATES OF AMERICA,　 )
　　　　　　　　　　　　　　　)
　　　　　　Respondent.　　　　)

## UNITED STATES' RESPONSE TO PETITIONER'S TWO REMAINING CLAIMS TO VACATE, SET ASIDE, OR CORRECT SENTENCE

The United States of America, by and through its attorneys, G. Zachary Terwilliger, United States Attorney for the Eastern District of Virginia, and John F. Butler and Andrew C. Bosse, Assistant United States Attorneys, hereby responds to Petitioner Nathaniel Powell's two remaining claims to vacate, set aside, or correct sentence as ordered by the Court on August 9, 2019. ECF No. 190.  Petitioner's Motion should be denied in its entirety because the remaining claims are without merit.  In support thereof, the Government states as follows:

## I.　　FACTUAL AND PROCEDURAL BACKGROUND[1]

On July 20, 2016, Petitioner was charged with four co-defendants in a twenty count indictment alleging, among other counts, Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute Heroin, in violation of 21 U.S.C. § 846 (Count One) and Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count Eleven).  ECF No. 17.  On September 20, 2016, the Court appointed Lawrence Woodward, Jr. to represent Petitioner. On October 20, 2016, Petitioner pled guilty to Count One of the Indictment. ECF Nos. 103, 104.

---

[1] The United States incorporates herein the factual background set out in its previous response (ECF No. 185).

## JA259

Following the disclosure of the PSR, Petitioner's counsel objected to his guidelines being enhanced by U.S.S.G. § 2D1.1(b)(12), for maintaining a premises for the purpose of distributing narcotics. ECF No. 155 at 2-3.

On March 31, 2017, this Court conducted Petitioner's sentencing hearing. The Court accepted Petitioner's plea of guilty and adjudged him guilty of the charged offense. ECF No. 158. The United States called DEA Task Force Officer (TFO) and Portsmouth Police Detective Robert Dyer to testify and address Petitioner's objections. After hearing argument on Petitioner's objections to the PSR, the Court adopted the PSR without changes. ECF Nos. 158, 161. The Court sentenced Petitioner to 300 months' imprisonment, which was a sentence five years below the low end of the advisory guidelines range and five years below the government's recommended sentence. ECF Nos. 160, 161. The Court advised the Petitioner of his right to appeal. ECF No. 158. Petitioner did not appeal his sentence.

On April 2, 2018, Petitioner filed a motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. ECF No. 168. On October 19, 2018, the Court ordered the United States to respond to Petitioner's motion. ECF No. 180. The United States responded to Petitioner's motion on January 7, 2019. ECF No. 185. Petitioner replied on January 22, 2019. ECF No. 186. The Court dismissed four of Petitioner's six claims on August 9, 2019. ECF No. 190. The Court directed the United States to file a supplemental brief regarding its position on the two remaining claims at least fourteen days before the evidentiary hearing, which currently is scheduled for April 1, 2020. *Id.*

The United States hereby submits its position and respectfully submits that the Court should deny Petitioner's motion.

# JA260

## II.    STANDARD OF REVIEW

To succeed in a claim of ineffective assistance of counsel, Petitioner must show 1) "that counsel's representation fell below an objective standard of reasonableness," and 2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, at 688, 694 (1984). Scrutiny of counsel's performance "must be highly deferential" and "viewed as of the time of counsel's conduct." *Id.* at 689-690.

## III.    ANALYSIS

### 1.    Claim One: Notice of Appeal

Petitioner alleges that his constitutional right to the effective assistance of counsel was denied because counsel was ineffective for failing to file a Notice of Appeal. In a sworn affidavit dated January 16, 2019, Petitioner stated, counsel "came to see me a few days after I was sentenced and ask[sic] me if I wanted to appeal at that time. I expressed that I was unhappy with the sentence and wish[sic] to appeal." ECF No. 186-2 at 2.

Petitioner's counsel submitted an affidavit to the Court on January 7, 2019 and again on March 18, 2020.  ECF Nos. 185-1 and 197-1. In the March 18, 2020, affidavit counsel stated,

> At no time after the plea did Mr. Powell indicate any desire to appeal. I consulted with Mr. Powell about the right to file a Notice of Appeal and specifically that he was waiving that right as part of the plea agreement he entered into with the United States. He indicated a clear understanding of the waiver of appeal.

> In counsel's 2019 affidavit, he indicated he had no record or memory of Petitioner's request to file a notice of appeal. Had Petitioner made such a request, counsel's practice was to file the notice of appeal and "then move to withdraw when the client has waived his right to appeal as part of the plea agreement." ECF No. 185-1 at 2 ¶ 5.

JA261

In this case, counsel consulted with Petitioner about his right to file a Notice of Appeal and Petitioner never made such a request. Had he done so, counsel would have filed the notice and then withdrawn from the case, as was his practice. Petitioner's claim that he asked his counsel to file a Notice of Appeal is false. Given the heightened deference called for by *Strickland*, Petitioner's claim on this issue should be denied.

2. Claim Two: Counsel Failed to Investigate Facts Related to the Premises Enhancement

Petitioner's second and final remaining claim for the Court to address is whether counsel performed ineffectively regarding the sentencing enhancement for maintaining a drug premises. Counsel was not ineffective, and § 2255's limitation on the type of claims that may be brought in this post-conviction proceeding bar Petitioner from attempting to re-litigate questions of fact already decided by this Court.

Petitioner seeks to contest the credibility of a co-defendant's statement that supported the enhancement. Petitioner has submitted a lease signed by a Ms. Dwanesa Brown for the period of January 2016 through 2017, perhaps to argue that his co-defendant could not have purchased drugs there prior to January 2016. There are at least three problems with Petitioner's argument.

First, the issue at this stage is not the credibility of the co-defendant or the various places Petitioner claims or will claim to have lived—instead it is about whether counsel was ineffective in addressing this enhancement. Counsel did in fact address this enhancement, both by objecting to it in his position paper and then objecting to it again at sentencing. The United States presented testimony from the DEA TFO who investigated the case, counsel cross-examined the officer, and the objection was overruled. Petitioner has not explained what else, if anything, his attorney purportedly should have done. A § 2255 proceeding is not another avenue toward re-litigate factual disputes.

4

**JA262**

The second problem with Petitioner's argument is that the production of a lease in the name of another individual does nothing to contradict the Court's previous finding on this issue. Even assuming the defendant was living with Ms. Brown at the Gateway apartment during the period of the lease, and during no other period, that would not disprove that he used it as a drug premises. Likewise, it does not preclude the possibility that the defendant, an admitted narcotics trafficker who has been dealing drugs much of his adult life, maintained other apartments for the purpose of manufacturing and distributing narcotics. Petitioner argues that his co-defendant's claim of purchasing heroin from him for five years could not be true given that he only lived at the Gateway apartment for one year, but that argument conflates two factual issues: how often his co-defendant purchased heroin from him at the Gateway apartment the length of time that co-defendant had been purchasing heroin from him. Nothing about the newly-produced lease suggests the co-defendant did not use Petitioner as a source of supply for five years; likewise, nothing about it suggests she could not have purchased heroin from him at the Gateway apartment twelve times over the course of one year, as the agent testified he learned from the co-defendant.

Petitioner's counsel's objection specifically addressed the co-defendant's credibility, but after testimony from DEA TFO Dyer, the Court overruled the objection. TFO Dyer testified about his interview with Ms. Wilson and her description of a kilogram of heroin she observed at a property on Gateway Drive used by Petitioner ("She explained that it was approximately 2 to 3 inches thick, and it was approximately 9 inches by 6 inches in size."). ECF No. 167 at 15. TFO Dyer was also asked how many times Ms. Wilson purchased heroin from Petitioner and his answer was "Approximately, 12." *Id.* at 19. Ultimately, the issue now is not the credibility of Ms. Wilson, but the effectiveness of Petitioner's counsel. Nothing about his performance was ineffective. He objected to the enhancement, contested the credibility of the source of the

5

**JA263**

enhancement, and cross-examined the agent witness. That the objection was overruled does not make counsel's performance per se ineffective.

The third problem with Petitioner's argument is his meritless claim that he instructed his counsel to investigate the lease. In a sworn affidavit Petitioner stated, "I ask[sic] [counsel] to get the lease agreement for the Gateway drive address to prove that the owner started renting in 2016." ECF No. 186-2 at 2. On March 18, 2020, Petitioner's counsel stated,

> I have no memory of being asked to [get the lease agreement for the Gateway Drive address] and my file does not indicate[] any such request from Mr. Powell. At no time during my representation of Mr. Powell did I become aware of the lease he filed with the Court (ECF Nos. 170-1 and 186-1). He and I discussed the premises enhancement, and based on those discussions and my review of a summary of Ms. Wilson's statement to law enforcement, I raised an objection with the Court at sentencing (ECF No. 155 page 3 ¶ 4), which was overruled.

ECF No. 197-1.

The Court directed the government to address the nature of defense counsel's investigation, and it is clear from Mr. Woodward's affidavit that no such request to obtain a lease was made at the time he represented Petitioner. For argument's sake, even if Petitioner had made such a request and Mr. Woodward had obtained the lease, it still would not have contradicted TFO Dyer's testimony about Ms. Wilson's debrief or overcome the fact that Petitioner used the apartment as a drug premises.

3.  Petitioner Can Not Establish Counsel's Deficient Performance.

The "deficient performance" component of *Strickland's* two-pronged formulation requires a litigant to demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. That is, a litigant must show that his attorney's performance "fell below an objective standard of reasonableness." *Id*. at 688. Judicial scrutiny of an attorney's performance "must be highly deferential." *Id*. at 689. Counsel consulted with Petitioner about on his rights to

**JA264**

appeal and Petitioner never asked counsel to file a notice of Appeal.  Furthermore, counsel examined Ms. Wilson's claim and objected to the premises enhancement. The government then produced testimony from the investigative officer to support the enhancement, and the Court overruled the objection. Under these circumstances, there is no basis for a finding that counsel made any "serious" errors, let alone those that would fall "below an objective standard of reasonableness." *Id*. at 688.

  4. Petitioner Was Not Prejudiced By Counsel's Performance.

  Petitioner has put forth no evidence to demonstrate a "reasonable probability" that "the result of the proceeding would have been different." *Id.* at 694.  In fact, the opposite could be found—but for Mr. Woodward's zealous advocacy, Petitioner may have received a 40 year sentence or a 30 year sentence as recommended by the United States and the advisory guidelines. Instead, Petitioner received a sentence five years below the low end of the advisory guidelines.

## IV. CONCLUSION

  While there will be an evidentiary hearing on the Notice of Appeal issue, it is in the Court's discretion to deny the second claim related to the premises enhancement without a hearing. The Government contends that the record supports a denial of the enhancement claim without the need to address it at the evidentiary hearing. For the foregoing reasons, the Government submits that Petitioner's remaining two grounds for relief under 28 U.S.C. § 2255 should be denied.

     Respectfully submitted,

     G. ZACHARY TERWILLGER
     UNITED STATES ATTORNEY

**JA265**

By: _____/s/_____
John F. Butler
Assistant United States Attorneys
Andrew C. Bosse
Assistant United States Attorney
Attorneys for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail: john.f.butler@usdoj.gov;
          andrew.bosse@usdoj.gov

JA266

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of March, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and mailed a true and correct copy of the foregoing to the following non-filing user:

Nathaniel Powell
Inmate No. 90186-083
FCI Butner Medium I
Federal Correctional Institution
P.O. Box 1000
Butner, NC 27509

_____/s/_____
John F. Butler
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail: john.f.butler@usdoj.gov

JA267

USCA4 Appeal: 21-6992     Doc: 32     Filed: 01/10/2024     Pg: 273 of 388

<u>AFFIDAVIT</u>

NOW COMES, Lawrence H. Woodward, Jr. and states as follows:

BACKGROUND: I was appointed to represent Nathaniel Powell in criminal case 2:16cr97 on September 20, 2016. Per the Court's Order (ECF No. 182), I submitted an Affidavit (ECF No. 185-1) regarding my representation of Nathaniel Powell and addressed various issues he raised in a Motion to Vacate (ECF No. 168). On August 9, 2019, the Court denied four of the claims and granted an evidentiary hearing on two remaining claims. I address those claims now and will do so again at the evidentiary hearing:

1.   As I stated previously (ECF No. 185-1 page 2 ¶ 4), at no time after the plea did Mr. Powell indicate any desire to appeal.

2.   I consulted with Mr. Powell about the right to file a Notice of Appeal and specifically, that he was waiving that right as part of the plea agreement he entered into with the United States. He indicated a clear understanding of the waiver of appeal.

3.   Mr. Powell claims in his sworn affidavit to the Court (ECF No. 186-2 page 2 ¶ 4) that he asked me to get the lease agreement for the Gateway Drive address. I have no memory of being asked to do this and my file does not indicates any such request from Mr. Powell. At no time during my representation of Mr. Powell did I become aware of the lease he filed with the Court (ECF Nos. 170-1 and 186-1). He and I discussed the premises enhancement, and based on those discussions and my review of a summary of Ms. Wilson's statement to law enforcement, I raised an objection with the Court at sentencing (ECF No. 155 page 3 ¶ 4), which was overruled.

STATE OF VIRGINIA
CITY/COUNTY OF VIRGINIA BEACH, to wit:

I, Lawrence H. Woodward, Jr. swear that this information is true and correct to the best of my knowledge and belief.

_____
Lawrence H. Woodward, Jr.


SUBSCRIBED and sworn to before me this 18th day of March, 2020.

_____
Notary Public

My Commission Expires:        November 30, 2021             Registration #: 193519

Pg: 274 of 388

Filed: 01/10/2024

Doc: 32

USCA4 Appeal: 21-6992

**JA269**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NATHANIEL POWELL,

            Petitioner,

v.                                          Case No.: 2:16CR97-02

UNITED STATES OF AMERICA,

            Respondent.

## NATHANIEL POWELL'S REPLY TO THE UNITED STATES' RESPONSE TO PETITIONER'S TWO REMAINING CLAIMS TO VACATE, SET ASIDE, OR CORRECT SENTENCE

Petitioner, Nathaniel Powell ("**Powell**"), by counsel, pursuant to the Court's Evidentiary Hearing Order (ECF 190) submits his Reply to the United States' Response to Petitioner's Two Remaining Claims to Vacate, Set Aside, or Correct Sentence (ECF 197).

## Relevant Background

This is a proceeding pursuant to 28 U.S.C. 2255. Left for adjudication are two narrow issues to be resolved at the coming evidentiary hearing. They are: (1) whether trial counsel disregarded instructions from Powell to file a notice of appeal, and (2) whether trial counsel was constitutionally deficient in his investigation of Powell's sentencing enhancement under United States Sentencing Guideline § 2D1.1(b)(12) resulting in prejudice.

## Relevant Legal Principals

"[T]he burden of proof is on the petitioner to establish his [§ 2255] claim by a preponderance of the evidence. *Albarran-Rivera v. United States*, No. 7:10-CR-95-FL-3, 2013 U.S. Dist. LEXIS 146951, 2013 WL 5570956, at *7 (E.D.N.C. 9 Oct. 2013) (*citing Miller v. United*

**JA270**

*States*, 261 F.2d 546, 547 (4th Cir. 1958) ("Because the proceeding under 28 U.S.C. § 2255 is a civil collateral attack upon the judgment of conviction, the burden of proof is upon petitioner to establish [his claim] by a preponderance of evidence . . . .")).

In *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), the Court held that criminal defendants have a Sixth Amendment right to "reasonably effective" legal assistance, and announced the now-familiar test: "[a] defendant claiming ineffective assistance of counsel must show (1) that counsel's representation 'fell below an objective standard of reasonableness,' and (2) that counsel's deficient performance prejudiced the defendant." *Roe v. Flores-Ortega*, 528 U.S. 470, 476-77, 120 S. Ct. 1029, 1034 (2000).

### i.    2255 Claims and Instructions to Note an Appeal

Relevant here, a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable. *See Rodriquez v. United States*, 395 U.S. 327, 23 L. Ed. 2d 340, 89 S. Ct. 1715 (1969); *cf. Peguero v. United States*, 526 U.S. 23, 28, 143 L. Ed. 2d 18, 119 S. Ct. 961 (1999). To establish ineffective assistance of counsel for failure to perfect an appeal, a defendant is not required to demonstrate that an appeal might have merit. *See Flores-Ortega*, 528 U.S. at 486; *United States v. Pham*, 722 F.3d 320, 324 (5th Cir. 2013). He is required to show only a reasonable probability that, but for counsel's failure, he would have timely appealed. *United States v. Tapp*, 491 F.3d 263, 266 (5th Cir. 2007) (holding "that the rule of *Flores-Ortega* applies even where a defendant has waived his right to direct appeal and collateral review" and that, "[i]n such circumstances, if the petitioner is able to demonstrate by a preponderance of the evidence that he requested an appeal, prejudice will be presumed and the petitioner will be entitled to file an out-of-time appeal, regardless of whether he is able to

identify any arguably meritorious grounds for appeal that would not be precluded by the terms of his appeal waiver.").

When evaluating whether a 2255-petitioner gave specific instructions to note an appeal to his trial counsel Courts do not require the instructions be written in stone. *Meadows v. United States*, No. 4:12-CR-78-D-1, 2017 U.S. Dist. LEXIS 99231, at *28-29 (E.D.N.C. May 9, 2017) *citing the following examples, United States v. Pham*, 722 F.3d 320, 322, 326-27 (5th Cir. 2013) (finding a non-English speaking defendant reasonably demonstrated his interest in appealing when he was visibly upset after sentencing and "brought up that he was concerned about getting 60 months and wanted to do something to get less time"); *United States v. Malone*, 442 F. App'x 864, 867 (4th Cir. 2011) (concluding defendant reasonably demonstrated an interest in appealing when he said after sentencing that he wanted an appeal and his son and daughter-in-law spoke with counsel about defendant's desire to appeal); *United States v. Poindexter,* 492 F.3d 263 (4th Cir. 2007) *cert. denied,* 558 U.S. 978 (2009) (an attorney is constitutionally ineffective if he fails to follow his client's unequivocal instruction to file timely notice of appeal, even though defendant waived his right to a appeal in a plea agreement); *Frazer v. South Carolina*, 430 F.3d 696, 703-05 (4th Cir. 2005) (expressed dissatisfaction with sentence deemed request to appeal, granting habeas relief due to counsel's failure to do so).

### ii.     *2255 Claims and Investigation by Counsel*

With regard to investigations, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Holmes v. United States*, No. 4:09cr85, 2015 U.S. Dist. LEXIS 10113, at *12 (E.D. Va. Jan. 28, 2015) *citing Strickland, supra.* "Trial counsel have an obligation to investigate possible methods for

impeaching a prosecution witness, and failure to do so may constitute ineffective assistance of counsel." *United States v. Caro*, 102 F. Supp. 3d 813, 835 (W.D. Va. 2015).  Failure to properly investigate not only impacts a criminal defendant's right to effective counsel, but also strips his due process rights.  *Hernandez v. United States,* Civil Action No. 3:12-cv-08368, 2014 U.S. Dist. LEXIS 54232, at *17 (S.D. W. Va. Mar. 20, 2014) ("It is well-established that [d]ue process forbids reliance on materially false or unreliable information in imposing sentence on a criminal defendant." *citing Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)); *see also United States v. Dalzell*, 455 F. App'x 306, 310-11 (4th Cir. 2011)).

### iii.    *2255 Claims and Attorney-Client Privilege*

Finally, because Powell has attacked his former attorney's representation, privilege is – in part – destroyed as to the scope of the challenge. *United States v. Juan*, 48 F. Supp. 3d 853, 858 (E.D. Va. 2014) *citing Tasby v. United States*, 504 F.2d 332, 336 (8th Cir. 1974) ("When a client calls into public question the competence of his attorney, the privilege is waived."); *United States v. Butler*, 167 F. Supp. 102 (E.D. Va. 1957), aff'd, 260 F.2d 574 (4th Cir. 1958) ("While the rule with respect to privileged communications between attorney and client should be zealously guarded, this privilege may be destroyed by the acts of the client in attacking the attorney on a charge of dereliction of duty."); *see also*, ECF 182 (Order compelling Mr. Woodward to disclose information due to Powell's 2255 filing).

### <u>Analysis and Anticipated Evidence</u>

Below, Mr. Powell sets forth the factual record and his good faith belief of the material issues in dispute.  However, Mr. Powell reserves the right to present additional evidence at the

coming hearing which, in is discretion, he deems necessary to fully develop the issues before the court for adjudication.

### i.        *Plea and Sentencing*

Mr. Powell plead guilty on October 20, 2016.  His plea agreement contains a waiver of appeal. ECF 104 at ¶ 6.  Pursuant to the Court's Sentencing Procedures Order (ECF 107), a sealed Presentence Investigation Report was disclosed on January 13, 2017. ECF 122.  Mr. Powell moved to continue his sentencing which was reset for March 31, 2017.  ECF 128.  According to Western Tidewater Regional Jail Records[1], attached hereto as **Exhibit 1**, Mr. Woodward visited Nathaniel Powell on four occasions in and around the time frame when sentencing preparations and appeal discussions would have occurred; those dates are:  March 13, 2017, March 18, 2017, March 29, 2017 and April 5, 2017. *Id.*

During the course of Mr. Powell's investigation on the instant 2255, Mr. Woodward produced a copy of his file. The file material reflects that, on March 9, 2017, Mr. Woodward met-and-conferred with US Probation and the United States on objections to the Presentence Investigation Report.  *See* **Exhibit 2** (emails among counsel and USPO to set up a meet and confer and USA response).   Part of that meet-and-confer involved a discussion of the premises enhancement.  Mr. Woodward's meeting notes, relevant portions of which are attached hereto as **Exhibit 3**, indicate Mr. Woodward met with Powell during the week of March 20, 2017 and discussed objections to the guidelines. As a result of the meet-and-confer process, Mr. Woodward indicates in his notes that "USATTY sent debrief of Wilson to supplement gun, drug wt., and drug

---

[1] Mr. Powell requested attorney visitation records from Western Tidewater Regional Jail on February 21, 2020. The request sought "to confirm [Powell's] jail visitation with counsel in early April 2017."  The jail produced records showing additional visits prior to April 2017 which are contained on Exhibit 1.

house…" *Id.*   Thereafter, according to counsel's notes, Mr. Woodward met with Powell and explained the "process for objecting and how objections are resolved" and that they would meet "again to discuss his statements/possible testimony at sentencing." *Id.* Mr. Woodward's file does not contain a copy of the lease filed as ECF 186-1.  It does not appear from the records reviewed by Mr. Powell that any public records search was performed or that Mr. Powell's residence history was otherwise independently investigated.   Additionally, according to Mr. Woodward and the government, the lease was not part of the discovery in the case.

The parties submitted their respective positions on sentencing on March 24, 2020.  ECF 155 and 156.  Each contains their position on the premises enhancement.  ECF 155 ¶ 4 and ECF 156 at p. 5.  Notably, the government argued that paragraph 10 of the PSR (ECF 153) resolves the question, stating "Wilson, who is related to the defendant, visited the defendant's home on Gateway Drive in the Churchland section of Portsmouth a dozen occasions since the summer of 2011 to purchase heroin."  ECF 156, at p. 5.  As the court will see, this statement demonstrably false.  Powell on the other hand argued that Ms. Wilson's creditability was compromised by her drug habit and the quality of the evidence she gave to police.

Mr. Powell's affidavit (ECF 186-2) indicates that he asked "Mr. Woodward to get the lease agreement for the Gateway drive address to prove that the owner started renting in 2016."  The evidence Mr. Powell expects to present at the hearing will include that (1) he told Mr. Woodward that he did not stay at the apartment on Gateway and (2) the lease (ECF 186-1) was given to Mr. Woodward at his request, by faxing to his office by Dwanesa Brown prior to sentencing.

On March 31, 2020, after denying Mr. Powell's objections and considering the statutory factors, the Court sentenced Mr. Powell.  At the conclusion of sentencing, the Court advised Mr.

Powell that despite his waiver of appeal, he could still note his appeal, and if he wanted to do so, he should consult with his attorney.  To notice a timely appeal, Mr. Powell had to file his notice on or before April 14, 2017. Fed. R. App. P. 4(b). No appeal was noted.

Mr. Powell was very upset with the sentencing result in light of his expectations. According to jail records (Exhibit 3) and Mr. Woodward's notes (relevant portions attached hereto as **Exhibit 4**), the two met on April 5, 2017 to discuss appeal rights.  Mr. Woodward's notes reflect that Powell was advised that (1) he waived his appeal and based on 4th Circuit law, is counsel's view, the waiver would be enforced, (2) if he appealed he would likely never get a sentencing reduction and that any reduction was not guaranteed regardless, (3) if he directed Mr. Woodward to appeal, Mr. Woodward would do so, but would also request to withdraw and new counsel would be appointed, and (4) court rulings on enhancements would never, in counsel's opinion, be reversed on appeal.  The notes also reflect that:

> [Mr. Powell] would not tell me if he wanted a noticed filed, said that he would let me know via his family.  I advised him of the time limits.  He said I was not trying to help him. I told him I was telling him the way the system worked.

Exhibit 4.  Mr. Powell's affidavit (ECF 186-2) indicates that Mr. Woodward "said that he will file the notice of appeal and ask to be withdrawn from the case."  Additionally, Mr. Powell intends to present that he did instruct Mr. Woodward to appeal; that his instructions were clear; and that later, he asked Dwanesa Brown to call Mr. Woodward to see what happened with the appeal. These factual creditability issues will have to be resolved by the Court with a finding of fact.

### ii.    *Claim One – Notice of Appeal*

The government relies exclusively on Mr. Woodward's affidavits suggesting Mr. Powell, "at no time after the plea…indicate[d] any desire to appeal."  Response in Opp. (ECF 197) at 3

**JA276**

*citing* January 7, 2019 affidavit (ECF 185-1) and March 18, 2020 affidavit (ECF 197-1).  In the first affidavit, nearly two years after sentencing, Mr. Woodward indicates Mr. Powell never "indicated any desire to appeal" and that he "has no record of Mr. Powell ever requesting that [Mr. Woodward] file a notice of appeal."   Mr. Powell's affidavit (ECF 186-2) contradicts Mr. Woodward's recollection.  Additionally, Mr. Woodward's notes indicate that Mr. Powell was at least accusatory towards Mr. Woodward's representation (i.e. accusing Mr. Woodward of not "trying to help him" – *see* Exhibit 4) when they discussed appellate rights.

The divergence in testimony will have to be resolved by the Court at the evidentiary hearing to come.  Additionally, if the Court finds there was no instruction to counsel to note the appeal, and in the alternative to the foregoing, the Court will have to determine (consistent with *Frazer*), if Mr. Powell's expressed dissatisfaction was sufficient to require counsel to note an appeal.

### iii.     Claim Two – Counsel's Failure to Investigate the Lease

The government's response is three-fold.  First, it claims Mr. Powell is asserting a creditability challenge against the testimony of Mrs. Wilson in this proceeding – he is not.  Second, the government minimizes the importance of the lease suggesting it does nothing to contradict its enhancement evidence – it does however.  Third, like Claim One, the government relies on Mr. Woodward's affidavit that is contrary to Mr. Powell's affidavit – a factual dispute to be resolved with a finding of fact.

In Mr. Powell's view, this is not a creditability attack against Mrs. Wilson, but his claim that, if his trial counsel would have performed a constitutionally sufficient investigation, additional evidence would have been presented.  That evidence, he contends, would have reasonably caused

a different result at the sentencing event.  If Mr. Powell's view is correct, he has satisfied the *Strickland* test.

       ***a.       The lease and its role at sentencing***

The sentencing testimony with regard to the premises enhancement suggested that Mr. Powell's base of drug operations was in the 3600 block of Gateway Drive.  ECF 167 at 23:6-14.

> Q:  Okay.  There's also an objection about maintaining a premises.  What do you know about the defendant's use of a residence to manufacture and sell heroin?
>
> A.  Debriefing of Valerie Wilson, she indicated that her purchase came from an address on Gateway Drive in Portsmouth, in an apartment complex.  During the time after Mr. Powell was wanted and I sought a criminal complaint, I actually conducted surveillance on an apartment complex on Gateway Drive in the 3600 block.

Under cross examination, TFO Dyer confirmed that there were "approximately 12" purchases between 2011 and 2016. *Id.* at 35:23-36:9. Additionally, the officer admitted that the one-kilo gram of drug weight (which significantly enhanced Mr. Powell's guidelines) and the premises enhancement were not independently verified, but were instead based on the statement of a cooperating witness with a serious drug problem.  *Id.* at 36:18-38:5. Further, Wilson's statement described the size of the package, but, as TFO Dyer admitted, Ms. Wilson never said she knew what was in the 9x3 package, but merely suspected it was heroin.  *Id.* at 35:5-8.  After cross-examination, the Court offered an opportunity for Powell to present additional evidence as it pertains to the objections.  Mr. Powell was advised, in open court, of his right to testify with regard to the objections, but declined because of the government's threat (ECF 156 at p. 4) to use debrief statements against him during sentencing if he took the stand.  *Id.* at 41:16-42:7.

In argument to the Court, Mr. Powell argued Mrs. Wilson was not creditable and there was not sufficient evidence to push her statements over the reliability threshold. Notably, the government argued that Mrs. Wilson's hearsay sentencing statements was both creditable and reliable, saying: "She specifies the street name, the neighborhood, **and a residence that never changed**…" *Id.* at 51:22-52:13 (emphasis added).

For purposes of the 2255 petition, Mr. Powell's evidence is that Mr. Woodward was told Powell did not live at Gateway for the alleged period, that the lease existed, and was provided to his office by fax. The government chiefly contends however, that "nothing about [the lease] suggest [Wilson] could not have purchased heroin from [Powell] at the Gateway apartment twelve times over the course of one year, as the agent testified he learned from the co-defendant." Response in Opp. (ECF 197) at 5. It does actually. The Gateway lease term begins on January 15, 2016 and executed by Ms. Brown on January 16, 2016. ECF 186-1. Ms. Brown will testify at the hearing to come that the lease was not a renewal of a prior term, but a new lease. With this in mind, the United States was aware that Mr. Powell was arrested on May 27, 2016 (yielding to federal custody on June 30, 2016) and was in continuous custody thereafter. ECF 153 p. 1. Based on the face of the lease, it is impossible that (1) Mrs. Wilson bought drugs from Powell 12 times in five years at Gateway and (2) that the residence "never changed" as was argued to the Court by the Government. The lease directly contradicts the sentencing hearing evidence and the government's position in this 2255 proceeding (*see* ECF 197 at p. 5) that, regardless, she bought drugs from him at Gateway for the course of a year. Moreover, the lease together with Mr. Powell's criminal history (i.e. that he was in jail for nearly a year between August of 2012 through

June of 2013 – see ECF 153 at ¶ 51), further belies the creditability of Mrs. Wilson that she frequented the Gateway property for drug purchases prior to January of 2016.

### b.    *Powell was prejudiced without the lease*

As the Court is well aware, uncorroborated hearsay evidence is admissible at a sentencing hearing "provided that the information has sufficient indicia of reliability to support its accuracy." *United States v. Mondragon*, 860 F.3d 227, 233 (4th Cir. 2017).  The lease is relevant to the *accuracy* of Mrs. Wilson's debrief testimony and the information in the presentence investigation report.  Absent its presentation, the information she provided stands on its own, the only manner of attack being that she is a junkie.  However, an independent basis actually existed at the time of sentencing that belies her statements to law enforcement.  If it was reasonable to discover the lease, or more generally, Mr. Powell's residence history, then Mr. Powell suffered prejudice.

The government contends that Powell is not prejudiced because his counsel objected to the premises enhancement and because the result of sentencing was five-years below the advisory guidelines.  Both these facts, while true, are merely *post hoc* fallacy – they do not mean Mr. Powell was not prejudiced.  Application Note 17 lists among the factors the court should consider in applying 2D1.1(b)(12); they are, (1) whether the defendant held a possessory interest, and (2) the extend to which the defendant controlled access to, or activities at, the premises.  The lease is relevant to both factors.

Had the lease been presented at the sentencing hearing, not only would the evidentiary presentation had been different, but the government's argument necessarily would have been different.  At a minimum, the lease, and evidence that it was not a renewal, would have directly contradicted the accuracy of Ms. Wilson's statements to police.  It would have demonstrated a lack

of possessory interest in the property. It also would have prevented the government from arguing that the residence "never changed" as it did to the Court in support of the enhancement. Because different evidence and different argument would have occurred if the lease was presented, it is reasonably probable that the result of the enhancement would have also been different. That is all that is needed to demonstrate prejudice. Not ill will or lack of competence; a mere probability of a different result. Indeed, the lease may have impacted how the Court viewed other evidence from Mrs. Wilson as well – she is the sole source of Mr. Powell's enhancements (1kilo and gun with drugs).

### c.  *Strategic Decisions*

The Evidentiary Hearing Order requires the parties to address whether any strategic decisions related to the lease claim were "unreasonable and prejudicial" to Mr. Powell. Based on Mr. Powell's understanding of the records reviewed and interviews with trial counsel, there were no strategic decisions made with respect to calling Ms. Brown as a witness to authenticate the lease, or seeking a stipulation for admission of the lease. Simply, the government's position is that Mr. Woodward was never advised to investigate the lease and thus there was never a strategy of whether to offer it or not.

WHEREFORE, Defendant, Nathaniel Powell, by counsel, respectfully pray that this Court resolve the evidentiary dispute existing between him and his former counsel, and issue such orders that are appropriate in light of his relief requested under 28 U.S.C. 2255.

Respectfully submitted this 24th day of March, 2020 by electronic filing.

Respectfully submitted,

**NATHANIEL POWELL**


By:        /s/  *Adam M. Carroll*

        Adam M. Carroll, Esquire
        VSB #68017
        WOLCOTT RIVERS GATES
        200 Bendix Road, Suite 300
        Virginia Beach, VA 23452
        Phone:  757.497.6633
        Facsimile: 757.687.3655
        E-mail: acarroll@wolriv.com
        *Attorney for the Nathaniel Powell*

## CERTIFICATE OF SERVICE

I hereby certify on the 24th day of March, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record including the following:

John F. Butler
Andrew C. Bosse
Assistant United States Attorneys
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail: john.f.butler@usdoj.gov
andrew.bosse@usdoj.gov

And courtesy copy by email to:

Lawrence "Woody" H. Woodward, Jr., Esq.
Ruloff, Swain, Haddad, Morecock,
 Talbert & Woodward, P.C.
317 30th Street
Virginia Beach, Virginia   23451
(757) 671-6047/direct dial
(757) 671-6000/main number
(757) 671-6004/fax number
lwoodward@srgslaw.com

        */s/ Adam M. Carroll, Esq.*

*Powell v. USA* – Criminal No. 2:16cr97-02
Page 13 of 13

**JA282**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| NATHANIEL POWELL | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Criminal No. 2:16-CR-97-02 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>GOVERNMENT'S SUR-REPLY TO PETITIONER'S MOTION</u>
## <u>TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255</u>

The United States of America, by and through its undersigned counsel, respectfully submits this sur-reply memorandum addressing a new argument raised in Petitioner's Reply to Government's Supplemental Response to Petitioner's Motion to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255. ECF No. 198. For the reasons stated below, the new argument raised in the Reply is not an accurate statement and is premised on facts materially different than those present here.

### ARGUMENT

In the Motion, Petitioner argued that he directed his former counsel to appeal. In support of that factual contention—which his former counsel denies—he provided a sworn affidavit about a visit he had with counsel following his sentencing. ECF No. 186-2 at 2. As the government demonstrated in its response brief, that sworn affidavit is factually incorrect. ECF No. 197 at 3. In his Reply, Petitioner raised a new legal argument: that his "expressed dissatisfaction" was sufficient to require counsel to note an appeal pursuant to *Frazer v. South Carolina*, 430 F.3d 696 (4th Cir. 2005). Reply at 3, 8.

**JA283**

A. Petitioner's Argument Does Not Accurately Reflect the Holding in *Frazer v. South Carolina.*

*Frazer* does not hold that an "expressed dissatisfaction" with a sentence is deemed a request to appeal. Instead, it holds, consistent with the Supreme Court's decision in *Flores-Ortega*, that "when there are non-frivolous issues to appeal or the defendant has manifested an interest in appealing, *Strickland* requires that counsel *consult* with the defendant in deciding whether to go forward." *Frazer*, 430 F.3d at 708 (emphasis added); *see Roe v. Flores-Ortega*, 528 U.S. 470, 478-79 (2000). This is precisely what former counsel did in Petitioner's case. His affidavit makes clear that "[a]t no time after the plea did Mr. Powell indicate any desire to appeal. I consulted with Mr. Powell about the right to file a Notice of Appeal." ECF No. 197-1; *see also* ECF Nos. 198-1, 198-4.

The defendant in *Frazer* pleaded guilty to possessing a firearm during the commission of a crime of violence and to possessing a controlled substance with intent to distribute. *Frazer*, 430 F.3d at 701. The court impermissibly sentenced the defendant to a fine that exceeded the statutory maximum and imposed two five-year sentences to run consecutively instead of concurrently—to the surprise of the government and the defendant, who immediately expressed his discontent. *Id.* at 701-702. Despite a prior assurance from Frazer's defense counsel to "file the necessary paperwork" if something went wrong at sentencing, Frazer's counsel's only effort was to raise an informal oral motion for reconsideration, which the court denied. Crucially, "at no time either before or after the denial of the motion for reconsideration did [defense counsel] ascertain whether *Frazer* wished to appeal.". *Id.* at 702. The district court noted:

> The undisputed evidence shows that immediately after sentencing, Frazer and [defense counsel] agreed that [defense counsel] would seek review of the sentence. [Defense counsel] assured Frazer that he "would file the necessary paperwork" to have the sentence modified, and Frazer did not hear from [defense counsel] again until Frazer contacted him about the status of his appeal.

2

**JA284**

*Id*. at 702-03.

The Court in *Frazer* explained that a three-step inquiry is required when confronted with a claim that counsel rendered ineffective assistance by failing to consult with the defendant regarding an appeal. *Id*. at 707-708. First, the threshold determination is whether the defendant independently decided whether to appeal and communicated that decision to counsel. *Id*. at 707. In Petitioner's case that is a fact in dispute. Mr. Woodward denies that Petitioner instructed him to appeal. Had Petitioner communicated his intent to appeal, Mr. Woodward is clear he would have moved the Court to dismiss him from representing Petitioner—an action that was never taken, suggesting that Petitioner never made such a request.

Next, if the defendant has not specifically requested an appeal, counsel has a professional obligation to "consult" with the defendant regarding the decision to appeal, unless the circumstances demonstrate that consultation is unnecessary. *Id*.; *Flores-Ortega*, 528 U.S. at 478-79. In Petitioner's case, it is undisputed that counsel consulted with Petitioner about his rights to appeal on April 5, 2017, following the March 31 sentencing hearing. ECF No. 198-1. In fact, notes of their meeting were presented in Petitioner's Response. ECF No. 198-4. Third, if counsel failed to consult, which is not the case for the Petitioner, the defendant may demonstrate prejudice by showing that a rational defendant would want to appeal. *Frazer*, 430 F.3d at 708. This can be done by showing that there were non-frivolous issues for appeal or that defendant adequately indicated his interest in appealing. *Id*. Here, the defendant's plea agreement affirmatively waived his right to appeal his conviction and sentence. Even if the Court reached this third question—which it does not need to on the plain facts of this case—any appeal of the defendant's sentence, which was within the statutory maximum, would have been frivolous in light of the explicit waiver to which the defendant agreed.

**JA285**

B.  The Facts in *Frazer v. South Carolina* are Distinguishable from Petitioner's Case.

Defense Counsel in *Frazer* never discussed the possibility of appealing. *Id.* In the instant case, Mr. Woodward consulted with Petitioner on April 5, 2017, five days after Petitioner was sentenced, about whether to file a Notice of Appeal. ECF Nos. 197-1, 198-1, 198-4. Here, "at no time after the plea did Mr. Powell indicate any desire to appeal." ECF No. 197-1.

Two other significant facts distinguish *Frazer* from this case: 1) the non-frivolous issue of an excessive fine that exceeded the statutory limit; and 2) the trial court's decision to run sentences consecutively instead of concurrently, against the expectations of both defense counsel and the government.[1] The defendant in *Frazer* "indicated his unhappiness with his consecutive sentences and asked [his counsel] to see about 'having [them] run together.'" *Frazer*, 430 F.3d at 712. Here, Petitioner seems to suggest that his general "expressed dissatisfaction" with the sentence would somehow automatically trigger his counsel's obligation to file an appeal. ECF No. 198 at 8. That is not the holding of *Frazer* and not the law in this Court. The Fourth Circuit found that the defendant's "interest in an appeal was unwavering and ongoing" and that he demonstrated "an intent to pursue [an appeal] at all costs." *Frazer*, 430 F.3d at 712. The record in Petitioner's case is not comparable by any stretch.

*Frazer* requires counsel to consult with Petitioner, which is what happened in this case. Former counsel thus fulfilled his constitutional duty to his client, and the Court should dismiss Petitioner's claim that counsel was ineffective.

---

[1] "The trial court's decision to impose consecutive sentences took both parties by surprise, and Frazer's sentencing took place just one day after 'a heated [pre-trial] hearing' in which 'thing[s] really kind of went [s]outh.' J.A. 183-84. Describing this hearing as 'brutal,' [defense counsel] noted that 'any adverse ruling we could have had' from the judge that sentenced Frazer the following day, 'we got.' Under these circumstances, we are not persuaded that an assertion by Frazer that his sentence was 'the result of partiality [or] prejudice' would be frivolous." *Frazer*, 430 F.3d at 711-12.

**JA286**

## CONCLUSION

For the reasons stated above and in the government's response brief, ECF No. 197, the

Motion should be denied.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By:    /s/
John F. Butler
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number:  757-441-6331
Facsimile Number: 757-441-6689
E-Mail Address: john.f.butler@usdoj.gov

JA287

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of April, 2020, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to:

> Adam M. Carroll, Esquire
> WOLCOTT RIVERS GATES
> 200 Bendix Road, Suite 300
> Virginia Beach, VA 23452
> Phone: 757.497.6633
> Facsimile: 757.687.3655
> E-mail: acarroll@wolriv.com
> *Attorney for the Nathaniel Powell*

I HEREBY CERTIFY that on this 14th day of April, 2020, I mailed a true and correct copy

of the foregoing to the following non-filing user:

> Nathaniel Powell
> Inmate No. 90186-083
> FCI Butner Medium I
> Federal Correctional Institution
> P.O. Box 1000
> Butner, NC 27509

> /s/
> _____
> John F. Butler
> Assistant United States Attorney
> United States Attorney's Office
> 101 West Main Street, Suite 8000
> Norfolk, Virginia 23510
> Office Number:  757-441-6331
> Facsimile Number: 757-441-6689
> E-Mail Address: john.f.butler@usdoj.gov

6

**JA288**

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 294 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 1 of 71 PageID# 1598

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF VIRGINIA
 2                            Norfolk Division

 3

 4     - - - - - - - - - - - - - - - - - -
          UNITED STATES OF AMERICA,        )
 5                                         )
                  Plaintiff,               )
 6                                         )       CRIMINAL CASE NO.
          v.                               )          2:16cr00097
 7                                         )
          NATHANIEL POWELL,                )
 8                                         )
                  Defendant.               )
 9     - - - - - - - - - - - - - - - - - -

10

11                       TRANSCRIPT OF PROCEEDINGS
                           (Evidentiary Hearing)
12
                             Norfolk, Virginia
13
                              June 8, 2021
14

15

16     BEFORE:   THE HONORABLE ARENDA L. WRIGHT ALLEN,
                 United States District Judge
17

18

19     APPEARANCES:

20              UNITED STATES ATTORNEY'S OFFICE
                By:  John Butler
21                   Assistant United States Attorney
                     Counsel for the United States
22
                WOLCOTT RIVERS GATES
23              By:  Adam Carroll
                     Counsel for the Defendant
24

25
```

USCA4 Appeal: 21-6892    Doc: 32    Filed: 01/10/2024    Pg: 295 of 388
Case 2:16-cr-00097-AWA-LRL    Document 231    Filed 03/18/22    Page 2 of 71 PageID# 1599

2

```
 1                        I N D E X

 2

 3   ON BEHALF OF THE GOVERNMENT:        Direct   Cross   Red.   Rec.

 4   L. Woodward                           14      26     36     38

 5

 6   ON BEHALF OF THE DEFENDANT:

 7   N. Powell                             43      55     --     --

 8

 9

10

11

12

13                      E X H I B I T S

14   No.                                                    Page

15   Defendant's Exhibit No. 1                                10

16   Defendant's Exhibit No. 2                                35

17   Defendant's Exhibit No. 3                                42

18   Defendant's Exhibit No. 4                                47

19   Defendant's Exhibit No. 5                                50

20   Defendant's Exhibit No. 6                                50

21

22

23

24

25
```

Heidi L. Jeffreys, Official Court Reporter

**JA290**

```
 1              (The hearing commenced at 9:01 a.m., as follows:)
 2              THE CLERK:  United States of America v. Nathaniel
 3     Powell, Criminal Case No. 2:16cr97.
 4              Mr. Butler, is the United States ready to proceed?
 5              MR. BUTLER:  Good morning, Your Honor.  The
 6     government is ready.
 7              THE COURT:  Good morning, Mr. Butler.
 8              THE CLERK:  Mr. Carroll, is the defendant ready to
 9     proceed?
10              MR. CARROLL:  The defendant is ready.  Good morning,
11     Your Honor.
12              THE COURT:  Good morning, Mr. Carroll, to you as
13     well.
14              I just want to put the factual posture on the record
15     before we begin.
16              On September 20, 2016, Mr. Lawrence Woodward was
17     appointed to represent Mr. Powell, and on -- Mr. Powell
18     entered into a plea agreement with the government and pled
19     guilty to Count One of the superseding indictment, charging
20     conspiracy to manufacture, distribute, and possess with
21     intent to distribute more than a hundred grams of heroin.
22     And the basis of the crime is that Mr. Powell was a leading
23     member of a drug-trafficking conspiracy that mainly took
24     place in Virginia, and his role was to procure heroin and
25     fentanyl from Baltimore, Maryland, to the Hampton Roads area,
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 297 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 4 of 71 PageID# 1601

4

1    and the drugs would be repackaged and resold.

2         One of his coconspirators was Ms. Valerie Wilson,

3    who obtained drugs from him, transported, and then sold them

4    in North Carolina.

5         Mr. Powell waived his right to appeal his conviction

6    or any sentence under the statutory maximum, and this Court

7    sentenced him to 300 months imprisonment and four years of

8    supervised release.

9         After sentencing and in the position paper of

10   Mr. Woodward, Mr. Woodward raised objections to four parts of

11   the PSR, one of which was the two-point enhancement for

12   maintaining premises for the purpose of distributing

13   narcotics.  The basis of this objection was the lack of

14   credibility of a witness, Ms. Wilson, who made statements to

15   law enforcement about Mr. Powell's drug premises at a Gateway

16   Drive address and the drug weights contained therein.  The

17   Court overruled the defendant's objection to the two-point

18   premise enhancement.

19        At the end of the sentencing hearing, the Court

20   advised Mr. Powell that he signed a plea agreement with a

21   waiver of appeal, but he could still appeal on the basis of

22   ineffective assistance of counsel, and such appeal must have

23   been filed by or before April 14, 2017.

24        On April 2, 2018, Mr. Powell filed the instant

25   motion to vacate, set aside, or correct his sentence under

USCA4 Appeal: 21-6992    Doc: 32       Filed: 01/10/2024    Pg: 298 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 5 of 71 PageID# 1602

5

```
 1    28 U.S.C. Section 2255.  He brought six claims of ineffective
 2    assistance of counsel against Mr. Woodward, and on August 9,
 3    2019, the Court entered an evidentiary hearing order, and in
 4    the order the Court dismissed four of the six claims.  The
 5    two surviving claims are the appeal claim and the lease
 6    claim.
 7              The appeal claim alleges that Mr. Woodward failed to
 8    file a notice of appeal as allegedly instructed by
 9    Mr. Powell.
10              The lease claim alleges that Mr. Woodward failed to
11    investigate potentially exculpatory evidence pertaining to a
12    two-point enhancement received for maintaining premises for
13    the purpose of distributing narcotics, including a
14    leaseholder agreement that purportedly shows that someone
15    else leased the premises during part of the time in question.
16              All right.  So that's the posture of the case, as I
17    understand it.  And I was prepared to have an evidentiary
18    hearing this morning, presumably hearing the testimony of
19    Mr. Powell and Mr. Woodward and then hear argument from
20    counsel and then take the matter under advisement.  About two
21    minutes before I took the bench I was informed that the
22    defense was asking for a continuance, so I'll hear from you
23    first, Mr. Carroll.
24              I also note that Mr. Woodward is here, prepared to
25    go forward with this hearing this morning, as well.
```

```
 1          MR. CARROLL:  Thank you.  Good morning, Your Honor.
 2   And I'm sorry to have to raise this motion.  My client has
 3   asked me to do so this morning.
 4          I've been involved in the case since my employment
 5   prior to the COVID pandemic.  I went down to Butner to visit
 6   my client when I realized that the U.S. Marshals would only
 7   transport him up here kind of in close proximity to the
 8   hearing.
 9          So I went down to see him.  He and I reviewed his
10   claims.  We talked about the evidentiary proceeding that
11   would take place that we're here for today.  We discussed at
12   length the lease, and in that discussion we identified the
13   leasehold tenant, Dwanesa Brown, as Mr. Powell's then
14   girlfriend.  She was continuing in that relationship with him
15   despite his incarceration.  I was provided two separate
16   addresses for Ms. Powell (sic).  I sent letters to her at
17   both addresses, confirmed one of them, and I spoke with
18   Ms. Powell -- I'm sorry, Ms. Brown -- on a number of
19   occasions after that.
20          I anticipated presenting her today to authenticate
21   the lease and to give testimony regarding that that lease was
22   not a renewal of a prior term so it shows that she was only
23   there from 2016 forward, and that that lease was provided to
24   Mr. Woodward's office by fax.
25          Now, I will tell you the reason why she was not --
```

```
 1            THE COURT:  Now, wait a minute.  What's that last
 2   sentence you said?
 3            MR. CARROLL:  That she provided the lease to
 4   Mr. Woodward's office by fax.
 5            I will tell you the reason why she was not
 6   subpoenaed was based on a discussion that I had with my
 7   client.  The concern that was raised at the time was that by
 8   issuing the subpoena she would be potentially contacted by
 9   the agent.  I advised that she might want to seek counsel;
10   that I could not give her legal advice or participate in any
11   way in that interaction, should it occur.  We made the
12   decision at that point not to issue a subpoena, so long as
13   she continued to be cooperative with my office and continued
14   to communicate.
15            She was cooperative with my office.  She did
16   continue to communicate up until -- I'm sorry -- including
17   the time frame before the last evidentiary hearing that was
18   continued on Mr. Powell's motion, without objection.  She
19   contacted my office, we had a prep session, we discussed what
20   she would be asked, talked about how she may be
21   cross-examined, and those issues.
22            At the conclusion of that discussion, she raised a
23   concern about a dental appointment that she had that was
24   apparently painful for her and scheduled overtop of the
25   hearing.  I contacted Mr. Butler's office; advised him of the
```

1    issue.  Mr. Butler did not have an objection, and then we
2    sought leave to adjourn the hearing to today's date, which
3    the Court granted.
4           I will tell you, based on my communication with that
5    client (sic), I did not ask her for a doctor's note or a
6    dental slip or anything to verify that, so I can't present
7    that to the Court.  We -- as soon as the hearing was
8    scheduled for today's date, my office sent her a letter,
9    said, "I advise you of the new date; put it on your calendar
10   and contact my office to set a prep appointment as the
11   hearing date approaches."  I set a reminder on my calendar to
12   reach out to her if we had not heard from her.  That reminder
13   came without contact.  I reached out to her on several
14   occasions through my office secretary and myself.
15          I went to go see Mr. Powell to prep for this
16   hearing, because he's going to testify, and we talked about
17   his testimony, but I also told him this was -- I don't have
18   it in front of me, but it was early last week, probably
19   Tuesday, Tuesday of last week.  I spoke to him and told him,
20   "Hey, I've not heard from Ms. Brown.  That's odd, because
21   she's had constant communication with me."  He indicated he
22   would try to speak with her, but he also told me at that time
23   that she was no longer his girlfriend; that that relationship
24   had since deteriorated.
25          We then -- my office again reached out to her, I

USCA4 Appeal: 21-6983    Doc: 32    Filed: 01/10/2024    Pg: 302 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 9 of 71 PageID# 1606

9

```
 1    e-mailed her and called her personally, and my secretary also
 2    followed up without contact.
 3           I went to see Mr. Powell yesterday morning and told
 4    him, "Look, she still hasn't contacted me.  What's going on?
 5    You need to get her on the phone, if you can, and see what's
 6    happening."
 7           I called her on the way to the jail yesterday
 8    morning before that discussion with Mr. Powell.  I also sent
 9    her a text message from my personal cell phone, in case she
10    was, frankly, avoiding the calls from my office.  She may not
11    recognize the cell phone number.  She responded to it, and
12    she called me when I was on my way back from the jail.  She
13    expressed that she was not willing to testify, and I told her
14    to send that to me in an e-mail.
15           Sorry, Your Honor.  May I grab it?
16           THE COURT:  You're fine.  Take your time.
17           (There was a pause in the proceedings.)
18           MR. CARROLL:  And I'd like to have this marked, Your
19    Honor.  I forwarded it to Mr. Butler yesterday.  Would you
20    like me to use my exhibit stickers?
21           THE COURT:  Yes, that's fine, Mr. Carroll.
22           MR. CARROLL:  Thank you, Your Honor.
23           THE COURT:  You're welcome.
24           Any objection, Mr. Butler?
25           MR. BUTLER:  No objection.
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 303 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 10 of 71 PageID# 1607

10

```
 1                  (The exhibit was admitted into evidence.)

 2                  THE COURT:  All right.  Thank you.

 3                  Let me see it real quick, Mr. White.

 4                  (There was a pause in the proceedings.)

 5                  THE COURT:  Okay.  So she doesn't want to testify.

 6                  MR. CARROLL:  No, ma'am, she does not.

 7                  THE COURT:  So what's the purpose of asking for a

 8      continuance?

 9                  MR. CARROLL:  Mr. Powell believes that despite her

10      unwillingness to testify she would still be truthful about

11      the items that I told you.  I will tell you that this

12      morning, when I met with him in the Marshal's lockup, we did

13      talk about alternatives to proceeding with the hearing

14      without Ms. Brown.

15                  In furtherance of that discussion, I spoke with

16      Mr. Butler, told him what the situation was and told him

17      those same four items I just told you.  Mr. Butler -- and

18      I'll let him speak for himself, but I understand Mr. Butler,

19      while he's not willing to stipulate those are

20      written-in-stone, gospel facts, may be willing to say that he

21      believes that's what she would testify to.

22                  THE COURT:  Yeah.  Why can't we have a stipulation

23      here?

24                  MR. CARROLL:  I'll let him speak for himself, Your

25      Honor, but I've been asked by my client to adjourn the
```

1    hearing for those purposes.  Thank you.

2           THE COURT:  All right.  Thank you very much,

3    Mr. Carroll.

4           All right, Mr. Butler.

5           MR. BUTLER:  We do object to continuing today's

6    evidentiary hearing.

7           THE COURT:  Okay.

8           MR. BUTLER:  We do have Mr. Woodward here --

9           THE COURT:  We do.

10          MR. BUTLER:  -- ready to testify.

11          THE COURT:  Yes.

12          MR. BUTLER:  And I do not dispute what Mr. Carroll

13   just proffered to this Court.

14          THE COURT:  Okay.

15          MR. BUTLER:  All right?  I don't dispute that she's

16   going to say that, "My lease" -- and this was filed as

17   Document 170-1.

18          THE COURT:  Okay.

19          MR. BUTLER:  It's a lease that shows a term of

20   January 2016 to January 2017.

21          I don't doubt that she's going to claim that is her

22   lease, her signature on that document, and I don't doubt that

23   she would testify that she sent this lease.  That's

24   apparently what she's going to testify to.  Now, whether or

25   not that's true is another matter, but that she would testify

```
 1    to that, I don't disagree with that.

 2            So accepting that proffer and encouraging the Court

 3    to accept that proffer from defense counsel, I don't think

 4    there's any need to have Ms. Brown here.

 5            THE COURT:  Okay.

 6            MR. BUTLER:  If she was going to testify, the issue

 7    is --

 8            THE COURT:  Mr. Woodward is here.  He's an honorable

 9    man of this court.  He's got his file, it looks like he's got

10    his assistant, and he'll tell us if he received a lease or

11    not, right?

12            MR. BUTLER:  Yes, Your Honor.

13            THE COURT:  All right.  Anything additional from

14    you, Mr. Carroll?

15            MR. CARROLL:  No, Your Honor.  The other part of the

16    proffer was that she would say it's not a renewal of a prior

17    term.

18            THE COURT:  This is what I want you-all to do:

19            You draft up the exact proffer of everything

20    Mr. Powell wants you to put that she's going to say.  "She's

21    my girlfriend, she's honest," whenever it is, "this is what

22    she would say:  It was her lease, she signed it, this was the

23    time period then."  Whatever you want her to say, you tell

24    your attorney, Mr. Carroll.  You add anything else in it that

25    you want, what you would cross-examine her about on it, and
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 306 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 13 of 71 PageID# 1610

13

```
 1    then submit it to the Court, and we'll figure it out.  That
 2    way we can go forward.  Mr. Woodward is here, you guys are
 3    all here, so we'll go forward that way.  Whatever you-all
 4    want in it.  And if we can have it seven days from today,
 5    does that give you enough time?
 6            MR. CARROLL:  I've actually already prepared it.  I
 7    can put it in a formal setting.  I've shown it to Mr. Butler
 8    already, so it will take seven days, easy.
 9            THE COURT:  Whatever you-all want in it, put it in
10    there so there's no complaints about what's not in it from
11    either side, all right?
12            And since this is Mr. Powell's motion, I assume that
13    we're going to start with you, Mr. Carroll?
14            MR. CARROLL:  Interestingly, Mr. Butler and I also
15    spoke about that.  I do concede it's our burden.  In a prior
16    one of these that I've done before the government went first
17    and put on the attorney to authenticate the affidavit.  And I
18    think we're comfortable with that procedure, but if the Court
19    would prefer for me to go first, I'm happy to.
20            THE COURT:  No, I'm comfortable with whatever makes
21    you-all comfortable.  Life is too stressful for folks not to
22    be comfortable.
23            All right, Mr. Butler.  Who is your first witness?
24            MR. BUTLER:  The United States calls Lawrence H.
25    Woodward, Jr.
```

USCA4 Appeal: 21-6992   Doc: 32   Filed: 01/10/2024   Pg: 307 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 14 of 71 PageID# 1611

14

————— L. Woodward - Direct—————

1            THE COURT:  All right.  Thank you.

2            (The clerk administered the oath.)

3            THE WITNESS:  Good morning, Your Honor.

4            THE COURT:  Good morning, Mr. Woodward.  And,

5   Mr. Woodward, I know you well enough that I don't really need

6   to see your mouth and your facial expressions, so you can

7   take your mask --

8            THE WITNESS:  A nice way to say you don't need to

9   see my face.  I appreciate that, Your Honor.

10           THE COURT:  We have a new order in place that leaves

11  it to the discretion of the Court whether or not the Court is

12  going to make folks put on their masks, but instead of me

13  trying to figure out who has received their vaccinations and

14  who hasn't, we're just going to assume that we need to stay

15  safe for another month or so.

16           THE WITNESS:  Yes, ma'am.

17           THE COURT:  All right, Mr. Butler.  You can proceed.

18           LAWRENCE H. WOODWARD, JR., called as a witness,

19  having been first duly sworn, testified as follows:

20                       DIRECT EXAMINATION

21  BY MR. BUTLER:

22  Q.  Sir, could you please state your name?

23  A.  My name is Lawrence Woodward.

24  Q.  And, sir, were you counsel to the petitioner here,

25  Nathaniel Powell?

Heidi L. Jeffreys, Official Court Reporter

# JA302

USCA4 Appeal: 21-6992    Doc: 32        Filed: 01/10/2024    Pg: 308 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 15 of 71 PageID# 1612

15

L. Woodward - Direct

```
 1   A.  Yes.  I was appointed by the Court after the public

 2   defender moved to withdraw.

 3   Q.  And before we get into the specifics of this case, I'd

 4   like to, just for our record, ask you a few questions about

 5   your experience as an attorney.

 6           How many years, approximately, have you practiced

 7   law, sir?

 8   A.  39.

 9   Q.  All right.  And could you tell the Court the various, you

10   know, practices of law that you've done over those 39 years?

11   A.  Well, the first part of my career I was a JAG officer --

12   well, very first part of my career I did public defender work

13   up in Richmond, in 1982 and '83, doing mainly -- almost a

14   hundred percent criminal cases.

15           I then joined the Air Force JAG Corps and was

16   stationed over in Europe for about five years, where I was

17   what was called a Circuit Defense Counsel, which basically

18   was covering the entirety of Europe to do criminal cases of

19   all kinds.  Unlike here in the states, at that time over in

20   Europe the Status of Forces Agreement that was in place had

21   the military have jurisdiction over everything, basically,

22   that Air Force members would do, so I -- it was like being a

23   public defender for the Air Force.  We didn't just cover

24   military crimes, we covered murders off base, drugs off --

25   everything.
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 309 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 16 of 71 PageID# 1613

16

─────────── L. Woodward - Direct ───────────

1    Q.  All right.  And then, after your career in the Air Force

2    and the Public Defender's Office, did you continue to do

3    defense work?

4    A.  To be clear, it wasn't the Public Defender's Office when

5    I first started, it was doing court-appointed work.  Richmond

6    didn't have a -- but, yes.

7         I joined a law firm.  It's my current firm.  I won't

8    go through all the iterations of the name changes.  I did a

9    bunch of criminal work.  I did -- you know, probably 20 years

10   ago I started doing almost exclusively criminal work.  My

11   practice is primarily today federal, although I still do

12   capital cases -- or used to still do capital cases in state

13   court until there are no more capital cases in state court.

14        I checked, at your request.  I've handled

15   approximately 400 cases in this court, probably 90 appeals in

16   the Fourth Circuit.  I've also done federal criminal cases in

17   Seattle, Washington; Dayton, Ohio; Baltimore, Washington,

18   Atlanta, Philadelphia, Greensboro, Oklahoma City.  I may be

19   forgetting some.  And I currently have federal cases in

20   Cleveland, Ohio, and Scranton, Pennsylvania.

21   Q.  Have you ever argued at the Fourth Circuit in the context

22   of ineffective assistance of counsel?

23   A.  I have.  In death penalty cases, one of the things that I

24   did and still do -- I think the system is pretty much cleaned

25   out now, but when the new death penalty *habeas* law came into

USCA4 Appeal: 21-6992   Doc: 32   Filed: 01/10/2024   Pg: 310 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 17 of 71 PageID# 1614

17

——— L. Woodward - Direct———

1   effect in probably 2000 I got appointed to a number of cases

2   by this court of inmates that were state court inmates that

3   had been sentenced to death in state court proceedings, and I

4   was appointed when the cases came into the federal system.

5   And in those cases -- I think I did five.  It might be four.

6   I don't remember.  But, of course, in those cases I would

7   argue ineffective assistance of counsel by the trial counsel

8   in the state court.  That's a little different than this, and

9   the death penalty cases are much different from this.

10          I've also occasionally -- I don't take *habeas corpus*

11   cases in my private practice cases -- I get called frequently

12   to do it -- but I do take them when a judge of this court

13   appoints me to one, and that, you know, happens once in a

14   while.

15   Q.  All right.  And do you serve -- outside of your

16   representation of clients, are you also active in the legal

17   community?  Do you serve on any committees, anything of that

18   nature?

19   A.  Well, I'd like to think I'm active.  I try to -- I help a

20   lot of younger lawyers.  In the past I've been appointed by

21   judges of this court to serve on the committee to select

22   magistrate judges.  I was appointed to -- on the committee to

23   interview and select the Federal Public Defender when now

24   Judge Nachmanoff left.

25          I was on the Second District Ethics Committee for

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 311 of 388

──────────── L. Woodward - Direct ────────────

1    the State Bar for two terms, a total of eight years.  I think

2    that was either 2000 to 2008 or '02 to '10.  They were

3    four-year terms.

4            I also served two terms -- was appointed by the

5    Fourth Circuit to be the representative on the Eastern

6    District of Virginia to select and screen lawyers who would

7    be qualified to be on the Fourth Circuit CJA panel.

8            Prior to the new system which is currently in place,

9    I was often, I guess, informally consulted by judges of this

10   court in capital cases about who would be appropriate to be

11   counsel for defendants I didn't have or to be co-counsel.

12   There's now a new system.  I'm not on that committee, but,

13   you know, I'm aware of it.

14   Q.  All right.  And all told, in your 39 years of defense

15   work and serving as a lawyer what would you estimate to be

16   the number of clients you've represented?

17   A.  Thousands.

18   Q.  Okay.

19   A.  I couldn't tell you.

20   Q.  And do you have -- and I want to just narrow this

21   question to just your representation of federal defendants.

22           Do you have a practice when somebody has pled guilty

23   and wants to appeal?  Can you tell the Court about what your

24   practice is?

25   A.  Yeah.  I mean, sometimes that comes up.  I always tell my

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 312 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 19 of 71 PageID# 1616

19

L. Woodward - Direct

```
 1   clients that, "If you file a notice of appeal, it's a breach
 2   of your plea agreement.  It could affect your ability to get
 3   a Rule 35."  I try to dissuade my clients from doing that and
 4   explain to them that, in my experience, the Fourth Circuit --
 5   it's a meaningless exercise, because the Fourth Circuit has
 6   ruled since time immemorial, I guess, that waivers are valid
 7   and enforceable, and the only thing that happens if you get a
 8   sentence that's within the guidelines or within the statutory
 9   maximum, actually -- I think in this case the sentence was
10   below the guidelines -- the appeal is going to get dismissed,
11   and the government is not going to look kindly upon that when
12   they come to judge you for a Rule 35.
13            If they persist, I understand the law requires me to
14   file an appeal.  Then I file an appeal, and I, along with
15   that, move to withdraw.  I've done that -- it doesn't come
16   up -- you know, in 40 years or 30 years of doing this, I've
17   probably done that a dozen times, give or take.  I've done
18   it.  I don't like to do it, but I've done it.  That's my
19   practice.
20   Q.  Okay.  So you've had multiple experiences where a client
21   has been adamant, against your advice wants to appeal, and
22   you have done that.  You filed the notice, and then you filed
23   a motion to withdraw.  You've done that in your career?
24   A.  Absolutely.
25   Q.  Okay.
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 313 of 388
Case 2:16-cr-00097-AWA-LRL    Document 231    Filed 03/18/22    Page 20 of 71 PageID# 1617

20

L. Woodward - Direct

1   A.  And more frequently what occurs is some family member or

2   friend or girlfriend or somebody will call and say, "I talked

3   to" so-and-so, "and they want to appeal."  I never file an

4   appeal based on that.  I don't represent those people.  It's

5   not their right to get a sentence reduction, so I only file

6   an appeal if I'm told to do that by my client.

7           My typical practice is after a sentencing in this

8   courtroom or any other one, I go down and talk to my client

9   in the lockup downstairs, and then I typically, depending on

10  how quickly they get moved, go out to the local jail and see

11  them again within the few days right after the sentencing.

12  Q.  Okay.  And you mentioned the family members communicating

13  with you, that that's happened before.  They don't face the

14  consequences that the defendant, you know, would in making

15  those constitutional decisions, right?

16  A.  Well, yeah.  And, look, it varies all over the place.  I

17  mean, I always advise my clients that, particularly depending

18  on -- and I have to make a judgment about the nature of the

19  family member or friend.  A lot of times the family members

20  and friends that my clients want to rely on and want me to

21  talk to are either under investigation in the case or are --

22  have possible exposure for something they may have done.

23          But yeah, I make it clear to all my clients in all

24  cases, "Look, I represent you; I don't represent your family.

25  I will keep your family informed of trial dates and

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 314 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 21 of 71 PageID# 1618

21

L. Woodward - Direct

 1   procedural things and what's going on with the case, but I'm

 2   not" -- you know, I -- the Court in a court-appointed case is

 3   not going to pay me to spend hours and hours talking and

 4   explaining everything to people's girlfriends, and I wouldn't

 5   do it even if they did, because it's not good practice.

 6   Q.  All right.  Let's shift gears now, and let's talk

 7   specifically about this case.

 8          Do you acknowledge that you signed an affidavit, a

 9   sworn affidavit, on December 12 of 2018 and again on March --

10   and then a second affidavit on March 18 of 2020?

11   A.  I do recall signing two affidavits.  I haven't reviewed

12   them.  If you tell me those are the dates, then I would not

13   dispute that with you.

14          MR. BUTLER:  All right.  And, Your Honor, at this

15   time could I have the assistance of the court security

16   officer?  I want to hand these two affidavits to the witness,

17   please.

18          THE COURT:  Absolutely.

19   BY MR. BUTLER:

20   Q.  And let's start in time with the one that was signed in

21   December of 2018.

22          MR. BUTLER:  And just for the Court's edification,

23   this was filed on January 7 of 2019.  It's Document 185-1.

24   BY MR. BUTLER:

25   Q.  And, really, I'm not going to have you reread this,

L. Woodward - Direct

1   because it's in the record and the Court has it, but the

2   issue here is whether or not you consulted with Mr. Powell

3   about filing a notice of appeal.

4   A.  I did.  I consulted with him.  I reviewed my notes.  I'm

5   not a great notetaker, but I write down the important things.

6   And I reviewed my notes, and they indicated that I consulted

7   with Mr. Powell both after the case and then also went out to

8   see him at Western Tidewater Regional Jail, and we talked

9   about it.  So I certainly did consult with him about it.

10          THE COURT:  And, Mr. Woodward, if you could bring

11  your mic to your mouth while you're reading the document.

12          THE WITNESS:  I've got you.  I'll lean this way.

13  BY MR. BUTLER:

14  Q.  Okay.  And you said that -- you referred to the notice of

15  appeal as something that was important enough to take notes

16  on.  Why?  Why is that so important?

17  A.  Well, because, look, it's -- you know, if a client

18  adamantly tells me to do it, I'm required to do it.  And I've

19  done it plenty of times, and, you know, I want the record to

20  be clear.  I mean, one of the things that's kind of evolved

21  since I've been doing this, as you're aware, in the plea

22  colloquy it's become increasingly more important that the

23  District Court Judges or the Magistrates clarify in the plea

24  agreement about the waiver of the right to appeal.  So

25  it's -- you know, not everything in a case is equally

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 316 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 23 of 71 PageID# 1620

23

────── L. Woodward - Direct ──────

1   important with everything else, but post-trial in a guilty
2   plea the two main things that are kind of left is is the
3   defendant going to comply with the plea agreement and
4   cooperate -- and, you know, I monitor that -- as well as, you
5   know, does he have a right to appeal, or does he want to file
6   an appeal.
7           I want to clarify that, because I tell -- I tell
8   clients all the time, I say, "Look" -- I use the analogy of
9   bond hearings.  I say, "Look, you can get a bond hearing, but
10  that's not what you want.  What you want is a bond."  And I
11  said, "You can file an appeal, but filing an appeal is an
12  administrative act.  If you've waived your right to appeal,
13  you're not going to get any benefit from it, and it carries
14  potentially bad consequences for your cooperation, because
15  it's a direct violation of the plea agreement."
16  Q.  Well, let's shift gears now to the next affidavit that
17  was signed March 18 of 2020 and filed that same day as
18  Document 197-1.  And I want to focus on a new issue here, and
19  it's paragraph 3 of your affidavit about this lease
20  agreement.
21          So in the 2255s there was a lease that was filed
22  about a year after Mr. Powell was sentenced.  Did you ever
23  receive, to your memory, that lease prior to his sentencing?
24  A.  I did not.  I have my file -- I turned my complete file
25  over to, I know, Mr. Carroll, and I think to you.  I went

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 317 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 24 of 71 PageID# 1621

24

L. Woodward - Direct

1    through my -- I did not get it.  My office is a busy office;

2    I have a busy practice.  I would never say under oath that a

3    piece of paperwork couldn't get lost, but I've had the same

4    fax number and the same system for getting things into my

5    files for 30-plus years.  So it was not in my file.  I don't

6    recall it.  I mean, I recall the issue about the premises

7    enhancement, because I -- as I recall -- and I heard the

8    Court's rendition this morning -- I objected to that at

9    sentencing, but I do not -- and my file did not contain that

10   lease.

11   Q.  Okay.  Now, had Ms. Brown testified, as we're going to

12   stipulate that she would have testified, that she faxed this

13   to your office, what would be your office practice upon

14   receiving, you know, that lease?

15   A.  Well, we have an office -- I'm trying to think.  In

16   2016 -- I can't remember when we moved to our new -- but the

17   practice has always been the same.  There's a fax machine

18   that has -- the last four of the number is 6004.  Myself and

19   my partner Bob Morecock and one of my other partners who does

20   civil work sort of share that fax machine.  That's always

21   been the fax number.  You know, when we know a fax is coming,

22   my assistant goes and gets it, and then every day there's a

23   slot and, you know, your stuff gets put in your slot.  I

24   mean, that's been the system, and --

25   Q.  All right.  And, hypothetically, let's just say your

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 318 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 25 of 71 PageID# 1622

25

1  office did have it.  I mean, you still would have objected as
2  you did at sentencing, correct?  You still would have
3  objected to the enhancement.  It wouldn't change the fact
4  that --
5  A.  Yeah.  I looked at the lease.  I think you showed it to
6  me a year ago or something.  I looked at it this morning with
7  you.  I saw the lease.  I mean, that lease wouldn't have
8  prevented me from objecting, because my recollection, without
9  going too far into privileged matters that I don't need to,
10 is that the basis of my objection was conversations I had
11 with Mr. Powell and what he said about his arrangements and
12 where he did and didn't do things.  So I -- you know, I
13 don't -- yeah.  I mean, the lease -- if your question is
14 would the lease have stopped me from filing the objection,
15 no.  If your question is -- and hindsight is 2020 -- looking
16 at the lease, do I think it would have made any difference,
17 the answer to that would be "No" as well.
18 Q.  Mr. Woodward, give me just one moment.  I want to go
19 through my notes and make sure that I covered everything I
20 wanted to cover here.
21         (There was a pause in the proceedings.)
22         MR. BUTLER:  All right.  Thank you.  I'm going to
23 tender the witness to Mr. Carroll.
24         THE COURT:  Thank you, Mr. Butler.
25         Mr. Carroll?

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 319 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 26 of 71 PageID# 1623

26

─────────── L. Woodward - Cross ───────────

1          MR. CARROLL:  Thank you, Your Honor.
2                     CROSS-EXAMINATION
3   BY MR. CARROLL:
4   Q.  Good morning, Mr. Woodward.
5   A.  Good morning, Mr. Carroll.
6   Q.  Just from a standpoint of record building, I just need to
7   ask you a couple of preliminary questions.
8          You alluded to it earlier, about providing a copy of
9   your file to me and to Mr. Butler in this process, correct?
10  A.  Yes.
11  Q.  And when you produced the copy of your file of
12  Mr. Powell's representation, was it the complete file that
13  you produced?
14  A.  Yes.  I mean, yeah, I...
15  Q.  I presume it is, too, but I just figured we needed that
16  in the record.
17         Mr. Woodward, part of your file included some
18  handwritten notes.
19          MR. CARROLL:  And if I could have the assistance of
20  the court security officer, Your Honor, I'd like to just hand
21  these up real quick.
22  BY MR. CARROLL:
23  Q.  Mr. Woodward, would you take a moment, please, and thumb
24  through those and let us know if those are your notes from
25  Mr. Powell's file?

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 320 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 27 of 71 PageID# 1624

27

────────────── L. Woodward - Cross ──────────────

1    A.   Yeah, this is all my handwriting, and, yes, these are my

2    notes.

3    Q.   Okay.  And I put a Bates number at the top of it, just

4    for ease of reference if we have to go through it.

5    A.   Okay.

6    Q.   Mr. Woodward, the evidentiary hearing order asks us to

7    address the nature of your investigation relating to the

8    enhancement, the lease agreement, as well as the appeal, so

9    would you please describe the nature of your investigation

10   regarding the premises enhancement, please.

11        MR. BUTLER:  I want to object at this point, because

12   the question presumes that he had a lease and that he had,

13   you know, information that he needed to investigate.  I mean,

14   it's the government's position he never had this lease; there

15   wasn't anything for him to investigate beyond what his --

16   this was a credibility issue of Ms. Wilson that he

17   cross-examined our agent on, and so the question presumes

18   things that the government, you know, contends didn't happen.

19        THE COURT:  And he can answer that.  If he didn't do

20   it, he didn't do it, if he didn't have the lease.  I overrule

21   it.  You can ask him, but Mr. Woodward --

22        THE WITNESS:  What was the question, again?

23   BY MR. CARROLL:

24   Q.   I didn't mean to be presumptuous with the government.  I

25   was just reading from the order.

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 321 of 388
Case 2:16-cr-00097-AWA-LRL    Document 231    Filed 03/18/22    Page 28 of 71 PageID# 1625

28

──────────── L. Woodward - Cross ────────────

1        The evidentiary hearing order asks us to address the
2   nature of your investigation relating to the enhancement and
3   the lease submitted by the petitioner, and so, just
4   generally, if you could, describe the nature of your
5   investigation into that premises enhancement, please.
6   A.  Well, I mean, I got the presentence report.  Obviously, I
7   think I'm a fairly experienced attorney, so I know a lot of
8   times in cases where people are alleged to have distributed
9   narcotics out of a home, a house, or an apartment or
10  something, that the Probation Office is going to include that
11  enhancement.
12        So I got the presentence report, I took it out to
13  Mr. Powell, as I recall, again trying not to go beyond the
14  scope.  He indicated to me that that wasn't true, or he
15  didn't use that apartment, or Ms. Wilson was lying.  And I
16  don't, you know, remember the exact details of that, but I
17  told him that, well, we're at sentencing, you pled guilty,
18  it's a preponderance-of-the-evidence standard, and it's a
19  very -- again, this is my assessment, but the premises
20  enhancement is not a heavy lift for the government.  I mean,
21  it's a very easy enhancement for the government to apply.
22  It's two points.  In the scope of a case like this, you know,
23  two points was not going to be the make or break.  As I
24  recall, Mr. Powell had a Criminal History VI.
25        So, look, I didn't -- you know, by "investigation"

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 322 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 29 of 71 PageID# 1626

29

L. Woodward - Cross

 1    do you mean did I hire an investigator to go, you know,

 2    subpoena records and research who lived where when?  No.  My

 3    investigation was consulting with my client, filing the

 4    objection, and preparing to examine the agent.  I didn't know

 5    for sure at sentencing whether Ms. Wilson would be called

 6    herself or not.  It was her credibility that was stake.

 7    Obviously, hearsay is admissible in sentencings, and the

 8    government chose to proceed by calling the agent.

 9          So I didn't do anything to investigate the lease,

10    because I didn't know anything about the lease at the time of

11    the sentencing.

12    Q.  Okay.  Thank you.  So just to be clear, you reviewed the

13    PSR, interviewed Mr. Powell, and obviously didn't do anything

14    with the lease because it was not sent to your office.

15          Were you able to determine through your conversations

16    with your client and a review of the PSR whether he owned or

17    rented the premises that the government contended he was

18    distributing the narcotics from, sir?

19    A.  I don't remember if I determined whether he owned or

20    rented it or not, but the allegation was that it was used to

21    distribute drugs from, which is what that enhancement is

22    about.  It's not -- in my experience with the judges in this

23    court, it's not really legally pertinent who owns or rents

24    it; it's what it's used for.  So, no.  I mean, the short

25    answer to that is "No."

USCA4 Appeal: 21-6992    Doc: 32      Filed: 01/10/2024    Pg: 323 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 30 of 71 PageID# 1627

30

---L. Woodward - Cross---

```
 1              And I want to make the record clear.  When you say
 2     the lease wasn't sent to my office -- I don't know Ms. Brown.
 3     I don't want to call Ms. Brown a liar.  All I can do is --
 4     she says she faxed it.  All I can do is say my system is my
 5     system, and that lease, if it got faxed to my office, didn't
 6     end up in my file.  So that's all I can say about that.
 7     Q.  I appreciate that.  During the course of your
 8     investigation of the premises enhancement, were you able to
 9     determine whether Mr. Powell had unrestricted access or if he
10     had a key to the premises or other manners of control of it?
11     A.  I don't recall that.  I do not -- you know, when you say
12     "unrestricted access," I just -- I don't know.  I mean, my
13     recollection is that the allegation was -- and I haven't
14     reviewed all the transcripts -- that it was what I would call
15     a storehouse.  Typically, a lot of times -- I've done a lot
16     of drug cases in my career -- people will have what they
17     think is a safe place that's not obvious that they use to
18     keep narcotics in.
19              Again, I don't know as I sit here today what
20     Mr. Powell's access was to that premises or any other
21     premises, frankly.
22     Q.  At the time you were preparing for sentencing and this
23     premises enhancement objection did you have reason to believe
24     that the storehouse operation was the apartment on Gateway
25     Drive?
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 324 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 31 of 71 PageID# 1628

31

———— L. Woodward - Cross————

1    A.  Well, again, I don't remember if the Gateway Drive -- I

2    don't remember that.  I haven't reviewed -- if you have the

3    PSR, I can look at it, but what I remember is -- you know, I

4    tell my clients, "Look, we only have to deal with what's in

5    the PSR."  And whatever premises there was in the PSR that

6    was going to add two points to the guidelines, Mr. Powell

7    expressed to me that that wasn't used for drug operations, so

8    I objected to it.

9    Q.  Mr. Woodward, would you take a look, please, at your

10   notes.  I want to just review three quick things.

11              MR. CARROLL:  And, Your Honor, may I use the lectern

12   here?

13              THE COURT:  Yes.

14              MR. CARROLL:  It's got to warm up just for a second.

15   BY MR. CARROLL:

16   Q.  Mr. Woodward, did you take a history of Mr. Powell at

17   some point in your representation?  And by that I mean

18   demographic information; who's who, numbers, and stuff like

19   that.

20   A.  I did.  And also I would say, for the record, I remember

21   talking to Keith Kimball when there was a transition.  But,

22   yes, I would have asked him about his background and his

23   family.  And, you know, I had the discovery, and, yes, I took

24   a -- I wouldn't call it a history, but, you know, if you want

25   to, that's fine.

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 325 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 32 of 71 PageID# 1629

32

—— L. Woodward - Cross——

1    Q.  That's what I call it, but the Keith Kimball references

2    are in here.

3          Would you turn in your notes to Powell 009, please?

4    A.  Okay, got it.

5    Q.  Would this be, basically, taking the demographics --

6          THE COURT:  You know what, Mr. Carroll?  I can't

7    hear you.

8          MR. CARROLL:  I'm sorry, Judge.

9          THE COURT:  Yes.  Just turn your microphone towards

10   your mouth.

11   BY MR. CARROLL:

12   Q.  Would this be that who's who history that we just talked

13   about?

14   A.  Yeah, this looks like one of my initial meetings.  The

15   reason I'm pausing is I don't remember how I got this case.

16   Sometimes I get summoned to the withdrawal hearing and get

17   appointed like in real time, and sometimes I get called and

18   they say, "We need you to take a case because somebody" --

19   but certainly this is my notes about Mr. Powell's background

20   and, you know, some of his people there.

21   Q.  And in here -- and I'll point to it on the screen and

22   then ask you about it, but...

23          That line right there where my pen is, Ms. Brown and

24   a phone number and it has "girlfriend" next to her, did you

25   ever speak with Ms. Brown in the course of the case, that you

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 326 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 33 of 71 PageID# 1630

33

————L. Woodward - Cross————

1   recall, sir?

2   A.  I don't recall if I did or not.  Just so the Court will

3   understand, my shorthand -- "B/M" is an abbreviation for baby

4   mamma, so I try to -- if somebody has relationships with

5   multiple women, I try to, you know, make a notation of the

6   women they would have children with.

7        I see I've written here that Ms. Mills was his

8   fiance and Ms. Brown was his girlfriend.  I'm sure at some

9   point I understood what the distinction is.  But, sure,

10  Ms. Brown, obviously, is there, and I wrote down that he told

11  me she was his girlfriend.

12  Q.  Okay.  And I want to turn a little bit to another portion

13  of your notes.  And, again, just for the completeness of the

14  record, there's a reference in them to "Gateway" that I'll

15  show you in just a second, but could you please flip over to

16  page 1?

17  A.  Page 1.  Okay.

18  Q.  And I'll represent to you -- and I'll show you in just a

19  second -- that the reference to "Gateway Drive" comes up on

20  Powell 03, but it's unclear to me, and I'd like you to

21  clarify for the Court, whether 03 is a continuation of prior

22  notes and if you can recall the context in which these notes

23  were taken, sir?

24  A.  No, I don't know.  I mean, it looks like to me that

25  page 1 is a stand-alone page that I maybe -- I don't remember

L. Woodward - Cross

1    the exact dates, but this looks like it would have been my

2    meeting with Mr. Powell after his sentencing.  And, you know,

3    as you can see, some of my notes are not dated.

4         What you have as Powell 2 looks like to me that it's

5    a discussion about the PSR, about what sort of things we

6    would object to and what we would not.  As I see here -- I'm

7    having a memory now where I see that thing about the jail

8    note, and I've written, "Not a threat."  Something came up, I

9    believe, between the plea and sentencing about the United

10   States Attorney or one of the agents contacting me that they

11   thought there was some note that Mr. Powell had written that

12   was -- could be read to be threatening to somebody, is what

13   that's about.  I don't remember the details of that.

14        And Powell 3 could be -- I'm not sure.  Dyer,

15   Special Agent Dyer, was a drug investigator, so I am not

16   clear.  And, again, I apologize for my notes, but this

17   certainly could have been a conversation I had with Special

18   Agent Dyer about the case, because -- again, I don't want to

19   go into anything too privileged.  When Mr. Powell was

20   debriefed there were a lot of statements made by him about a

21   lot of activity up in Baltimore that probably was beyond what

22   the case was --

23   Q.  Maybe we can clarify the importance of that.  Was the

24   debrief prior to or after sentencing?

25   A.  The debrief, as I recall it, was prior to sentencing.

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 328 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 35 of 71 PageID# 1632

35

L. Woodward - Cross

1  Q.  And so, based on many of these notes and, I guess -- I

2  don't want to get into too much speculation, but if this is

3  the conversation with Detective Dyer, would that have

4  occurred prior to or after sentencing?

5  A.  It could have occurred either or both.  I mean,

6  typically, my practice is to try to get as much

7  information -- I get a case, I talk to the U.S. Attorney, I

8  talk to the agents.  My memory is that the debrief -- which

9  it's typical there's a transportation order done, and the

10  debrief occurs between the plea and sentencing, but I didn't

11  date these notes, so I can't answer that definitively.

12  Q.  Thank you.  And you don't need that anymore.  I'm not

13  going to ask you any more questions about that, unless

14  Mr. Butler would like to.

15          MR. CARROLL:  And I would ask the Court to receive

16  these notes as Petitioner's Exhibit Number 2.

17          THE COURT:  All right.  It will be admitted.

18          (The exhibit was admitted into evidence.)

19          MR. CARROLL:  Might I have just a moment with my

20  client, Your Honor?

21          THE COURT:  Yes, of course.

22          (There was a pause in the proceedings.)

23          MR. CARROLL:  Thank you, Your Honor.  Those are all

24  my questions.

25          THE COURT:  All right.  Thank you, Mr. Carroll.

USCA4 Appeal: 21-6992     Doc: 32     Filed: 01/10/2024     Pg: 329 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 36 of 71 PageID# 1633

36

L. Woodward - Redirect

```
 1            Any redirect, sir?
 2            MR. BUTLER:  Just briefly, to clear up this exhibit.
 3                        REDIRECT EXAMINATION
 4    BY MR. BUTLER:
 5    Q.  Mr. Woodward, do you still have your notes?
 6    A.  I don't.  I gave it up to the Court.
 7    Q.  Sorry about that.
 8    A.  All right, now I do.
 9    Q.  All right.  Just clarifying page 1 of your notes, the
10    date here, April 5, 2017 -- now, this is just after
11    Mr. Powell had been sentenced, right?
12    A.  What was his sentencing date?
13    Q.  March --
14    A.  As I can tell, it was after sentencing.  I don't know how
15    long after, but it was after.
16    Q.  And how can you tell that?  Decipher your notes here,
17    because some of them are hard to read.
18            For example, let's look at the second bullet down
19    here.  What does that say?
20    A.  It says -- I apologize for my -- that second bullet says,
21    "I told him he had waived his right to appeal and that the
22    Fourth Circuit would, in my view, find that waiver
23    enforceable."
24    Q.  Okay.  And then are the next bullets that are in there
25    also part of your consultation about the appeal?
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 330 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 37 of 71 PageID# 1634

37

L. Woodward - Redirect

1   A.   Yes.   The next one says, "I told him if he appealed he
2   would likely never get a Rule 35..."
3        THE COURT:   You know what?   You need to pull the
4   microphone --
5        THE WITNESS:   I'm sorry.   I told him -- the third
6   bullet says, "I told him if he appealed he would likely never
7   get a Rule 35 and that there was no guarantee of a Rule 35,
8   anyway."
9   BY MR. BUTLER:
10  Q.   Okay.
11  A.   Then I told him -- I'll read them -- "if he directed me,
12  I would file a notice to appeal but would move to withdraw,
13  and other counsel would be appointed."
14       I told him that in my opinion the Court's rulings on
15  the enhancements would never be reversed on appeal.
16       And I wrote, "He would not tell me if he wanted a
17  notice filed; said he would let me know via his family.   I
18  advised him of the time limits.   He said I was not trying to
19  help him.   I told him I was telling him the way the system
20  worked."
21  Q.   All right.   Now, based on your practice, if he had told
22  you at this meeting that he wanted to go against your advice
23  and file an appeal, would you have noted that in your notes?
24  A.   Yeah, I would have noted -- I mean, yes.   And these
25  notes -- like I said, I was trying -- I'm not -- I tried to

L. Woodward - Recross

 1   convince him that it would not be smart to file an appeal.

 2           But I just want the record to be clear.  I mean,

 3   filing an appeal is -- I mean, it takes about the same amount

 4   of time as it just took me to write those notes.  I mean,

 5   it's just a one-page document that's on a word processor, and

 6   you say, "The defendant hereby appeals from the judgment,"

 7   you know, of whatever date, and you send it to the Clerk's

 8   Office.  I mean, it's not an onerous process to file a notice

 9   of appeal.

10   Q.  Thank you, Mr. Woodward.  Those are all the questions I

11   have.

12           THE COURT:  Any further questions, Mr. Carroll?

13           MR. CARROLL:  Just one.

14                       RECROSS-EXAMINATION

15   BY MR. CARROLL:

16   Q.  Mr. Woodward, were those notes taken contemporaneously

17   with your visit to Mr. Powell and the advice that you gave

18   him?

19   A.  Well, yeah.  You know, when you say "contemporaneously,"

20   I don't know if I was writing them as I was -- I mean,

21   sometimes I write them as I'm talking, and this looks like to

22   me something that I might have written when I got back to the

23   office, because some of other ones seem to be more like

24   taken -- but when you say "contemporaneously," they were

25   written either the day of the visit or the next day.

USCA4 Appeal: 21-6992     Doc: 32     Filed: 01/10/2024     Pg: 332 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 39 of 71 PageID# 1636

39

L. Woodward - Recross

1   Q.  Thank you.

2           THE COURT:  I have a question, Mr. Woodward.

3           Was he ever given a Rule 35(b)?

4           THE WITNESS:  No, ma'am, Your Honor, not that I'm

5   aware of.

6           THE COURT:  Did he ever ask you about it, do you

7   know, after the sentencing?  Did he ever inquire as to what

8   the status of a Rule 35 was?

9           THE WITNESS:  I believe he did, Your Honor.  My

10  recollection is, when I was looking through my file, that

11  there's a letter -- he wrote me a letter about wanting some

12  property back, and I think I -- or he -- and I responded to

13  that letter.  Somebody in the last few days, Mr. Butler or

14  Mr. Carroll, showed me that letter.  I don't have it here

15  with me, but there was a letter, and I believe in that letter

16  I addressed the Rule 35 some.

17          THE COURT:  And would you have told him that he was

18  not getting the Rule 35(b)?

19          THE WITNESS:  No, ma'am, I didn't tell him that he

20  was not, and typically I never do, because I've had -- you

21  know, I've had cases where a Rule 35 seems dead and gone and

22  then somebody gets arrested or -- I mean, I got a call not

23  too long ago about, you know, an old, old case where, you

24  know, somebody that I represented now may be able to help the

25  government with something.

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 333 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 40 of 71 PageID# 1637

40

———— L. Woodward - Recross————

1          So I would have certainly told him that it hadn't
2    been filed, but I don't think I ever tell anybody it's
3    completely off the table.
4          THE COURT:  Okay.  And that correspondence that you
5    got from Mr. Powell would have been after you consulted with
6    him about his right to appeal?
7          THE WITNESS:  Oh, yes, ma'am.  That would have been
8    months.  Like I said, I can get that letter and provide it to
9    the Court, if you want.
10          THE COURT:  Do you have that letter in your file,
11    Mr. Carroll?
12          MR. CARROLL:  If it's the one that he's referencing,
13    I can show it to him.  I think I do.
14          THE COURT:  Yes.  I just want the month and the year
15    and what it says.
16          MR. CARROLL:  Make sure that's the right one.
17          THE WITNESS:  Yes, Your Honor, this is the letter I
18    wrote to Mr. Powell, and it's dated September 26, 2017.  I
19    can read it into the record, if the Court would like.
20          THE COURT:  What does it say about -- yeah, go ahead
21    and do it, please.
22          THE WITNESS:  It says, "Dear Mr. Powell:  I enclose
23    the discovery pleadings and other file information that I am
24    able to release under the Federal Rules.  I was court
25    appointed to your case, and my representation ended when the

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 334 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 41 of 71 PageID# 1638

41

L. Woodward - Recross

 1   sentencing was over.  Contrary to your erroneous assertion in

 2   your letter dated September 4, 2017, I did not agree to

 3   represent you for free in trying to obtain property that was

 4   seized during the investigation.  What I did tell you was

 5   that you could file to obtain the property or you could hire

 6   an attorney to try to do that for you.  I advised you that

 7   doing so could be a lengthy and time-consuming process.

 8   There is no transcript of your sentencing.  You will need to

 9   purchase the sentencing transcript directly from Heidi

10   Jeffreys" -- address and phone number.  "There was no *Brady*

11   material at your sentencing.  I never advised you that you

12   would get a time cut, and your plea documents make it clear

13   that the decision on whether to file for a sentencing

14   reduction is within the sole discretion of the United States,

15   if they conclude that you were completely truthful and

16   offered substantial assistance.  I did tell you that if you

17   plead guilty you would be eligible for a reduction of your

18   guideline range for acceptance of responsibility, which you

19   received.  And please be advised that some of the documents I

20   am sending you are originals and keep them in a safe place."

21              THE COURT:  Okay.  That's it?  Okay.  And that would

22   have been your last correspondence with Mr. Powell?

23              THE WITNESS:  As far as I recall, yes, Your Honor.

24              THE COURT:  All right.  And then he filed his 2255

25   in April of 2018.

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 335 of 388
Case 2:16-cr-00097-AWA-LRL    Document 231    Filed 03/18/22    Page 42 of 71 PageID# 1639

42

```
 1              THE WITNESS:  Right.  And I sent him -- you know, I
 2    sent him -- I guess that would cause me to clarify one thing.
 3              I sent him -- when I used the term "my file,"
 4    reading this letter, I sent him the information that I
 5    received; you know, the discovery, the pleadings, the
 6    indictment.  I didn't copy all the discovery, just for cost
 7    purposes, but my entire file has all my notes and everything
 8    that I did.  The discovery came from the government, and I
 9    sent that to        Mr. Powell at his request.
10              THE COURT:  Okay.  Hold on one second.
11              (There was a pause in the proceedings.)
12              THE COURT:  All right.  I have no further questions.
13              Any additional questions from you, Mr. Carroll?
14              MR. CARROLL:  No, Your Honor.  Thank you.
15              THE COURT:  All right.  Mr. Butler, anything from
16    you?
17              MR. BUTLER:  No, Your Honor.
18              THE COURT:  All right.  Thank you, Mr. Woodward.
19              THE WITNESS:  Judge, do you want this letter in the
20    record?
21              THE COURT:  Yes, go ahead.  What is your number?
22    Number 3?  That will be Number 3.  Can you mark it Number 3,
23    please?
24              (The exhibit was admitted into evidence.)
25              THE WITNESS:  Your Honor, do I need to wait, or am
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 336 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 43 of 71 PageID# 1640

43

————N. Powell - Direct————

1    I --

2              THE COURT:  Can he be excused, Mr. Butler?

3              MR. BUTLER:  Yes, Your Honor.

4              THE COURT:  Mr. Carroll?

5              MR. CARROLL:  Yes, Your Honor.

6              THE COURT:  All right, Mr. Woodward.  Thank you for

7    your testimony, and please have a good rest of your day.

8              All right, Mr. Butler.  That's all that you have,

9    correct?

10             MR. BUTLER:  Yes, Your Honor.

11             THE COURT:  All right, Mr. Carroll, I'll be glad to

12   receive your evidence.

13             MR. CARROLL:  I would call Nathaniel Powell, please.

14             THE COURT:  All right, Mr. Powell.  Can we put him

15   under oath?

16             (The clerk administered the oath.)

17             THE COURT:  All right, Mr. Powell, make sure you

18   pull the microphone close.

19             NATHANIEL E. POWELL, called as a witness, having

20   been first duly sworn, testified as follows:

21                        DIRECT EXAMINATION

22   BY MR. CARROLL:

23   Q.  Mr. Powell, would you please state your full name?

24   A.  Nathaniel E Powell.

25   Q.  And were are you currently housed, sir?

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 337 of 388

—————— N. Powell - Direct ——————

1    A.   Western Tidewater Regional Jail.

2    Q.   And you filed the instant 2255 petition regarding a

3    number of issues, and we're here today on two of them.  I

4    want to first start by just asking you a couple of questions

5    about the preparation for this hearing.

6         Would you agree that you and I have met on a number

7    of occasions to discuss your claims?

8    A.   Yes.

9    Q.   And would you agree that we're prepared to proceed for

10   the hearing today?

11   A.   Yes.

12   Q.   My notes reflect that you and I had five phone or video

13   conferences and two meetings in person -- well, three now,

14   because of this week.

15        Would you agree that we met sufficiently in regard to

16   this hearing, sir?

17   A.   Yes.

18   Q.   During our meetings in preparation for today you were

19   made aware that you had a right to choose to testify.  Is

20   that right?

21   A.   Yes.

22   Q.   Okay.  And you were also advised that under the law that

23   any false testimony would be punishable by perjury charges,

24   correct?

25   A.   Yes.

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 338 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 45 of 71 PageID# 1642

45

N. Powell - Direct

1   Q.  And notwithstanding those discussions, who made the

2   decision to testify at this hearing today, sir?

3   A.  I did, sir.

4   Q.  And is it your intention, sir, to testify regarding

5   instructions you gave to your former counsel regarding your

6   intentions to appeal your case, number one?

7   A.  Yes.

8   Q.  And is it also your intention to testify today that you

9   made your counsel aware of the existence of the lease that

10  was submitted to the Court previously, sir?

11  A.  Yes.

12  Q.  Okay.  Now, previously you provided an affidavit in

13  support of your 2255 petition.  Is that correct?

14  A.  Yes.

15  Q.  And it's already part of the Court file and the record,

16  but that affidavit appears on the docket as Docket No. 186-2

17  and was filed on January 22, 2019.  Is that accurate, sir?

18  A.  Yes.

19  Q.  Now, have you had a chance to recently review that

20  affidavit, sir?

21  A.  No, sir.

22  Q.  Okay.  Well, let me give it to you, then.

23          (There was a pause in the proceedings.)

24  BY MR. CARROLL:

25  Q.  Mr. Powell, I just handed you a copy of the document that

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 339 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 46 of 71 PageID# 1643

46

————N. Powell - Direct————

```
 1    I referenced.  Would you please review it, sir.
 2             (There was a pause in the proceedings.)
 3    BY MR. CARROLL:
 4    Q.  Are you finished?
 5    A.  Yes, sir.
 6    Q.  Okay.  And what is the document that I handed you?
 7    A.  An affidavit that I prepared.
 8    Q.  And on page 2 of 3 of the affidavit is your signature on
 9    that document, sir?
10    A.  Yes.
11    Q.  And at the time you signed it, on January 16 of 2019, is
12    it your testimony that the information contained in the
13    affidavit was true and accurate at that time?
14    A.  Yes.
15    Q.  And is there anything that has changed in your
16    recollection since you executed this affidavit on January 16
17    of 2019?
18    A.  No, sir.
19    Q.  And so is it your testimony today that the information in
20    this affidavit is still true and accurate?
21    A.  Yes.
22             MR. CARROLL:  Your Honor, the affidavit is part of
23    the Court's file at Document 186-2.  I'm happy to tender it
24    as an exhibit today, if you need one to hold onto.
25             THE COURT:  That's fine, if we could do that.  Thank
```

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 340 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 47 of 71 PageID# 1644

47

─────────────── N. Powell - Direct ───────────────

 1    you.

 2            (The exhibit was admitted into evidence.)

 3    BY MR. CARROLL:

 4    Q.  Mr. Powell, I'm going to hand you a copy of what I just

 5    tendered to the Court so you have it in front of you quickly.

 6            I'm going to ask you about numbered paragraph 4,

 7    which reads:  "I ask Mr. Woodward to get the lease agreement

 8    for the Gateway Drive address to prove that the owner started

 9    renting in 2016," okay?

10            Do you see that language, sir?

11    A.  Yes.

12    Q.  Okay.  And I need you to clarify for the Court what your

13    testimony is regarding when you advised Mr. Woodward to

14    secure the Gateway lease.

15    A.  After I got my PSR and I found out that Ms. Wilson was

16    stating that she dealt with me for -- since 2011 to 2016 from

17    this address.

18    Q.  So would that have been during your preparations with

19    Mr. Woodward for sentencing, sir?

20    A.  Yes.

21    Q.  And how many times did you meet with Mr. Woodward in

22    preparation for your sentencing; do you know?

23    A.  I can't recollect how many times I met with him.

24    Q.  If I showed you a record from the Western Tidewater

25    Regional Jail that shows your visitation history, would that

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 341 of 388

─────────N. Powell - Direct─────────

 1  refresh your recollection?

 2  A.  Sort of.

 3  Q.  Well, let's try, okay?  There you go.

 4        Take a moment, please, and review that document and

 5  let me know if that refreshes your recollection, please.

 6          MR. CARROLL:  And, Your Honor, may I put it on the

 7  court system?

 8          THE COURT:  You may.

 9  BY MR. CARROLL:

10  Q.  Okay, Mr. Powell.  It shows the visitation record with

11  Mr. Woodward on February 20 of 2017, March 13 of 2017,

12  March 18 of 2017, March 29 of 2017, and then the

13  post-sentencing contact -- or noncontact visit on April 5 of

14  2017.  Do you see that, sir?

15  A.  Yes, sir.

16  Q.  Okay.  And while you may not have a recollection of those

17  exact dates, does that comport with your recollection of your

18  visitations with your attorney?

19  A.  Yes.

20  Q.  Okay.  At some point -- the lease that's at issue in the

21  case, did you actually have possession of it when you told

22  Mr. Woodward about it?

23  A.  I didn't have access to it, but Ms. Brown did.

24  Q.  All right.  And did you advise your counsel where he

25  might be able to secure a copy of the lease?

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 342 of 388

————N. Powell - Direct————

1    A.  Yes.

2    Q.  At some point in time did you come in possession of that

3    lease, sir?

4    A.  Not at the time of sentencing or nothing like that.

5    Q.  I asked you a bad question.

6         At some point after the sentencing did you get a copy

7    of it?

8    A.  Yes.

9    Q.  Okay.  And is that the document that you filed on the

10   docket at 186-1?

11   A.  Yes.

12   Q.  And, sir, I'd just like to show it to you and make sure

13   you agree that it's the same document.

14        I just handed you the document that's filed at 186-1

15   on the docket.  Would you review that and advise me what it

16   is, please?

17   A.  The lease that I was provided from Ms. Brown to the

18   Gateway Drive address.

19   Q.  And was this document ever provided from you to

20   Mr. Woodward prior to sentencing?

21   A.  No, sir.

22   Q.  But it's your testimony he was at least made aware of it.

23   He was made aware of it at the time.  Is that your testimony?

24   A.  Yes.

25             MR. CARROLL:  Your Honor, I'd ask the Court to

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 343 of 388

─────────N. Powell - Direct─────────

1    receive the copy of the lease, even though it's already on

2    the docket.

3            THE COURT:  It will be received.

4            (The exhibit was admitted into evidence.)

5            MR. CARROLL:  And while we're at it, Your Honor, I'd

6    ask the court security officer to tender the visitation

7    record that I just reviewed with him.

8            THE COURT:  It will be admitted as well.

9            MR. CARROLL:  Thank you, Judge.

10           THE COURT:  You're welcome.

11           (The exhibit was admitted into evidence.)

12   BY MR. CARROLL:

13   Q.  All right, Mr. Powell.  Let's transition from where we

14   are now to some of the run-up to sentencing.

15           First let's talk about your expectations just from

16   some historical perspective going into the sentencing event.

17   Can you explain to the Court, please, what your expectations

18   were going into sentencing with regard to how much time you

19   would get?

20   A.  Nowhere near 20 years.

21   Q.  And there are a number of enhancements in your

22   presentence report; credible threat, the Facebook post, a

23   firearm enhancement, a drug premises enhancement, and also a

24   weight objection.  Did -- what was your expectation with

25   regard to the enhancements, based on your discussions with

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 344 of 388

─────────────── N. Powell - Direct ───────────────

1    your counsel?

2    A.   Mr. Woodward -- when I got my PSR, my PSR was saying 360

3    to 480 months, and Mr. Woodward advised me that I didn't have

4    to worry about the 360 to 480 months, I just needed to worry

5    about the 5 years to 40, and that the Judge had discretion to

6    sentence me underneath the 5 years, if she wanted to.

7    Q.   And a number of the objections were asserted on your

8    behalf by counsel.  Is that correct?

9    A.   Yes.

10   Q.   Okay.  And ultimately you were sentenced to 300 months.

11   Is that correct?

12   A.   Yes, sir.

13   Q.   Okay.  And based on your expectations going in, what was

14   your reaction to the 300-month sentence?

15   A.   I wasn't happy.

16   Q.   Did you express your dissatisfaction to Mr. Woodward,

17   sir?

18   A.   Yes.

19   Q.   Okay.  I need you to elaborate a bit and tell the Court

20   when you discussed your appellate rights with Mr. Woodward.

21   A.   A couple of days after the sentencing -- well, the

22   following week, because I got sentenced on a Friday.  When he

23   came to see me, I would tell him I wasn't happy with his work

24   and I would like to appeal.

25   Q.   Where did that conversation take place?

USCA4 Appeal: 21-6992    Doc: 32        Filed: 01/10/2024    Pg: 345 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 52 of 71 PageID# 1649

52

─────────N. Powell - Direct─────────

1    A.  In the noncontact time at Western Tidewater Regional

2    Jail.

3    Q.  I know Her Honor has been at Western Tidewater Regional

4    Jail when she was on this side of bench, but there's three

5    attorney panels in Western Tidewater.  Is that accurate, sir?

6    A.  Yes.

7    Q.  And those panels have a glass divider and a phone system

8    in between them.  Is that correct, sir?

9    A.  Yes.

10   Q.  And would you agree that the jail record that I showed

11   you -- that that conversation took place on April 5?  Is that

12   correct?

13   A.  Yes.

14   Q.  Okay.  What was the tone of the discussion?  And by

15   "tone" I mean your tone.

16   A.  Like kind of debating, like a debate, an angry kind of

17   tone.

18   Q.  You were upset?

19   A.  Yes.

20   Q.  Okay.  And what were you debating with Mr. Woodward?

21   A.  His performance.

22   Q.  At the sentencing event?

23   A.  At the sentencing hearing.

24   Q.  Okay.  So you were upset with him?

25   A.  Yes.

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 346 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 53 of 71 PageID# 1650

53

————N. Powell - Direct————

1    Q.  All right.  And Mr. Woodward testified -- and we do have

2    some notes from him from April 5 or thereabouts -- that there

3    was a discussion had about waiving the right to appeal, the

4    breach of plea agreement if you do, and there really being no

5    up side or benefit, because it may harm you in the event of a

6    Rule 35 consideration.

7           Do you recall his testimony on that, sir?

8    A.  Yes.

9    Q.  Do you dispute that you had that conversation with him?

10   A.  No, sir.

11   Q.  So that conversation was had?

12   A.  Yes.

13   Q.  Okay.  At the conclusion of that discussion, you need to

14   tell the Court exactly what you told him about what you

15   wanted to do with regard to an appeal.

16   A.  Well, when he was telling me about the Rule 35 I told him

17   that I really didn't think I was going to get a Rule 35

18   because of the way things went in the courtroom and really

19   asked him could he appeal the case.

20   Q.  Okay.  Again, that's a generalization of what you said.

21   I need you to tell the Court the words you spoke to your

22   attorney about what you wanted to do with regard to your

23   appeal.

24   A.  To appeal.

25   Q.  You -- okay.

USCA4 Appeal: 21-6992   Doc: 32   Filed: 01/10/2024   Pg: 347 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 54 of 71 PageID# 1651

54

————N. Powell - Direct————

1          After you concluded your meeting with Mr. Woodward
2    that day, what was your expectation of what your counsel was
3    going to do?
4    A.  File the notice of appeal and withdraw.
5    Q.  Okay.  And that's -- I guess we do need to speak about
6    that.  Why did you think he was going to withdraw from the
7    case?
8    A.  Because he told me would file the notice of appeal and
9    withdraw.
10   Q.  When you were meeting with Mr. Woodward, was he taking
11   notes in your conversation?
12   A.  No, sir.
13   Q.  What follow-up, if any, did you do with Mr. Woodward with
14   regard to your instructions that he appeal your case,
15   according to your testimony?
16   A.  None, because he told me -- it was no need to follow up,
17   because he told me he was no longer going to be my counsel.
18   Q.  And so at some point in time you discovered that an
19   appeal was not noted.  Is that correct?
20   A.  Yes, because I wrote for a docket sheet to the courts and
21   got a docket sheet and didn't see it up there.
22   Q.  When was that, sir?
23   A.  Sometime in 2017.  I can't recall exactly when.
24   Q.  Okay.  I have one question about the lease that I
25   neglected to ask you, so I'm sorry to do this out of order.

USCA4 Appeal: 21-6992    Doc: 32      Filed: 01/10/2024    Pg: 348 of 388

                              N. Powell - Cross

1              During the sentencing event when you were arguing the
2     objections, did you have any discussions with
3     Mr. Woodward at counsel table about the lease?
4     A.  Yes.  I asked him did he have the lease agreement in his
5     files at the time at the counsel table.
6     Q.  Why did you ask him that?
7     A.  Because he was arguing credibility, and my whole thing
8     was the house wasn't rented over a five-year period of time.
9     I knew the house had only been rented in that year, January
10    of that year, sometime in that year of '16.
11    Q.  Thank you, Mr. Powell.  Please answer the United States'
12    questions or the Court's, if she has any.
13              MR. BUTLER:  Your Honor, would you permit me to ask
14    questions from counsel table so I can see the witness?
15              THE COURT:  Yes, absolutely.  And you can sit down.
16              MR. BUTLER:  Okay.  Thank you.
17                           CROSS-EXAMINATION
18    BY MR. BUTLER:
19    Q.  Mr. Powell, are you able to see me and hear me?
20    A.  I can't really see you, but I can hear you.
21    Q.  Okay.  All right.
22              THE COURT:  Move over to your right, if you need to,
23    Mr. Butler, or your left, whatever.
24    BY MR. BUTLER:
25    Q.  How about now?  Is this a little bit better?

USCA4 Appeal: 21-6992    Doc: 32      Filed: 01/10/2024    Pg: 349 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 56 of 71 PageID# 1653

56

─────N. Powell - Cross─────

1   A.  Yes.

2   Q.  Okay.  All right.  So first I want to ask you to just

3   acknowledge some things, if you remember doing these things.

4        Do you remember entering into a statement of facts as

5   part of your plea agreement?

6   A.  Yes.

7   Q.  Okay.  And that statement of facts was true, right?

8   A.  Yes.

9   Q.  Okay.  And in that statement of facts it says, "From in

10  or about March of 2012 to in or about July 2016, the

11  defendant Nathaniel Powell was a leading member of a drug

12  trafficking conspiracy."

13  A.  Yes.

14  Q.  All right.  And also in that statement of facts you

15  acknowledged that you supplied your coconspirator, Valerie

16  Wilson.  Do you remember that?

17  A.  Yes.

18  Q.  Okay.  She was somebody that you supplied drugs with

19  regularly, more than one time, right?

20  A.  Yes.

21  Q.  Okay.  And that was over the course of multiple years,

22  correct?

23  A.  Yes.

24  Q.  All right.  The next thing I want to move on to is your

25  plea agreement.  In paragraph 6 of your plea agreement it

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 350 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 57 of 71 PageID# 1654

57

———— N. Powell - Cross ————

1   says, "The defendant knowingly waives the right to appeal the
2   conviction and any sentence within the statutory maximum."
3        Now, do you agree that you were aware of that
4   provision of your plea agreement?
5   A.  Yes.
6   Q.  And you did understand it.
7   A.  Yes.
8   Q.  Mr. Woodward went over that provision with you.
9   A.  Yes.
10  Q.  Okay.  You also just testified when Mr. Carroll was
11  asking you some questions, and you did acknowledge that you
12  knew you faced up to 40 years.  You understood that as a
13  possibility, correct?
14  A.  Once I got my PSR.
15  Q.  Once you got your PSR.  Okay.
16       And you wanted -- your testimony is that you wanted
17  Mr. Woodward to file an appeal, and my question to you is
18  what did you want him to appeal?  What would be the basis of
19  your appeal?
20       MR. CARROLL:  I'm going to object to the line of
21  questioning.  The case law makes it very clear that --
22       THE COURT:  Hold on one second.  Repeat your
23  question, please.
24       MR. BUTLER:  He testified, Your Honor, that he
25  wanted Mr. Woodward to file a notice of appeal, and my

———N. Powell - Cross———

1    question was, What would you want him to appeal?  What would

2    be the nature?  What's the grounds, the basis, of that

3    appeal.

4            THE COURT:  Okay.  And what is your objection?

5            MR. CARROLL:  Thank you, Your Honor.  My objection

6    to that line of questioning is that the case law makes it

7    very clear that meritorious grounds for appeal do not need to

8    exist in order for a counsel --

9            THE COURT:  Oh, absolutely.  He can answer the

10   question.

11           Go ahead, answer the question.

12           THE WITNESS:  The case itself, the sentence

13   enhancement, the case itself, didn't sit to where -- and I

14   found out that I had the right to appeal by the Judge at

15   sentencing.  The Judge told me I still had the right to

16   appeal my case, if I wanted to; to get with my lawyer.

17   BY MR. BUTLER:

18   Q.  So your understanding at that time, when you told him --

19   when you claim you told him you wanted to appeal, was just

20   generally you wanted the case appealed?

21   A.  The objections, because I never thought I should have got

22   found guilty of the objections.

23   Q.  All right.  Let's talk about those.

24           You do acknowledge that Mr. Woodward objected to the

25   drug weight assessed in your case, right?

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 352 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 59 of 71 PageID# 1656

59

———————N. Powell - Cross———————

1   A.  Yes.

2   Q.  He objected to the firearm enhancement.

3   A.  Yes.

4   Q.  He objected to the obstruction enhancement.

5   A.  Yes.

6   Q.  And he objected to the maintaining premises enhancement.

7   A.  Yes.

8           MR. BUTLER:  Your Honor, those are all the questions

9   I have.

10          THE COURT:  Mr. Powell, are you saying that you did

11  not know that the statutory max was 40 years until you got

12  your PSR?

13          THE WITNESS:  Well, I knew it was 5 to 40, but he

14  kept telling me, "Don't worry about" -- I was -- from the

15  beginning I told him I didn't want to plead guilty and get 20

16  to 25 years.  He had me under the impression that I wasn't

17  facing nowhere near 20 years.  That's why I accepted the plea

18  from the beginning.

19          THE COURT:  All right.  But my question is this:

20          You said that you didn't understand that you were

21  going to get so much time until you got your PSR, so did you

22  understand that the statutory max was 40 years when you pled

23  guilty to your crime.

24          THE WITNESS:  Yes.

25          THE COURT:  Because you were placed under oath by a

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 353 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 60 of 71 PageID# 1657

60

──────────N. Powell - Cross──────────

1    judge of this court, correct?

2              THE WITNESS:  Yes.

3              THE COURT:  And the judge of this court went over

4    the statutory 5 to 40, correct?

5              THE WITNESS:  Yes.

6              THE COURT:  Orally, correct?

7              THE WITNESS:  Yes.

8              THE COURT:  And then within the plea agreement, the

9    judge also went through the plea agreement with you, each

10   page of which you had initialed and signed, correct?

11             THE WITNESS:  Yes.

12             THE COURT:  And the plea agreement contained that

13   the minimum was 5 and the maximum was 40, correct?

14             THE WITNESS:  Yes.

15             THE COURT:  So you were told that several times

16   before you even got your PSR, correct?

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.  So when you get your PSR, the 5

19   to 40 is still there, correct?

20             THE WITNESS:  Yes, but --

21             THE COURT:  And then the guideline range was 360 to

22   480.

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.  And then your ultimate sentence

25   was below that 360, correct?

USCA4 Appeal: 21-6992   Doc: 32   Filed: 01/10/2024   Pg: 354 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 61 of 71 PageID# 1658

61

———N. Powell - Cross———

1          THE WITNESS:  Yes.

2          THE COURT:  It was 300 months.

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Okay.  How many prior felonies do you

5    have?

6          THE WITNESS:  I don't know right offhand.

7          THE COURT:  Can you think back, and is it one?  Is

8    it two?  How many is it?

9          THE WITNESS:  (Pause.)  I want to believe that it

10   may be three prior to this one.

11         THE COURT:  Three prior felonies?

12         THE WITNESS:  Yes.

13         THE COURT:  Are they all state felonies?

14         THE WITNESS:  Yes.

15         THE COURT:  No federal felonies?

16         THE WITNESS:  No, ma'am.

17         THE COURT:  Okay.  I don't have any further

18   questions, either.

19         Mr. Carroll, do you have any redirect, based on my

20   questions?

21         MR. CARROLL:  No, Your Honor, I do not.

22         THE COURT:  All right.  Mr. Butler, do you have any?

23         MR. BUTLER:  No, Your Honor.

24         THE COURT:  All right.  All right, Mr. Powell.

25   Thank you for your testimony.

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 355 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 62 of 71 PageID# 1659

62

```
1          MR. CARROLL:  Your Honor, the petitioner rests.
2     That's the conclusion of our evidence.
3          THE COURT:  All right.  So if we can have brief
4     argument.  I'll hear from you first, Mr. Carroll, and then
5     you, Mr. Butler, and then if you-all will get me the
6     stipulation within the next seven days, and then we'll get
7     our order out.
8          MR. CARROLL:  Thank you, Your Honor.  We addressed,
9     really, the basis of our position in our position statement
10    that was previously filed, and I would ask the Court to
11    consider that when you take the matter under advisement.
12         Mr. Powell's basic argument is that Counsel could
13    have and should have discovered the existence of the Gateway
14    Drive lease.  I'll leave the notice of appeal issue.  That's
15    really just a call on the divergence in testimony.
16         But with regard to, I guess, the more complex issue
17    of the impact of the lease on sentencing, whether it's
18    prejudicial and whether Counsel should have investigated it
19    under the facts that have been present here today, what I
20    would like the Court to consider when you evaluate that is,
21    first off, the position of the United States in its original
22    sentencing paper, which was filed at ECF 156, at page 5,
23    specifically.
24         What was argued by the government to begin with in
25    their opening position paper was that Ms. Wilson, who was
```

1   related to the defendant, visited the defendant's home on
2   Gateway Drive, in the Churchland section of Portsmouth, on a
3   dozen occasions since the summer of 2011.  At the sentencing
4   hearing, there was obviously a lot of back-and-forth about
5   this particular issue, and at page 23, lines 9 through 11,
6   the agent testified regarding the purchases from the Gateway
7   Drive address that, quote,            "Ms. Wilson indicated that
8   her purchases came from an address on Gateway Drive in
9   Portsmouth in an apartment complex," very specific testimony.
10          Under cross-examination of Detective or Agent Dyer,
11  Mr. Woodward was pressing on the credibility issues.  At
12  page 35, line 23, spilling over to page 36, line 17, the
13  cross of the agent appears as follows.  Mr. Woodward
14  indicates that:
15          "As a matter of fact, what that says" -- and they're
16  referring to the debrief -- "is that she was buying bundles
17  of heroin, which are ten bags..."  And, again, there's some
18  correction about racks and bundles and so on, but
19  Mr. Woodward asks, at line 8, about the purchasing, "Since
20  2011?"  And the answer was:  "On approximately ten
21  occasions."
22          And then Mr. Woodward reads a piece of the debrief,
23  which is quoted at transcript page 36, lines 13 to 15, and
24  I'd like to read it into the record, which is:
25          "Wilson indicated that she had been purchasing

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 357 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 64 of 71 PageID# 1661

64

1    heroin from Powell since the summer of 2011.  She indicated
2    that she had been to the apartment approximately 12
3    occasions.  Is that correct?"  Answer:  "Yes, sir."
4              Finally, the United States offered to the Court its
5    position on this enhancement, and the Court asked Mr. Butler
6    what his position was on the premises enhancement.
7    Mr. Butler responded consistent with his earlier position
8    statement:
9              "This all comes down to Ms. Wilson and her
10   information, and she says she's going to the same place
11   12 different, you know, times over the course of the
12   conspiracy.  This goes back years.  She specified the street
13   name, the neighborhood, and the residence that never
14   changed."  And then there's some further argument.
15             Your Honor, Mr. Powell would submit that the lease
16   is important to the sentencing and his counsel was deficient
17   in discovering it, because the Gateway Drive lease begins on
18   January 15 of 2016.  It was not a renewal of a prior term, as
19   will be submitted in the proffer we'll give you shortly.
20   Mr. Powell was arrested on May 27, 2016, into state custody,
21   and he was in continuous custody thereafter.  That's
22   reflected in the court record at ECF 153, at page 1, the PSR.
23   It was, accordingly, if that is the evidence that the Court
24   finds to be credible, impossible that the purchases were from
25   2011 to January 14 of 2016, referring to Gateway; it is

1    impossible that the purchases' locations never changed, as

2    offered by the government.

3         I would point out that all enhancements, even in the

4    government's position at sentencing, were based on the

5    credibility of Ms. Wilson.  The United States argued that she

6    was reliable because she was so specific.  The

7    cross-examination and the argument of counsel, of course, was

8    focused on she's just a user and was not someone to be

9    believed.  Mr. Powell's position is that if that is the --

10   that if the lease would have been identified, investigated,

11   and presented that all of those positions that I just rattled

12   off there would have necessarily changed.  And our argument

13   in our position statement is that because the evidentiary

14   presentation would have been different, and because the

15   United States would not have been able to argue as it did,

16   then he is prejudiced.  We've laid out some of the support

17   for that a little bit more eloquently than I just did in our

18   position statement, and I'd ask the Court to consider that.

19        Thank you.

20        THE COURT:  All right.  Thank you, Mr. Carroll.

21        All right, Mr. Butler.

22        MR. BUTLER:  Your Honor, just stepping back a

23   moment, I want to just address the *Strickland* standard here,

24   the two-prong test.

25        The question is whether or not the performance of

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 359 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 66 of 71 PageID# 1663

66

```
 1   Mr. Woodward was below an objective standard of
 2   reasonableness, and, two, that but for counsel's
 3   unprofessional errors, the result would have been different.
 4   The standard in which to evaluate this test is that the
 5   judicial scrutiny of counsel's performance must be highly
 6   deferential, and so the Court today has to make a credibility
 7   determination.  We've got two contradicting statements, and
 8   when making this determination the Court should consider the
 9   Strickland precedent that, quote, "...Counsel is strongly
10   presumed to have rendered adequate assistance," end quote.
11           So there's two issues.  The first is whether or not
12   there was this demand to file a notice of appeal, as claimed
13   by the petitioner.  And so what we have is testimony from
14   Mr. Woodward, who has practiced for 39 years, has had
15   thousands of clients, has dealt with Fourth Circuit appeals
16   approximately 90 times, 400 federal cases, was on an ethics
17   committee, was on a committee to select magistrate judges.
18   This is somebody who is very familiar with the ineffective
19   assistance of counsel claims, because the Fourth Circuit --
20   he argued in a death penalty case this very issue.  He was
21   sort of Mr. Carroll at the Fourth Circuit, doing just what
22   Mr. Carroll is doing here today.
23           So this is somebody who has a lot of experience in
24   these minefields and why he took the notes that he took after
25   his visit after the sentencing with Mr. Powell.  And there's
```

 1    nothing in his notes and he testified here today and in his

 2    affidavit that Mr. Powell never told him to file a notice of

 3    appeal.  And had he done so, his practice would have been to

 4    do it and file a motion to withdraw, something that he has

 5    done upwards of a dozen times in other cases where clients

 6    are, you know, adamant and go against his advice.  So that's

 7    sort of issue number one.

 8          Now issue number two is this premises enhancement.

 9    What's really going on here is this is a question that was

10    fully considered by the Court, and it's being reframed in a

11    collateral attack, using ineffective assistance of counsel as

12    a mechanism to relitigate an issue that has already been

13    extensively litigated.  And here are the facts:

14          Mr. Woodward objected to the enhancement in his

15    position paper.  He objected at sentencing.  He subjected DEA

16    Task Force Officer Rob Dyer to extensive cross-examination

17    and through that cross-examination contested the credibility

18    of Ms. Wilson.  Yet the Court found by a preponderance of the

19    evidence that the enhancement was supported by the facts and

20    this issue had already been dealt with.

21          And I hate to go back in time, but I need to do it,

22    because, you know, Mr. Carroll wasn't here at that time.

23    What I'm putting before the Court on the monitor is the PSR.

24    In paragraph 10 -- because I don't want -- what's happening

25    here is a conflation of issues, okay?  And I'm going to try

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 361 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 68 of 71 PageID# 1665

68

1    to break this down.

2            It is undisputed, as the petitioner just testified

3    to, that he supplied Valerie Wilson, he supplied her on

4    multiple occasions, and he supplied her in multiple years.

5    That's not in dispute.

6            What the PSR indicates is that since 2011 she's

7    buying from him, okay?  Nowhere in paragraph 10 does it

8    mention anything about the Gateway property.  She, in her

9    debrief with Task Force Officer Dyer, just says, Yes, I have

10   been supplied by this defendant since 2011.  And she -- you

11   know, there's occasion here -- 12 occasions where she can

12   recall it.  There was a memory of the defendant

13   manufacturing, you know, some heroin, a pretty substantial

14   quantity of which was assessed at over a thousand grams or

15   1 kilogram.

16           So to the extent that, you know, Mr. Carroll wants

17   to point out things that I put on the record or what's in my

18   position paper, what I say is not evidence.  The evidence is

19   Task Force Officer Dyer's testimony, and what he testified to

20   and what's in the record is that Ms. Wilson was supplied by

21   this defendant over the course of years and that she does

22   remember a Gateway Inn apartment.  So whether this Gateway

23   Inn apartment was leased for 1 year or 5 years, it doesn't

24   matter, because his testimony wasn't that she was buying out

25   of this apartment for 5 years.  That's not what he testified

USCA4 Appeal: 21-6992    Doc: 32    Filed: 01/10/2024    Pg: 362 of 388
Case 2:16-cr-00097-AWA-LRL   Document 231   Filed 03/18/22   Page 69 of 71 PageID# 1666

69

1    to.  It was that she had been supplied by him over the course

2    of years and that she did have a memory of that specific

3    apartment.

4         And, you know, I hesitated whether or not to even go

5    down that rabbit hole and go into the facts again because at

6    the end of the day the issue that's before this Court is

7    really Mr. Woodward's representation of -- you know, whether

8    or not he was effective in this regard.  And he says in his

9    affidavit and, again, testifying under oath to this

10   Court that he doesn't have any memory of receiving a lease or

11   even becoming aware of it until a year later, after

12   sentencing, when this defendant, you know, finds this lease

13   and submits it with his 2255.  And in his testimony today,

14   even if he did have it, it wouldn't have changed the fact

15   that he objected.  He still objected to the enhancement.

16        So I'll just close by this:  You know, the issue is

17   not about the lease, it's not about how long Mr. Powell was

18   in that particular property, it's whether or not they can

19   show that Mr. Woodward's performance was below an objective

20   standard of reasonableness, which he's not shown.

21        And while he cannot meet the first prong of

22   *Strickland*, I'll also just mention that, even in theory, had

23   he done that the outcome may not even -- it wouldn't have

24   made any difference, right?  His offense level was a 37,

25   so -- he's 360 to 480.  Even if the Court had sustained the

```
 1   objection and the maintaining premises enhancement went away

 2   and he was a 35, offense level 35, Criminal History Category

 3   VI, his sentence of 300 months is still within the

 4   guidelines.  It's a really small point, but it's one I just,

 5   you know, thought of as I was, you know, making notes here

 6   today.

 7           But in the end, Your Honor, the Strickland two-prong

 8   test cannot be met.  We have a lot of legal talent that has

 9   been assigned to Mr. Powell through Mr. Kimball, to

10   Mr. Woodward in his 39 years of experience, and now with

11   Mr. Carroll.  It's just been extensively litigated, and I

12   would submit that he has not met the standards required, Your

13   Honor.

14           THE COURT:  All right.  Thank you, Mr. Butler.

15           Anything additional, Mr. Carroll?

16           MR. CARROLL:  No, Your Honor.  We would stand on our

17   previous filings.  Thank you.

18           THE COURT:  All right.  Thank you.

19           All right.  Well, I thank everybody for their

20   briefing and their time this morning.  Get the stipulation to

21   the Court, and then you'll be hearing from us shortly

22   thereafter.

23           All right.  Everybody have a good rest of your day,

24   and stay safe.

25           (The hearing adjourned at 10:40 a.m.)
```

1           <u>CERTIFICATION</u>

2

3           I certify that the foregoing is a correct transcript

4      from the record of proceedings in the above-entitled matter.

5

6                          /s

7                 Heidi L. Jeffreys

8

9                 March 18, 2022

10                      Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NATHANIEL POWELL,

          Petitioner,

v.                                                 Case No.: 2:16CR97-02

UNITED STATES OF AMERICA,

          Respondent.

## JOINT STIPULATION

Petitioner, Nathaniel Powell ("**Mr. Powell**") and the United States of America, by their respective counsel, submit the following Joint Stipulation in support of the Evidentiary Hearing held on June 8, 2021. Accordingly, Mr. Powell and the United States of America stipulate that, if called as a witness at the hearing, Dwanesa Brown, would testify[1] as follows:

1. That she was, until recently, the girlfriend of Mr. Powell.

2. In 2016, she leased the apartment on Gateway Drive which is reflected in the lease filed on the docket as Document 186-1 (the "**Lease**").

3. The Lease was not a renewal of a prior term.

4. She spoke to Mr. Woodward about the Lease.

5. She faxed it to Mr. Woodward's office prior to sentencing.

---

[1] As the parties indicated on the record at the June 8, 2021 evidentiary hearing, the United States does not stipulate to the truth of the facts to which Ms. Brown would testify—simply that this is what she would say.

*Powell v. USA* – Criminal No. 2:16cr97-02

Page 1 of 2

The parties so stipulate on this 8th day of June, 2021.


_____ /s/ *Adam M. Carroll* _____
Adam M. Carroll, Esquire
VSB #68017
WOLCOTT RIVERS GATES
200 Bendix Road, Suite 300
Virginia Beach, VA 23452
Phone:  757.497.6633
Facsimile: 757.687.3655
E-mail: acarroll@wolriv.com
*Attorney for the Nathaniel Powell*

_____ /s/ *John F. Butler* _____
John F. Butler
Assistant United States Attorneys
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail: john.f.butler@usdoj.gov
*Counsel for the United States*
*Signature used with permission by*
*Email dated June 8, 2021 at 4:56 p.m.*


*Powell v. USA* – Criminal No. 2:16cr97-02

Page 2 of 2


**JA361**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NATHANIEL POWELL,

          Petitioner,

    v.

UNITED STATES OF AMERICA,

          Respondent.

Criminal No. 2:16cr97-02

## ORDER

Pending before the Court is Petitioner Nathaniel Powell's Motion to Vacate, Set Aside, or Correct Sentence. ECF No. 168. For the following reasons, Petitioner's Motion (ECF No. 168) is **DENIED**.

## I.    BACKGROUND

Petitioner Nathaniel Powell entered into a Plea Agreement with the Government and pleaded guilty to Count One of the Superseding Indictment, Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute more than 100 grams of Heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B). Plea Agreement, ECF No. 104. Petitioner was a leading member of a drug trafficking conspiracy that took place mainly in Virginia. Statement of Facts, ECF No. 105. His role was to procure heroin and fentanyl from Baltimore, Maryland to the Hampton Roads area of Virginia. *Id.* The drugs were repackaged and resold. *Id.* One of his co-conspirators, Ms. Valerie Wilson, obtained drugs from Petitioner and sold them in North Carolina. *Id.* Petitioner waived his right to appeal his conviction or any sentence imposed below

1

**JA362**

the statutory maximum. *Id.* at 3. This Court sentenced Petitioner to 300 months' imprisonment and four years' supervised release, which was below the statutory maximum. Judgment, ECF No. 160.

At sentencing and in Defendant's position paper, defense counsel objected to four issues in the Presentence Report ("PSR"): (1) the kilogram quantity attributed to Petitioner; (2) the two-point firearm enhancement; (3) two enhancements for making threatening communications on social media; and (4) the two-point enhancement for maintaining premises for the purpose of distributing narcotics. *See* Sentencing Transcript, ECF No. 167 at 4–5. These objections challenged Ms. Wilson's lack of credibility, who made statements to law enforcement about Petitioner's drug premises, his housing at a Gateway Drive address, and the drug weight attributed to him. Def. POP at 3, ECF No. 155.

Petitioner argued that Ms. Wilson's statements were unreliable because of her drug addiction. Petitioner Reply at 6, ECF No. 198. Petitioner also purportedly directed his counsel, Mr. Woodward, to search for the lease governing the renting of the alleged premises, contending that this would show that he did not start renting the premises until 2016 and would refute the applicability of the enhancement. It is unclear whether Mr. Woodward searched for the lease. In response to this objection, the Government argued that Ms. Wilson was related to Petitioner and routinely visited his house to purchase heroin. Gov't POP at 5, ECF No. 156. The Court overruled Petitioner's objections and adopted the findings of the PSR without modification at the sentencing on March 31, 2020. Judgment, ECF No. 160. At the end of the

2

**JA363**

sentencing hearing, the Court noted that Petitioner had signed a plea agreement with a waiver of appeal, but advised that Petitioner could choose to appeal based on ineffective assistance of counsel; Petitioner was advised that his appeal had to be filed by or before April 14, 2017.

Mr. Woodward met with Petitioner on April 5, 2017 to discuss Petitioner's appeal rights. Mr. Woodward advised Petitioner of the law regarding appeal waivers, the likelihood of a sentencing reduction, and explained that he would file an appeal if requested to do so but would have to withdraw and get new counsel appointed. Petitioner Reply at 7, ECF No. 198; Woodward Notes, Ex. 4 to Petitioner Reply, ECF No. 198-4. Petitioner did not advise Mr. Woodward whether he wanted to file a Notice of Appeal. *Id.* Petitioner told Mr. Woodward that his family would indicate whether Mr. Woodward should file an appeal. *Id.* Mr. Woodward advised Petitioner of the time limit to file an appeal. *Id.* The Government submitted an affidavit from Mr. Woodward indicating that Petitioner never requested that a Notice of Appeal be filed and never expressed an interest in appealing. First Woodward Aff., Ex. 1 to Gov't Resp. in Opp'n at 2, ECF No. 185-1.

On April 2, 2018, Petitioner filed the instant Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. ECF No. 168. Petitioner brought six claims of ineffective assistance counsel.[1] On August 9, 2019, this Court entered an

---

[1] Those six claims were: (1) counsel failed to file a Notice of Appeal as allegedly instructed by Petitioner ("the Appeal Claim"); (2) counsel allegedly failed to properly challenge relevant conduct at sentencing which led to a larger drug quantity being ascribed to Petitioner in the PSR ("the Relevant Conduct Claim"); (3) counsel failed to challenge allegedly perjured testimony offered by Detective Robert Dyer at

**JA364**

Evidentiary Hearing Order. ECF No. 190. In the Order, the Court dismissed four of the six claims. The Appeal Claim and the Lease Claim remain pending. The Appeal claim alleges that Petitioner's counsel failed to file a Notice of Appeal as allegedly instructed by the Petitioner. The Lease Claim alleges that counsel failed to investigate potentially exculpatory evidence pertaining to a two-point enhancement received for "maintaining premises for the purposes of distributing narcotics." Mot. to Vacate, ECF No. 168. The Parties briefed their positions on the claims, and the Court held an evidentiary hearing on June 8, 2021. The matter is ripe for resolution.

## II.    § 2255 LEGAL STANDARDS GENERALLY

A person in federal custody "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). A district court must "grant a prompt

---

sentencing ("the Perjury Claim"); (4) counsel failed to object to the Government allegedly breaching the Plea Agreement by using statements made by Petitioner after his guilty plea to increase the drug quantity ascribed to Petitioner ("the Breach of Plea Agreement Claim"); (5) counsel allegedly failed to object the Government's use of materials that were not turned over to the defense in contravention of the United States Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963) ("the *Brady* Claim"); and (6) counsel allegedly failed to investigate potentially exculpatory evidence pertaining to a two-point enhancement received for "maintaining premises for the purpose of distributing narcotics," including a leaseholder agreement that purportedly shows that someone else leased the premises during part of the time in question ("the Lease Claim"). *Id.*; ECF No. 169.

4

**JA365**

hearing thereon" unless the record "conclusively show[s] that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

The Sixth Amendment to the Constitution of the United States guarantees an accused the right "to have the Assistance of Counsel for his defense." U.S. Const., Amend. VI. The Supreme Court has held that "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970)) (internal quotation marks omitted). To succeed in a claim of ineffective assistance of counsel, a petitioner must show: (1) "that counsel's representation fell below an objective standard of reasonableness;" and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[2] *Id.* at 688, 694.

A showing of deficient performance requires more than "merely below-average performance." *Griffin v. Warden, Md. Corr. Adjustment Ctr.*, 970 F.2d 1355, 1357 (4th Cir. 1992). It requires a showing that the attorney's actions fell "below the wide range of professionally competent performance." *Id.* At the heart of the second prong is whether the ultimate outcome is fundamentally unfair or unreliable because of the attorney's performance. *Strickland*, 466 U.S. at 687. If a petitioner makes an insufficient showing of one prong, the Court need not address the other prong. *Id.* at 697. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. A

---

[2] A petitioner must meet a higher burden when alleging an ineffective assistance of counsel claim after entering a guilty plea. After a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hooper v. Garraghty*, 845 F.2d 471, 475 (4th Cir. 1988) (internal quotation marks and citation omitted).

**JA366**

court decides *de novo* "whether specific facts constitute ineffective assistance of counsel." *United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000).

The *Strickland* decision requires the Court to review counsel's performance "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgement." *Id.* "Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* at 698.

## III. THE APPEAL CLAIM

Petitioner argues that he was deprived of his Sixth Amendment right to effective counsel because Mr. Woodward failed to file a Notice of Appeal despite being directed to do so. Mot. to Vacate at 11, ECF No. 168. Petitioner asserts that he told Mr. Woodward to appeal at a post-sentencing meeting. Petitioner Reply at 7, ECF No. 198.

### A. Legal Standard

A decision to seek or foreclose the ability to appeal is a decision that rests with the defendant and not the attorney. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). The Supreme Court has applied the *Strickland* test in a case in which the Court recognized that a defendant must decide whether an appeal should be pursued. *Roe v. Flores-Ortega*, 528 U.S. 470, 477–80 (2000). Courts apply the same two-part test to

**JA367**

assess whether the failure to consult regarding an appeal constitutes ineffective as-sistance of counsel. *Id.*

The court in *Flores-Ortega* clarified an attorney's role regarding the filing of an appeal by a defendant. There is no *per se* rule that requires an attorney to consult with his client about a direct appeal. *Flores-Ortega*, 528 U.S. at 479. If a defendant has not explicitly instructed counsel to file an appeal or has specifically instructed counsel to *decline* to file an appeal, the initial question is "whether counsel in fact consulted with defendant about an appeal." *Id.* at 478. That is, whether counsel has undertaken a reasonable effort to discover a defendant's wishes or has explained the advantages and disadvantages of pursuing an appeal. *Id.* Where counsel has con-sulted with a defendant, deficient performance has occurred if counsel failed to follow a defendant's express instructions regarding the appeal. *Id.* If counsel has not con-sulted with a defendant about an appeal, then the court must determine whether counsel's failure to consult with the defendant itself constitutes deficient perfor-mance. *Id.*

At the center of the inquiry is "[u]nder what circumstances does counsel have an obligation to consult with the defendant about an appeal?" *Id.* A failure to consult with a defendant about an appeal is not necessarily deficient performance. *Id.* Coun-sel is required to consult with the defendant about an appeal if (1) there are non-frivolous issues to appeal or (2) the defendant has manifested an interest in appeal-ing. *Id.* at 480. Courts consider a variety of factors when undertaking the second in-quiry. A key factor is whether the conviction follows a trial or a guilty plea. *Id.* A

7

**JA368**

guilty plea reduces the scope of appealable issues; a plea may indicate that defendant wants to end the judicial proceedings. *Id.* Where the inquiry is made after a guilty plea, a court considers factors such as: "whether the defendant's conviction followed a trial or a guilty plea; whether the defendant received the sentence bargained for as part of the plea; and whether the plea expressly reserved some or all appeal rights." *United States v. Cooper*, 617 F.3d 307, 313 (4th Cir. 2010) (citing *Flores-Ortega*, 528 U.S. at 480).

Where an appeal is involved, a defendant must show that there is a reasonable probability that, but for counsel's failure to consult with the defendant about an appeal, the defendant would have timely appealed. *Flores-Ortega*, 528 U.S. at 484. If a defendant cannot demonstrate that but for counsel's below-standard performance the defendant would have appealed, then counsel's performance has not deprived the defendant of anything. *Id.* This inquiry may overlap with the deficient performance inquiry.

B.    Analysis

Petitioner has failed to establish that ineffective assistance of counsel occurred here. Petitioner has not shown that Mr. Woodward inadequately consulted with him about filing a Notice of Appeal.

First, Petitioner insufficiently alleges that he told Mr. Woodward to appeal. Petitioner submitted an affidavit stating that he "expressed that [he] was unhappy with the sentence and wish[ed] to appeal." Petitioner Aff. at 16, Ex. 2 to First Petitioner Reply, ECF No. 186-2. He stated that Mr. Woodward told him that he would file a Notice of Appeal and ask to be withdrawn from the case. *Id.* Mr. Woodward

8

**JA369**

submitted two affidavits contradicting this. He testified that he has "no record or memory of Mr. Powell ever requesting that [he] file a Notice of Appeal." First Woodward Aff. at 2, Ex. 1 to Gov't Resp. in Opp'n at 2, ECF No. 185-1. Mr. Woodward asserted in a second affidavit that "at no time after the plea did Mr. Powell indicate any desire to appeal." Second Woodward Aff., Ex. 1 to Gov't Resp. to Remaining Claims, ECF No. 197-1. Counsel testified to the same at the evidentiary hearing.

Mr. Woodward's notes from his meeting with Petitioner after sentencing support counsel's assertions. The notes reflect that Petitioner told Mr. Woodward that his family would advise counsel if Petitioner wanted him to file a Notice of Appeal. Woodward Notes, Ex. 4 to Petitioner Reply, ECF No. 198-4.

If Petitioner's testimony and assertions are accepted, then Mr. Woodward's failure to file a Notice of Appeal could be a breach of the *Strickland* duty. *Cooper*, 617 F.3d at 313 (collecting cases). However, Petitioner fails to establish that counsel's performance here was deficient.

The Court must determine whether Petitioner's dissatisfaction with his sentence amounted to a manifestation of his interest in appealing and whether, as a result, Mr. Woodward's post-sentencing meeting with Petitioner constituted a sufficient consultation under *Flores-Ortega*'s application of the *Strickland* test. Petitioner relies on the decision in *Frazer v. S. Carolina*, 430 F.3d 696 (4th Cir. 2005) to advance his argument that counsel was compelled to file a Notice of Appeal.[3] The decision in

---

[3] Specifically, Petitioner argues that his dissatisfaction with his sentence that he expressed at his meeting with counsel on April 5, 2017 should have compelled the filing of a Notice of Appeal. Petitioner Reply at 7–8, ECF No. 198. The Fourth Circuit did

9

**JA370**

*Frazer* does not require an attorney to immediately file a notice of appeal where a
defendant is dissatisfied with the sentence imposed. 430 F.3d at 708. Instead, *Frazer*,
applying *Flores-Ortega*, requires that an attorney consult with the defendant if the
defendant has shown a manifested interest in appealing.

The Court agrees that Petitioner manifested an interest in appealing when
Petitioner met with Mr. Woodward on April 5, 2017 to discuss appeal rights. Mr.
Woodward's performance in response was exemplary: he advised Petitioner of the law
regarding appeal waivers, the likelihood of obtaining a sentencing reduction, and that
Mr. Woodward would file an appeal if asked to do so, but would then withdraw and
arrange the appointment of new counsel for Petitioner. Petitioner Reply at 7, ECF
No. 198; Woodward Notes, Ex. 4 to Petitioner Reply, ECF No. 198-4. After the con-
sultation, Petitioner did not direct Mr. Woodward to file a Notice of Appeal. First
Woodward Aff. at 2, Ex. 1 to Gov't Resp. in Opp'n at 2, ECF No. 185-1; Second Wood-
ward Aff., Ex. 1 to Gov't Resp. to Remaining Claims, ECF No. 197-1.

Accordingly, Petitioner has not shown that Mr. Woodward's consultation was
deficient. Courts have found deficient performances in failing to file a Notice of Ap-
peal in cases in which attorneys either failed to follow express instructions or failed
to consult with the defendants. *See Cooper*, 617 F.3d at 313 (collecting cases). Mr.

---

not rule that "expressed dissatisfaction" with a sentence should be treated as a re-
quest to appeal. Instead, *Frazer* requires an attorney to *consult* with a dissatisfied
defendant to determine whether to file a Notice of Appeal. *Frazer*, 430 F.3d at 708).
The attorney in *Frazer* did not consult with the defendant and never discussed the
possibility of appealing. *Frazer*, 430 F.3d at 711. Mr. Woodward met with Petitioner
five days after sentencing and discussed the option of appealing thoroughly.

**JA371**

Woodward acted reasonably in this case. He conducted a post-sentencing meeting with the Petitioner and explained to him the existing law relevant to his offense and the sentencing guidelines, the likelihood success of an appeal, and other facts relevant to a potential appeal.

## IV.    THE LEASE CLAIM

Petitioner challenges his sentencing enhancement under USSG § 2D1.1(b)(12). Petitioner Supp. to Mot. to Vacate, ECF No. 170. Petitioner's offense level was increased because he was found to be maintaining a drug premises. He alleges that counsel performed ineffectively because counsel failed to make a reasonable search for his primary residence lease as Petitioner requested, and the failure resulted in prejudice.

Petitioner argues that evidence of the lease at sentencing would have produced a different outcome. Evidence of the lease could have supported a challenge to Ms. Wilson's testimony about obtaining drugs from his primary residence at the Gateway Drive address and might have cast doubt about who maintained those premises. *See* Petitioner Supp. to Mot. to Vacate, ECF No. 170; Petitioner Reply at 3–4, 8–12, ECF No. 198. Evidence of the lease might have suggested that Petitioner lived at the Gateway Drive address for only one year; Ms. Wilson testified that she had been purchasing heroin from Petitioner at this location for five years. *Id.*

### A.    Legal Standard

To succeed under the Lease Claim, Petitioner must prove that (1) Mr. Woodward performed deficiently because he did not search for the lease for Petitioner's residence at Gateway Drive address, and (2) Petitioner was prejudiced by this

11

**JA372**

performance because there is a "reasonable probability" that the result of the sentencing hearing would have been different had Mr. Woodward done so. *Strickland*, 466 U.S. at 688, 694. Petitioner argues specifically that had counsel located the lease, Petitioner would have avoided the enhancement under USSG § 2D1.1(b)(1) and the Court would have sustained his objection at sentencing.

The relevant portion of USSG § 2D1.1(b)(12) provides that "[i]f the defendant maintained a premise for the purposes of manufacturing or distributing a controlled substance, increase [the offense level] by 2 levels." This enhancement applies where the premise is a residence and the defendant has a substantial connection to the residence. USSG § 2D1.1, comment (n.7). The enhancement is inapplicable to defendants who are merely casual visitors to the premises. However, a defendant need not be the lessee or the owner of the premises for the enhancement to apply. *United States v. Clark*, 665 F. App'x 298, 301 (4th Cir. 2016) (applying the enhancement under USSG § 2D1.1(b)(12) where defendant did not lease or permanently reside at the premises in question). Evidence of maintaining the premises may include showing control of the site and a substantial connection between the premises and the defendant. Specific examples of such evidence may include furnishing the premises, making repairs inside the premises, protecting the premises, and continuous use of the premises. *United States v. Williams*, 923 F.2d 1397, 1403 (10th Cir. 1990). "Drug storage on the property and transactions on the property will usually suffice to establish primary use." *United States v. Messer*, No. 15-4262, 2016 WL 3971727, at *2 (4th Cir. 2016) (quoting *United States v. Bell*, 766 F.3d 634, 638 (6th Cir. 2014)).

12

**JA373**

B.    Analysis

Petitioner has not shown that counsel deficiently performed by failing to look for the lease of Petitioner's residence at Gateway Drive. Mr. Woodward took other steps in his representation of Petitioner to advocate for sustaining the objection and seeking a lower sentence. Mr. Woodward advanced arguments thoroughly in Defendant's position paper and again at the hearing. He cross-examined the agent in charge of the investigation to challenge the premises enhancement. Ms. Wilson's testimony and statements regarding her multiple visits to Petitioner's residence at Gateway Drive to buy heroin were found credible despite Mr. Woodward's thorough efforts on behalf of Petitioner.[4] As the finder of fact, this Court made reasonable, correct findings regarding Ms. Wilson's credibility, other related evidence, and the objections presented.

Petitioner also advances arguments regarding the testimony of his ex-girlfriend, Dwanesa Brown. The Parties filed a Joint Stipulation about Ms. Brown's testimony. ECF No. 216. If Ms. Brown had testified, she would have stated that she leased the apartment at Gateway Drive in 2016, the lease was not a renewal of a prior term, and that she spoke to Mr. Woodward about the lease and provided a copy of it to him prior to sentencing. *Id.* at 1. Petitioner has not shown how this evidence would

---

[4] Mr. Woodward zealously supported this objection in his position paper and expounded upon it at the sentencing after challenging Ms. Wilson's claims and statements to the agents. *Id.* His performance never fell below an objective standard of reasonableness. *Id.* at 7. Petitioner has failed to present any evidence showing a reasonable probability that the result of the sentencing would be different had counsel obtained evidence regarding the lease. Petitioner received a sentence that was five years below the low end of the advisory guidelines range. *Id.*

13

**JA374**

have compelled a different ruling on the objection. The enhancement can apply even if a defendant does not lease or own the premises. Sufficient evidence was produced at time of sentencing for this Court to find that Mr. Powell was selling drugs from this address regardless of the status of ownership of the premises.

Petitioner has failed to establish that he has been prejudiced by the alleged deficient performance. Petitioner argues that "[b]ecause different evidence and different argument would have occurred if the lease was presented, it is reasonably probable that the result of the enhancement would have also been different. That is all that is needed to demonstrate prejudice." Petitioner Reply at 12, ECF No. 198. However, the law requires that to show prejudice, a defendant must "demonstrate that the error worked to his 'actual and substantial' disadvantage,' not *merely that the error created a 'possibility of prejudice.'" Satcher v. Pruett*, 126 F.3d 561, 572 (4th Cir. 1997) (quoting *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (emphasis added)). Petitioner fails to provide evidence or substantive argument that shows that the Court would have sustained his objection and granted him a more lenient sentence if the lease were produced.

Even if this objection had been sustained, Mr. Powell's sentence likely would have been the same. He had an offense level of 37, which resulted in a guidelines range of 360 months to life, restricted to the statutory maximum of 480 months. PSR at 24, ECF No. 153. If the objection had been sustained, his offense level would have been a 35, resulting in a guidelines range of 292 months to 365 months at the time of

**JA375**

sentencing. Mr. Powell was sentenced to 300 months, the low end of the Guidelines

range. Judgment, ECF No. 160. No evidence of prejudice is presented.

## V.    CONCLUSION

For the foregoing reasons, Petitioner's Motion (ECF No. 168) is **DENIED**. The

Clerk is **REQUESTED** to forward a copy of this Order to Petitioner Nathaniel Pow-

ell, his defense counsel, and the Assistant United States Attorney.

**IT IS SO ORDERED.**

_____
/s/
Arenda L. Wright Allen
United States District Judge

June 24, 2021
Norfolk, Virginia

**JA376**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NATHANIEL POWELL,

        Petitioner,

v.                                          Case No.: 2:16CR97-02

UNITED STATES OF AMERICA,

        Respondent.

## **NOTICE OF APPEAL**

Notice is hereby given that, Nathaniel Powell, Petitioner in the above-named case, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the final judgment entered in this action on the 24th day of June, 2021. This notice of appeal is submitted, despite the Court's final order not issuing or denying a Certificate of Appealability pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255. Mr. Powell has submitted a motion to determine appealability and, if a certificate is denied, he will seek a certificate from the Fourth Circuit pursuant to Rule 22 of the Federal Rules of Appellate Procedure.

Respectfully submitted,
**NATHANIEL POWELL**

By:           /s/  *Adam M. Carroll*
Adam M. Carroll, Esquire
VSB #68017
WOLCOTT RIVERS GATES
200 Bendix Road, Suite 300
Virginia Beach, VA 23452
Phone: 757.497.6633
Facsimile: 757.687.3655
E-mail: acarroll@wolriv.com
*Attorney for the Nathaniel Powell*

*Powell v. USA* – Criminal No. 2:16cr97-02

Page 1 of 2

# JA377

## CERTIFICATE OF SERVICE

I hereby certify on the 28th day of June, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record including the following:

John F. Butler
Andrew C. Bosse
Assistant United States Attorneys
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail: john.f.butler@usdoj.gov andrew.bosse@usdoj.gov

_____ /s/__Adam M. Carroll_____

*Powell v. USA* – Criminal No. 2:16cr97-02

Page 2 of 2

# JA378

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NATHANIEL POWELL,

                Petitioner,

      v.

UNITED STATES OF AMERICA,

                Respondent.

Criminal No. 2:16cr97-02

**AMENDED ORDER**

This Court previously denied Petitioner Nathaniel Powell's Motion to Vacate, Set Aside, or Correct Sentence (ECF No. 168) by Order filed on June 24, 2021. ECF No. 217. Petitioner subsequently filed a Motion for Certificate of Appealability. ECF No. 219. The United States Court of Appeals for the Fourth Circuit has remanded the action for the limited purpose of permitting this Court to supplement the record with an order granting or denying a certificate of appealability.

The Court has reviewed the action and all of the briefing submitted therein. The analysis and conclusions provided in the Court's Order (ECF No. 217) are adopted in full by this Amended Order. The Court **DENIES** a certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, because Petitioner has failed to demonstrate a "substantial showing of the denial of a

1

**JA379**

constitutional right." 28 U.S.C. § 2253(c)(2); *Miller v. Cockrell*, 537 U.S. 322, 335–38 (2003). The Motion for Certificate of Appealability (ECF No. 219) is **DENIED**.

The Clerk is **REQUESTED** to forward a copy of this Order to Petitioner Nathaniel Powell, his defense counsel, and the Assistant United States Attorney. The Clerk of the Court is requested to return the Record, as supplemented, to the United States Court of Appeals for the Fourth Circuit.

**IT IS SO ORDERED.**

/s/

Arenda L. Wright Allen
United States District Judge

July 1, 2021
Norfolk, Virginia

2

**JA380**

FILED: October 5, 2023

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 21-6992
(2:16-cr-00097-AWA-LRL-2; 2:18-cv-00175-AWA)

———————

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

        v.

NATHANIEL POWELL, a/k/a Nate,

                Defendant - Appellant.

———————

O R D E R

———————

Nathaniel Powell seeks to appeal the district court's order denying relief on

his 28 U.S.C. § 2255 motion.  We grant a certificate of appealability on the issue of

whether Powell's trial counsel rendered ineffective assistance by failing to present a

lease agreement and witness testimony to rebut the Government's assertion that

Powell maintained a residence on Gateway Drive in Portsmouth, Virginia, for the

**JA381**

distribution of controlled substances.  Counsel will be appointed to represent Powell, and a formal briefing schedule will be established, by separate order.

For the Court

/s/ Nwamaka Anowi, Clerk

2

**JA382**

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2024, the foregoing was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Morgan V. Maloney*
Morgan V. Maloney